# EXHIBIT A

**State Court of Fulton County**
**\*\*E-FILED\*\***
**23EV000288**
**1/13/2023 6:01 PM**
**Donald Talley, Clerk**
**Civil Division**

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| Luis Alfredo Cáceres and Luis Angel Cáceres, Individually, as executor of the Estate of Alfredo Cáceres, and as trustee of the Luis Angel Cáceres Charitable Remainder Unitrust, | ) ) ) ) ) ) |
| Plaintiffs, | ) CIVIL ACTION FILE NO.: |
| | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| Sidley Austin LLP, | ) ) |
| Defendant. | ) |

## COMPLAINT

Plaintiffs Luis Alfredo Cáceres and Luis Angel Cáceres, individually, as executor of the Estate of Alfredo Cáceres, and as trustee of the Luis Angel Cáceres Charitable Remainder Unitrust (collectively, "Cácereses") complain against Sidley Austin LLP ("Sidley") as follows:

## NATURE OF THE CASE

1.     This lawsuit results from Sidley's conflicted and negligent advice to its clients, the Cácereses, to engage in what Sidley represented to be a legitimate tax planning transaction involving Plaintiffs' sale of UPC Holding Corp. ("UPC") stock to a company that Sidley knew (but failed to disclose) was a promoter of illegal tax shelter transactions.  Unbeknownst to Plaintiffs, Sidley's tax opinion letter that the transaction should be respected by the IRS was a sham.

2.      Sidley was hired to provide an independent tax opinion to the Cácereses confirming that the sale of UPC stock (the "UPC Transaction") legitimately minimized the tax consequences to the Cácereses related to the sale their interest in Belca Food Services Inc.  The Cácereses relied on Sidley's tax advice and representations about the propriety of the stock sale transaction before deciding to move forward with the Belca sale transaction.

3.      Sidley duped Plaintiffs into transactions Sidley knew or should have known did not and could not legally result in the tax advantages promised by Sidley. Among other things, Sidley knew or should have known that (a) if the IRS analyzed the UPC stock transaction, the basis shifting tax strategies used by the stock purchaser to avoid paying UPC's corporate taxes would be disallowed; (b) the legality of the stock sale strategy it sold to Plaintiffs would be tainted by the illegal tax shelter strategies intertwined into the transaction; and (c) the transaction would not achieve the tax treatment Sidley represented.  Instead of telling Plaintiffs the truth, Sidley told Plaintiffs that intermediary transaction strategies were perfectly legal, would result in substantial savings in taxes, and would survive scrutiny by the IRS.

4.      Plaintiffs bring this action seeking to hold Sidley responsible for $56 million in taxes, penalties, and interest the IRS is now seeking to impose on Plaintiffs resulting from the stock sale transaction in which Sidley advised Plaintiffs.

<u>THE PARTIES</u>

5.      At all times relevant to this action, plaintiff Luis Angel Cáceres resided in Alpharetta, GA, which is within the jurisdiction of this Court, and now resides in

2

Guaynabo, PR.  He is the son of Alfredo Cáceres and the brother of Plaintiff Luis Alfredo Cáceres.  He owned 2.45 percent of UPC in his own name.  He also served as a vice president, secretary, treasurer, and director of UPC.  Luis Angel Cáceres is named both individually, as the executor of the Estate of Alfredo Cáceres, and as the trustee of the Luis Angel Cáceres Charitable Remainder Unitrust.

6.     Plaintiff Luis Alfredo Cáceres resides in Guaynabo, PR.  He is the son of Alfredo Cáceres and the brother of Plaintiff Luis Angel Cáceres.  When UPC was incorporated and conducting business in Georgia, Luis Alfredo Cáceres owned 24.5 percent of the company, and served as a vice president and a director.  As such, he subjected himself to the Court's jurisdiction for litigation arising out of the business that he and UPC conducted in Georgia.

7.     The Luis Angel Cáceres Charitable Remainder Unitrust is a trust with mailing addresses in Pennington, NJ and Charlotte, NC.  Luis Angel Cáceres, who is within this Court's jurisdiction, is the trust's grantor, trustee, and beneficiary.  He used the trust to hold a 22.05 percent interest in UPC (in addition to the 2.45 percent he held in his own name).  Upon information and belief, the trust expired in January 2017.

