# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HENCO HOLDING CORP., | ) | |
| ALFREDO CACERES, | ) | |
| LUIS ALFREDO CACERES, | ) | |
| LUIS ANGEL CACERES (individually | ) | |
| and as beneficiary of the Luis Angel | ) | |
| Caceres Charitable Remainder | ) | |
| Unitrust), and LUIS ANGEL | ) | |
| CACERES CHARITABLE | ) | |
| REMAINDER UNITRUST, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **COMPLAINT**

The United States, by and through undersigned counsel, complains and

alleges as follows:

1.     The United States brings this action to: (1) reduce to judgment

Defendant Henco Holding Corp.'s unpaid tax liabilities; and (2) receive money

judgments for fraudulent transfers from Henco Holding Corp. to Defendants

Alfredo Caceres, Luis Alfredo Caceres, Luis Angel Caceres, and the Luis Angel

Caceres Charitable Remainder Unitrust (hereinafter "Transferee Defendants").

2.     This action is authorized by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and is brought at the direction of the Attorney General of the United States, in accordance with 26 U.S.C. § 7401.

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. § 7402.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1396 because the tax and transferee liabilities at issue accrued in this district.

## THE PARTIES

5.     Defendant Henco Holding Corp. was formerly known as UPC Holding Corp., which in turn was formerly known as United Poultry Corp. These entities are collectively referred to as "Henco" throughout this Complaint.

6.     At all times relevant to this action, Henco was a Georgia corporation. Henco is currently incorporated in Wyoming (where it was administratively dissolved in 2012 due to a tax delinquency), and it maintains a business address of 950 Third Avenue, 23rd Floor, New York, NY 10022.

7.     Defendant Alfredo Caceres resides in Guaynabo, PR. He is the father of Defendants Luis Alfredo Caceres and Luis Angel Caceres. When Henco was incorporated in—and conducting business in—Georgia, Alfredo Caceres owned 51 percent of the company, served as its president and as a director, and helped direct

the fraudulent transfer of the company's assets to himself and his family members. As such, he subjected himself to the Court's jurisdiction for litigation arising out of the business that he and Henco conducted in Georgia.

8.      Defendant Luis Alfredo Caceres resides in Guaynabo, PR. He is the son of Defendant Alfredo Caceres and the brother of Defendant Luis Angel Caceres. When Henco was incorporated in—and conducting business in—Georgia, Luis Alfredo Caceres owned 24.5 percent of the company, served as a vice president and a director, and helped direct the fraudulent transfer of the company's assets to himself and his family members. As such, he subjected himself to the Court's jurisdiction for litigation arising out of the business that he and Henco conducted in Georgia.

9.      Defendant Luis Angel Caceres resides in Alpharetta, GA, which is within the jurisdiction of this Court. He is the son of Defendant Alfredo Caceres and the brother of Defendant Luis Alfredo Caceres. He owned 2.45 percent of Henco in his own name. He also served as a vice president, secretary, treasurer, and director of Henco and helped direct the fraudulent transfer of the company's assets to himself and his family members. Luis Angel Caceres is named both individually and as the beneficiary of the Luis Angel Caceres Charitable Remainder Unitrust.

10. The Luis Angel Caceres Charitable Remainder Unitrust is a trust with mailing addresses in Pennington, NJ and Charlotte, NC. Luis Angel Caceres, who is within this Court's jurisdiction, is the trust's grantor, trustee, and beneficiary. He used the trust to hold a 22.05 percent interest in Henco (in addition to the 2.45 percent he held in his own name). Upon information and belief, the trust expired in January 2017.

THE UNDERLYING TAX LIABILITIES CANNOT BE CHALLENGED

11. The tax liabilities at issue, as well as the fraudulent transfers, arose from the participation of Henco and Transferee Defendants in an unlawful tax shelter in 1997.

12. Henco challenged the assessment of the tax liabilities at issue in the United States Tax Court. *See Henco Holding Corp. v. Comm'r*, No. 021886-08 (Tax Ct.). The Tax Court sustained the assessment against Henco of taxes and penalties in the amounts of $12,107,676 and $2,421,535.20, respectively. With subsequent interest and penalties, Henco's liabilities related to its involvement in the tax shelter total more than $56 million as of May 2018.

13. Because of the Tax Court's ruling, Henco and Transferee Defendants (who are in privity with Henco) are estopped from challenging the tax and penalty assessments in this action. As a result, the only portion of this case subject to

challenge is Transferee Defendants' liability for the fraudulent transfer of Henco's assets.

## INTERMEDIARY TRANSACTION TAX SHELTERS

14.     The Internal Revenue Code imposes two levels of taxation on a corporate taxpayer's sale of an appreciated asset and subsequent distribution of the sale proceeds to shareholders. First, the company (here, Henco) must pay a capital gains tax. *See* 26 U.S.C. §§ 1(h), 11, 1001, 1221, 1222. And second, the shareholders (here, Transferee Defendants) are taxed on the distributed proceeds. *Id.* §§ 331, 1001.

15.     To circumvent the first level of taxation, some taxpayers have engaged in what the IRS has labeled "intermediary transaction tax shelters." *See* IRS Notice 2008-111, 2008-51 I.R.B. 1299; IRS Notice 2001-16, 2001-1 C.B. 730. These transactions are unlawful, lack economic substance, and are disregarded for tax purposes.

16.     The tax shelters involve a sham sale to an intermediary, which facilitates the evasion of taxes in exchange for a fee paid out of the money saved due to the evasion.

17.     In Notice 2008-111, the IRS defines an intermediary transaction tax shelter as follows:

An Intermediary Transaction involves a corporation (T) that would have a Federal income tax obligation with respect to the disposition of assets the sale of which would result in taxable gain (Built-in Gain Assets) in a transaction that would afford the acquiror or acquirors (Y) a cost or fair market value basis in the assets. An Intermediary Transaction is structured to cause the tax obligation for the taxable disposition of the Built-in Gain Assets to arise, in connection with the disposition by shareholders of T (X) of all or a controlling interest in T's stock, under circumstances where the person or persons primarily liable for any Federal income tax obligation with respect to the disposition of the Built-in Gain Assets will not pay that tax . . . .

