IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Luis Alfredo Cáceres and | ) | |
| Luis Angel Cáceres, Individually, | ) | |
| as executor of the Estate of Alfredo | ) | |
| Cáceres, and as beneficiary of the | ) | |
| Luis Angel Cáceres Charitable | ) | |
| Remainder Unitrust, | ) | |
| | ) | Case No. 1:23-CV-00844-SDG |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| Sidley Austin LLP, | ) | |
| | ) | |
| Defendant. | | |

## AMENDED COMPLAINT

Plaintiffs Luis Alfredo Cáceres and Luis Angel Cáceres, individually, as executor of the Estate of Alfredo Cáceres, and as beneficiary of the Luis Angel Cáceres Charitable Remainder Unitrust (collectively, "Cácereses") complain against Sidley Austin LLP ("Sidley") as follows:

## <u>NATURE OF THE CASE</u>

1.      This lawsuit results from Sidley's conflicted and negligent advice to its clients, the Cácereses, to engage in what Sidley represented to be a legitimate tax planning transaction involving Plaintiffs' sale of UPC Holding Corp. ("UPC") stock to a company that Sidley knew (but failed to disclose) was a promoter of

illegal tax shelter transactions.  Unbeknownst to Plaintiffs, Sidley's tax opinion letter that the transaction should be respected by the IRS was a sham.

2.     Sidley was hired to provide an independent tax opinion to the Cácereses confirming that the sale of UPC stock (the "UPC Transaction") legitimately minimized the tax consequences to the Cácereses related to the sale of their interest in Belca Food Services Inc.  The Cácereses relied on Sidley's tax advice and representations about the propriety of the stock sale transaction before deciding to move forward with the Belca sale transaction.

3.     Sidley duped Plaintiffs into transactions Sidley knew or should have known did not and could not legally result in the tax advantages promised by Sidley.  Among other things, Sidley knew or should have known that (a) if the IRS analyzed the UPC stock transaction, the basis shifting tax strategies used by the stock purchaser to avoid paying UPC's corporate taxes would be disallowed; (b) the legality of the stock sale strategy it sold to Plaintiffs would be tainted by the illegal tax shelter strategies intertwined into the transaction; and (c) the transaction would not achieve the tax treatment Sidley represented.  Instead of telling Plaintiffs the truth, Sidley told Plaintiffs that intermediary transaction strategies were perfectly legal, would result in substantial savings in taxes, and would survive scrutiny by the IRS.

4.      Plaintiffs bring this action seeking to hold Sidley responsible for the

$7 million in taxes, penalties, and interest the IRS imposed on Plaintiffs resulting

from the stock sale transaction about which Sidley advised Plaintiffs.

<u>THE PARTIES</u>

5.      At all times relevant to this action, plaintiff Luis Angel Cáceres

resided in Alpharetta, GA, which is within the jurisdiction of this Court, and

now resides in Guaynabo, PR.  He is the son of Alfredo Cáceres and the brother

of Plaintiff Luis Alfredo Cáceres.  He owned 2.45 percent of UPC in his own

name.  He also served as a vice president, secretary, treasurer, and director of

UPC.  Luis Angel Cáceres is named both individually, as the executor of the

Estate of Alfredo Cáceres, and as the beneficiary of the Luis Angel Cáceres

Charitable Remainder Unitrust.

6.      Plaintiff Luis Alfredo Cáceres resides in Guaynabo, PR.  He is the

son of Alfredo Cáceres and the brother of Plaintiff Luis Angel Cáceres.  When

UPC was incorporated and conducting business in Georgia, Luis Alfredo

Cáceres owned 24.5 percent of the company, and served as a vice president and

a director.  As such, he subjected himself to the Court's jurisdiction for litigation

arising out of the business that he and UPC conducted in Georgia.

7.      The Luis Angel Cáceres Charitable Remainder Unitrust is a trust

with mailing addresses in Pennington, NJ and Charlotte, NC.  Luis Angel

Cáceres, who is within this Court's jurisdiction, is the trust's grantor, trustee, and beneficiary.  He used the trust to hold a 22.05 percent interest in UPC (in addition to the 2.45 percent he held in his own name).  Upon information and belief, the trust expired in January 2017.

