## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Luis Alfredo Cáceres and Luis Angel Cáceres, Individually, as executor of the Estate of Alfredo Cáceres, and as trustee of the Luis Angel Cáceres Charitable Remainder Unitrust,<br><br>    Plaintiffs,<br><br>  vs.<br><br>Sidley Austin LLP,<br><br>    Defendant. | Case No. 1:23-CV-00844-SDG |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................ 4

    A.    The 1997 Tax Opinion Letter ................................................ 4

    B.    The 2018 IRS Action Against the Cácereses ...................................... 6

    C.    This Action ............................................................ 9

LEGAL STANDARD ........................................................................ 9

ARGUMENT ................................................................................ 10

    A.    The Cácereses' Claims for Breach of Contract, Professional Negligence, and Negligent Misrepresentation Are Untimely ............ 10

        1.    The Statute of Limitations Expired in 2001 ............................ 10

        2.    The Settlement Has No Bearing on the Accrual Dates for the Legal Malpractice Claims ................................ 13

        3.    The FAC Does Not Allege Any Facts That Would Toll the Statute of Limitations ............................................ 14

        4.    Even With Tolling, the Legal Malpractice Claims Are Untimely ................................................................ 19

    B.    The Cácereses' Common-Law Indemnification Claim Fails to State a Claim for Relief ................................................ 22

    C.    The Court Should Dismiss The FAC With Prejudice ........................ 25

CONCLUSION ............................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Ahmed v. Warehouse Distrib. Co.*,
  2018 WL 1831174 (E.D. Ark. Apr. 17, 2018)................................................ 14

*Am. Proteins, Inc. v. River Valley Ingredients, LLC*,
  60 F. Supp. 3d 1364 (N.D. Ga. 2022) .......................................................... 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... 9

*Carvalho-Knighton v. Univ. of S. Fla. Bd. of Trs.*,
  2016 WL 7666137 (M.D. Fla. Mar. 18, 2016) ............................................ 19

*Coffee v. Gen. Motors Acceptance Corp.*,
  30 F. Supp. 2d 1376 (S.D. Ga. 1998) .......................................................... 13

*Dist. 65 Ret. Tr. v. Prudential Sec., Inc.*,
  925 F. Supp. 1551 (N.D. Ga. 1996).............................................................. 10

*Douglas v. HERC Rentals, Inc.*,
  2021 WL 3852063 (N.D. Ga. Aug. 27, 2021) ............................................. 24

*Espinoza v. Herc Rentals, Inc.*,
  2020 WL 13532585 (N.D. Ga. Jan 14, 2020)............................................... 23

*Garcia v. Chiquita Brands Int'l, Inc.*,
  48 F.4th 1202 (11th Cir. 2022) .................................................................... 25

*Gonsalvez v. Celebrity Cruises Inc.*,
  750 F.3d 1195 (11th Cir. 2013) ................................................................... 10

*Gowen Oil Co. v. Foley & Lardner, LLP*,
  2013 WL 909903 (S.D. Ga. Mar. 6, 2013) .................................................. 16

*Horne v. Potter*,
  392 F. App'x 800 (11th Cir. 2010) ............................................................ 6, 22

*In re Donovan*,
   411 B.R. 756 (S.D. Fla. 2009) ............................................................ 1

*James Settlement Services Int'l, LLC v. Conestoga Trust Services,*
   *LLC*,
   2020 WL 10147065 (N.D. Ga. Sept. 30, 2020).................................. 10

*Klopfenstein v. Deutsche Bank Sec., Inc.*,
   592 F. App'x 812 (11th Cir. 2014) ............................................. *passim*

*Lechter v. Aprio, LLP*,
   565 F. Supp. 3d 1279 (N.D. Ga. 2021).............................................. 16

*Melson v. Comm'r, Ala. Dep't of Corr.*,
   713 F.3d 1086 (11th Cir. 2013) ......................................................... 18

*Mintu v. Ocwen Loan Servicing, LLC*,
   2012 WL 12844929 (N.D. Ga. Nov. 13, 2012) ................................. 10

*Morris v. Weyerhauser Co.*,
   2006 WL 8435968 (S.D. Ga. 2006)................................................... 15

*N.H. Ins. Co. v. Wiregrass Constr. Co.*,
   2010 WL 2038298 (S.D. Ala. May 20, 2010) ................................... 13

*Profit v. Americold Logistics, LLC*,
   248 F.R.D. 293 (N.D. Ga. 2008) ....................................................... 25

*Tellabs, Inc. v. Major Issues & Rights Ltd.*,
   551 U.S. 308 (2007) ........................................................................... 6

*United States v. Henco Holding Corp.*,
   2019 WL 12434673 (N.D. Ga. May 14, 2019)................................... 8

*United States v. Henco Holding Corp.*,
   985 F.3d 1290 (11th Cir. 2021) .......................................................... 8

*Yancy v. Cothran*,
   32 F. 687 (N.D. Ga. 1887) ................................................................ 22

**STATE CASES**

*Armstrong v. Cuffie*,
    311 Ga. 791 (2021) ........................................................................... 12

*Auto-Owners Ins. v. Anderson*,
    252 Ga. App. 361 (2001) ..................................................................... 3

*Bryant v. Allstate Ins.*,
    254 Ga. 328 (1985) ........................................................................... 12

*Coe v. Proskauer Rose, LLP*,
    314 Ga. 519 (2022) ............................................................ 11, 12, 15

*CPD Plastering, Inc. v. Miller*,
    284 Ga. App. 172 (2007) ................................................................. 14

*Crawford v. Johnson*,
    227 Ga. App. 548 (1997) ................................................................. 25

*Dist. Owners Ass'n, Inc. v. AMEC Env't Infrastructure, Inc.*,
    322 Ga. App. 713 (2013) ................................................................. 23