8.     Alfredo Cáceres, now deceased, was the father of Defendants Luis Alfredo Cáceres and Luis Angel Cáceres.  When UPC was incorporated and conducting business in Georgia, Alfredo Cáceres owned 51 percent of the company, and served as its president and as a director.

9.     Non-party UPC, now known as Henco Holding Corp., was formerly known as United Poultry Corp.  These entities are collectively referred to as "UPC"

3

throughout this Complaint.  At all times relevant to this action, UPC was a Georgia corporation.  Plaintiffs sold the stock of UPC to Midco Henco, which is currently incorporated in Wyoming (where it was administratively dissolved in 2012 due to a tax delinquency).

10.     Defendant Sidley Austin LLP is a limited liability partnership organized under the laws of the State of Delaware that maintains its headquarters in Chicago, Illinois.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court pursuant to Article 6, Section 4, Paragraph 1 of the Constitution of the State of Georgia and O.C.G.A. § 9-10-91.  Sidley purposefully directed an opinion letter and gave advice to Plaintiffs, some of whom were Georgia residents, in Georgia for the purpose of facilitating and advancing the Midco transaction.  Sidley also drafted the legal opinion provided to Plaintiffs with the express purpose of providing a basis for Georgia residents to make business and legal decisions associated with the UPC sale.  Sidley also accepted payment from Georgia residents in return.  *See Curtis Inv. Co. v. HVB, Sidley*, et al, 2007 U.S. Dist. LEXIS 94012, at 19-20 (N.D. Ga. 2007) (denying Sidley motion to dismiss on personal jurisdiction grounds for opinion letter issued to Georgia resident in tax shelter transaction).

12.     Venue is proper in this Court pursuant to Article 6, Section 2, Paragraph 6 of the Constitution of the State of Georgia an O.C.G.A. § 14-2-510.

13.     Removal to the United States District court is not proper because a limited partnership is a citizen of each state in which its general and limited partners hold

4

citizenship. Upon information and belief, at least four partners at Sidley are admitted to practice in Georgia, and others may reside therein.

## FACTUAL ALLEGATIONS

14.     At all relevant times, Alfredo Cáceres and his two sons, Luis Alfredo Cáceres and Luis Angel Cáceres, controlled 100% of the stock of UPC.  UPC's sole asset was a 50.5% interest in Belca Foodservice Corp. ("Belca").  The Cácereses were instrumental in building Belca into a food service business worth hundreds of millions of dollars through acquisitions and franchising.

15.     KPMG LLP provided accounting and tax related advice and services to the Cácereses and to Belca, including but not limited to advising about potential acquisitions, preparing transaction documents, dealing with third parties as Cácereses' agent, providing accounting services to Cáceres, and preparing Belca Food Service tax returns.  KPMG also served as Belca Food Service's auditor.

16.     At some point, UPC began to consider selling its interest in Belca and distributing the proceeds from the sale to the Cácereses in their capacity as UPC shareholders.

17.     If UPC liquidated its Belca stock and directly distributed the proceeds to the Cácereses, there would be a dual taxation on the transaction since (1) UPC would have to pay a capital gains tax on the Belca stock because it appreciated substantially in the time after UPC acquired it; and (2) the Cácereses would each be taxed on their respective share of the distribution.

18.     On January 31, 1997, the Cácereses sold UPC's Belca interest to an unrelated third party. Subsequently, on April 10, 1997, the Cácereses sold their UPC stock to UP Acquisitions, a subsidiary of Skandia Capital Group (collectively, "Skandia"), and resigned their positions as officers, employees, and directors at UPC.

19.     Skandia, as the new owner and director of UPC and under the terms of the Stock Purchase Agreement, was obligated to pay taxes on the UPC transaction—but did not perform as promised and instead allowed the IRS to impose a judgment against UPC in excess of $56 million, inclusive of penalties and interest.

**SIDLEY OPINED THAT THE CÁCERESES WOULD FACE NO LIABILITY, EVEN IF UPC FAILED TO PAY ITS TAXES**

20.     The Cácereses retained Sidley as special federal income tax counsel in connection with the UPC Transaction to provide an opinion regarding whether UPC shareholders—i.e., the Cácereses—could be held liable for any federal income tax liability imposed on UPC with respect to UPC's gain from the sale of its Belca shares if neither UPC nor the buyer of the shares paid the federal income tax arising from such sale.