## OVERVIEW OF DEFENDANTS' SCHEME TO EVADE TAXES

18.     The company currently known as "Henco" was incorporated in Georgia in 1976.

19.     Henco was organized as a "C" corporation, which meant that it was responsible for reporting corporate-level income taxes on Form 1120 each year and paying those taxes as they became due.

20.     By 1996, Henco was considering selling its 50.5 percent interest in a subsidiary, Belca Foodservice Corp. ("Belca"), and distributing the proceeds from the sale to Transferee Defendants, who were Henco's shareholders.

21.     As of December 1996, the Belca stock was Henco's sole asset.

22.     The Belca stock had increased substantially in value since the time when Henco acquired it.

23.     If Henco had liquidated its Belca position and directly distributed the proceeds to Transferee Defendants, there would have been a capital gains tax on the liquidation and an additional tax on the distribution.

24.     From the outset, Transferee Defendants were aware of and sought to avoid this dual taxation. For instance:

A.     In a July 12, 1996 letter, W. Woodrow Stewart, an attorney for Henco, Alfredo Caceres, and Luis Angel Caceres, wrote a letter to Luis Alfredo Caceres informing him of the "problem" of a "dual tax."

B.     Meanwhile, in a September 9, 1996 letter to Luis Alfredo Caceres, Mr. Stewart laid out a plan to "avoid double taxation on the appreciation of Belca Foodservice." Mr. Stewart estimated that the plan would avoid between $11 million and $13.7 million in taxes.

25.     The plan that ultimately emerged was to engage in transactions that, though given a different and artificial form, were in substance a liquidation of Henco and distribution of its assets to Transferee Defendants.

26.     Specifically, Transferee Defendants determined to engage in a sham sale of Henco's stock to an intermediary, Skandia Capital Group (a/k/a Scandia Capital Group). Skandia Capital Group used a special purpose vehicle, UP

Acquisitions, to "purchase" the stock. Skandia Capital Group and UP Acquisitions are hereinafter referred to collectively as "Skandia."

27.     Skandia was subsequently featured in the indictment of Robert Pfaff, who pled guilty to a conspiracy charge stemming from his promotion of tax shelters. The indictment lists Skandia as one of the vehicles that Pfaff used to perpetrate the conspiracy. *See United States v. Pfaff*, No. 1:08-cr-239-RMB, ECF No. 1 ¶ 33m (S.D.N.Y.). Pfaff received a sentence of 57 months. *Id.* at ECF No. 56. Pfaff had previously been convicted in another tax shelter case along with R.J. Ruble, who is discussed *infra*. *See United States v. Stein*, No. 1:05-cr-888, ECF No. 1453 (S.D.N.Y.).

28.     In this case, Skandia was a front for Diversified Group, a notorious tax shelter promotor run by James Haber.

29.     Diversified Group was once "considered a leader in developing tax-motivated transactions for corporations and high net worth individuals." *Jacoby v. Comm'r*, 109 T.C.M. (CCH) 1365, at *4–5 (Tax Ct. 2015). Many of these transactions were intermediary transaction tax shelters. *Id.* at *6. The IRS has assessed a $25 million penalty against Haber and Diversified Group for their involvement in tax shelters. *See Haber v. United States*, 823 F.3d 746, 748 (2d Cir. 2016).

30.     Dag Sundby, who controlled Skandia, was an associate of Mr. Haber. For instance, at around the same time as the Henco sale, Mr. Sundby and Mr. Haber participated in another intermediary transaction tax shelter involving a company named Cohan's Sonic Enterprises. *See United States v. Irizarry & McCall, P.C. ex rel. Raymond D. McCall*, 2005 WL 2837260 (D. Colo. Sept. 20, 2005) (United States' memorandum in support of petition to enforce IRS summonses). Irizarry & McCall, counsel for the intermediary in this case, also served as counsel for the intermediary in the Cohan's Sonic Enterprises case. *Id.*

31.     By the time of the "sale" of Henco's stock to Skandia, Henco had liquidated its Belca interest and was left with approximately $37 million in cash and a capital gains tax liability of approximately $13 million.

32.     Although Henco was only worth around $24 million due to the built-in capital gains taxes, Skandia offered to pay more than $33 million for Henco's stock.

33.     Skandia was able to offer millions of dollars in excess of the stock's value because it never intended for the capital gains taxes to be paid on the Belca appreciation.

34.     Instead, it intended to help Henco evade the taxes. Specifically, Skandia planned to sell Henco's stock to other associates of Mr. Haber and

Diversified Group, who would engage in additional tax shelter transactions to artificially eliminate Henco's tax liabilities.

35.     The intermediary transaction tax shelter allowed Transferee Defendants to improperly increase the size of their ultimate distribution of the Belca proceeds by millions of dollars.

36.     For its part, Skandia, Diversified Group, and other associates of Mr. Haber received over $3 million in fees—an amount that was a percentage of the capital gains taxes that Henco evaded.

## PRE-TRANSACTION NEGOTIATIONS

37.     In the negotiations leading up to the consummation of the intermediary transaction tax shelter, Transferee Defendants were aware that the purpose of the transaction was the artificial reduction of taxes.

38.     Indeed, prior to the execution of the tax shelter, Transferee Defendants hired attorney R.J. Ruble of the law firm Brown & Wood LLP to draft a tax opinion letter purporting to release them of personal liability for Henco's capital gains taxes in the event that neither Henco nor Skandia paid the taxes.

39.     In 2008, Mr. Ruble was convicted for writing tax opinion letters that blessed bogus tax shelters created for wealthy customers. Mr. Ruble wrote about

600 such letters and was paid around $50,000 for each one. He received a sentence of six-and-a-half years. *See Stein*, No. 1:05-cr-888 at ECF No. 1451.