8.    Alfredo Cáceres, now deceased, was the father of Defendants Luis Alfredo Cáceres and Luis Angel Cáceres.  When UPC was incorporated and conducting business in Georgia, Alfredo Cáceres owned 51 percent of the company, and served as its president and as a director.

9.    Non-party UPC, now known as Henco Holding Corp., was formerly known as United Poultry Corp.  These entities are collectively referred to as "UPC" throughout this Complaint.  At all times relevant to this action, UPC was a Georgia corporation.  Plaintiffs sold the stock of UPC to Midco Henco, which is currently incorporated in Wyoming (where it was administratively dissolved in 2012 due to a tax delinquency).

10.    Defendant Sidley Austin LLP is a limited liability partnership organized under the laws of the State of Delaware that maintains its headquarters in Chicago, Illinois.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper in this Court pursuant to Article 6, Section 4, Paragraph 1 of the Constitution of the State of Georgia and O.C.G.A. § 9-10-91. Sidley purposefully directed an opinion letter and gave advice to Plaintiffs, some of whom were Georgia residents, in Georgia for the purpose of facilitating and advancing the Midco transaction.  Sidley also drafted the legal opinion provided to Plaintiffs with the express purpose of providing a basis for Georgia residents to make business and legal decisions associated with the UPC sale.  Sidley also accepted payment from Georgia residents in return.  *See Curtis Inv. Co. v. HVB, Sidley*, et al, 2007 U.S. Dist. LEXIS 94012, at 19-20 (N.D. Ga. 2007) (denying Sidley motion to dismiss on personal jurisdiction grounds for opinion letter issued to Georgia resident in tax shelter transaction).

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391.

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are residents and citizens of Puerto Rico and based on Sidley's Notice of Removal, Sidley, a limited liability partnership, does not have any partners who are citizens of either Georgia or Puerto Rico.

## FACTUAL ALLEGATIONS

14.     At all relevant times, Alfredo Cáceres and his two sons, Luis Alfredo
Cáceres and Luis Angel Cáceres, controlled 100% of the stock of UPC.  UPC's
sole asset was a 50.5% interest in Belca Foodservice Corp. ("Belca").  The
Cácereses were instrumental in building Belca into a food service business worth
hundreds of millions of dollars through acquisitions and franchising.

15.     KPMG LLP provided accounting and tax related advice and services
to the Cácereses and to Belca, including but not limited to advising about
potential acquisitions, preparing transaction documents, dealing with third
parties as Cácereses' agent, providing accounting services to the Cácereses, and
preparing Belca Food Service tax returns.  KPMG also served as Belca Food
Service's auditor.

16.     At some point, UPC began to consider selling its interest in Belca
and distributing the proceeds from the sale to the Cácereses in their capacity as
UPC shareholders.

17.     If UPC liquidated its Belca stock and directly distributed the
proceeds to the Cácereses, there would be a dual taxation on the transaction since
(1) UPC would have to pay a capital gains tax on the Belca stock because it
appreciated substantially in the time after UPC acquired it; and (2) the Cácereses
would each be taxed on their respective share of the distribution.

6

18.     On January 31, 1997, the Cácereses sold UPC's Belca interest to an unrelated third party. Subsequently, on April 10, 1997, the Cácereses sold their UPC stock to UP Acquisitions, a subsidiary of Skandia Capital Group (collectively, "Skandia"), and resigned their positions as officers, employees, and directors at UPC.

19.     Skandia, as the new owner and director of UPC and under the terms of the Stock Purchase Agreement, was obligated to pay taxes on the UPC transaction—but did not perform as promised and instead allowed the IRS to impose a judgment against UPC in excess of $56 million, inclusive of penalties and interest.

## SIDLEY OPINED THAT THE CÁCERESES WOULD FACE NO LIABILITY, EVEN IF UPC FAILED TO PAY ITS TAXES

20.     The Cácereses retained Sidley as special federal income tax counsel in connection with the UPC Transaction to provide an opinion regarding whether UPC shareholders—i.e., the Cácereses—could be held liable for any federal income tax liability imposed on UPC with respect to UPC's gain from the sale of its Belca shares if neither UPC nor the buyer of the shares paid the federal income tax arising from such sale.