*Dunn v. Towle*,
    170 Ga. App. 487 (1984) ................................................................. 19

*Evans v. Lipscomb*,
    266 Ga. 767 (1996) ........................................................................... 18

*Fowler v. Latham*,
    201 Ga. 68 (1946) ............................................................................... 1

*Hines v. Holland*,
    334 Ga. App. 292 (2015) ................................................................. 23

*Hoffman v. Ins. Co. of N. Am.*,
    241 Ga. 328 (1978) ........................................................................... 11

*Hunter, Maclean, Exley & Dunn, P.C. v. Frame*,
    269 Ga. 844 (1998) ........................................................................... 16

*Hyman v. Jordan*,
    201 Ga. App. 852 (1991) ................................................................. 16

*Jankowski v. Taylor, Bishop & Lee,*
  246 Ga. 804 (1980) .................................................................. 14

*Kilby v. Shepherd,*
  177 Ga. App. 462 (1986) .......................................................... 12

*MacDowell v. Gallant,*
  344 Ga. App. 856 (2018) .......................................................... 21

*Shipman v. Horizon Corp.,*
  245 Ga. 808 (1980) .................................................................. 15

*Shores v. Troglin,*
  260 Ga. App. 696 (2003) .......................................................... 15

*Wilson v. Phillips,*
  230 Ga. App. 290 (1998) ....................................................... 2, 16

**FEDERAL STATUTES**

26 U.S.C. § 6502 ........................................................................... 8

**STATUTES - OTHER**

O.C.G.A.. § 9-3-24 ...................................................................... 19

O.C.G.A. § 9-3-25 ..................................................................... 2, 12

O.C.G.A. § 9-3-26 ....................................................................... 12

O.C.G.A. § 9-3-31 ......................................................................... 2

O.C.G.A. § 9-3-96 .......................................................... 2, 15, 19, 20

**FEDERAL RULES**

Fed. R. Civ. P 12(b)(6) .................................................................. 6

## INTRODUCTION

On the eve of a hearing on Defendant Sidley Austin LLP's[1] ("Sidley") Motion to Dismiss, Plaintiffs Luis Alfredo Cáceres and Luis Angel Cáceres[2] (collectively, with their father, "the Cácereses") amended their complaint in an attempt to avoid dismissal. Their effort was futile. The amended allegations do not cure the fundamental defects of the complaint identified in Sidley's prior Motion to Dismiss. To the contrary, they confirm that the Cácereses cannot amend their complaint to state a claim for relief, and that the Court should dismiss the First Amended Complaint ("FAC") with prejudice.

The fundamental problem with the FAC is the same as with the original complaint: The Cácereses' claims concern a single event that took place more than twenty-five years ago. This is an immutable fact no amendment can change. The FAC alleges that R.J. Ruble, then a partner at Brown & Wood, negligently advised

---

[1] On May 1, 2001, Brown & Wood merged with Sidley & Austin. The merged firm was named Sidley Austin Brown & Wood LLP. On January 1, 2006, the name of the merged firm was changed to Sidley Austin LLP. The First Amended Complaint uses Sidley as shorthand for all of these entities. Sidley refers to both Brown & Wood and Sidley throughout this motion as appropriate.

[2] The Cácereses bring their claims both as individuals and in Luis Angel Cáceres's capacity as executor of his father's estate and trustee of the now-expired Luis Angel Cáceres Charitable Remainder Unitrust. FAC ¶ 7. Luis Angel Cáceres's status as executor and trustee does not affect any of the analysis in this motion. *See, e.g.*, *In re Donovan*, 411 B.R. 756, 762 (S.D. Fla. 2009) (notice to trustee imputed to trust); *Fowler v. Latham*, 201 Ga. 68, 74 (1946) (notice and knowledge of executor imputed to estate through principal-agent relationship).

1

the Cácereses in an April 10, 1997 tax opinion letter that they could legitimately minimize their federal taxes by engaging in a tax shelter transaction. The FAC alleges that the Cácereses paid for the opinion letter, that the transaction set forth in the opinion letter was illegal, and that the Cácereses incurred $7 million in federal tax liability based on this purportedly negligent advice. This single letter written more than two decades ago forms the basis for the Cácereses' breach of contract, professional negligence, and negligent misrepresentation claims (collectively, the "legal malpractice claims"), each of which is subject to a four-year limitations period that began running in 1997 and expired in 2001. O.C.G.A. §§ 9-3-25, 9-3-26, 9-3-31. Established case law makes clear that all of these claims were ripe for adjudication in 1997 and all are now untimely.

Tolling does not apply. The Cácereses' amendments confirm as much. By statute, Georgia authorizes tolling only when the defendant is "guilty of a fraud" that has "debarred or deterred" the plaintiff from bringing an action, in which case the limitations period is tolled until the fraud is discovered or by reasonable diligence should have been discovered. O.C.G.A. § 9-3-96. "[T]o toll the statute of limitation under O.C.G.A. § 9-3-96, the concealment of a cause of action must be *by positive affirmative act*, not by mere silence." *Wilson v. Phillips*, 230 Ga. App. 290, 290–91 (1998) (emphasis added). Yet, silence is all the FAC alleges in its effort to invoke tolling. Further dooming the Cácereses' request for tolling is

the fact that the FAC, like its predecessor, fails to allege that the Cácereses acted diligently to uncover their claims at any point over the last two decades. The Cácereses failed to allege such diligence even after the Internal Revenue Service filed a complaint in 2018 against them detailing that Ruble, the tax lawyer they had relied on, had been convicted of fraud and that their tax-shelter transaction had been rejected by the IRS.