21.     Sidley opined that the Cácereses could *not* be held liable for several reasons, including that the UPC transaction would be treated as a sale of the Shares by the Cácereses and not as a transfer of corporate assets that would subject them to liability, and that the IRS could not successfully apply the 'step transaction' doctrine to treat UPC as though it were distributing assets to its shareholders, the Cácereses.

22.     Sidley's opinion was wrong. The U.S. government now seeks to do precisely what Sidley assured the Cácereses it could not and would not do: hold the Cácereses liable for a transfer of corporate assets by applying the 'step transaction' doctrine to the UPC Transaction.

23.     Furthermore, Sidley did not disclose that it knew or should have known that Skandia, as the new owner and manager of UPC, did not intend to pay the taxes owed but would instead use a Son of BOSS tax shelter to avoid paying it.

## SIDLEY KNEW THE UPC TRANSACTION WOULD FAIL BECAUSE IT WAS PREMISED ON FRAUDULENT TAX SHELTERS

24.     Sidley concealed material facts about the UPC Transaction when it opined about its legality.  First and foremost, despite its many representations that the UPC Transaction would legally achieve the tax results promised, the UPC Transaction's tax strategy failed, and the Cácereses may have to pay more than $56 million in taxes, penalties, and interest to the IRS and the State of Georgia and territory of Puerto Rico.

25.     Unbeknownst to the Cácereses, rather than using legitimate tax strategies to structure the UPC Transaction, Skandia loaded the UPC Transaction with what Sidley knew were fraudulent tax shelters that would not withstand IRS scrutiny. Instead of using a legitimate intermediary that could offset income with loss assets, Skandia used a shell corporation, UP Acquisitions, created only for this sale, and relied on the use of tax "products" including distressed debt and Son of BOSS transactions to attempt to shelter corporate income.

26.     Although the Midco transaction had been represented as transferring any risk of the transaction from the Cácereses to the intermediary, Sidley concealed from Plaintiffs that the intermediary held no assets and was created solely for the purpose of the UPC Transaction.  Skandia's use of an insolvent intermediary not only left the Cácereses on the hook for any taxes owed, but also left them without any remedy if UP Acquisitions failed to pay the taxes.

27.     Sidley also concealed that the intermediary UP Acquisitions was not independent but was working in concert with the KPMG team, another fact that defeated much of the purpose of the MIDCO strategy.

28.     Sidley knew or should have known, but did not advise the Cácereses, that if the transaction were examined, the IRS would not respect the intermediary as legitimate and would conclude that the purported stock sale by Plaintiffs was an asset sale and liquidation, which would cause the income from the asset sale to be attributed to Plaintiffs as transferees, thereby making Plaintiffs responsible for UPC's corporate taxes, as well as their own personal taxes.

## TAX LITIGATION

29.     The IRS sued the Cácereses for $56 million in unpaid tax liabilities of UPC in 2018.  But the Cácereses had every reason to believe their exposure with respect to the UPC corporation concluded when they sold the stock to UP Acquisition more than 20 years before.

30.     For that reason, the District Court initially granted the Cácereses' motion to dismiss the IRS's complaint against them as untimely in May 2019.  Unfortunately,

8

however, the Eleventh Circuit Court of Appeals recently reversed the dismissal and reinstated the IRS's claims against the Cácereses in January 2021.

31.    Prior to that time, the Cácereses had no reason to believe that Sidley's advice was incorrect or that the Cácereses would suffer any injury associated with the UPC Transaction.

32.    Plaintiffs' tax case with the IRS (the "Tax Litigation") is not resolved and as a result Plaintiffs have not yet suffered any pecuniary injury and will not until such time as the case is tried to verdict or the Parties settle.

## COUNT I: BREACH OF CONTRACT

33.    Plaintiffs incorporate each and every allegation made in paragraphs 1-32 above, as if fully set forth herein.

34.    Plaintiffs entered into a contract with Sidley whereby Sidley agreed to satisfactorily provide a tax legal opinion and tax consulting services for Plaintiffs in exchange for the Plaintiffs' agreement to pay Sidley fees for those services.