40.    The reason Transferee Defendants sought the tax opinion letter was that they knew that neither Henco nor Skandia intended to pay capital gains taxes. In particular:

A.    The sale of Henco's stock and distribution of the profits from the Belca sale would leave Henco insolvent and without any ability to pay the taxes; and

B.    Skandia refused to even present the appearance that it would pay the taxes on Henco's behalf. Specifically, Mr. Ruble requested, in order to create the impression that there was no "intent to defraud the IRS," that Skandia agree to file all tax returns and pay the associated taxes "with respect to any period during which [it] realize[d] any income, gain, deduction or loss" attributable to Henco. Skandia, however, declined to include that language in the agreement.

41.    Transferee Defendants also knew that Skandia's financial incentive to participate in the transaction was that it would receive a fee based on a percentage of the capital gains on which Henco evaded taxes. For instance, Luis Angel Caceres wrote a letter reflecting his understanding that the fee would be "on [the]

capital gain." The letter was to Steve Cornelison, who represented Henco, Alfredo Caceres, and Luis Angel Caceres.

42.     Mr. Ruble acknowledged his awareness that Skandia was "using its tax position to make a profit," and he even suggested that using the term "fee" to describe its compensation for promoting the tax shelter was "not the best optically."

43.     Additionally, Transferee Defendants knew that the sale to Skandia lacked economic substance.

44.     In particular, Transferee Defendants knew that Skandia lacked the money to purchase the Henco stock. Instead, Skandia knew that Henco would sell its Belca stock, which would leave Henco holding nothing other than cash. Skandia would then, in effect, use that cash to "buy" the Henco stock and distribute the money to Transferee Defendants.

45.     Purporting to directly buy a company's stock with the company's own money would raise red flags because it is economically identical to a liquidation followed by a distribution to shareholders.

46.     As a result, Skandia intended to accomplish its goal indirectly. Specifically, it planned to take out a sham loan, use the loan proceeds to pay for the Henco stock (and pay Transferee Defendants), and then use Henco's cash—

which it received from the sale of its Belca interest—to repay the loan. Indeed, on

December 31, 1996, Mr. Ruble was informed that Skandia intended to use the "pot

of cash" from the Belca sale to "repay their lender." The transaction would

essentially proceed as follows:



47.     Though this circular flow of money was complicated in form, in

substance it still was no different from a liquidation followed by a distribution.

Indeed, the transaction was only possible because of the Belca cash sitting in

Henco's coffers.

48.     Alfredo Caceres, through his personal attorney, Ray O'Neill, expressed "discomfort" about the lack of economic substance. In a letter to Mr. Cornelison (an attorney for Henco, Alfredo Caceres, and Luis Angel Caceres), Mr. O'Neill wrote (with emphasis added):

> After pondering the proposed Skandia transaction long and hard, I believe my discomfort would be virtually eliminated if we could obtain from the purchasers a representation to the effect that the assets of [Henco] will not be used, directly or indirectly (e.g. a pledge of the shares of [Henco]), to finance the acquisition of the shares of [Henco]. My thinking is as follows: It is obvious from the structure of the proposed transaction that there will be no deal with Skandia unless at the time of the closing the only asset of [Henco] is cash. *Since cash is fungible, there is no economic difference between using the cash of [Henco] to pay the Caceres family and borrowing the money from a bank and pledging the [Henco] cash to secure the bank loan. Obviously it looks even worse if the bank loan is secured by the [Henco] cash and shortly after the closing the bank is repaid out of the [Henco] cash.*

49.     Similarly, Mr. Ruble, on behalf of Transferee Defendants, wrote in a letter to Mr. Cornelison that it would be problematic for Skandia to use Henco's cash to "directly pay the selling shareholders." This statement is underlined by hand in the letter, with a handwritten notation next to it saying "key point."

50.     After receiving the letter from Mr. O'Neill, Mr. Cornelison asked counsel for Skandia if Skandia would be willing to stay silent on its intention to use Henco's cash to repay the loan. In particular, he asked for the following

assurance (with emphasis in the original): "that the loan documents with the lender will not, by their terms, <u>require</u> that the assets of [Henco] be used to repay the loan[]. I am not so concerned that in fact they will be used to repay the loan[], just that the documents not require it." Mr. Cornelison added that including this representation in the opinion letter being drafted by Mr. Ruble could "make it stronger."

51.     Mr. Cornelison's letter demonstrates that Transferee Defendants were fully aware that the transaction was a tax shelter and that they were focused on manipulating the terms to obscure the abusive nature of the transaction.

52.     Counsel for Skandia, however, refused to place any restrictions on Skandia's use of Henco's cash.

53.     Not only did Transferee Defendants know that the transaction lacked economic substance, they were also aware that this lack of substance meant that the transaction could be disregarded for tax purposes.

54.     Specifically, a letter from Luis Angel Caceres to Mr. O'Neill and Mr. Cornelison contains a handwritten citation to the Tax Court case *ACM P'ship v. Comm'r*, 73 T.C.M. (CCH) 2189 (Tax Ct. 1997), *aff'd in part*, 157 F.3d 231 (3d Cir. 1998). In that case, the Tax Court (and later the Third Circuit) set aside a partnership's transactions because they lacked economic substance.

## EXECUTING THE TAX SHELTER

### Step 1

55.     On January 31, 1997, Henco agreed to sell its Belca interest to an unrelated third party.

56.     By the time of the Belca sale, Transferee Defendants had agreed to sell their Henco stock to Skandia, but the deal had not yet closed.

57.     Skandia, despite not owning the Henco stock yet, consented to the Belca sale the day before it occurred.

58.     As a result of the Belca sale, Henco had no other assets apart from over $37 million in cash from the sale of the Belca stock and the concurrent repayment of debt from Belca to Henco. Henco also had capital gains tax liabilities of approximately $13 million.