21.     Sidley opined that the Cácereses could *not* be held liable for several reasons, including that the UPC Transaction would be treated as a sale of the Shares by the Cácereses and not as a transfer of corporate assets that would

subject them to liability, and that the IRS could not successfully apply the 'step transaction' doctrine to treat UPC as though it were distributing assets to its shareholders, the Cácereses.

22.     Sidley's opinion was wrong. The U.S. government sought to do precisely what Sidley assured the Cácereses it could not and would not do: hold the Cácereses liable for a transfer of corporate assets by applying the 'step transaction' doctrine to the UPC Transaction.

23.     Furthermore, Sidley did not disclose that it knew or should have known that Skandia, as the new owner and manager of UPC, did not intend to pay the taxes owed but would instead use a Son of BOSS tax shelter to avoid paying it.

### SIDLEY KNEW THE UPC TRANSACTION WOULD FAIL BECAUSE IT WAS PREMISED ON FRAUDULENT TAX SHELTERS

24.     Sidley concealed material facts about the UPC Transaction when it opined about its legality.  First and foremost, despite its many representations that the UPC Transaction would legally achieve the tax results promised, the UPC Transaction's tax strategy failed, and the Cácereses had to pay approximately $7 million in taxes, penalties, and interest to the IRS and potential additional liability to the State of Georgia and territory of Puerto Rico.

25.     Unbeknownst to the Cácereses, rather than using legitimate tax strategies to structure the UPC Transaction, Skandia loaded the UPC Transaction

with what Sidley knew were fraudulent tax shelters that would not withstand IRS scrutiny.  Instead of using a legitimate intermediary that could offset income with loss assets, Skandia used a shell corporation, UP Acquisitions, created only for this sale, and relied on the use of tax "products" including distressed debt and Son of BOSS transactions to attempt to shelter corporate income.

26.     Although the Midco transaction was represented as transferring any risk of the transaction from the Cácereses to the intermediary, Sidley concealed from Plaintiffs that the intermediary held no assets and was created solely for the purpose of the UPC Transaction.  Skandia's use of an insolvent intermediary not only left the Cácereses on the hook for any taxes owed, but also left them without any remedy if UP Acquisitions failed to pay the taxes.

27.     Sidley also concealed that the intermediary UP Acquisitions was not independent but was working in concert with the KPMG team, another fact that defeated much of the purpose of the Midco strategy.

28.     Sidley knew or should have known, but did not advise the Cácereses, that if the transaction were examined, the IRS would not respect the intermediary as legitimate and would conclude that the purported stock sale by Plaintiffs was an asset sale and liquidation, which would cause the income from the asset sale to be attributed to Plaintiffs as transferees, thereby making

Plaintiffs responsible for UPC's corporate taxes, as well as their own personal taxes.

## TAX LITIGATION

29.     The IRS sued the Cácereses for $56 million in unpaid tax liabilities of UPC in 2018.  But the Cácereses had every reason to believe their exposure with respect to the UPC corporation concluded when they sold the stock to UP Acquisition more than 20 years before.

30.     For that reason, the District Court initially granted the Cácereses' motion to dismiss the IRS's complaint against them as untimely in May 2019. Unfortunately, however, the Eleventh Circuit Court of Appeals recently reversed the dismissal and reinstated the IRS's claims against the Cácereses in January 2021.

31.     Prior to that time, the Cácereses had no reason to believe that Sidley's advice was incorrect or that the Cácereses would suffer any injury associated with the UPC Transaction.

32.     As of the original filing of this case, Plaintiffs' tax case with the IRS (the "Tax Litigation") was not resolved and as a result Plaintiffs had not yet suffered any pecuniary injury. On or about July 21, 2023, Plaintiffs paid the IRS approximately $7 million to resolve all liability associated with the UPC

Transaction. On July 31, 2023, the IRS and Plaintiffs stipulated to dismiss the Tax Litigation with prejudice.