These omissions are fatal to any attempt by the Cácereses to salvage their claims. Even if they were not, the end result would still be the same because the claims are untimely even with tolling. As the FAC itself alleges, the IRS action "sought to do precisely what Sidley assured the Cácereses [the IRS] could not and *would not do*." FAC ¶ 22 (emphasis added). The Cácereses therefore had actual notice of their claims against Sidley at the latest by 2018—five years before this action was filed. Because it is apparent from the face of the FAC that the claims are untimely—with or without tolling—and because the FAC confirms that the Cácereses cannot amend the FAC to overcome the statute of limitations issue, the Court should dismiss the legal malpractice claims with prejudice.

The Cácereses' fourth claim for common-law indemnification should meet the same fate. Common-law indemnification is a vicarious liability claim that applies only when the plaintiff was "compelled to pay damages because of liability imputed to him as the result of a tort committed by another." *Auto-Owners Ins. v.*

*Anderson*, 252 Ga. App. 361, 363 (2001). The FAC does not allege that the IRS

sought to hold the Cácereses vicariously liable for Sidley's conduct, nor could it

given the allegations in the IRS action. Rather, the FAC alleges that Sidley

breached its professional and contractual obligations to the Cácereses and that by

heeding the advice in the tax opinion letter, the Cácereses now owe the IRS $7

million as part of a negotiated settlement to the IRS action. As a matter of law,

those allegations do not state a claim for relief for common-law indemnification.

The Cácereses had nearly nine months to amend their original complaint to

account for these fundamental failings. Their new allegations do not address the

original complaint's failings in any meaningful way—demonstrating that any

further attempts at amendment would be futile. Sidley respectfully requests that

the Court dismiss the FAC with prejudice.

### FACTUAL AND PROCEDURAL BACKGROUND[3]

**A.      The 1997 Tax Opinion Letter**

The Cácereses were highly successful businessmen who served as officers of

United Poultry Corp. ("UPC") and controlled 100% of UPC's stock. FAC ¶¶ 5–8,

14. At all relevant times, UPC's sole asset was a 50.5% interest in Belca

Foodservice Corporation ("Belca"), which had "appreciated substantially." *Id.*

---

[3] For purposes of this motion only, Sidley accepts as true the well-pleaded
allegations of the FAC.

¶¶ 14, 17.  "The Cácereses were instrumental in building Belca into a food service business worth hundreds of millions of dollars through acquisitions and franchising."  *Id.* ¶ 14.  On January 31, 1997, the Cácereses sold UPC's Belca interest (the "Belca sale").  *Id.* ¶ 18.  According to the FAC, "[i]f UPC liquidated its Belca stock and directly distributed the proceeds to the Cácereses, there would be a dual taxation on the transaction."  *Id.* ¶ 17.  Specifically, the FAC alleges that there would be both "a capital gains tax" as well as an individual tax on the Cácereses' "respective share[s] of the distribution."  *Id.*

Seeking to avoid this "dual taxation," the Cácereses planned to sell all of their UPC stock to a third-party entity and resign their positions at UPC.  *Id.* ¶¶ 2, 3, 17, 18.  Before executing this plan, however, the Cácereses allege that they "retained" Brown & Wood as "special federal income tax counsel" to provide an opinion "confirming" that if they sold all of their UPC stock, they could "legitimately minimize[] the tax consequences to [themselves]" arising out of the Belca sale.  *Id.* ¶¶ 2, 20.  The Cácereses allege that they asked Ruble to provide an opinion as to whether they would be individually liable for UPC's capital gains tax if neither UPC nor the third-party to whom they planned to sell their UPC shares paid the required tax.  *Id.* ¶ 20.  The Cácereses allege that they also retained KPMG LLP to "prepar[e] transaction documents," "deal[] with third parties as" their

agent, and otherwise provide "tax related advice" in connection with the Belca sale. *Id.* ¶ 15.

The Cácereses allege that Ruble prepared a single tax opinion letter that opined the Cácereses "could *not* be held liable" for UPC's unpaid capital gains taxes if they sold their UPC stock. *Id.* ¶¶ 11, 21, 37, 56. The Cácereses paid fees to Brown & Wood "in exchange for" the opinion letter. *Id.* ¶¶ 11, 37, 38. Purportedly relying on that opinion, the Cácereses sold their UPC stock to third-party UP Acquisitions on April 10, 1997, the same day they received the letter. *Id.* ¶¶ 18, 51. Neither UPC nor UP Acquisitions paid any capital gains tax on the proceeds from the Belca sale. *Id.* ¶¶ 26, 28, 29.

## B.     The 2018 IRS Action Against the Cácereses

On June 27, 2018, the IRS filed a forty-two page complaint (the "IRS complaint") in this court against UPC (which had changed its name to Henco Holding Corp.), the Cácereses, and a trust run by Luis Angel Cáceres. *See* Request for Judicial Notice, Ex. A (IRS Complaint).[4]  The IRS complaint sought more than

---

[4] The Supreme Court has held that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, *in particular*, documents incorporated into the complaint by reference." *Tellabs, Inc. v. Major Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007); *see also Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (court "may take judicial notice" of pleadings in another case "without converting a motion to dismiss into a motion for summary judgment"). That includes the IRS complaint, which the FAC liberally references. FAC ¶¶ 4, 22, 29–32, 35.

$56 million in unpaid tax liabilities from the Cácereses and detailed the unlawful nature of the tax shelter the Cácereses used to evade taxes. *Id.* ¶¶ 12, 15–99.

The IRS complaint alleged that as early as 1996, the Cácereses "were aware of and sought to avoid . . . dual taxation" of the Belca proceeds, which totaled approximately $37 million and were subject to an approximately $13 million capital gains tax. *Id.* ¶ 24. The IRS complaint alleged that the Cácereses accomplished their goal by "engag[ing] in a sham sale of [UPC's] stock to an intermediary," UP Acquisitions, that was "in substance a liquidation of [UPC] and distribution of its assets" to the Cácereses. *Id.* ¶¶ 25–26. The IRS complaint also went into detail about Ruble's role in preparing a fraudulent tax opinion letter for the Cácereses, and it noted that Ruble had been convicted in 2008 for "writing tax opinion letters that blessed bogus tax shelters." *Id.* ¶¶ 38–41. According to the IRS complaint, UP Acquisitions took out a loan to pay the Cácereses for their UPC stock and, after acquiring UPC, immediately repaid that loan with the proceeds from the Belca sale. *Id.* ¶¶ 36, 46–47. In essence, the IRS alleged that UP Acquisitions paid the Cácereses with the proceeds of the Belca sale.