35.    Plaintiffs performed fully each and every contractual obligation to Sidley.

36.    Sidley breached its obligations to Plaintiffs by, among other things:

   (a)    failing to inform Plaintiffs of the significant risks associated with the Midco stock sale transaction;

   (b)    failing to inform Plaintiffs that Sidley knew of significant risks relating to the proposed stock sale transaction to Skandia;

   (c)    failing to inform Plaintiffs that the Midco strategy was not a legitimate tax strategy to avoid transferee liability for UPC;

(d)     failing to identify legitimate alternative tax planning devices that

would legally reduce Plaintiffs' taxes; and

(e)     failing to provide professional legal services to Plaintiffs in a good faith

manner.

37.     Sidley breached its obligations under its contract with Plaintiffs by these

and other acts and omissions, including those acts and omissions previously alleged.

38.     As a direct and proximate result of Sidley's breaches of this contract,

Plaintiffs may suffer substantial direct, economic, and consequential damages in an

amount to be proven at trial.

39.     Because Sidley knew that the tax strategies it sold to Plaintiffs had

significant legal problems and would not likely pass muster with the IRS but concealed

such information from Plaintiffs, Sidley acted in bad faith.

## COUNT II: NEGLIGENT MISREPRESENTATIONS

40.     Plaintiffs incorporate each and every allegation made in paragraphs 1-39

above, as if fully set forth herein.

41.     Sidley owed a duty of care to Plaintiffs which required the transmittal of

accurate and not misleading information to Plaintiffs.

42.     To the extent that any of its misrepresentations to Plaintiffs were not

intentional, Sidley made numerous grossly negligent misrepresentations in promoting,

marketing, advising Plaintiffs in connection with the Midco stock sale transaction.

43.     Sidley's grossly negligent misrepresentations to Plaintiffs include, but are

not limited to:

(a)     MIDCO was permissible, legal, and would be allowed by federal and state authorities;

(b)     Sidley's opinion letter evidenced the legality and permissibility of a Midco transaction that would insulate Plaintiffs from penalties;

(c)     the Sidley opinion letter was individually tailored for Plaintiffs;

(d)     Sidley had thoroughly researched Midco tax transactions and determined it "should" survive IRS scrutiny;

(e)     Plaintiffs' Midco stock sale transaction could be relied upon to avoid transferee liability and to minimize the tax impact of Plaintiffs' divestment of UPC;

44.     To the extent that Sidley's misrepresentations were not made intentionally, Sidley's misrepresentations were made with reckless and grossly negligent disregard for the truth.

45.     Sidley knew, or a review of available information in Sidley's possession would have revealed, that the representations by Sidley were false.

46.     Sidley intended that Plaintiffs would rely or act upon Sidley's grossly negligent misrepresentations.

47.     Sidley had knowledge that Plaintiffs would rely upon the negligent misrepresentations and that such reliance would likely cause Plaintiffs economic injury.

48.     Plaintiffs justifiably relied upon Sidley's misrepresentations of material fact because of Plaintiffs' past relationship with Skandia and KPMG, Sidley's experience and expertise, and Sidley's representations that its advice was based on its

11

expertise in tax and accounting and that Sidley's partners, including in particular R.J. Ruble, were tax and accounting experts.

49.     As a direct and proximate result of Sidley's grossly negligent misrepresentations, Plaintiffs may suffer direct, consequential, and economic damages in an amount to be proven at trial.

50.     Sidley's wrongful actions constitute willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences, rendering Sidley liable to Plaintiffs for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

51.     Because Sidley acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT III: SIDLEY'S PROFESSIONAL NEGLIGENCE

52.     Plaintiffs incorporate each and every allegation made in paragraphs 1-51 above, as if fully set forth herein.

53.     Sidley was specifically engaged by Plaintiffs to provide an independent tax legal opinion regarding whether the IRS would respect the UPC Transaction and that Plaintiffs would not be subject to personal (or transferee) liability associated with UPC's tax liabilities after sale of stock.

54.     As a result of this relationship, Sidley owed Plaintiffs a duty to use the degree of care and skill ordinarily employed by and required of tax lawyers under similar conditions and like surrounding circumstances when providing such services (the "standard of care").

55.     Plaintiffs were entitled to expect that Sidley's services would be performed consistent with the standard of care.

56.     Despite its relationship with Plaintiffs, Sidley's acts and omissions fell significantly below the standard of care.