### Step 2

59.     Transferee Defendants and Skandia agreed on a purchase price of $33,493,284 (subject to the possibility of a later adjustment in the event that Henco received additional money from its sale of the Belca stock).

60.     On or around April 4, 1997, Henco opened a bank account at Rabobank.

61.     Rabobank is a Dutch bank that has provided financing in several intermediary transaction tax shelters. *See, e.g.*, *Slone v. Comm'r*, 810 F.3d 599, 609 (9th Cir. 2015); *Diebold Found., Inc. v. Comm'r*, 736 F. 3d 172, 178 (2d Cir. 2013); *Enbridge Energy Co. v. United States*, 354 F. App'x 15, 17 (5th Cir. 2009) (per curiam).

62.     Alfredo Caceres and Luis Angel Caceres had signature authority over the account.

63.     On April 9, 1997, Henco transferred $37,187,606.30, which was all of its cash from the sale of the Belca stock and the concurrent repayment of debt from Belca to Henco, to the account at Rabobank.

64.     On April 10, 1997, the following occurred:

A.      Skandia borrowed the purchase price ($33,493,284) from Rabobank via a promissory note. It promised to repay that amount plus interest by May 9, 1997;

B.      Skandia pledged the Henco stock it was going to purchase to secure the Rabobank loan;

C.      Skandia promised to immediately declare a dividend from Henco in the amount of the loan plus $1 million and use the dividend to

purchase a certificate of deposit from Rabobank. This ensured that Rabobank would get repaid; and

D.     Skandia used the loan to "purchase" the Henco stock.

65.     That same day, April 10, 1997, Rabobank received instructions to distribute the sale proceeds (minus a negotiated holdback) to Transferee Defendants according to their ownership interests as follows:

A.     $16,581,575 to Alfredo Caceres (in addition to $500,000 held in escrow for his benefit, for a total of $17,081,575);

B.     $8,231,194 to Luis Alfredo Caceres;

C.     $7,385,269 to the Luis Angel Caceres Charitable Remainder Unitrust; and

D.     $795,246 to Luis Angel Caceres.

66.     Effective April 10, 1997, Alfredo Caceres, Luis Alfredo Caceres, and Luis Angel Caceres gave up their positions as officers, employees, and directors of Henco. In their place, Mr. Sundby, who controlled Skandia, became Henco's sole director and then appointed himself president, secretary, and treasurer of Henco.

67.     In another April 10, 1997 transaction, Mr. Sundby, per the agreement between Skandia and Rabobank, declared a $34,493,284 dividend (the principal

amount of the loan plus $1 million) and used the dividend to purchase from Rabobank a certificate of deposit that matured on May 9, 1997.

68. On the certificate's maturity date, Skandia used it to repay Rabobank.

69. On May 21, 1997, Transferee Defendants received additional distributions due to adjustments stemming from the sale of the Belca stock. *See supra* ¶ 59. The distributions were as follows:

A. $142,030 to Alfredo Caceres;

B. $68,230 to Luis Alfredo Caceres;

C. $61,407 to the Luis Angel Caceres Charitable Remainder Unitrust; and

D. $6,823 to Luis Angel Caceres.

70. Thus, between the distributions in ¶¶ 65 and 69, *supra*, Transferee Defendants received the following amounts:

A. $17,223,605 to Alfredo Caceres;

B. $8,299,424 to Luis Alfredo Caceres;

C. $7,446,676 to the Luis Angel Caceres Charitable Remainder Unitrust; and

D. $802,069 to Luis Angel Caceres.

**Step 3**

71.     As a result of the first two steps of the transaction, Transferee Defendants had received an inflated payout and given up their interest in Henco.

72.     However, Henco, which was now controlled by Skandia, had not yet evaded its responsibility for the capital gains taxes. To evade that responsibility, Henco had to engage in additional transactions.

73.     On May 16, 1997, just over a month after Henco's stock was acquired by Skandia, it was sold to Squires, LLC.

74.     Squires was a limited liability company formed under the laws of the Isle of Man on May 1, 1997.

75.     Although Henco's stock was "purchased" by Skandia for $33,493,284, it was sold to Squires for just $870,537.

76.     The members of Squires were two Irish citizens, Martin Hawkes and Samuel Mahoney.

77.     Like Mr. Sundby, Mr. Hawkes and Mr. Mahoney were associates of Mr. Haber and Diversified Group.

78.     Diversified Group loaned Squires the money for the purchase price.

79.     In connection with the acquisition by Squires, Mr. Haber became the president of Henco, and Mr. Sundby resigned from his positions at the company.

80.     A District Court examining a different tax shelter found that Mr. Haber paid Mr. Hawkes and Mr. Mahoney to engage in transactions aimed at creating tax losses. *Fid. Int'l Currency Advisor A Fund, LLC, by Tax Matters Partner v. United States*, 747 F. Supp. 2d 49, 121–22 (D. Mass. 2010), *aff'd*, 661 F.3d 667 (1st Cir. 2011).

81.     Despite receiving millions of dollars in payments in the Massachusetts case, Mr. Hawkes and Mr. Mahoney did not "contribute[] any funds, perform[] any substantial work, or ma[ke] any investment decisions." *Id.* at 121.

82.     One of Diversified Group's signature schemes was manufacturing sham losses by using currency options to create an artificially high tax basis. *Id.* at 65–66.

83.     The use of such options was part of a tax shelter known as Son of Boss, which is described in IRS Notice 2000-44, 2000-2 C.B. 255.

84.     On May 16, 1997 (the day it acquired the Henco stock), Squires entered into four European-style currency options with Lehman Brothers Commercial Corporation.

85.     In two of these trades, Lehman Brothers "purchased" two options from Squires for $35,069,500 each (a total of $70,139,000).

86.     In the other two, Squires "purchased" two options from Lehman Brothers for $34,917,500 each (a total of $69,835,000). One of these was option number 319466.