33.     **Fraudulent Concealment/Deterrence under <u>O.C.G.A. § 9-3-96</u>**: Even after the IRS sued Plaintiffs with respect to the UPC Transaction, Plaintiffs had no reason to believe that Sidley's advice was knowingly false, negligent, or otherwise incorrect. As Plaintiffs' retained tax attorney, Plaintiffs put a high degree of trust in Sidley and had a confidential and fiduciary relationship with Sidley such that they reasonably expected that if Sidley learned that its prior advice was incorrect that it would communicate as much. Sidley never withdrew its written opinion to Plaintiffs that the transaction should be respected nor suggested that Sidley knew or later learned facts suggesting that its prior advice was incorrect.

34.     By virtue of Sidley continuing to stand by its opinion and its failure to disclose material facts it knew about the transaction, Plaintiffs were fraudulently delayed and deterred from bringing their claims against Sidley at an earlier date. Sidley knew and intentionally withheld from Plaintiffs that its prior advice was false and that its failure to correct that prior advice would be relied upon by the Plaintiffs in deciding whether to pursue the instant claims against Sidley at an earlier time.

35.    Even after the Tax Litigation was revived on appeal, Plaintiffs had no reason to believe that Sidley's prior advice was incorrect as Sidley did not produce virtually any documents in the Tax Litigation and still claims to this day that it has no written files or internal communications concerning the detailed tax opinion provided to Plaintiffs. On information and belief, Sidley did communicate with certain other tax shelter clients after closing on the transction about the IRS's later investigation into those transactions. At no time during the pendency of the Tax Litigation Appeal did Plaintiffs believe that Sidley was not continuing to stand by its advice that the transaction should be respected. As a result, Plaintiffs exercised reasonable diligence in deciding not to sue Sidley at an earlier time.

## COUNT I: BREACH OF CONTRACT

36.    Plaintiffs incorporate each and every allegation made in paragraphs 1-35 above, as if fully set forth herein.

37.    Plaintiffs entered into a contract with Sidley whereby Sidley agreed to satisfactorily provide a tax legal opinion and tax consulting services for Plaintiffs in exchange for the Plaintiffs' agreement to pay Sidley fees for those services.

38.    Plaintiffs performed fully each and every contractual obligation to Sidley.

39.    Sidley breached its obligations to Plaintiffs by, among other things:

    (a)    failing to inform Plaintiffs of the significant risks associated with the Midco stock sale transaction;

    (b)    failing to inform Plaintiffs that Sidley knew of significant risks relating to the proposed stock sale transaction to Skandia;

    (c)    failing to inform Plaintiffs that the Midco strategy was not a legitimate tax strategy to avoid transferee liability for UPC;

    (d)    failing to identify legitimate alternative tax planning devices that would legally reduce Plaintiffs' taxes; and

    (e)    failing to provide professional legal services to Plaintiffs in a good faith manner.

40.    Sidley breached its obligations under its contract with Plaintiffs by these and other acts and omissions, including those acts and omissions previously alleged.

41.    As a direct and proximate result of Sidley's breaches of this contract, Plaintiffs suffered substantial direct, economic, and consequential damages in an amount to be proven at trial.

42.    Because Sidley knew that the tax strategies it sold to Plaintiffs had significant legal problems and would not likely pass muster with the IRS but concealed such information from Plaintiffs, Sidley acted in bad faith.

## COUNT II: NEGLIGENT MISREPRESENTATIONS

43.     Plaintiffs incorporate each and every allegation made in paragraphs 1-42 above, as if fully set forth herein.

44.     Sidley owed a duty of care to Plaintiffs which required the transmittal of accurate and not misleading information to Plaintiffs.

45.     To the extent that any of its misrepresentations to Plaintiffs were not intentional, Sidley made numerous grossly negligent misrepresentations in promoting, marketing, advising Plaintiffs in connection with the Midco stock sale transaction.

46.     Sidley's grossly negligent misrepresentations to Plaintiffs include, but are not limited to:

    (a)     Midco was permissible, legal, and would be allowed by federal and state authorities;

    (b)     Sidley's opinion letter evidenced the legality and permissibility of a Midco transaction that would insulate Plaintiffs from penalties;

    (c)     the Sidley opinion letter was individually tailored for Plaintiffs;

    (d)     Sidley had thoroughly researched Midco tax transactions and determined it "should" survive IRS scrutiny;

14

(e)     Plaintiffs' Midco stock sale transaction could be relied upon to avoid transferee liability and to minimize the tax impact of Plaintiffs' divestment of UPC;

47.     To the extent that Sidley's misrepresentations were not made intentionally, Sidley's misrepresentations were made with reckless and grossly negligent disregard for the truth.