Because this was not, on paper at least, a liquidation followed by a direct transfer of proceeds to shareholders, and because neither UPC nor UP Acquisitions paid capital gains tax, *id.* ¶¶ 83–97, the Cácereses received approximately $33.5

million out of $37 million in proceeds[5] from the Belca sale and avoided paying approximately $13 million in capital gains taxes. *Id.* ¶¶ 98–99.

In light of UPC's insolvent status, the IRS complaint sought to hold the Cácereses personally liable "for the fraudulent transfer of [UPC's] assets" and UPC's unpaid tax liabilities. *Id.* ¶¶ 13, 125–177.  The Cácereses successfully moved to dismiss the IRS complaint on timeliness grounds under a specific federal statute. *United States v. Henco Holding Corp.*, 2019 WL 12434673, at *7 (N.D. Ga. May 14, 2019).  On January 19, 2021, the Eleventh Circuit reversed and remanded.[6] *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1292 (11th Cir. 2021); RJN, Ex. B (IRS Docket).  On July 21, 2023, the Cácereses "paid the IRS approximately $7 million" to settle the IRS action—a fraction of the $56 million originally sought and substantially less than the $13 million in capital gains taxes the Cácereses avoided paying in 1997.  FAC ¶¶ 29, 32.

---

[5] UP Acquisitions retained the remaining $3.5 million as a fee.  *Id.* ¶¶ 36, 98.
[6] The statute of limitations issue in the IRS action concerned whether the action was timely under 26 U.S.C. § 6502, which provides for a 10-year period for the government to recover certain tax liabilities.  *Henco Holding*, 985 F.3d at 1305.  At issue was whether the IRS could rely on its 2007 assessment of taxes against UPC under the federal statute (in which case the action was timely) or whether the IRS was required to separately assess tax liabilities against the Cácereses for UPC's unpaid tax liabilities (in which case the action would be untimely).  *Id.*  Those issues have no bearing on the timeliness of the Cácereses' state law claims here.

### C.    This Action

Fifteen years after Ruble's conviction for tax evasion, and more than four years after the IRS filed its complaint against the Cácereses for their 1997 transaction, the Cácereses filed a complaint against Sidley in Fulton County State Court.  On February 27, 2023, Sidley removed the action to federal court.  On March 13, 2023, Sidley moved to dismiss.  Briefing was completed on April 17, 2023, and the Court scheduled a hearing on Sidley's motion to dismiss for December 1, 2023.  On November 30, 2023, the day before the hearing, the Cácereses sought leave to file an amended complaint to add allegations addressing the IRS settlement and fraudulent concealment.

The Cácereses seek $7 million from Sidley for breach of contract, negligent misrepresentation, professional negligence, and common-law indemnification.

## LEGAL STANDARD

To withstand dismissal, a complaint must "state a claim to relief that is plausible on its face." *Am. Proteins, Inc. v. River Valley Ingredients, LLC*, 60 F. Supp. 3d 1364, 1372 (N.D. Ga. 2022) (cleaned up).  "A claim to relief is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id.* The court may rely on its "experience and common sense" when deciding whether an inference can be reasonably and plausibly drawn. *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009).  The court need not accept as true any legal conclusions that are

cast in the complaint as factual allegations or any allegations "that are contradicted

by public records and other evidentiary materials of which the Court may take

judicial notice."  *Mintu v. Ocwen Loan Servicing, LLC*, 2012 WL 12844929, at *1

n.2 (N.D. Ga. Nov. 13, 2012).

## **ARGUMENT**

### A.   **The Cácereses' Claims for Breach of Contract, Professional Negligence, and Negligent Misrepresentation Are Untimely**

Although the statute of limitations is an affirmative defense, "dismissal on

statute of limitations grounds is appropriate if it is apparent from the face of the

complaint that the claim is time-barred."  *Gonsalvez v. Celebrity Cruises Inc.*, 750

F.3d 1195, 1197 (11th Cir. 2013) (citation and internal quotation marks omitted);

*Dist. 65 Ret. Tr. v. Prudential Sec., Inc.*, 925 F. Supp. 1551, 1558 n.7 (N.D. Ga.

1996).  Because it is obvious from the face of the FAC that the Cácereses' legal

malpractice claims are untimely, the Court should dismiss them.  *Gonsalvez*, 750

F.3d at 1197.

### 1.   **The Statute of Limitations Expired in 2001**

In Georgia, the statute of limitations for breach of contract and professional

negligence actions begins to run "when the first breach of the agreement occurs,"

*James Settlement Services Int'l, LLC v. Conestoga Trust Services, LLC*, 2020 WL

10147065, at *11 (N.D. Ga. Sept. 30, 2020), and on the "date the attorney breached

the duty owed to the client," *Hoffman v. Ins. Co. of N. .* 241 Ga. 328 (1978).  The limitations period for negligent misrepresentation claims begins to run when the plaintiff first "suffers pecuniary loss" due to the defendant's misrepresentations. *Coe v. Proskauer Rose, LLP*, 314 Ga. 519, 526, 528 (2022).  Applying these well-established principles to the FAC, the limitations period for each of the Cácereses' legal malpractice claims began running in 1997 and expired in 2001.