57.     Sidley breached the standard of care by, among other things:

(a)     failing to provide the tax legal services for which Plaintiffs contracted;

(b)     failing to design and implement Plaintiffs' divestment of interests in UPC through legitimate strategies allowed by the IRS;

(c)     inducing Plaintiffs to structure their divestment of UPC using a fraudulent Midco tax shelter that Sidley knew or should have known would not pass muster with the IRS;

(d)     failing to adequately disclose the risks of using that tax shelter which risks were known to Sidley;

(e)     inducing Plaintiffs to participate in that tax shelter when Sidley knew or should have known that the purported "strategy" it proposed would not achieve the results promised and that Plaintiffs could be hit with massive transferee tax liability;

(f)     inducing Plaintiffs to structure their divestment of UPC knowing Skandia, the party purchasing UPC's stock, would likely use fraudulent tax shelters that Sidley knew or should have known would not pass muster with the IRS;

13

(g)     preparing an opinion letter that falsely stated Plaintiffs would not be

responsible for UPC Enterprises' tax liability as transferees;

(h)     preparing an opinion letter that falsely claimed that the strategy

"should" survive IRS scrutiny if reviewed by the IRS;

(i)     inducing Plaintiffs to rely on its purportedly independent opinion

letter, when Sidley knew or should have known the letter did not

represent the independent opinion of the law firm;

(j)     representing to Plaintiffs that Sidley had thoroughly reviewed and

considered all aspects of the purported stock sale transaction while

concealing from Plaintiffs the fact that Sidley's own partners and staff

had expressed concerns about the legitimacy of these fraudulent tax

shelters;

(k)     failing to advise Plaintiffs that the Sidley opinion letter did not

represent independent advice with respect to the merit of the Midco

tax shelter;

(l)     failing to identify and advise Plaintiffs to use tax planning that would

legally and legitimately minimize Plaintiffs' taxes.

58.     By committing these and other acts, Sidley's acts and omissions fell

substantially below the standard of care.

59.     Sidley intentionally, recklessly, and/or with gross negligence breached

the duty of care that it owed to Plaintiffs by these and other acts and omissions,

including those acts and omissions previously alleged.

14

60.     As a direct and proximate result of Sidley's professional negligence,

Plaintiffs may suffer direct, consequential, and economic damages in an amount to be

proven at trial.

## COUNT IV: COMMON LAW INDEMNITY

61.     Plaintiffs incorporate each and every allegation made in paragraphs 1-60

above, as if fully set forth herein.

62.     Sidley represented to Plaintiffs that a Midco transaction was a reliable

way to avoid transferee liability and to minimize the tax impact of Plaintiffs' divestment

of UPC, and that such transactions were permissible, legal, and "should" survive IRS

scrutiny.

63.     Sidley knew, or a review of available information in Sidley's possession,

would have revealed, that the representations by Sidley were false. Sidley's actions

constitute tortious negligent misrepresentations and professional negligence.

64.     In the Tax Litigation, Plaintiffs are alleged to have engaged in fraudulent

transfers pursuant to Ga. Code Ann. §§ 12-2-21 and 18-2-22 that were in effect in 1997

(the time of the allegedly fraudulent transactions), which require the IRS to establish

that the transaction was made with the intent to defraud UPC's creditors, and that

Plaintiffs were aware of that intent.

65.     Specifically, Plaintiffs are alleged to have known that the purpose of the

UPC Transaction was the artificial reduction of tax liability because they hired R.J.

Ruble, a Sidley partner, to write a tax opinion letter on the legality of the UPC

Transaction. (Compl. ¶¶ 37-38, ECF No. 1, *United States v. Henco Holding Corp.*, No. 1:18-cv-03093 (N.D. Ga.).)

66.     Only R.J. Ruble had actual knowledge of the fraudulent nature of the UPC Transaction; the Complaint in the Tax Litigation alleges that "Mr. Ruble acknowledged his awareness that Skandia was 'using the tax position to make a profit,'" that "Mr. Ruble was informed that Skandia intended to use the 'pot of cash' from the Belca sale to 'repay their lender,'" and that "Mr. Ruble, on behalf of Transferee Defendants, wrote in a letter to Mr. Cornelison that it would be problematic for Skandia to use UPC's cash to 'directly pay the selling shareholders.'" *Id.* ¶¶ 42, 46, 48.