87.     Only $304,000 (the net of the two purchase prices) actually changed hands between the four transactions.

88.     The options contracts almost entirely offset each other. As a result, neither party faced meaningful financial risk from the transactions.

89.     On June 11, 1997, the day before the options contracts matured, Squires contributed option number 319466 to Henco in exchange for 175 shares of Henco stock.

90.     Squires reported that option 319466 had a tax basis of $34,917,500. This inflated basis was entirely divorced from the fair market value of the option.

91.     On June 12, 1997, option 319466 became worthless based on the ratio between the U.S. dollar and the Irish pound.

92.     Henco claimed a tax "loss" of $34,917,500 on the option.

93.     All but $96,000 of this amount was offset by a corresponding "gain" to Squires.

94.     Squires, however, is not a U.S. company and did not intend to pay U.S. taxes on the gain.

95.     By transferring just the one option to Henco, Squires gave Henco the loss leg of the transaction without transferring in the corresponding gain.

96.     In effect, Squires paid Lehman Brothers a $96,000 fee to create an artificial tax loss.

97.     On its Form 1120 corporate income tax return for the period ending September 27, 1997, Henco reported the $34,917,500 "loss" to completely offset the capital gain from the sale of the Belca stock.

CONSEQUENCES OF THE TAX SHELTER

**Transferee Defendants received an inflated distribution**

98.     The following chart illustrates the difference between what Transferee Defendants actually received (not including the May 21, 1997 price adjustments) as a result of the intermediary transaction tax shelter and what they would have received in a traditional liquidation followed by a distribution:

|  | Liquidation followed by distribution | Tax shelter | Net savings from tax shelter |
|---|---|---|---|
| Fair market value of assets on sale date: | $37,269,001 | $37,269,001 | $0 |
| Corporate taxes (federal and state) | ($13,218,838) | $0 | $13,218,838 |
| Promotor fee | $0 | ($3,603,789) | ($3,603,789) |
| Shareholder tax on liquidation | ($4,810,033) | ($6,733,042) | ($1,923,010) |

| proceeds | | | |
|---|---|---|---|
| Ending value | $19,240,130 | $26,932,170 | **$7,692,039** |

99.    As noted in the chart, Transferee Defendants received a distribution that was artificially high because it did not account for $13,218,838 in corporate-level federal and state taxes on the appreciation of the Belca stock. Even after accounting for other adjustments, such as the fee that Skandia, Diversified Group, and other associates of Mr. Haber received for promoting the tax shelter, Transferee Defendants still realized unjustified savings in excess of $7 million.

### Henco became insolvent

100.    Another consequence is that Henco became insolvent no later than April 10, 1997, the day that the Skandia "sale" closed and Transferee Defendants received their distributions.

101.    By April 10, 1997, Henco had approximately $37.27 million in assets, as compared to $48,287,122 in liabilities consisting of: a federal capital gains tax liability of $11,236,012, a Georgia state tax liability of $1,982,826, a dividend liability of $34,493,284, and assorted fees due to tax shelter facilitators in the amount of $575,000.

102.    As a result, by April 10, 1997, Henco had liabilities that were in excess of the company's assets.

FRAUDULENT TRANSFERS UNDER GEORGIA LAW

103.   In 1997, the time of the relevant transactions, fraudulent transfers in Georgia were governed by Ga. Code Ann. §§ 18-2-21 and 18-2-22. Although these provisions have since been superseded by statute, they nonetheless control the United States' fraudulent transfer claims.

104.   Under § 18-2-21, a creditor "may attack as fraudulent a judgment, conveyance, or any other arrangement interfering with [its] rights, either at law or in equity."

105.   Under § 18-2-22(2), "[e]very conveyance of real or personal estate . . . with intention to delay or defraud creditors, where such intention is known to the taking party," is "null and void."

106.   Under § 18-2-22(3), "[e]very voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance," is "null and void." Voluntariness and lack of valuable consideration are not separate elements. Instead, the definition of "voluntary" is a lack of valuable consideration. *See Brown v. Citizens & S. Nat. Bank*, 253 Ga. 119, 122 (Ga. 1984) ("The cases show that the word voluntary is not used in its ordinary sense . . . . In fact, the word voluntary is used to mean without valuable consideration.") (internal quotation marks and footnote omitted).

107.    Under Georgia law, the substance of a transaction, rather than the particular form it takes, controls. *See, e.g.*, *Grantham Transfer Co. v. Hawes*, 225 Ga. 436, 442 (Ga. 1969) ("[T]he true meaning of [a] business transaction cannot be changed by a mere changing of name.").

### COUNT I: REDUCE TO JUDGMENT (AGAINST HENCO)

108.    The United States incorporates by reference the allegations in paragraphs 1–107.

109.    Based on the artificial "loss" stemming from the currency option, Henco reported negative taxable income of $1,547,566.60 for the tax year ending September 27, 1997.

110.    Henco subsequently filed Form 1139 on which it attempted to carry this loss back to the tax years ending October 1, 1994, September 30, 1995, and September 28, 1996.

111.    Henco requested and received refunds of $118,574, $138,406, and $171,219, respectively, for those three years.

112.    Henco and the IRS executed several agreements that extended the IRS's deadline for making assessments against Henco related to the tax year ending September 27, 1997 (and, by extension, to the three prior tax years to the extent that Henco carried back the loss it claimed on its return for tax year 1997).

26

113.    As a result of these extensions and applicable deficiency procedures, the IRS's deadline for making assessments was November 27, 2007. *See* 26 U.S.C. §§ 6501(a), 6503(a)(1).

114.    In a statutory notice of deficiency dated June 13, 2007, the IRS disallowed the tax shelter losses that were used to offset Henco's capital gains on the sale of the Belca stock. Henco defaulted by failing to contest the notice in a Tax Court petition.