48.     Sidley knew, or a review of available information in Sidley's possession would have revealed, that the representations by Sidley were false.

49.     Sidley intended that Plaintiffs would rely or act upon Sidley's grossly negligent misrepresentations.

50.     Sidley had knowledge that Plaintiffs would rely upon the negligent misrepresentations and that such reliance would likely cause Plaintiffs economic injury.

51.     Plaintiffs justifiably relied upon Sidley's misrepresentations of material fact because of Plaintiffs' past relationship with Skandia and KPMG, Sidley's experience and expertise, and Sidley's representations that its advice was based on its expertise in tax and accounting and that Sidley's partners, including in particular R.J. Ruble, were tax and accounting experts.

52.     As a direct and proximate result of Sidley's grossly negligent misrepresentations, Plaintiffs have suffered direct, consequential, and economic damages in an amount to be proven at trial.

53.     Sidley's wrongful actions constitute willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences, rendering Sidley liable to Plaintiffs for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

54.     Because Sidley acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### COUNT III: SIDLEY'S PROFESSIONAL NEGLIGENCE

55.     Plaintiffs incorporate each and every allegation made in paragraphs 1-54 above, as if fully set forth herein.

56.     Sidley was specifically engaged by Plaintiffs to provide an independent tax legal opinion regarding whether the IRS would respect the UPC Transaction and that Plaintiffs would not be subject to personal (or transferee) liability associated with UPC's tax liabilities after sale of stock.

57.     As a result of this relationship, Sidley owed Plaintiffs a duty to use the degree of care and skill ordinarily employed by and required of tax lawyers under similar conditions and like surrounding circumstances when providing such services (the "standard of care").

16

58.     Plaintiffs were entitled to expect that Sidley's services would be performed consistent with the standard of care.

59.     Despite its relationship with Plaintiffs, Sidley's acts and omissions fell significantly below the standard of care.

60.     Sidley breached the standard of care by, among other things:

    (a)     failing to provide the tax legal services for which Plaintiffs contracted;

    (b)     failing to design and implement Plaintiffs' divestment of interests in UPC through legitimate strategies allowed by the IRS;

    (c)     inducing Plaintiffs to structure their divestment of UPC using a fraudulent Midco tax shelter that Sidley knew or should have known would not pass muster with the IRS;

    (d)     failing to adequately disclose the risks of using that tax shelter which risks were known to Sidley;

    (e)     inducing Plaintiffs to participate in that tax shelter when Sidley knew or should have known that the purported "strategy" it proposed would not achieve the results promised and that Plaintiffs could be hit with massive transferee tax liability;

    (f)     inducing Plaintiffs to structure their divestment of UPC knowing Skandia, the party purchasing UPC's stock, would likely use

fraudulent tax shelters that Sidley knew or should have known would not pass muster with the IRS;

(g)    preparing an opinion letter that falsely stated Plaintiffs would not be responsible for UPC Enterprises' tax liability as transferees;

(h)    preparing an opinion letter that falsely claimed that the strategy "should" survive IRS scrutiny if reviewed by the IRS;

(i)    inducing Plaintiffs to rely on its purportedly independent opinion letter, when Sidley knew or should have known the letter did not represent the independent opinion of the law firm;

(j)    representing to Plaintiffs that Sidley had thoroughly reviewed and considered all aspects of the purported stock sale transaction while concealing from Plaintiffs the fact that Sidley's own partners and staff had expressed concerns about the legitimacy of these fraudulent tax shelters;

(k)    failing to advise Plaintiffs that the Sidley opinion letter did not represent independent advice with respect to the merit of the Midco tax shelter;

(l)    failing to identify and advise Plaintiffs to use tax planning that would legally and legitimately minimize Plaintiffs' taxes.