The FAC alleges that Sidley breached its professional obligations to the Cácereses by providing negligent advice and omitting what the FAC alleges was critical information from Ruble's 1997 opinion letter.  *See* FAC. ¶¶ 37–40, 46, 59, 60.  Accordingly, the Cácereses' breach of contract and professional negligence claims accrued when the Cácereses received that letter, which though not alleged must have been on or before April 10, 1997—the date the Cácereses purportedly sold their UPC stock in reliance on the opinion letter.  *Id.* ¶ 2, 18.

The calculation is similarly straightforward for the Cácereses' negligent misrepresentation claim.  In *Coe*, the Georgia Supreme Court held that plaintiffs suffer a concrete pecuniary loss sufficient to trigger the limitations period for negligent misrepresentation when they pay attorney's fees in reliance on alleged misrepresentations.  314 Ga. at 528.  Here, the Cácereses paid such fees in 1997; the FAC alleges that Sidley "accepted payment" from the Cácereses "in exchange for" the 1997 opinion letter.  FAC ¶¶ 11, 37–38.  The fact that the Cácereses do not

11

seek to recover those fees does not disturb the reality that there *was* such a loss and that the Cácereses *could have* maintained a negligent misrepresentation claim to recover those fees in 1997.  That is all the law requires for the limitations period to begin running.  *See Coe*, 314 Ga. at 528 (negligent misrepresentation claim based on tax-shelter opinion letter accrued when plaintiffs "*first* could have successfully maintained" a claim, "at the point when [plaintiffs] relied on those representations and paid . . . fees" for letter (emphasis in orginal)); *Bryant v. Allstate Ins.*, 254 Ga. 328, 330 (1985) (claim accrues "on the date that suit on the claim can first be brought" (citation and internal quotation marks omitted)).

Having accrued in 1997, the breach of contract, professional negligence, and negligent misrepresentation claims are untimely.  "It has long been the law in [Georgia] that a cause of action for legal malpractice, alleging negligence or unskillfulness is subject to the four-year statute of limitation in OCGA § 9-3-25." *Armstrong v. Cuffie*, 311 Ga. 791, 793 n.4 (2021) (alterations adopted) (citation and internal quotation marks omitted).  That same four-year statute of limitations applies to claims for negligent misrepresentation and breach of contract.  *See* O.C.G.A. §§ 9-3-26 (breach of contract), 9-3-31 (negligent misrepresentation); *see also Coe*, 314 Ga. at 524 (negligent misrepresentation); *Kilby v. Shepherd*, 177 Ga. App. 462, 463 (1986) (breach of contract malpractice claim).  Accordingly, the

Cácereses had until 2001 to timely bring these claims.  They did not.  Instead, they filed this action *twenty-two years later*, long after the claims expired.

### 2.     The Settlement Has No Bearing on the Accrual Dates for the Legal Malpractice Claims

On November 29, 2023, the Court issued a remark to the parties that expressed concern over whether the Cácereses had standing to bring their claims "given that the IRS case against [them] has not yet been resolved."  Even though the settlement means that the Cácereses now know with certainty the total amount of damages they may seek to recover from Sidley, the settlement itself does not affect the untimeliness of the Cácereses' claims, for two reasons.

*First*, there is "no authority or other support for the proposition that a ripe claim must be dismissed as unripe if additional damages may accrue in the future." *N.H. Ins. Co. v. Wiregrass Constr. Co.*, 2010 WL 2038298, at *2 (S.D. Ala. May 20, 2010).  Even if the settlement damages were speculative when the complaint was filed, that does not change the fact that any such damages would have been *in addition to* the fees the Cácereses paid Sidley in exchange for Ruble's opinion letter in 1997.  Because the Cácereses suffered an injury-in-fact (the exchange of fees for a negligent opinion letter) in connection with Ruble's 1997 opinion letter and could have maintained a legal malpractice action against Sidley to recover those fees decades ago, the legal malpractice claims were both ripe *and* untimely at the time the complaint was filed.  *Cf. Coffee v. Gen. Motors Acceptance Corp.*, 30

F. Supp. 2d 1376, 1382 (S.D. Ga. 1998) ("It is unnecessary, however, for Plaintiffs to have experienced their *entire* injury for an actual injury to occur." (emphasis in original)).

*Second*, even if the law considers only the specific damages sought by the plaintiff to assess Article III standing and the Cácereses seek only to recover the amount of the settlement, such rules do not extend to calculating accrual dates, which asks when the plaintiff *could have* first maintained a successful action for the same conduct. *See CPD Plastering, Inc. v. Miller*, 284 Ga. App. 172, 174 (2007). In Georgia, the cause of action for legal malpractice "arises . . . before the client sustains all, or even the greater part, of the damages occasioned by his attorney's negligence." *Jankowski v. Taylor, Bishop & Lee*, 246 Ga. 804, 806 (1980). The Cácereses cannot evade the limitations period by strategically declining to seek damages that they had incurred substantially earlier. *Cf. Ahmed v. Warehouse Distrib. Co.*, 2018 WL 1831174, at *3 (E.D. Ark. Apr. 17, 2018) (claim began to accrue as of the date of first injury, however "slight," and not from the date the plaintiff incurred the damages he sought); *Jankowski*, 246 Ga. at 806 (similar). The legal malpractice claims thus accrued in 1997 and lapsed in 2001.

### 3. The FAC Does Not Allege Any Facts That Would Toll the Statute of Limitations

Because the dates alleged in the FAC make clear that the statute of limitations bars the Cácereses' legal malpractice claims, the claims must be

14

dismissed unless the FAC alleges facts that would toll the limitations period. *See Klopfenstein v. Deutsche Bank Sec., Inc.*, 592 F. App'x 812, 815 (11th Cir. 2014). The FAC, however, is devoid of any allegations that would trigger tolling.