67.     Plaintiffs' potential liability in the Tax Litigation turns on Plaintiffs' alleged knowledge of Skandia's intent to defraud the IRS—knowledge that Sidley had (but did not share with Plaintiffs), and which the IRS seeks to impute to Plaintiffs through Sidley as Plaintiffs' provider of independent legal tax advice.

68.     As a direct result of Sidley's tortious conduct, liability including direct, consequential, and economic damages may be imputed to Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for judgment as follows:

A.      That the Court award Plaintiffs damages on all counts in an amount to be proven at trial;

B.      That Plaintiffs recover prejudgment interest;

C.      That Plaintiffs recover punitive damages pursuant to O.C.G.A. § 51-12-5.1;

D.    That Plaintiffs recover their costs and reasonable attorneys' fees pursuant

to O.C.G.A. § 13-6-11; and

E.    That this Court award Plaintiffs such other and further relief as may be

just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY.

/s/Michael E. Brooks
Michael E. Brooks
Georgia Bar No. 084710
mbrooks@brooksandwarner.com
Jill Warner
Georgia Bar No. 378472
jwarner@brooksandwarner.com
BROOKS & WARNER LLC
1768 Century Boulevard NE, Suite B
Atlanta, Georgia 30345
404.681.0720 – Brooks Direct
404.681.0730 – Warner Direct
404.681.0780 – Fax

-and-

Scott F. Hessell
Clayton Faits
SPERLING & SLATER, P.C.
55 West Monroe St., Suite 3200
Chicago, Illinois 60603
shessell@sperling-law.com
cfaits@sperling-law.com
*(Pro Hac Vice Applications to be filed)*

***Attorneys for Plaintiffs***

State Court of Fulton County
**E-FILED**
23EV000288
1/13/2023 6:01 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

## STATE COURT OF FULTON COUNTY
Civil Division

CIVIL ACTION FILE #: _____

Luis Alfredo Cáceres, et al.

c/o Brooks & Warner LLC

_____

1768 Century Blvd, NE, Suite B

_____

Atlanta, Georgia 30345

_____

Plaintiff's Name, Address, City, State, Zip Code

vs.

Sidley Austin LLP

_____

One South Dearborn

_____

Chicago, Illinois 60603

_____

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [X] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

 You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name:  Michael E. Brooks, Brooks & Warner LLC
_____

Address:  1768 Century Blvd, NE, Suite B
_____

City, State, Zip Code:  Atlanta, Georgia 30345
_____   Phone No.:  (404) 681-0720

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

*SERVICE INFORMATION:*

 Served, this _____ day of _____, 20_____.

_____
DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:

We, the jury, find for _____

_____

This _____ day of _____, 20_____.   _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
23EV000288
2/10/2023 11:16 AM
Donald Talley, Clerk
Civil Division

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| Luis Alfredo Cáceres and Luis Angel Cáceres, Individually, as executor of the Estate of Alfredo Cáceres, and as trustee of the Luis Angel Cáceres Charitable Remainder Unitrust, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION FILE NO.: 23EV000288 |
| Sidley Austin LLP, | ) ) | |
| Defendant. | ) | |

## ACKNOWLEDGMENT OF SERVICE

Defendant Sidley Austin LLP hereby acknowledges service and receipt of the Summons and Complaint in the above-styled action and waives any further service of process, including the defenses of insufficiency of process and insufficiency of service of process.  Defendant reserves all other defenses unrelated to service.

Service acknowledged this 30th day of January, 2023.

/s/ Michael A. Caplan
Michael A. Caplan
Georgia Bar No. 601039
Jarred A. Klorfein
Georgia Bar No. 562965
CAPLAN COBB LLC
75 Fourteenth Street, N.E.
Suite 2700
Atlanta, Georgia 30309
Telephone: (404) 596-5600
Facsimile: (404) 596-5604
mcaplan@caplancobb.com
jklorfein@caplancobb.com

Brad D. Brian
MUNGER, TOLLES & OLSON LLP
350 South Grand Ave.
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 683-4092
brad.brian@mto.com
(*Pro hac vice* application to be filed)

Xiaonan April Hu
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300
april.hu@mto.com
(*Pro hac vice* application to be filed)

Attorneys for Defendant