115.    In accordance with applicable deficiency procedures, a delegate of the Secretary of the Treasury assessed taxes, as well as applicable penalties and interest, against Henco on the dates and in the amounts shown below:

| TAX YEAR | ASSESSMENT DATE | AMOUNT | TYPE OF ASSESSMENT | BALANCE DUE* |
|---|---|---|---|---|
| 1994 | 10/26/2007 | $118,574 | TAX ASSESSED BY EXAMINATION | $463,565.02 |
| | | $147,570.97 | INTEREST | |
| | | $23,714.80 | 26 U.S.C. § 6662(a) PENALTY | |
| | 4/14/2008 | $80 | COLLECTION FEES AND EXPENSES | |
| 1995 | 10/26/2007 | $138,406 | TAX ASSESSED BY EXAMINATION | $532,616.41 |
| | | $166,478.61 | INTEREST | |
| | | $27,681.20 | 26 U.S.C. § 6662(a) PENALTY | |
| 1996 | 10/26/2007 | $171,219 | TAX ASSESSED BY | $643,809.61 |

| | | | EXAMINATION | |
|---|---|---|---|---|
| | | $196,167.69 | INTEREST | |
| | | $34,243.80 | 26 U.S.C. § 6662(a) PENALTY | |
| 1997 | 10/26/2007 | $11,679,477 | TAX ASSESSED BY EXAMINATION | $54,716,727.73 |
| | | $13,509,074.16 | INTEREST | |
| | | $2,335,895.40 | 26 U.S.C. § 6662(a) PENALTY | |
| | 10/22/2012 | $2,919,869.24 | LATE PAYMENT PENALTY | |
| | 11/2/2015 | $16,806,134.38 | INTEREST | |
| **TOTAL** | | | | **$56,356,718.77** |

*As of May 3, 2018. Balance due reflects further interest and statutory additions as allowed by law less any credits, including for payments received.

116.   A delegate of the Secretary of the Treasury properly gave notice to Henco of the unpaid taxes described in paragraph 115. Despite notice and demand for payment, Henco failed and refused to pay the entire amount of the liabilities described in paragraph 115.

117.   Following Henco's failure to pay, the IRS issued a notice of intent to levy on March 13, 2008 and a notice of federal tax lien on March 25, 2008. Both notices informed Henco of its right to request a collection due process hearing.

118.   On April 11, 2008, Henco submitted a request for a collection due process hearing.

119. Following collection due process proceedings, the IRS sustained the levy and the lien filings in a notice of determination issued on August 6, 2008.

120. On September 5, 2008, Henco filed a Tax Court petition challenging both the collection activity and the underlying tax liabilities. *See Henco Holding Corp.*, No. 021886-08 at ECF No. 1.

121. On October 19, 2011, the Tax Court entered an order sustaining the liabilities assessed against Henco for tax years 1994–1997.

122. As a result of the Tax Court's decision, Henco is estopped from challenging any of the assessments at issue in this case.

123. Pursuant to 26 U.S.C. § 6502(a), the United States has 10 years following an assessment to bring an action to reduce a liability to judgment. However, that statute was tolled for over three years between the request for a collection due process hearing and the resolution of the case in Tax Court. *See* 26 U.S.C. §§ 6503(a)(1), 6330(e)(1). As a result, this action is timely.

124. Taking into account all payments, credits, and abatements, as of May 3, 2018, Henco owes $56,356,718.77, plus further interest and statutory additions thereon as allowed by law, in corporate income taxes, penalties, and interest for tax years 1994–1997.

## COUNT II: FRAUDULENT TRANSFER PURSUANT TO GA CODE ANN. §§ 18-2-21, 18-2-22 (AGAINST ALFREDO CACERES)

125.    The United States incorporates by reference the allegations in paragraphs 1–124.

126.    Alfredo Caceres, who is in privity with Henco, is estopped from challenging Henco's tax liabilities as a result of the Tax Court's October 19, 2011 decision.

127.    The United States, by virtue of Henco's tax liabilities, is a creditor of Henco.

128.    By April 10, 1997, the United States had already become Henco's creditor because the Belca stock had previously appreciated, resulting in built-in capital gains taxes. Henco's sale of the Belca stock resulted in Henco realizing those taxes.

129.    In substance, Alfredo Caceres received transfers from Henco on April 10 and May 21, 1997 in the amount of $17,223,605.

130.    The Rabobank loan and stock sale to Skandia were shams. In substance, Henco paid Alfredo Caceres with its own cash as opposed to the loan proceeds. Additionally, the stock sale was, in substance, a liquidating distribution from Henco to Alfredo Caceres.

131.   Henco made the transfers to Alfredo Caceres with the intention to delay or defraud its creditors, including the United States.

132.   Alfredo Caceres was aware that the purpose of the transfers was to delay or defraud Henco's creditors, including the United States.

133.   The transfers have interfered with the United States' rights by frustrating the collection of taxes.

134.   Henco was insolvent by April 10, 1997. *See supra* ¶¶ 100–02.

135.   Henco did not receive valuable consideration from Alfredo Caceres in exchange for the transfers.

136.   In the alternative, even if the "sale" to Skandia is not disregarded as a sham, Alfredo Caceres is still the recipient of fraudulent transfers under Georgia law. In this alternative scenario, Henco made a fraudulent transfer to Skandia, which in turn made a fraudulent transfer to Alfredo Caceres (making him a transferee of Skandia as opposed to Henco). To the extent that Skandia is considered to have purchased the Henco stock, it became liable by April 10, 1997 for Henco's capital gains liabilities. Upon information and belief, Skandia lacked the funds to pay these liabilities following the distributions to Transferee Defendants. Skandia was a willing participant in the fraud and was aware at all times that the purpose of the transaction was the evasion of capital gains taxes.

Any transfers from Skandia to Alfredo Caceres did not involve the receipt of valuable consideration; were made with the intent to delay or defraud creditors, including the United States; and interfered with the United States' rights.