61.     By committing these and other acts, Sidley's acts and omissions fell substantially below the standard of care.

62.     Sidley intentionally, recklessly, and/or with gross negligence breached the duty of care that it owed to Plaintiffs by these and other acts and omissions, including those acts and omissions previously alleged.

63.     As a direct and proximate result of Sidley's professional negligence, Plaintiffs have suffered direct, consequential, and economic damages in an amount to be proven at trial.

## COUNT IV: COMMON LAW INDEMNITY

64.     Plaintiffs incorporate each and every allegation made in paragraphs 1-63 above, as if fully set forth herein.

65.     Sidley represented to Plaintiffs that a Midco transaction was a reliable way to avoid transferee liability and to minimize the tax impact of Plaintiffs' divestment of UPC, and that such transactions were permissible, legal, and "should" survive IRS scrutiny.

66.     Sidley knew, or a review of available information in Sidley's possession, would have revealed, that the representations by Sidley were false. Sidley's actions constitute tortious negligent misrepresentations and professional negligence.

67.     In the Tax Litigation, Plaintiffs are alleged to have engaged in fraudulent transfers pursuant to Ga. Code Ann. §§ 12-2-21 and 18-2-22 that were in effect in 1997 (the time of the allegedly fraudulent transactions), which require the IRS to establish that the transaction was made with the intent to defraud UPC's creditors, and that Plaintiffs were aware of that intent.

68.     Specifically, Plaintiffs are alleged to have known that the purpose of the UPC Transaction was the artificial reduction of tax liability because they hired R.J. Ruble, a Sidley partner, to write a tax opinion letter on the legality of the UPC Transaction. (Compl. ¶¶ 37-38, ECF No. 1, *United States v. Henco Holding Corp.*, No. 1:18-cv-03093 (N.D. Ga.).)

69.     Only R.J. Ruble had actual knowledge of the fraudulent nature of the UPC Transaction; the Complaint in the Tax Litigation alleges that "Mr. Ruble acknowledged his awareness that Skandia was 'using the tax position to make a profit,'" that "Mr. Ruble was informed that Skandia intended to use the 'pot of cash' from the Belca sale to 'repay their lender,'" and that "Mr. Ruble, on behalf of Transferee Defendants, wrote in a letter to Mr. Cornelison that it would be problematic for Skandia to use UPC's cash to 'directly pay the selling shareholders.'" *Id.* ¶¶ 42, 46, 48.

70.     Plaintiffs' liability in the Tax Litigation turned on Plaintiffs' alleged knowledge of Skandia's intent to defraud the IRS—knowledge that only Sidley

had (but did not share with Plaintiffs), and which the IRS imputed to Plaintiffs through Sidley as Plaintiffs' provider of allegedly independent legal tax advice.

71.     As a direct result of Sidley's tortious conduct, liability including direct, consequential, and economic damages were imputed to Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for judgment as follows:

A.     That the Court award Plaintiffs damages on all counts in an amount to be proven at trial;

B.     That Plaintiffs recover prejudgment interest;

C.     That Plaintiffs recover punitive damages pursuant to O.C.G.A. § 51-12-5.1;

D.     That Plaintiffs recover their costs and reasonable attorneys' fees pursuant to O.C.G.A. § 13-6-11; and

E.     That this Court award Plaintiffs such other and further relief as may be just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

Respectfully submitted this 30th day of November, 2023.

/s/Michael E. Brooks

BROOKS & WARNER LLC          Michael E. Brooks
1768 Century Boulevard NE, Suite B    Georgia Bar No. 084710
Atlanta, Georgia  30345             mbrooks@brooksandwarner.com
(404) 681-0720 – Brooks Direct

(404) 681-0730 – Warner Direct
(404) 681-0780 – Fax

Jill Warner
Georgia Bar No. 378472
jwarner@brooksandwarner.com

SPERLING & SLATER, P.C.
55 West Monroe St., Suite 3200
Chicago, Illinois 60603
T - (312) 641-4882
F - (312) 641-6492

Scott F. Hessell
Admitted Pro Hac Vice
shessell@sperling-law.com
Clayton Faits
Admitted Pro Hac Vice
cfaits@sperling-law.com

Attorneys for Plaintiffs