By statute, a plaintiff who seeks to toll a limitation period under OCGA § 9-3-96 "must make three showings: first, that the defendant committed actual fraud; second, that the fraud concealed the cause of action from the plaintiff, such that the plaintiff was debarred or deterred from bringing an action; and third, that the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the statute of limitation." *Coe*, 314 Ga. at 529 (citation and internal quotation marks omitted). For legal malpractice actions, tolling applies "only upon a showing of a *separate independent* actual fraud involving moral turpitude which deters a plaintiff from filing suit." *Shores v. Troglin*, 260 Ga. App. 696, 696–97 (2003) (emphasis added) (citation and internal quotation marks omitted). Thus, where, as here "the gravamen of the action is other than actual fraud, such as . . . negligence, breach of contract, etc.," "there must be a separate independent actual fraud involving moral turpitude which debars and deters the plaintiff from bringing his action" for tolling to apply. *Shipman v. Horizon Corp.*, 245 Ga. 808, 809 (1980); *Morris v. Weyerhauser Co.*, 2006 WL 8435968, at *7 (S.D. Ga. 2006).

Nothing in the FAC suggests that the statutory requirements for tolling have been met here.  If anything, the FAC confirms that they are not.  With respect to fraudulent concealment, the FAC adds three paragraphs that amount to little more than a complaint that "Sidley never withdrew its written opinion."  FAC ¶ 33.  But the law in Georgia is clear: "[M]ere silence" does not amount to an *affirmative* act of fraudulent concealment sufficient to trigger tolling.  *Wilson*, 230 Ga. App. at 290–91.  Seeking to paper over this deficiency, the FAC spins Sidley's inaction as "continuing to stand by its advice that the transaction should be respected" and suggests that this should be sufficient because "Plaintiffs put a high degree of trust in Sidley."  FAC ¶¶ 33, 35.  This theory of fraudulent concealment has been roundly rejected by the Georgia Supreme Court, which has held that "a confidential relationship cannot, standing alone, toll the running of the statute" and that a plaintiff seeking tolling "still must" establish a separate and independent act of fraudulent concealment.  *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 847–48 (1998); *Hyman v. Jordan*, 201 Ga. App. 852, 853 (1991).

Courts within this district have repeatedly held that tolling is available only where the complaint alleges that the defendant attorneys made subsequent representations to the plaintiff doubling down on their original misrepresentations. *See, e.g.*, *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1305–06 (N.D. Ga. 2021); *Gowen Oil Co. v. Foley & Lardner, LLP*, 2013 WL 909903, at *4 (S.D. Ga. Mar.

6, 2013).  The FAC tellingly does not allege anything of that sort—an omission that underscores the inapplicability of tolling to the Cácereses' claims here.

Also missing from the FAC are any allegations that suggest the Cácereses "exercised reasonable diligence to discover" their legal malpractice claims. *Doe*, 313 Ga. at 561 (citation and internal quotation marks omitted).  Quite the opposite, the FAC alleges that "[t]he IRS sued the Cácereses for $56 million in unpaid tax liabilities of UPC in 2018"—five years before the Cácereses filed this action—but says nothing about what the Cácereses did in response.  FAC ¶ 29.  According to the FAC, through the IRS action, "[t]he U.S. government sought to do precisely what Sidley assured the Cácereses it could not and *would not* do: hold the Cácereses liable for a transfer of corporate assets by applying the 'step transaction' doctrine."  *Id.* ¶ 22 (emphasis added).  The FAC does not identify "any reasonably diligent steps" undertaken by the Cacareses to explain having waited five years to bring this action.  *See Klopfenstein v. Deutsche Bank Sec., Inc.*, 592 F. App'x 812, 816 (11th Cir. 2014) (no tolling where plaintiff did not "identify any reasonably diligent steps he took in light of that lawsuit to explore his own potential claims").

At most, the FAC attempts to attribute some of the Cácereses' delay to the Eleventh Circuit's decision in 2021 reinstating the IRS action as timely.  *See* FAC ¶¶ 29–31.  But even before then, the IRS complaint had informed the Cácereses of several points of concern that triggered the Cácereses' obligation to investigate

their claims, irrespective of the timeliness of the IRS action.  *See Klopfenstein*, 592 F. App'x at 815 (receipt of information that directly "conflicted" with the defendants' representations triggered obligation to exercise "reasonable diligence").  These include: (1) Ruble had been convicted and sentenced to six-and-a-half years in prison "for writing tax opinion letters that blessed bogus tax shelters created for wealthy customers," Ex. A at ¶ 39; (2) the Tax Court had already entered an order sustaining the liabilities assessed against Henco in connection with the tax shelter transaction, *id.* ¶¶ 120–22; and (3) the IRS was seeking to recover from the Cácereses precisely what the opinion letter opined the IRS "would not" seek to recover, FAC ¶ 22.  Confronted with these allegations as part of a legal complaint initiated by the IRS, the Cácereses inexplicably did nothing for *five years*.  That is not reasonable diligence.  It is "complete inaction," *Melson v. Comm'r, Ala. Dep't of Corr.*, 713 F.3d 1086, 1090 (11th Cir. 2013), for which tolling is unavailable.

"A plaintiff cannot sit quietly by for a length of time exceeding that named in the statute of limitations, and . . . save his cause of action by the mere allegation that he made the discovery only recently."  *Evans v. Lipscomb*, 266 Ga. 767, 770 (1996) (citation and internal quotation marks omitted).  Because the FAC does not include any allegations that would support tolling the limitations period under

OCGA § 9-3-96, the Cácereses' legal malpractice claims expired in 2001 and must be dismissed.

### 4.     Even With Tolling, the Legal Malpractice Claims Are Untimely

In any event, dismissal is warranted because the legal malpractice claims are untimely even with tolling. Tolling under O.C.G.A. § 9-3-96 extends only "until such time as the fraudulent conduct was discovered, or by exercise of due diligence ought to have been discovered." *Dunn v. Towle*, 170 Ga. App. 487, 488 (1984). Based on the FAC's allegations, the IRS complaint put the Cácereses on notice of their claims against Sidley in 2018, at which point any tolling would have ended and the four-year limitations period for those claims would have commenced. The Cácereses thus had until 2022 to file their complaint.[7] Instead, they filed their action in 2023.