137. Federal law governs the timeframe during which the United States may assess and collect federal taxes. *See* 26 U.S.C. § 6502(a). Because this action is timely under federal law, the United States is entitled to a money judgment against Alfredo Caceres. Georgia's statute of limitations for fraudulent transfers is not applicable against the United States.

### COUNT III: FRAUDULENT TRANSFER PURSUANT TO GA CODE ANN. §§ 18-2-21, 18-2-22 (AGAINST LUIS ALFREDO CACERES)

138. The United States incorporates by reference the allegations in paragraphs 1–137.

139. Luis Alfredo Caceres, who is in privity with Henco, is estopped from challenging Henco's tax liabilities as a result of the Tax Court's October 19, 2011 decision.

140. The United States, by virtue of Henco's tax liabilities, is a creditor of Henco.

141. By April 10, 1997, the United States had already become Henco's creditor because the Belca stock had previously appreciated, resulting in built-in

capital gains taxes. Henco's sale of the Belca stock resulted in Henco realizing those taxes.

142.   In substance, Luis Alfredo Caceres received transfers from Henco on April 10 and May 21, 1997 in the amount of $8,299,424.

143.   The Rabobank loan and stock sale to Skandia were shams. In substance, Henco paid Luis Alfredo Caceres with its own cash as opposed to the loan proceeds. Additionally, the stock sale was, in substance, a liquidating distribution from Henco to Luis Alfredo Caceres.

144.   Henco made the transfers to Luis Alfredo Caceres with the intention to delay or defraud its creditors, including the United States.

145.   Luis Alfredo Caceres was aware that the purpose of the transfers was to delay or defraud Henco's creditors, including the United States.

146.   The transfers have interfered with the United States' rights by frustrating the collection of taxes.

147.   Henco was insolvent by April 10, 1997. *See supra* ¶¶ 100–02.

148.   Henco did not receive valuable consideration from Luis Alfredo Caceres in exchange for the transfers.

149.   In the alternative, even if the "sale" to Skandia is not disregarded as a sham, Luis Alfredo Caceres is still the recipient of fraudulent transfers under

Georgia law. In this alternative scenario, Henco made a fraudulent transfer to Skandia, which in turn made a fraudulent transfer to Luis Alfredo Caceres (making him a transferee of Skandia as opposed to Henco). To the extent that Skandia is considered to have purchased the Henco stock, it became liable by April 10, 1997 for Henco's capital gains liabilities. Upon information and belief, Skandia lacked the funds to pay these liabilities following the distributions to Transferee Defendants. Skandia was a willing participant in the fraud and was aware at all times that the purpose of the transaction was the evasion of capital gains taxes. Any transfers from Skandia to Luis Alfredo Caceres did not involve the receipt of valuable consideration; were made with the intent to delay or defraud creditors, including the United States; and interfered with the United States' rights.

150.   Federal law governs the timeframe during which the United States may assess and collect federal taxes. *See* 26 U.S.C. § 6502(a). Because this action is timely under federal law, the United States is entitled to a money judgment against Luis Alfredo Caceres. Georgia's statute of limitations for fraudulent transfers is not applicable against the United States.

## COUNT IV: FRAUDULENT TRANSFER PURSUANT TO GA CODE ANN. §§ 18-2-21, 18-2-22 (AGAINST LUIS ANGEL CACERES)

151.   The United States incorporates by reference the allegations in paragraphs 1–150.

152.   Luis Angel Caceres, who is in privity with Henco, is estopped from challenging Henco's tax liabilities as a result of the Tax Court's October 19, 2011 decision.

153.   The United States, by virtue of Henco's tax liabilities, is a creditor of Henco.

154.   By April 10, 1997, the United States had already become Henco's creditor because the Belca stock had previously appreciated, resulting in built-in capital gains taxes. Henco's sale of the Belca stock resulted in Henco realizing those taxes.

155.   In substance, Luis Angel Caceres received transfers from Henco on April 10 and May 21, 1997 in the amount of $802,069.

156.   The Rabobank loan and stock sale to Skandia were shams. In substance, Henco paid Luis Angel Caceres with its own cash as opposed to the loan proceeds. Additionally, the stock sale was, in substance, a liquidating distribution from Henco to Luis Angel Caceres.

157.   Henco made the transfers to Luis Angel Caceres with the intention to delay or defraud its creditors, including the United States.

158.   Luis Angel Caceres was aware that the purpose of the transfers was to delay or defraud Henco's creditors, including the United States.

159.   The transfers have interfered with the United States' rights by frustrating the collection of taxes.

160.   Henco was insolvent by April 10, 1997. *See supra* ¶¶ 100–02.

161.   Henco did not receive valuable consideration from Luis Angel Caceres in exchange for the transfers.

162.   In the alternative, even if the "sale" to Skandia is not disregarded as a sham, Luis Angel Caceres is still the recipient of fraudulent transfers under Georgia law. In this alternative scenario, Henco made a fraudulent transfer to Skandia, which in turn made a fraudulent transfer to Luis Angel Caceres (making him a transferee of Skandia as opposed to Henco). To the extent that Skandia is considered to have purchased the Henco stock, it became liable by April 10, 1997 for Henco's capital gains liabilities. Upon information and belief, Skandia lacked the funds to pay these liabilities following the distributions to Transferee Defendants. Skandia was a willing participant in the fraud and was aware at all times that the purpose of the transaction was the evasion of capital gains taxes.

Any transfers from Skandia to Luis Angel Caceres did not involve the receipt of valuable consideration; were made with the intent to delay or defraud creditors, including the United States; and interfered with the United States' rights.

163. Federal law governs the timeframe during which the United States may assess and collect federal taxes. *See* 26 U.S.C. § 6502(a). Because this action is timely under federal law, the United States is entitled to a money judgment against Luis Angel Caceres. Georgia's statute of limitations for fraudulent transfers is not applicable against the United States.