It is difficult to imagine a more clear-cut example of a complaint that is on its face untimely.  As discussed above, *see supra* p. 11, the Cácereses have predicated their legal malpractice claims against Sidley on Ruble's purportedly negligent representations that the transaction "'should' survive IRS scrutiny" and

---

[7] The six-year limitations period for breach of a written contract, O.C.G.A. § 9-3-24, does not apply because the FAC does not allege the existence of any written instrument.  Courts "should not assume that the plaintiff can prove facts that were not alleged."  *Carvalho-Knighton v. Univ. of S. Fla. Bd. of Trs.*, 2016 WL 7666137, at *2 (M.D. Fla. Mar. 18, 2016).  Notably, the Cácereses did not amend the complaint to allege a written contract, even though Sidley made this exact point in its prior motion-to-dismiss briefing.  ECF No. 16 at 17–18.

Case 1:23-cv-00844-SDG   Document 24-1   Filed 12/21/23   Page 26 of 34

that the Cácereses "would not be responsible for [UPC's] tax liability as transferees." FAC ¶¶ 46, 60. On June 27, 2018, the IRS filed its action against the Cácereses. RJN, Ex. A. The IRS's 42-page complaint explained, in detail, (i) why the "sham" transaction the Cácereses had engaged in did *not* survive scrutiny; and (ii) why the Cácereses were liable for UPC's unpaid tax liabilities and the amount of those liabilities. *See generally id.* In particular, the IRS complaint stated that the Tax Court had rejected the tax-shelter transaction and sustained the imposition of additional taxes and penalties in connection with that transaction—and noted that the Cácereses were "estopped from challenging" that ruling. *Id.* ¶¶ 115–122, 139, 152, 165. The FAC acknowledges that the filing of this action meant that "Sidley's opinion was wrong." FAC ¶ 22. At that point, the Cácereses had actual notice (or at the very least, constructive notice) of their claims against Sidley, and any tolling would have ended. *See* O.C.G.A. § 9-3-96.

The Eleventh Circuit's decision in *Klopfenstein* is instructive. In that case, the plaintiff sued Deutsche Bank Securities for providing him with opinion letters wrongly certifying that the tax shelter transactions he planned to engage in "had economic substance" and were legitimate. *Klopfenstein*, 592 F. App'x at 813. The plaintiff relied on those letters to claim millions of dollars in tax losses from 1996 to 2000, which reduced his taxable income each year. *Id.* In the fall of 2000, however, the IRS sent the plaintiff a statutory notice of deficiency that notified him

the IRS "intended to disallow the deductions he had taken" because the tax shelter transaction "lacked economic substance." *Id.* Thirteen years later, the plaintiff sued Deutsche Bank for fraud, breach of fiduciary duty, and violations of Georgia's RICO statute arising out of its fraudulent opinion letters. *Id.* at 814.

The Eleventh Circuit affirmed the dismissal of his claims as time-barred. *Id.* at 816. As the Eleventh Circuit explained, the IRS's notice sent in the fall of 2000 provided the plaintiff with "direct information that conflicted with [the defendants'] representation that the tax shelter transactions at issue had economic substance." *Id.* at 815 (internal quotation marks omitted). Accordingly, the plaintiff was "on notice that the Deutsche Bank entities' representation may have been false" in 2000, rendering his claims untimely. *Id.* at 815.

The facts here, as alleged in the FAC, are even stronger than they were in *Klopfenstein*. Not only did the IRS complaint inform the Cácereses that the Tax Court had rejected the tax shelter Ruble's opinion letter had addressed, the IRS complaint sought to hold the Cácereses liable under a theory that Ruble's opinion letter had said could not be used against them. *See* FAC ¶ 22. That is a textbook example of actual notice. *See MacDowell v. Gallant*, 344 Ga. App. 856, 863 (2018). The fact that the FAC incorporates many of the allegations in the IRS's

complaint against the Cácereses[8] further confirms that the Cácereses were on actual notice of their claims by June 27, 2018, when the IRS filed its complaint, and that any tolling would have ended on that date. *See Yancy v. Cothran*, 32 F. 687, 690–91 (N.D. Ga. 1887) (concluding plaintiff was on notice when there was a legal proceeding concerning the same subject and rejecting argument that plaintiff "had a right to wait until the termination of that suit" to see who prevailed before filing suit). The Cácereses therefore had until June 27, 2022—four years after the IRS filed its action—to bring their legal malpractice claims. They filed their action on January 13, 2023, more than half a year too late.

Because it is apparent from the face of the FAC that any tolling would have ended long before the Cácereses brought their legal malpractice claims, the Court should dismiss them. *See Horne*, 304 F. Supp. 3d at 1338.

### B.    The Cácereses' Common-Law Indemnification Claim Fails to State a Claim for Relief

The Court should also dismiss the Cácereses' common-law indemnification claim because it fails to state a claim for relief. "[U]nder Georgia law indemnity is

---

[8] The FAC incorporates numerous allegations from the IRS complaint, including allegations that: (i) UP Acquisitions was not a "legitimate intermediary" that could offset income with loss assets; (ii) UPC's corporate gains from the Belca sale were sheltered using "Son of BOSS transactions"; and (iii) UP Acquisitions was an "insolvent intermediary," which meant the Cácereses would be "on the hook for any taxes owed" on UPC's capital gains from the Belca sale. *Compare* FAC. ¶¶ 25–26 *with* RJN, Ex. A ¶¶ 15–16 (sale of UPC stock was a "sham sale"), 26 (UP Acquisitions was a "special purpose vehicle"); 44 (UP Acquisitions "lacked the money to purchase" UPC stock), 83–97 (use of "Son of Boss" tax shelters).

defined as the obligation or duty resting on one person to make good any loss or damage another has incurred by *acting at his request or for his benefit*." *Dist. Owners Ass'n, Inc. v. AMEC Env't Infrastructure, Inc.*, 322 Ga. App. 713, 715 (2013) (emphasis added) (citation and internal quotation marks omitted).  A claim for common-law indemnification exists only if "a person is compelled to pay damages because of negligence *imputed* to him as the result of a tort committed by another." *Espinoza v. Herc Rentals, Inc.*, 2020 WL 13532585, at *6 (N.D. Ga. Jan 14, 2020) (citation omitted).