## COUNT V: FRAUDULENT TRANSFER PURSUANT TO GA CODE ANN. §§ 18-2-21, 18-2-22 (AGAINST LUIS ANGEL CACERES CHARITABLE REMAINDER UNITRUST AND ITS BENEFICIARY, LUIS ANGEL CACERES)

164. The United States incorporates by reference the allegations in paragraphs 1–163.

165. The Luis Angel Caceres Charitable Remainder Unitrust, which is in privity with Henco, is estopped from challenging Henco's tax liabilities as a result of the Tax Court's October 19, 2011 decision.

166. The United States, by virtue of Henco's tax liabilities, is a creditor of Henco.

167. By April 10, 1997, the United States had already become Henco's creditor because the Belca stock had previously appreciated, resulting in built-in

capital gains taxes. Henco's sale of the Belca stock resulted in Henco realizing those taxes.

168.   In substance, the Luis Angel Caceres Charitable Remainder Unitrust received transfers from Henco on April 10 and May 21, 1997 in the amount of $7,446,676.

169.   The Rabobank loan and stock sale to Skandia were shams. In substance, Henco paid the Luis Angel Caceres Charitable Remainder Unitrust with its own cash as opposed to the loan proceeds. Additionally, the stock sale was, in substance, a liquidating distribution from Henco to the Luis Angel Caceres Charitable Remainder Unitrust.

170.   Henco made the transfers to the Luis Angel Caceres Charitable Remainder Unitrust with the intention to delay or defraud its creditors, including the United States.

171.   Luis Angel Caceres, the trust's grantor, trustee, and beneficiary, was aware that the purpose of the transfers was to delay or defraud Henco's creditors, including the United States.

172.   The transfers have interfered with the United States' rights by frustrating the collection of taxes.

173.   Henco was insolvent by April 10, 1997. *See supra* ¶¶ 100–102.

174.   Henco did not receive valuable consideration from the Luis Angel Caceres Charitable Remainder Unitrust in exchange for the transfers.

175.   In the alternative, even if the "sale" to Skandia is not disregarded as a sham, the Luis Angel Caceres Charitable Remainder Unitrust is still the recipient of fraudulent transfers under Georgia law. In this alternative scenario, Henco made a fraudulent transfer to Skandia, which in turn made a fraudulent transfer to the Luis Angel Caceres Charitable Remainder Unitrust (making it a transferee of Skandia as opposed to Henco). To the extent that Skandia is considered to have purchased the Henco stock, it became liable by April 10, 1997 for Henco's capital gains liabilities. Upon information and belief, Skandia lacked the funds to pay these liabilities following the distributions to Transferee Defendants. Skandia was a willing participant in the fraud and was aware at all times that the purpose of the transaction was the evasion of capital gains taxes. Any transfers from Skandia to the Luis Angel Caceres Charitable Remainder Unitrust did not involve the receipt of valuable consideration; were made with the intent to delay or defraud creditors, including the United States; and interfered with the United States' rights.

176.   Luis Angel Caceres, the beneficiary of the Luis Angel Caceres Charitable Remainder Unitrust, is jointly and severally liable for the fraudulent transfers to the Luis Angel Caceres Charitable Remainder Unitrust.

177.   Federal law governs the timeframe during which the United States may assess and collect federal taxes. *See* 26 U.S.C. § 6502(a). Because this action is timely under federal law, the United States is entitled to a money judgment against the Luis Angel Caceres Charitable Remainder Unitrust and its beneficiary, Luis Angel Caceres. Georgia's statute of limitations for fraudulent transfers is not applicable against the United States.

WHEREFORE, Plaintiff, the United States, respectfully prays for the following relief:

A.     That, with respect to Count I, the Court enter judgment in favor of the United States and against Henco in the amount of $56,356,718.77 as of May 3, 2018, plus interest statutory additions thereafter as provided by law, for unpaid corporate income taxes, penalties, and interest for the tax years ending October 1, 1994, September 30, 1995, September 28, 1996, and September 27, 1997;

B.     That, with respect to Count II, the Court enter judgment in favor of the United States and against Alfredo Caceres in the amount of $14,529,211.20, plus pre-judgment interest from the time of the transfers until the date of judgment and post-judgment interest accruing thereafter. Although Alfredo Caceres received transfers in excess of $14,529,211.20, that is the amount of taxes and penalties sustained by the Tax Court as a result of the tax shelter (*see supra* ¶ 12);

C.      That, with respect to Count III, the Court enter judgment in favor of the United States and against Luis Alfredo Caceres in the amount of $8,299,424, plus pre-judgment interest from the time of the transfers until the date of judgment and post-judgment interest accruing thereafter;

D.      That, with respect to Count IV, the Court enter judgment in favor of the United States and against Luis Angel Caceres in the amount of $802,069, plus pre-judgment interest from the time of the transfers until the date of judgment and post-judgment interest accruing thereafter;

E.      That, with respect to Count V, the Court enter judgment of joint and several liability in favor of the United States and against the Luis Angel Caceres Charitable Remainder Unitrust, as well as against its beneficiary, Luis Angel Caceres, in the amount of $7,446,676, plus pre-judgment interest from the time of the transfers until the date of judgment and post-judgment interest accruing thereafter; and

F.      That the United States have such other and further relief as the Court may deem just and proper.

Date: June 27, 2018

Respectfully submitted,

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

*/s/ Robert S. Silverblatt*
THOMAS K. VANASKIE
ROBERT S. SILVERBLATT
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 14198
Washington, D.C. 20044
202-305-7921 (v)
202-514-4963 (f)
Thomas.K.Vanaskie@usdoj.gov
Robert.S.Silverblatt@usdoj.gov

Byung J. Pak
United States Attorney

Neeli Ben-David
Assistant U.S. Attorney
Georgia Bar No. 049788
Office of the U.S. Attorney
75 Ted Turner Drive, SW
Suite 600
Atlanta, Georgia 30303
404-581-6303
Neeli.Ben-David@usdoj.gov

I certify that this document was prepared using Times New Roman, 14 point.

*/s/ Robert S. Silverblatt*