The FAC is devoid of any allegations of vicarious or imputed liability. Instead, the FAC alleges that (i) Sidley acted negligently towards the Cácereses in representing that the tax shelter transaction could lawfully minimize their tax obligation; and (ii) that the IRS now seeks to recover millions of dollars from the Cácereses in unpaid taxes.  FAC ¶¶ 62–68.  As courts in Georgia have recognized, that is a straightforward claim for professional negligence or breach of contract and damages—it is not a claim for common-law indemnification.  *See, e.g.*, *Hines v. Holland*, 334 Ga. App. 292, 296 (2015) (claim that defendant breached standard of care against the plaintiff is not a claim for common-law indemnification).

The FAC nonetheless attempts to cloak its legal malpractice claims in the garb of common-law indemnification by alleging that the Cácereses' "liability" in the IRS action "turned on [their] alleged knowledge" of fraud, which knowledge

the "IRS imputed to Plaintiffs through Sidley."  FAC ¶ 70.  That is not enough.

Setting aside the fact that imputed *knowledge* is not the same as imputed *liability*,

the IRS's fraudulent transfer claims against the Cácereses are clearly predicated on

the Cácereses' *own conduct and purported wrongdoing*.  The IRS complaint

specifically alleges that the Cácereses formulated a plan as early as September 9,

1996, to "avoid double taxation" on the proceeds from the Belca sale. RJN, Ex. A

¶ 24.  The IRS complaint further alleges that the Cácereses "knew . . . neither

[UPC]" nor its purchaser "intended to pay capital gains taxes" and retained Ruble

specifically to prepare an opinion letter that would "release them of personal

liability" for the unpaid capital gains tax.  *Id.* ¶¶ 38, 40.  And the IRS complaint

alleges that the Cácereses agreed to pay UP Acquisitions a fee "based on a

percentage of the capital gains on which [UPC] evaded taxes," quoting from

communications that the Cácereses purportedly penned themselves. *Id.* ¶ 41.

Based on these allegations, the IRS action charges that the Cácereses

committed fraudulent transfer by intentionally and knowingly evading taxes.  That

is an action predicated on the Cácereses' *own* wrongdoing—not an attempt to hold

the Cácereses vicariously responsible for Sidley's negligent opinion, for which the

Cácereses may seek indemnification.  Accordingly, the Cácereses' claim for

common-law indemnification fails as a matter of law.  *See, e.g.*, *Douglas v. HERC*

*Rentals, Inc.*, 2021 WL 3852063, at *5 (N.D. Ga. Aug. 27, 2021); *see also*

*Crawford v. Johnson*, 227 Ga. App. 548, 555 (1997) (common law indemnification claim not available "for [plaintiff's] . . . own acts of moral turpitude").

### C.   <u>The Court Should Dismiss The FAC With Prejudice</u>

The Eleventh Circuit has held that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1220 (11th Cir. 2022) (citation and internal quotation marks omitted).  The Cácereses availed themselves of that chance when they amended the complaint on the eve of the hearing on Sidley's original motion to dismiss.  The result of that amendment, the FAC, confirms that any further amendment would be futile—both because the legal malpractice claims are barred by the statutes of limitations and the FAC makes clear that the Cácereses cannot satisfy the conditions for tolling; and because the FAC makes no attempt to allege a theory of common-law indemnification that fits within the narrow framework set forth by Georgia courts. Under these circumstances, "dismissal with prejudice is appropriate."  *Profit v. Americold Logistics, LLC*, 248 F.R.D. 293, 297 (N.D. Ga. 2008).

### <u>CONCLUSION</u>

For the foregoing reasons, Sidley respectfully requests that the FAC be dismissed in its entirety with prejudice.

DATED:  December 21, 2023          CAPLAN COBB LLC

                                      By:  _____*/s/ Michael A. Caplan*_____

                                        MICHAEL A. CAPLAN (GA Bar No. 601039)
mcaplan@caplancobb.com
JARRED A. KLORFEIN (GA Bar No. 562965)
jklorfein@caplancobb.com
CAPLAN COBB LLC
75 Fourteenth Street, N.E.
Suite 2700
Atlanta, Georgia 30309
Telephone:  (404) 596-5600
Facsimile:   (404) 596-5604

DATED:  December 21, 2023          MUNGER, TOLLES & OLSON LLP

                                      By:  _____*/s/ Brad D. Brian*_____
BRAD D. BRIAN (*pro hac vice*)
brad.brian@mto.com
JOHN B. MAJOR (*pro hac vice*)
john.major@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

                                      XIAONAN APRIL HU (*pro hac vice*)
April.Hu@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW.
Suite 500E
Washington, D.C. 20001-5369
Telephone:  (202) 220-1100
Facsimile:   (202) 220-2300

                                      *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing was prepared in Times New Roman font, 14-point type, and complies with Local Rule 5.1(C).

This 21st day of December, 2023.

*/s/ Michael A. Caplan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2023, I electronically filed the foregoing document through the Court's CM/ECF system, which will automatically send electronic notification of such filing to all counsel of record.

This 21st day of December, 2023.

*/s/ Michael A. Caplan*