# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 04-22058-CIV-MORENO/Garber

MARK J. GAINOR,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )
                                         )
SIDLEY AUSTIN BROWN & WOOD, LLP,         )
                                         )
        Defendant.                       )
                                         )
_____     )

**DEFENDANT SIDLEY AUSTIN BROWN & WOOD LLP'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(1), 12(b)(6), AND 9(b)
<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

Defendant SIDLEY AUSTIN BROWN & WOOD LLP ("Brown & Wood") [1] moves

pursuant to Rules 12(b)(1), 12(b)(6), and 9(b), Federal Rules of Civil Procedure, for an order

dismissing the Complaint filed against Brown & Wood by Plaintiff Mark J. Gainor ("Plaintiff")

on the grounds that the Court lacks subject matter jurisdiction, the Complaint fails to state any

claims upon which relief can be granted, and fails to plead fraud with particularity.  As grounds

for the requested relief, Brown and Wood submits the following Memorandum of Law, which is

incorporated herein by reference.



---

[1] Defendant Sidley Austin Brown & Wood LLP is the successor to Brown & Wood as the result of a merger in 2001.

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500  FAX 305-579-0717  www.gtlaw.com
AMSTERDAM  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DALLAS  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW JERSEY  NEW YORK
ORLANDO  PHILADELPHIA  PHOENIX  TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON  ZÜRICH

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................ 3

III.  ARGUMENT ................................................................................................ 6

    A.  Plaintiff's Complaint Should Be Dismissed For Lack Of Subject Matter Jurisdiction Because His Claims Are Not Ripe. ..................................... 6

    B.  In The Alternative, The Complaint Fails To Allege That Brown & Wood Caused Plaintiff Harm. ........................................................................ 9

    C.  Plaintiff's Fraud And Misrepresentation Claims Are Defective Because He Fails To Allege That He Relied On Any Representations By Brown & Wood. ..................................................................................... 12

    D.  Plaintiff's Breach Of Oral Contract Claim Is Defectively Pled. ........................... 13

    E.  Plaintiff Has Failed To State A Claim For Tortious Interference With An Advantageous Business Relationship. .................................................... 13

    F.  Plaintiff Fails To State A Florida Rico Act Violation. ....................................... 14

    G.  Plaintiff's Fraud And RICO Claims Fail Pursuant To Federal Rule Of Civil Procedure 9(B). ............................................................................ 17

IV.  CONCLUSION ............................................................................................ 20

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500  FAX 305-579-0717  www.gtlaw.com

AMSTERDAM  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DALLAS  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW JERSEY  NEW YORK
ORLANDO  PHILADELPHIA  PHOENIX  TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON  ZÜRICH

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*A/S J. Ludwig Mowinckles Rederi v. Tidewater Const. Co.,*
559 F.2d 928 (4th Cir. 1977) ........................................................................................ 8

*Abbott Labs v. Gardner,*
387 U.S. 136 (1967) ..................................................................................................... 6

*Ageloff v. Kiley,*
318 F. Supp. 2d 1157 (S.D. Fla. 2004) ...................................................................... 19

*Anthony Distributors, Inc. v. Miller Brewing Co.,*
904 F. Supp. 1363 (M.D. Fla. 1995) .......................................................................... 18

*Armstrong v. Ala. Power Co.,*
667 F.2d 1385 (11th Cir. 1982) ................................................................................... 8

*Avirgan v. Hull,*
691 F. Supp. 1357 (S.D.Fla. 1988) ............................................................................ 16

*Benchmark Electronics, Inc. v. J.M. Huber Corp.,*
343 F.3d 719 (5th Cir. 2003) ...................................................................................... 17

*Bonner v. City of Prichard,*
661 F.2d 1206 (11th Cir. 1981) ................................................................................... 6

*Brooks v. Blue Shield of Florida,*
116 F.3d 1364 (11th Cir. 1997) .............................................................................. 4, 17

*Busby v. Crown Supply, Inc.,*
896 F.2d 833 (4th 1990) ........................................................................................ 16, 17

*Butterworth v. Quick & Reilly, Inc.,*
998 F. Supp. 1404 (M.D. Fla. 1998) .......................................................................... 10

*Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp., et al,*
57 F.3d 56 (1st Cir. 1995) ........................................................................................... 16

*Craighead v. E.F. Hutton & Co., Inc.,*
899 F.2d 485 (6th Cir. 1990) ...................................................................................... 16

*Danielsen v. Burnside-Ott Aviation Training Center, Inc.,*
941 F.2d 1220 (D.C. Cir. 1991) .................................................................................. 16

*Durham v. Business Mgmt Assoc.,*
847 F.2d 1505 (11th Cir. 1988) ................................................................................. 15

*Filler v. Hanvit Bank,*
247 F. Supp. 2d 425 (S.D.N.Y. 2003) ....................................................................... 12

## TABLE OF AUTHORITIES
### (continued)

Page

*Fogie v. THORN Americas, Inc.*,
190 F.3d 889 (8th Cir. 1999)..............................................................................16

*Gibbs v. Republic Tobacco, L.P.*,
119 F. Supp. 2d 1288 (M.D. Fla. 2000) ..............................................................20

*Grider v. Texas Oil & Gas Corp.*,
868 F.2d 1147 (10th Cir. 1989)..........................................................................16

*Halder v. Standard Oil Co.*,
642 F.2d 107 (5th Cir. 1981).................................................................................6

*Hernandez v. CIBA-GEIGY Corp. USA*,
200 F.R.D. 285 (S.D. Tex. 2001) ........................................................................20

*Hirshfield v. Winer*,
Nos. 87 CIV. 8079, 8640-41, 1989 WL 120584 (S.D.N.Y. Oct. 3, 1989)..............6, 7

*In re Cascade Int'l Securities Litigation*,
840 F. Supp. 1558 (S.D.Fla. 1993)......................................................................20

*In re Managed Care Litigation*,
150 F. Supp 2d 1330 (S.D. Fla. 2001)..............................................16, 17, 18, 19

*In re Managed Care Litigation*,
298 F. Supp. 2d 1259, 1272 (S.D.Fla. 2003).......................................................17

*In re Sunstar Securities Healthcare Litigation*,
173 F. Supp. 2d 1315 (M.D. Fla. 2001) ..............................................................20

*Inter-Urban Broad. of Cincinnati, Inc. v. Lewis*,
Nos. 94-32126, 95-0523, 1994 WL 774050 (E.D. La. March 14, 1995)..................7

*Jackson v. Bellsouth Telecomm.*,
372 F.3d 1250 (11th Cir. 2004)..........................................................................15

*Jones v. Childers*,
18 F.3d 899 (11th Cir. 1994).................................................................................5

*KMS Restaurant Corp. v. Wendy's International, Inc.*,
361 F.3d 1321 (11th Cir. 2004)..........................................................................14

*Lachmund v. ADM Investor Services, Inc.*,
191 F.3d 777 (7th Cir. 1999)..............................................................................18

*Lincoln House, Inc. v. Dupre*,
903 F.2d 845 (1st Cir. 1990)..................................................................................8

*Loftin v. KMPG LLP*,
No. 02-81166-CIV, 2003 WL 22225621 (S.D. Fla. 2003).....................................2, 7

GREENBERG-TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*McCulloch v. PNC Bank Inc.*,
298 F.3d 1217 (11th Cir. 2002) ........................................................................... 15

*National Organization for Women v. Scheidler*,
510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) ......................................... 15

*National Park Hospitality Ass'n v. Dep't of Interior*,
538 U.S. 803, 123 S. Ct. 2026 (2003) .................................................................. 6

*NCR Credit Corp. v. Reptron Electronics Inc.*,
155 F.R.D. 690 (M.D. Fla. 1994) ........................................................................ 19

*Nugget Hydroelectric, L.P. v. Pacific Gas & Electric*,
981 F.2d 429 (9th Cir. 1992) ............................................................................... 16

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir 1990) ................................................................................... 16

*Pardo v. Tanning Research Lab., Inc.*,
996 F. Supp. 1222 (M.D. Fla. 1996) ................................................................... 11

*Parker & Parsley Petroleum Co. v. Dresser Indus.*,
972 F.2d 580 (5th Cir. 1992) ............................................................................... 16

*Patterson v. Downtown Med. & Diagnostic Center, Inc.*,
866 F. Supp. 1379 (M.D. Fla. 1994) ................................................................... 12

*Potomac Electric Power Co. v. Electric Motor and Supply, Inc.*,
262 F.3d 260 (4th Cir. 2001) ............................................................................... 16

*Regional Rail Reorganization Act Cases*,
419 U.S. 102 (1974) .............................................................................................. 6

*Rentclub, Inc. v. Transamerica Rental Finance Corp.*,
775 F. Supp. 1460 (M.D. Fla. 1991) ................................................................... 18

*Rose v. Bartle*,
871 F.2d 331 (3d Cir. 1989) ............................................................................... 16

*Saporito v. Combustion Engineering*,
843 F.2d 666 (3rd Cir. 1988) ............................................................................. 19

*Shibata v. Lim*,
133 F. Supp.2d 1311 (M.D. Fla. 2000) ............................................................... 13

*Southern Ute Indian Tribe v. La Plata County*,
94-1310, 1995 WL 427683 (10th Cir. July 20, 1995) ........................................... 7

*T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc.*,
931 F.2d 816 (11th Cir. 1991) ............................................................................. 10

*Texas v. United States*,

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

523 U.S. 296 (1998) .................................................................................................. 6

*United States ex rel. Butler v. Magellan Health Servs.,*
74 F. Supp.2d 1201 (M.D. Fla. 1999) ...................................................................... 18

*Warner Cable Comms., Inc. v. City of Niceville,*
911 F.2d 634 (11th Cir. 1990) .................................................................................. 6

*Ziemba v. Cascade International, Inc.,*
256 F.3d 1194 (11th Cir. 2001) .............................................................................. 19

**STATE CASES**

*Amstar Ins. Co. v. Cadet,*
862 So.2d 736 (Fla. DCA 5th 2003) ....................................................................... 11

*Economy Suppliers & Fabricators, Inc. v. Centennial Homes, Inc.,*
325 So.2d 421 (Fla. DCA 4th 1976) ....................................................................... 11

*Fremont Indem. Co. v. Carey, Dwyer, Eckhart, Mason & Spring, P.A.,*
796 So.2d 504 (Fla. 2001) ......................................................................................... 9

*Glucksman v. Persol N. Am., Inc.,*
813 So.2d 122 (Fla. DCA 4th 2002) ......................................................................... 9

*Goldschmidt v. Holman,*
571 So.2d 422 (Fla. 1990) ....................................................................................... 10

*Gracey v. Eaker,*
837 So.2d 348 (Fla. 2002) ......................................................................................... 9

*Ilgen v. Hendersen Properties, Inc.,*
683 So.2d 513 (Fla. DCA 2d 1996) ......................................................................... 10

*Insurance Concepts and Design, Inc. v. Healthplan Services Inc.,*
785 So.2d 1232 (Fla. 4th DCA 2001) ..................................................................... 13

*M/I Schottenstein Homes, Inc. v. Azam,*
813 So.2d 91 (Fla. 2002) ......................................................................................... 12

*Olmsted v. Emmanuel,*
783 So.2d 1122 (Fla. DCA 1st 2001) ....................................................................... 9

*Pappas v. Smart Health U.S.A.,*
861 So.2d 84 (Fla. DCA 4th 2003) ......................................................................... 11

*Peat, Marwick, Mitchell & Co. v. Lane,*
565 So.2d 1323 (Fla. 1990) ....................................................................................... 9

*Perez-Abreu, Zamora & De La Fe, P.A. v. Taracido,*
790 So.2d 1051 (Fla. 2001) ....................................................................................... 9

GREENBERG-TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com

AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

**TABLE OF AUTHORITIES**
(continued)

                                                                                    **Page**

*Sarkis v. Pafford Oil Co., Inc.*,
   697 So.2d 524 (Fla. DCA 1st 1997) .......................................................................... 14

*Scott-Steven Development Corp. v. Gables by Sea, Inc.*,
   167 So.2d 763 (Fla. DCA 1964) ............................................................................... 10

*Seminole Tribe v. Times Publishing Co.*,
   780 So.2d 310 (Fla. DCA 4th 2001) .......................................................................... 14

*Smith v. Ocean State Bank*,
   335 So.2d 641 (Fla. DCA 1st 1976) .......................................................................... 14

*Sobi v. Fairfield Resorts, Inc.*,
   846 So.2d 1204 (Fla. DCA 5th 2003) ........................................................................ 14

*State Farm Mut. Auto. Ins. Co. v. Novotny*,
   657 So.2d 1210 (Fla. DCA 5th 1995) ........................................................................ 12

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(1) ........................................................................ 1

Federal Rule of Civil Procedure 12(b)(6) ........................................................................ 1

Federal Rule of Civil Procedure 9(b) ........................................................................ passim

Fl. RICO Act, Fla. Statute § 772.101 .............................................................................. 14

Fl. RICO Act, Fla. Statute § 772.103 .......................................................................... 15, 16

Fl. RICO Act, Fla. Statute § 772.103(1) ....................................................................... 15, 16

Fl. RICO Act, Fla. Statute § 772.104 .............................................................................. 16

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com

AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

## MEMORANDUM OF LAW

## I.      INTRODUCTION

According to his Complaint, Plaintiff brings this action against Brown & Wood because Plaintiff's long-time, trusted accountant Arthur Andersen LLP ("Andersen") persuaded him to execute certain investments and take certain tax deductions designed to save Plaintiff $17 million in taxes on over $120 million in capital gains. Andersen allegedly told Plaintiff that it would provide him with a "'more likely than not' opinion letter" that would support the validity of the transactions. Compl. ¶ 12.

Plaintiff now seeks millions of dollars not from Andersen, but from Brown & Wood, whom he alleges provided the opinion letter at issue, even though Plaintiff has never paid any additional tax or penalties, and even though Brown & Wood could not possibly have caused Plaintiff to enter into the transactions of which he complains because Plaintiff had concluded them long before Brown & Wood ever communicated with him. In other words, Plaintiff's claims are both jurisdictionally and substantively defective and should be dismissed.

*First*, Plaintiff's claims fail for lack of subject matter jurisdiction because they are not ripe. Plaintiff has paid no additional tax, interest, or penalty as a result of the transactions at issue and, by his own admission, is currently "negotiating" with the IRS concerning the subject matter of this lawsuit. As of now, no one knows whether Plaintiff will *ever* pay additional tax or whether Plaintiff will in fact profit from engaging in the transactions. As Judge Ryskamp observed in nearly identical circumstances, "[u]ntil and unless [Plaintiff] and the IRS reach a final resolution . . . it is impossible to determine whether [Plaintiff] actually suffered damages from Defendants' alleged misconduct." *Loftin v. KMPG LLP*, No. 02-81166-CIV, 2003 WL 22225621, at *7 (S.D. Fla. 2003) (dismissing complaint for lack of ripeness).

*Second*, Plaintiff has failed to plead that Brown & Wood actually caused him harm. His own Complaint makes clear that Plaintiff decided to enter the transactions at Andersen's behest months before he ever received any communication from Brown & Wood. Plaintiff therefore

1

suggests that even if Brown & Wood never communicated with him, Andersen acted as Brown & Wood's agent, rendering Brown & Wood liable for Andersen's statements. Plaintiff, however, fails to allege any facts supporting the notion that Brown & Wood controlled Arthur Andersen or that an agency relationship existed. Because causation is an essential element of all Plaintiff's claims, and because Plaintiff fails to allege causation, those claims fail on the face of the Complaint. For the same reasons, Plaintiff cannot show that he ever relied on any representation from Brown & Wood.

*Third*, and in the alternative, Plaintiff's Florida RICO claim never identifies the supposed RICO enterprise and does not properly allege injury, requiring dismissal. Likewise, Plaintiff's claims for breach of an oral contract and for tortious interference with an advantageous business relationship fail to plead the essential elements of each claim, and would have to be dismissed on that ground if no other.

*Finally*, Plaintiff makes no effort to comply with Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity. Plaintiff never identifies who at Andersen allegedly induced Plaintiff to enter the transactions at issue, or when or where the so-called misrepresentations were made. He never says who at Brown & Wood supposedly gave Andersen "authority" to say or do anything on Brown & Wood's behalf, or who at Brown & Wood communicated with Andersen, or vice-versa. This mode of pleading falls well below the standard set by Rule 9(b), again requiring dismissal.

## II.    STATEMENT OF FACTS[2]

In 1998, Plaintiff decided to sell his 81.2% interest in Gainor Medical Management, LLC. Compl. ¶¶ 8, 9. At that time, Andersen was Plaintiff's accountant, consultant, and financial advisor with whom he had "an established relationship of trust and confidence. . . ." *Id.*

---

[2] Brown & Wood does not concede the accuracy of any of the facts alleged in the Complaint, but treats them as true for the purposes of this motion only.

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DALLAS  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW JERSEY  NEW YORK
ORLANDO  PHILADELPHIA  PHOENIX  TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON  ZÜRICH

¶ 9. Before the sale closed, someone at Andersen allegedly informed Plaintiff that "it might be able to recommend a certain strategy to help reduce his total tax liability on the planned sale." *Id.* ¶ 10. Plaintiff does not allege that this unidentified individual made any reference to Brown & Wood.

The sale of Plaintiff's business closed in January 1999 and resulted in a gain of over $120 million. Compl. ¶ 11. In March 1999, someone at Andersen allegedly offered Plaintiff a strategy that would save him approximately $17.0 million in taxes. *Id.* ¶ 12. This unidentified individual allegedly told him that he would receive "a 'more likely than not' opinion letter" indicating that the strategy "would be upheld if challenged by the Internal Revenue Service." *Id.* Although Plaintiff characterizes the strategy as the "Sidley Plan,"[3] *id.* ¶ 12, he never alleges that *Brown & Wood's* name was so much as mentioned by the unidentified individual at Andersen, much less that Andersen told him he would receive an opinion letter *from Brown & Wood.*

On August 20, 1999, someone at Andersen sent Plaintiff a schedule of fees and costs for the strategy, which were approximately $2.1 million. *Id.* ¶¶ 13, 14. On September 1, 1999 Plaintiff authorized Andersen to proceed with the transaction. *Id.* ¶ 15. He does not allege that he had any contact with Brown & Wood, or was even aware of Brown & Wood, before he decided to proceed with the strategy.

After Plaintiff authorized Andersen to proceed, "a series of complex and costly transactions were conducted" to implement the strategy. *Id.* ¶ 21. The transactions concluded on December 14 and December 23, 1999, and resulted in capital losses of $70.6 million. *Id.* ¶ 24. "After the transactions were finalized," Plaintiff received two "qualified" opinion letters from

---

[3] While the complaint repeatedly characterizes the transaction strategy at issue as "the Sidley Plan," that term is obviously a fabrication by Plaintiff's counsel rather than a phrase that was used contemporaneously by anyone involved in the transaction. The opinion on which this suit is allegedly based was rendered in 1999 by Brown & Wood, which did not combine with Sidley & Austin until May 2001. None of the transaction documents refer to a "Sidley Plan," a "Brown & Wood plan," or anything of the kind.

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

Brown & Wood stating that it was "more likely than not" that the transactions would be "upheld if challenged by the IRS." *Id.* ¶ 25. Plaintiff was further advised that:

> A number of issues raised by the matters addressed in this letter, including matters upon which we have stated opinions, are complex and have not been definitively resolved by the tax laws. . . [W]e cannot be assured that our interpretation will prevail if the issues become the subject of judicial or administrative proceedings. *Realization of the tax consequences set forth in this letter is subject to the significant risk that the IRS might challenge the tax treatment and that a court could sustain a challenge.*

Exh. A, p. 50; Exh. B, p. 52 (emph. added).[4] Plaintiff's receipt of the Brown & Wood opinion letters was the first and only time Plaintiff allegedly communicated with Brown & Wood. Of the $2.1 million in fees and costs for the transaction, Plaintiff paid Brown & Wood $400,000. *Id.* ¶ 52.

On December 10, 1999 the IRS released Notice 99-59 warning that transactions described therein might not generate losses deductible under the Internal Revenue Code. Compl. ¶ 22. Plaintiff alleges that on the same day the Notice was released, some unidentified individual at Brown & Wood told some unidentified individual at Andersen that Brown & Wood "would still issue the favorable 'more likely than not' opinion letters, but that the opinions would have to address Notice 99-59." *Id.* ¶ 23. The unidentified person at Brown & Wood allegedly told the unidentified person at Andersen, however, that Notice 99-59 "could impair [Plaintiff's] ability to rely in good faith on the advice of a tax professional," which the December 31, 1999 opinion letters allegedly failed to state. *Id.* ¶ 26.

On December 22, 2001, the IRS issued Announcement 2002-2, 2002-1 C.B. 304, which encouraged taxpayers to disclose their participation in certain tax transactions in exchange for the waiver of penalties. Compl. ¶ 29. On March 14, 2002 Brown & Wood advised Plaintiff of

---

[4] See Exhibits A and B attached hereto. Although Plaintiff has failed to attach the Brown & Wood Opinion Letters to his Complaint, this Court may consider those documents as part of the pleadings for purposes of this motion. *Brooks v. Blue Shield of Florida*, 116 F.3d 1364, 1368-69 (11th Cir. 1997) (key documents referenced in a complaint become part of pleadings and may be attached to a motion to dismiss without transforming into summary judgment motion).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

thereafter voluntarily disclosed his participation in the tax strategy to the IRS, and is currently in negotiations with the IRS. *Id.* ¶¶ 31-32. Plaintiff alleges neither that he has paid any additional taxes or penalties as a result of the tax transactions at issue, nor that he has resolved his ongoing dispute with the IRS concerning the tax transactions at issue.

On or about June 22, 2004, Plaintiff filed suit against Brown & Wood in Florida state court alleging nine causes of action: (I) malpractice; (II) breach of oral contract; (III) breach of contract implied in fact; (IV) breach of contract implied in law or unjust enrichment; (V) negligent misrepresentation; (VI) fraudulent misrepresentation; (VII) breach of fiduciary duty; (VIII) tortious interference with an advantageous business relationship; and (IX) violations of Florida Civil Remedies for Criminal Practices Act (the "Florida RICO Act").[5]

Brown & Wood was served on July 14, 2004. As the parties are diverse and the amount in controversy exceeds $75,000, Brown & Wood timely removed the case to federal court on August 12, 2004. Pursuant to this Court's *Order Granting Defendant's Agreed Motion For Enlargement Of Time To Respond To Complaint*, Brown & Wood's time to file this motion to dismiss was extended to September 2, 2004. When Hurricane Frances forced the federal court in Miami to close on September 2 and 3, the time for filing was extended to Tuesday, September 7, 2004.

## III. ARGUMENT

### A. Plaintiff's Complaint Should Be Dismissed For Lack Of Subject Matter Jurisdiction Because His Claims Are Not Ripe.

Federal courts have no jurisdiction over premature claims. *National Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 123 S. Ct. 2026, 2030 (2003); *Hirshfield v. Winer*, Nos. 87 CIV. 8079, 8640-41, 1989 WL 120584, at *2 (S.D.N.Y. Oct. 3, 1989). The burden falls on

---

[5] Gainor alleges violations of Florida Statute § 772.103 of the Civil Remedies for Criminal Practices Act. Complaint ¶ 96. This is Florida's Civil RICO provision. *See Jones v. Childers,* 18 F.3d 899, 910 (11th Cir. 1994).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

Plaintiff to demonstrate that his claims are ripe. *Warner Cable Comms., Inc. v. City of Niceville*, 911 F.2d 634, 640 (11th Cir. 1990).

At bottom, ripeness is "a question of timing," *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974), "its basic rationale [being] to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967). For this reason, the ripeness doctrine deprives a court of jurisdiction where – as in this case – the claims at issue relate to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *E.g., Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted); *Halder v. Standard Oil Co.*, 642 F.2d 107 (5th Cir. 1981) (rejecting plaintiff's suit for share of potential future proceeds for lack of ripeness because "it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass.").[6]

In this case, Plaintiff has not alleged sufficient facts demonstrating that his claims are ripe. He fails to plead that he has paid, or has been ordered to pay, additional tax, interest, or penalties in connection with his 1999 tax return. Instead, he describes only contingent possibilities: that he is "*subject* to a disallowance," Compl. ¶ 32; that he has been "*expos[ed]* to millions of dollars of additional taxes," *e.g., id.* ¶¶ 38, 44, 50; that he is currently "*negotiating* with the IRS" regarding the tax transactions at issue. *Id.* ¶ 32 (all emphases added).

The court in *Loftin v. KPMG* found claims virtually indistinguishable from Plaintiff's barred for lack of ripeness. Like Plaintiff here, the *Loftin* plaintiff sued Brown & Wood, among others, for allegedly "fraudulently advis[ing] him to participate in tax-avoidance strategies currently under IRS review." 2003 WL 22225621, at \*1. The plaintiff in *Loftin* alleged that he

---

[6] Decided on April 6, 1981, *Halder* is binding precedent in this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as precedent all of the decisions of the former Fifth Circuit handed down prior to September 30, 1981).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

was negotiating with the IRS and insisted that he was "committed to pursuing a settlement agreement with the IRS." *Id.* at \*3.

Judge Ryskamp began his analysis by observing that the plaintiff had failed to plead the essential element of injury:

> The [Complaint] merely establishes that Loftin is in the midst of a dispute with the IRS. According to the Complaint, "Loftin's 1997, 1999 and 2000 [tax] returns are under audit by the [IRS] . . . he is currently in negotiations with the IRS . . . and may be assessed significant penalties." . . . Loftin speculates that he will have to pay a "hefty sum" as a settlement. *Until and unless Loftin and the IRS reach a final resolution of the dispute, it is impossible to determine whether Loftin actually suffered damages from Defendants' alleged misconduct. . . . Consequently, Loftin has failed to allege that he has suffered an actual injury from the alleged misconduct and therefore lacks standing . . . .*

*Loftin,* 2003 WL 22225621, at \*7 (emphasis added, citations omitted); *see Hirshfield v. Winer,* Nos. 87 CIV. 8079, 8640-41, 1989 WL 120584, at \*2 (S.D.N.Y. Oct. 3, 1989) (where the plaintiffs sued their lawyers over a tax opinion while still in a dispute with the IRS, "any decree of a conclusive character . . . would be premised upon a hypothetical state of facts").[7]

Put simply, until Plaintiff conclusively resolves his negotiations with the IRS, the Court cannot know whether Plaintiff will take an administrative appeal of the IRS's position, litigate with the IRS in the Tax Court or the District Court, or pay some unspecified tax. Indeed, as of now, no one knows for certain whether Plaintiff will *ever* pay additional tax or penalties. Furthermore, should Plaintiff settle with the IRS on favorable terms, he may actually profit from the transaction and again have no viable claim. Under these circumstances, and for the reasons already articulated by Judge Ryskamp, Plaintiff's complaint should be dismissed for lack of subject matter jurisdiction.

---

[7] *See also Southern Ute Indian Tribe v. La Plata County,* 94-1310, 1995 WL 427683, at \*2 (10th Cir. July 20, 1995) ("The threat of imposed taxes does not supply the finality necessary to a determination that a claim is fit for judicial review."); *cf. Inter-Urban Broad. of Cincinnati, Inc. v. Lewis,* Nos. 94-32126, 95-0523, 1994 WL 774050, at \*2 (E.D. La. March 14, 1995) (claim seeking reimbursement for potential tax liabilities and alleging, *inter alia,* fraud, breach of fiduciary duty, and aiding and abetting breach was not yet ripe for adjudication).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

Plaintiff also alleges that he has been damaged because he paid professional fees in connection with his IRS dealings. This expense, however, was expressly contemplated and bargained for by the parties in connection with the tax transaction. Plaintiff himself alleges that Andersen told him the IRS might challenge the transaction, and that the IRS might prevail. *See* Compl. ¶ 12 (Andersen told Plaintiff that the IRS might challenge the transaction and Plaintiff would receive only a "more likely than not" opinion that the transaction would withstand scrutiny). In addition, the tax opinions Plaintiff received from Brown & Wood expressly envisioned the possibility of an IRS challenge. Exh. A, p. 50; Exh. B, p. 52. Plaintiff can hardly bootstrap an argument that potential costs built into the transaction render his claim ripe, at least not until he establishes that conducting the transaction caused him harm. *See, e.g., A/S J. Ludwig Mowinckles Rederi v. Tidewater Const. Co. ("Ludwig")*, 559 F.2d 928, 932 (4th Cir. 1977) (demand for expenses, including attorneys fees, was unripe when there might turn out to be no liability on the underlying claim); *Armstrong v. Ala. Power Co.*, 667 F.2d 1385, 1388 (11th Cir. 1982) (same, quoting *Ludwig*); *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 848 (1st Cir. 1990) (same).

It is also worth noting that Plaintiff's claims are equally premature under state law. In Florida, the mere existence of a dispute between the IRS and a taxpayer does not "conclusively establish[] an injury upon which to base a professional malpractice action." *Peat, Marwick, Mitchell & Co. v. Lane*, 565 So.2d 1323, 1326 (Fla. 1990). Rather, a cause of action cannot accrue "until the underlying legal proceeding" on which the malpractice claim is based has "been completed on appellate review," *id.* at 1325-26, or a final settlement has been executed by the parties. *Perez-Abreu, Zamora & De La Fe, P.A. v. Taracido ("Perez-Abreu")*, 790 So.2d 1051, 1054 (Fla. 2001). The reason for this rule is that until there has been an irrevocable settlement of the dispute between the IRS and Plaintiff, or a complete litigation of the legality of Plaintiff's tax treatment, "there [is] no injury" to her. *Peat, Marwick*, 565 So.2d at 1326; *accord Fremont Indem. Co. v. Carey, Dwyer, Eckhart, Mason & Spring, P.A.*, 796 So.2d 504, 506 (Fla. 2001)

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

(insurer could not establish redressable harm until litigation finally concluded because litigation could be resolved in a manner that would obviate injury to insurer). *See also Glucksman v. Persol N. Am., Inc.*, 813 So.2d 122, 126 (Fla. DCA 4th 2002) (legal malpractice action not ripe until the execution of the out-of-court settlement extinguishes the parties' right to sue).

In sum, until Plaintiff's dispute with the IRS has been resolved, Plaintiff cannot show that his claims against Brown & Wood are fit for adjudication, and those claims must be dismissed for lack of jurisdiction.

**B.      In The Alternative, The Complaint Fails To Allege That Brown & Wood Caused Plaintiff Harm.**

Under Florida law, causation is an essential element of Plaintiff's claims for professional malpractice, breach of fiduciary duty, breach of contract (however formed),[8] negligent misrepresentation, fraudulent misrepresentation, and tortious interference in an advantageous business relationship.[9] These claims should be dismissed because Plaintiff cannot show he was injured by Brown & Wood's conduct.

Plaintiff alleges that "[a]s a result of" Brown & Wood's "breaches and deviations, [he] entered into the subject transactions." Compl. ¶ 38; *see also id.* ¶¶ 44, 50, 62, 70, 79. Brown & Wood, however, could not have caused Plaintiff to enter the transactions because his only communication with Brown & Wood -- the December 31, 1999 opinion letters -- occurred "*after* the transactions were finalized. . . ." *Id.* ¶ 25 (emphasis added).

---

[8] Plaintiff's contract based claims are, in reality, nothing more than claims for professional malpractice. *Compare* ¶¶ 36, 37 (professional malpractice) with ¶ 42 (breach of oral contract), ¶¶ 48, 49 (breach of contract implied in fact) and ¶¶ 53, 54 (breach of contract implied in law).

[9] *See Olmsted v. Emmanuel*, 783 So.2d 1122, 1125 (Fla. DCA 1st 2001) (essential element of legal malpractice is causing loss); *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002) (causation is element for breach of fiduciary duty); *Scott-Steven Development Corp. v. Gables by Sea, Inc.*, 167 So.2d 763, 764 (Fla. DCA 1964) (the law remedies those breaches of contract "only for such wrongful acts *as result in injury or damage*") (emphasis added); *Butterworth v. Quick & Reilly, Inc.*, 998 F. Supp. 1404, 1411 (M.D. Fla. 1998) (plaintiff's claims of fraudulent inducement and negligent misrepresentation both failed on failure of causation); *T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 825-26 (11th Cir. 1991) (tortious interference with a business relationship requires causation).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

In other words, Plaintiff's own Complaint forecloses any showing that he based his decision to engage in the transactions on communications from Brown & Wood. Clearly, Brown & Wood's December 1999 opinion letters could not have caused Plaintiff to enter into a transaction that happened in September 1999.

Recognizing this, Plaintiff urges that Andersen somehow made its statements to Plaintiff as Brown & Wood's "agent." According to Plaintiff, the supposed agency relationship makes Brown & Wood liable for Andersen's alleged misrepresentations. This argument fails as a matter of law, however, because Plaintiff pleads no "ultimate facts that establish actual or apparent agency." *Goldschmidt v. Holman*, 571 So.2d 422, 423 (Fla. 1990).

The essential elements of an agency relationship are "(1) acknowledgement by the principal that the agent will act for him; (2) the agent's acceptance of the undertaking; and (3) *control by the principal over the actions of the agent*." *Ilgen v. Hendersen Properties, Inc.*, 683 So.2d 513, 515 (Fla. DCA 2d 1996) (dismissing for failure to plead first element) (emphasis added).

Plaintiff never alleges (and could not honestly allege) that Brown & Wood controlled Andersen. This should surprise no one since, by Plaintiff's own admission, (1) Andersen, not Brown & Wood, had a relationship with Plaintiff; (2) Andersen, not Brown & Wood, chose which tax strategies to suggest to him; (3) Andersen, not Brown & Wood, made the representations at issue; and (4) Andersen, not Brown & Wood, received $1.7 million of the $2.1 million in fees. Compl. ¶¶ 12, 41; *see also id.* ¶¶ 20, 40, 56-57, 64-65. Where Andersen exercised so high a level of independent control, no actual agency can exist. *See Economy Suppliers & Fabricators, Inc. v. Centennial Homes, Inc.*, 325 So.2d 421, 422 (Fla. DCA 4th 1976) (dismissing agency allegation because by definition an agent is not "free from control with regard to the details of the engagement") (citation omitted).

Moreover, according to the Complaint, Brown & Wood authorized Andersen to tell "prospective customers" only that "Andersen would arrange for the customers to get legal

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

representation from [Brown & Wood]" for "'independent,' more likely than not opinion letters." Compl. ¶ 20. This without more is not enough to create actual agency. *See Pappas v. Smart Health U.S.A.*, 861 So.2d 84, 85 (Fla. DCA 4th 2003) ("mere permissive use of [defendant's] name did not create an agency relationship").

Nor does Plaintiff fare better under an apparent agency theory. The essential elements of an apparent agency relationship are "1) there was a representation by the principal; 2) the injured party relied on that representation; and 3) the injured party changed position in reliance upon the representation and suffered detriment." *Amstar Ins. Co. v. Cadet*, 862 So.2d 736, 742 (Fla. DCA 5th 2003). "The focus is on the appearance created by the *principal*, and not the appearance created by the *agent*." *Pardo v. Tanning Research Lab., Inc.*, 996 F. Supp. 1222, 1226 (M.D. Fla. 1996) (emphasis in original). Plaintiff's Complaint never alleges that Brown & Wood made any representation whatsoever, much less one that created the appearance that Andersen was its agent.

Accordingly, Gainor's claims for malpractice (Count I), breach of oral contract (Count II), breach of contract implied in fact (Count III), negligent misrepresentation (Count V), fraudulent misrepresentation (Count VI), breach of fiduciary duty (Count VII), and tortious interference in an advantageous business relationship (Count VIII) should be dismissed.

## C. Plaintiff's Fraud And Misrepresentation Claims Are Defective Because He Fails To Allege That He Relied On Any Representations By Brown & Wood.

Plaintiff's fraud and negligent misrepresentation claims (Counts V and VI) should likewise be dismissed for failure to plead reliance. Detrimental reliance is an essential element of both claims. *See Patterson v. Downtown Med. & Diagnostic Center, Inc.*, 866 F. Supp. 1379, 1383 (M.D. Fla. 1994) (fraud and negligent misrepresentation); *see also M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 94-95 (Fla. 2002) (reliance on the alleged false statement is an essential element of a fraud claim). Plaintiff cursorily alleges that he "justifiably relied on [Brown & Wood's] misrepresentations and omissions entering into the subject transactions and

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

paying substantial fees and transaction costs." Complaint ¶¶ 61, 69. His specific allegations, however, flatly contradict this conclusory assertion.

Plaintiff alleges that he decided to enter into the transaction and pay the fees based *solely* on advice and communications from Andersen *before* he ever had any contact with Brown & Wood. Complaint ¶ 25 (alleging that the Brown & Wood December 31, 1999 opinion letters came only "[a]fter the transactions were finalized"). As noted previously, because Plaintiff already had decided to invest, and indeed had completed the transaction, before receiving any communication from Brown & Wood, he could not have relied on Brown & Wood's representations in making his decision to invest, and his fraud-based claims fail as a matter of law. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So.2d 1210, 1213-14 (Fla. DCA 5th 1995) (dismissing action for fraudulent misrepresentation because at time alleged misrepresentation was made, plaintiff had "already made the decision" to change her position and thus could not have acted to her detriment in reliance on the misrepresentation); *Filler v. Hanvit Bank*, 247 F. Supp. 2d 425, 430 (S.D.N.Y. 2003) ("For the plaintiffs to allege reliance, as required for actionable fraud under both federal and common law, plaintiffs must allege with particularity that defendants made false statements *prior to* [the plaintiffs' act of detrimental reliance]").[10]

## D.    Plaintiff's Breach Of Oral Contract Claim Is Defectively Pled.

Plaintiff attempts to state a claim for breach of oral contract even though he never spoke to anyone at Brown & Wood, and even though he fails to allege that Brown & Wood breached an express term of the contract.

---

[10] For the reasons discussed above with respect to causation, Gainor cannot rely on alleged misrepresentations or omissions by Andersen to satisfy the reliance element because he has failed to plead facts sufficient to establish that Andersen was acting as Brown & Wood's agent.

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

In an attempt to remedy the first defect, Plaintiff alleges that Andersen acted as Brown & Wood's "agent." Compl. ¶¶ 40-41. As already discussed, the Complaint fails to allege facts sufficient to establish an agency relationship.

As to the second defect, Gainor alleges that Brown & Wood violated the so-called oral contract by breaching (1) "an implied covenant . . . to exercise ordinary skill and knowledge in the rendition of legal professional services" and (2) an "implied covenant of good faith and fair dealing." Compl. ¶¶ 42, 43. Under Florida law, however, a "cause of action for breach of the implied covenant cannot be maintained . . . in the absence of breach of an express term of the underlying contract." *Shibata v. Lim*, 133 F. Supp.2d 1311, 1318 (M.D. Fla. 2000). Plaintiff is trying to do exactly what Florida law forbids: state a claim for breach of implied covenant without alleging breach of an express term. *Insurance Concepts and Design, Inc. v. Healthplan Services Inc.*, 785 So.2d 1232, 1234 (Fla. 4th DCA 2001). Count II for breach of oral contract should be dismissed on this alternative and independent ground as well.

**E.      Plaintiff Has Failed To State A Claim For Tortious Interference With An Advantageous Business Relationship.**

The elements of tortious interference are (1) "existence of a business relationship [not founded on contract]; (2) knowledge of the relationship on the part of the interferer; (3) an intentional and unjustified interference with that relationship by the defendant; and (4) damage to the plaintiff as a result of breach of the relationship." *Smith v. Ocean State Bank*, 335 So.2d 641, 644 (Fla. DCA 1st 1976) (compiling and analyzing cases); *see also Sobi v. Fairfield Resorts, Inc.*, 846 So.2d 1204, 1207 (Fla. DCA 5th 2003).

First, nothing alleged by Plaintiff could possibly constitute "interference." Under Florida law, "interference" occurs when the defendant induces the third party "not to deal with" the plaintiff. *Seminole Tribe v. Times Publishing Co.*, 780 So.2d 310, 315 (Fla. DCA 4th 2001). Here, Andersen continued to serve as Plaintiff's accountant, consultant, and financial advisor in the transaction at issue (for which it received approximately $1.7 million), and there is no

13

allegation that Andersen ever terminated the relationship. Where, as here, the most that Plaintiff alleges is "only that [Brown & Wood] solicited isolated acts of disloyalty which affected the 'quality' of [Andersen's relationship with Plaintiff]," the tortious interference claim fails as a matter of law. *Seminole Tribe*, 780 So.2d at 315.

Second, Plaintiff never alleges that Brown & Wood knew of his *specific* business relationship with Andersen and targeted it. *See KMS Restaurant Corp. v. Wendy's International, Inc.*, 361 F.3d 1321, 1325 (11th Cir. 2004) (under Florida law the elements of tortious interference required plaintiff KMS to establish defendant "Wendy's knowledge of the business relationship between KMS and Citicorp."). Instead, he pleads only that Brown & Wood knew "that Andersen maintained *these types of relationships* with *clients such as Gainor*." Complaint ¶¶ 77 (emphasis added). The cases make clear that alleging Brown & Wood intended only to affect Andersen's relationship with its clients generally is not enough to sustain Plaintiff's tortious interference claim. *See Sarkis v. Pafford Oil Co., Inc.*, 697 So.2d 524 (Fla. DCA 1st 1997) (affirming dismissal on this ground).

### F.    Plaintiff Fails To State A Florida Rico Act Violation.

Plaintiff's attempt to assert a claim for violations of the Florida RICO Act, Florida Statute § 772.101 *et seq.*, is equally unavailing. In addition to the Complaint's failure to satisfy the particularity requirements of Fed. R. Civ. P. 9(b) (as described immediately below), Plaintiff never identifies the RICO "enterprise" and never properly alleges injury.

Although Plaintiff refrains from citing which of the four subsections of § 772.103 he claims Brown & Wood violated, it appears from Paragraph 95 that he intends to allege violation of § 772.103(1). That section reads:

> It is unlawful for any person ... who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

14

The Florida RICO Act was patterned after the federal RICO statute, *see Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1263-64 (11th Cir. 2004), and § 772.103(1) is nearly identical to 18 U.S.C. § 1962(a).[11]  As a result, case law interpreting § 1962(a) informs the interpretation of § 772.103(1).  *See Jackson*, 372 F. 3d at 1263-64.

Description of the alleged RICO enterprise constitutes an "[e]ssential" and "basic requirement[]" of a RICO claim. *Jackson*, 372 F.3d at 1264; *see also McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002) ("To state a RICO claim, a plaintiff must plead … an 'enterprise'"); *Durham v. Business Mgmt Assoc.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (same). Here Plaintiff never even attempts to explain the nature of the RICO enterprise supposedly at issue.  Moreover, to the extent that Plaintiff is trying to allege that Brown & Wood itself represents the "enterprise," his claim fails as a matter of law.  This Court has previously noted that,

> [i]n *National Organization for Women v. Scheidler*, 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), the Supreme Court, in the course of interpreting Sections 1962(a) and (b), stated that the "enterprise in these subsections is the victim of unlawful activity" and must be "an entity that was acquired through the illegal activity or the money generated from illegal activity."

*In re Managed Care Litigation,* 150 F. Supp 2d 1330, 1352 (S.D. Fla. 2001).  This Court then dismissed the RICO conspiracy claim alleged in *In re Managed Care Litigation* because, in part, "each Defendant is not a victim nor can it acquire itself." *Id.* at 1332.  For the same reasons, the Florida RICO claim against Brown & Wood should be dismissed.

In addition, while it is not necessary for the court to reach this issue because of the failure to allege an "enterprise," Plaintiff has not alleged injury under § 772.103(1).  A cause of action

---

[11] 18 U.S.C. § 1962(a) reads in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500  FAX 305-579-0717  www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

may be brought pursuant to this section only by a person who "has been injured *by reason of* any violation of the provisions of § 772.103." Fla. Stat. § 772.104 (emphasis added). Pursuant to the plain language of § 772.103, Plaintiff must allege that he has been injured by the *use* or *investment* of racketeering proceeds, and not simply by predicate acts. This is the conclusion drawn by at least nine federal circuit courts construing the identical injury or standing requirement for the federal statutes, which allow a civil cause of action to be brought only by a person who was injured "by reason of" a violation of 1962.[12]

The Eleventh Circuit has not addressed this issue, and the district courts in the circuit have reached different conclusions. In *Avirgan v. Hull*, 691 F. Supp. 1357, 1362 (S.D.Fla. 1988), the district court did not have the benefit of the large volume of circuit cases, and held that it was most persuaded by a Pennsylvania district court decision since abrogated by the Third Circuit's holding in *Rose*. *See Princeton Economics Group, Inc. v. AT&T Co.*, 768 F. Supp. 1101, 1111-12 (D.N.J. 1991) (noting abrogation). The contrary view was taken by another court in this District. *See In re Sahlen & Assoc., Inc.*, 773 F. Supp. 342, 367 (S.D.Fla. 1991).

We recognize that this Court has agreed with the minority view and held that a plaintiff suffers sufficient injury from the "receipt of income from a pattern of racketeering activity" rather than its investment or use. *In re Managed Care Litigation*, 150 F. Supp.2d at 1351.[13]

---

[12] *See Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149-50 (10th Cir. 1989); *Rose v. Bartle*, 871 F.2d 331, 357-58 (3d Cir. 1989); *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 494 (6th Cir. 1990); *Ouaknine v. MacFarlane*, 897 F.2d 75, 82-83 (2d Cir 1990); *Danielsen v. Burnside-Ott Aviation Training Center, Inc.*, 941 F.2d 1220, 1229-30 (D.C. Cir. 1991); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 584 & n.4 (5th Cir. 1992); *Nugget Hydroelectric, L.P. v. Pacific Gas & Electric*, 981 F.2d 429, 437 (9th Cir. 1992), *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp., et al*, 57 F.3d 56, 91 (1st Cir. 1995); *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 895 (8th Cir. 1999). Only the Fourth Circuit has held to the contrary, in *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837-38 (4th 1990). More recently that court observed that it is constrained to follow its minority view until an *en banc* decision changes it, noting that "[e]very other circuit to address the issue has adopted an 'investment use injury' requirement." *Potomac Electric Power Co. v. Electric Motor and Supply, Inc.*, 262 F.3d 260, 264 n.2 (4th Cir. 2001).

[13] When this case returned to this Court after appellate review on other issues, the plaintiffs alleged investment injury despite the court's earlier ruling that it was not necessary to their claims. *See In re Managed Care Litigation*, 298 F. Supp. 2d 1259, 1272 (S.D.Fla. 2003).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

Nevertheless, Brown & Wood respectfully submits that this Court should adopt the majority view here. The *Busby* rule would allow a plaintiff who was allegedly injured by a single predicate act to sue for treble damages and attorneys fees if the defendant does nothing more than receive proceeds indirectly derived from one other alleged predicate act within five years, *see* § 772.102(4) (definition of "pattern" under Florida law), a result that seems unlikely to embody the Florida legislature's intent, and whose analogue has been consistently rejected by the Federal Courts.

## G. Plaintiff's Fraud And RICO Claims Fail Pursuant To Federal Rule Of Civil Procedure 9(B).

Finally, Plaintiff's claims against Brown & Wood for fraudulent misrepresentation, negligent misrepresentation, and violations of the Florida RICO Act should also be dismissed because the Complaint utterly fails to state "the circumstances of fraud. . . with particularity" as required by Fed. R. Civ. P. 9(b).[14]

As this Court has noted, to satisfy the requirements of Rule 9(b), a plaintiff must allege:

> (1) the precise statements, documents or misrepresentations made;
> (2) the time, place and person responsible for the statement; (3) the content and manner in which these statement misled the Plaintiffs;
> and (4) what the defendants gained as a consequence of the fraud.

*In re Managed Care Litig.*, 150 F. Supp.2d at 1346 (citation omitted). Where, as here, the defendant is an organization, a plaintiff must also identify the individual(s) within the organization who made the allegedly false or misleading statements. *United States ex rel. Butler v. Magellan Health Servs.*, 74 F. Supp.2d 1201, 1216 (M.D. Fla. 1999). Furthermore, the nature of the agency relationship alleged must be pled with particularity "when the plaintiff relies upon

---

[14] In addition to Plaintiff's claim for fraudulent misrepresentation, Rule 9(b) applies to the Florida RICO Act claim, which is premised on mail fraud under 18 U.S.C. § 1341 (*see* Compl. ¶ 92), and the negligent misrepresentation claim. *See Brooks v. Blue Cross and Blue Shield*, 116 F.3d 1364, 1380-81 (11th Cir. 1997) (applying Rule 9(b) to mail fraud allegation in RICO action); *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003) (9(b) applies to negligent misrepresentation claim if based on the same alleged facts as fraudulent misrepresentation).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

the same circumstances to establish both the alleged fraud and the agency relationship." *Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 782-83 (7th Cir. 1999) (applying Rule 9(b)).

Plaintiff's Complaint violates Rule 9(b) in every way. It does not identify who at Brown & Wood allegedly gave Andersen "express or implicit authority" to act on its behalf in dealing with Plaintiff, Complaint ¶ 12; who allegedly "authorized and encouraged" Andersen to use its name as part of an "agree[ment] to work together" on tax shelters, *id.* ¶¶19, 20, 56; who purportedly admitted to Andersen that Plaintiff could not rely "on the advice of a tax professional," *id.* ¶ 23; or who issued the allegedly misleading opinion letters. This is fatal to Plaintiff's claims. *See, e.g., Rentclub, Inc. v. Transamerica Rental Finance Corp.*, 775 F. Supp. 1460, 1462 (M.D. Fla. 1991) (requiring plaintiff to re-plead because he "should specifically identify the individuals who made the alleged misrepresentations[,]... [and] their specific statements to organize, orchestrate, and commence the alleged plan"); *Anthony Distributors, Inc. v. Miller Brewing Co.*, 904 F. Supp. 1363, 1365 (M.D. Fla. 1995) (noting requirement to "specifically identify the individuals").

Further, the Complaint does not identify who at Andersen allegedly "offered" the strategy to Plaintiff, Compl. ¶ 12; misled him about "the actual risk associated" with the transaction, *id.* ¶¶ 28(a), 57; or was told about the purported impact of Notice 99-59 on Plaintiff's ability to rely on the advice of tax professionals. *Id.,* ¶ 23. *See, e.g., NCR Credit Corp. v. Reptron Electronics Inc.*, 155 F.R.D. 690, 693 (M.D. Fla. 1994) (dismissing complaint under Rule 9(b) for failure to identify agents who made alleged misrepresentations). Nor does it set forth what the unidentified person at Andersen told Plaintiff about the tax strategy or when the alleged misrepresentations were made. Finally, it fails to allege "the manner in which [the misrepresentations] misled" him. *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); *see* Compl. ¶¶ 28, 57 & 65 (both incorporating ¶ 28).

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZURICH

In an effort to cure Plaintiff's inability to allege causation and reliance on Brown & Wood's Opinion Letters (as described in detail above), Plaintiff obliquely refers to Brown & Wood's "preliminary advice and directives." Compl. ¶ 28. Nowhere in the Complaint, however, does Plaintiff ever detail these supposed communications, identify who at Brown & Wood purportedly gave them, state when they were provided, or describe the impact on Plaintiff.

Plaintiffs' Florida RICO Act claim suffers from similar defects. Plaintiff groups Andersen and the accounting firm KPMG LLP with unidentified "accounting and financial consulting firms" and "other financial institutions" as "The Marketers." Compl. ¶ 84. He fails, however, to identify any individuals at any of "The Marketers" who were allegedly authorized by Brown & Wood to make the representations to other taxpayers, *id.*, ¶¶ 85, 86, or who made representations to any of the taxpayers identified in the Complaint. This failure requires dismissal. *See In re Managed Care*, 150 F. Supp. 2d at 1347 (*citing Saporito v. Combustion Engineering,* 843 F. 2d 666, 675 (3rd Cir. 1988)). Further, he fails to allege who at Brown & Wood "authorized and encouraged The Marketers" to make promises to "prospective customers" *id.,* ¶ 85, or "authorized" them to make representations regarding the tax consequences of certain deductions they might take if they implemented the tax strategies. *Id.* ¶ 86; *see Ageloff v. Kiley,* 318 F. Supp. 2d 1157, 1159 (S.D. Fla. 2004) (a civil RICO complaint must plead all of the elements of each alleged predicate act with particularity).

To the extent Plaintiff purports to allege specific "material omissions," Compl. ¶ 28, he fails to allege how the purported omissions misled him, or facts establishing circumstances that would require such disclosures. Rule 9(b) "requires" him to set forth *"where* the statement was, or should have been, made" as well as *"when* the statement was, or should have been, made." *In re Sunstar Securities Healthcare Litigation*, 173 F. Supp. 2d 1315, 1318 (M.D. Fla. 2001) (emphasis added); *see also Gibbs v. Republic Tobacco, L.P.,* 119 F. Supp. 2d 1288, 1294 (M.D. Fla. 2000) (plaintiff should plead "the time and place" of misstatement or omission); *Hernandez v. CIBA-GEIGY Corp. USA,* 200 F.R.D. 285, 291 (S.D. Tex. 2001) (dismissing fraud claim under

19

Rule 9(b) because plaintiff "fail[ed] to allege the circumstances that would necessitate making such disclosures, such as when and where these disclosures should have been made"). Plaintiff fails to identify any affirmative representations by either Andersen or Brown & Wood that were misleading because of the alleged omissions or explain how these omissions misled him. *See, e.g., In re Cascade Int'l Securities Litigation*, 840 F. Supp. 1558, 1574 (S.D.Fla. 1993) (for omissions to be actionable, plaintiff must allege the "manner in which [he was] misled").

Because, as set forth above, Plaintiff fails to plead fraud with the required specificity, his claims for negligent misrepresentation (Count V), fraudulent misrepresentation (Count VI), and violation of Florida's civil RICO statute (Count IX) should be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's Complaint should be dismissed

DATED: September 7th, 2004.

Respectfully submitted,

GREENBERG TRAURIG, P.A.
Attorneys for Defendant SIDLEY AUSTIN
  BROWN & WOOD LLP
1221 Brickell Avenue
Miami, Florida  33131
Tel:  (305) 579-0500
Fax: (305) 579-0717
E-mail:  sochinl@gtlaw.com

By:_____
            LORI A. SOCHIN
            Florida Bar No. 013048

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE  MIAMI, FLORIDA 33131
305-579-0500  FAX 305-579-0717  www.gtlaw.com
AMSTERDAM  ATLANTA  BOCA RATON  BOSTON  CHICAGO  DALLAS  DENVER  FORT LAUDERDALE  LOS ANGELES  MIAMI  NEW JERSEY  NEW YORK
ORLANDO  PHILADELPHIA  PHOENIX  TALLAHASSEE  TYSONS CORNER  WASHINGTON, D.C.  WEST PALM BEACH  WILMINGTON  ZÜRICH

Case No.: 04-22058-CIV-MORENO/Garber

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by fax and first class U.S. mail to **Richard B. Wilkes, Esq.** and **Kenneth C. Thomas, Esq.,** Gardner Wilkes Shaheen, Counsel for Plaintiff, P.O. Box 1810, Tampa, FL 33601-1810 on September 7th, 2004.

LORI A. SOCHIN

\\MIA-SRV01\SOCHINL\720265v01\LVC901_.DOC\9/7/04\67230.010400

GREENBERG TRAURIG, P.A.
1221 BRICKELL AVENUE MIAMI, FLORIDA 33131
305-579-0500 FAX 305-579-0717 www.gtlaw.com
AMSTERDAM ATLANTA BOCA RATON BOSTON CHICAGO DALLAS DENVER FORT LAUDERDALE LOS ANGELES MIAMI NEW JERSEY NEW YORK
ORLANDO PHILADELPHIA PHOENIX TALLAHASSEE TYSONS CORNER WASHINGTON, D.C. WEST PALM BEACH WILMINGTON ZÜRICH

# Exhibit A

December 31, 1999

Lucor Special Investments, Inc.
3333 Peachtree Road, NE
Suite 450
Atlanta, GA  30326

Mr. Mark Gainor
8022 Fisher Island Drive
Miami, FL  33109

Ladies and Gentlemen:

You have requested our opinion regarding certain US Federal income tax consequences of certain transactions described below ("Transactions"). Gainor Medical USA, Inc. ("GMUSA") was organized under the laws of California on December 7, 1984. GMUSA's sole shareholder was Mark Gainor ("Gainor") indirectly through Gainor Medical Canada Ltd. GMUSA was taxed as a C corporation for U.S. Federal income tax purposes until July 1, 1997. On July 1, 1997 GMUSA elected to be treated as an S corporation for U.S. Federal income tax purposes. GMUSA's principal business activity was wholesale medical supply sales and distribution.

## I.    DESCRIPTION OF TRANSACTIONS

On June 13, 1997, GMUSA contributed its assets to Gainor Medical Management, LLC ("LLC"), a Georgia limited liability company, other than stock owned by GMUSA in Brooke Medical Inc. In exchange for the contributed assets LLC issued to GMUSA 556,6000 LLC Class A units and 556,000 LLC Class B units.

After such contribution, GMUSA became an investment vehicle for Gainor. In October 1999, GMUSA began evaluating its investments, which then consisted primarily of the LLC units. In order to diversify GMUSA's investments, GMUSA opened an account at Merrill Lynch

M0303727

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 2

("ML") using $4,500,000 of cash that was contributed from Gainor's personal account at Goldman Sachs. Based upon advice received from ML, GMUSA decided to invest in United States Treasury Bills ("T-Bills"). Such investment was made for substantial non-tax business reasons including: (i) GMUSA's and Gainor's belief that the Federal Reserve Board would lower interest rates in an attempt to encourage continued growth of the U.S. economy in the wake of the Y2K fears, (ii) to produce an overall economic profit due to GMUSA's and Gainor's belief the yield curve for T-Bills would change, and (iii) GMUSA's and Gainor's belief that the most direct way with the most leverage to realize gains for the expected change in interest rates was to invest in T-Bills.

To take maximum advantage of possible interest rate changes, GMUSA decided to purchase the T-Bills on margin. This enabled GMUSA to purchase more T-Bills than it would otherwise be able to purchase and to maximize any increase in the value of the T-Bills due to interest rate fluctuations. Due to market volatility and the size of the margin loan, ML required that additional collateral be pledged to secure the margin loan. GMUSA pledged its units in LLC to satisfy the requirement for additional collateral.

GMUSA and Gainor decided to purchase the T-Bills through ML because GMUSA had already established an account with ML and ML provided lower transaction costs (interest rates and loan fees) than other brokerage firms. On October 18, 1999, GMUSA purchased $30,779,154 of face value T-Bills that matured on December 30, 1999. The T-Bills had a cost basis of $30,549,049. The amount of the margin loan was $28,600,000.

Gainor had a basis in his shares of GMUSA of approximately $27,461,000 and such shares had a fair market value of approximately $32,164,000. GMUSA's interest in LLC had a tax basis of $24,630,000 and a fair market value of $31,111,000.

Gainor was approached by the Palladium Financial Trust ("Palladium") and its wholly-owned subsidiary, LSI Holdings Inc. ("LSI") about purchasing GMUSA. LSI, however, did not want to acquire GMUSA's interest in LLC, because it did not fit within LSI's overall investment strategy.

To facilitate the acquisition of GMUSA by LSI, GMUSA and Gainor decided to distribute GMUSA's interest in LLC to Gainor. However, GMUSA was informed by ML and its attorneys that such a distribution would violate California corporate law. According to ML's

NYLIB1.683386.4

M0303728

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 3

attorneys, the California corporate laws could be avoided if GMUSA was reincorporated in the State of Georgia. In order to reincorporate GMUSA in Georgia, Gainor formed Lucor Special Investments, Inc. ("Lucor") under the laws of Georgia, and on November 12, 1999, GMUSA was merged into Lucor, with Lucor as the surviving entity. After such merger, Gainor owned 100% of the issued and outstanding shares of Lucor. Lucor immediately elected to be taxed as an S corporation for U.S. federal income tax purposes.

On November 23, 1999, Palladium entered into a letter of intent to acquire all of the shares of Lucor. The letter of intent was non-binding, but provided for a period of exclusivity.

On December 22, 1999, Lucor distributed its Units in LLC to Gainor. The then tax basis in the units was $27,121,000, and their fair market value was $33,601,000.

On December 23, 1999, Gainor contributed his shares of Lucor to MJG Partners ("MJG"), a limited partnership of which Gainor was an 85.7% partner. Such contribution terminated Lucor's S corporation election. Gainor and MJG made an election pursuant to Section 1362(e)(3) of the Internal revenue Code of 1986, as amended ("Code), to compute the taxable income of Lucor under normal tax accounting rules. On December 23, 1999, LSI purchased the stock of Lucor from MJG for $125,755.

## II.    REPRESENTATIONS

For purposes of this opinion, Gainor has made the following representations:

1.    GMUSA invested in United States Treasury Bills for substantial nontax business reasons, including (i) to produce overall economic profits, because of their belief that the United States treasury yield curve would change, and (ii) their belief that the most direct way, with the most leverage, to realize gain from expected interest rate changes was to invest in United States Treasury Bills.

2.    The sale of GMUSA's shares to Palladium was made for substantial nontax business reasons.

3.    The distribution of the LLC interest was made for substantial nontax business reasons.

4.    Neither GMUSA nor Gainor were obligated to engage in any transaction upon the completion of any other transaction.

NY1:11316683844

M0303729

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 4

## III.   SUMMARY OF OPINIONS

In rendering our opinions, we have reviewed representations and advice from various parties to the transactions described herein, which representations and advice are referred to below. In rendering our opinions, we have also examined such corporate records and such other agreements, certificates, instruments, and documents as we have believed are relevant, and we have made such other inquires of officers, owners and representatives of the entities involved in the transactions described herein as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, records, agreements, certificates, instruments, documents, and responses to such inquiries, if any such representations, advice, records, agreements, certificates, instruments, documents, or responses is inaccurate in any material respect, the opinions contained herein may not be relied upon. If such description or assumptions are inaccurate in any material respect, or the documents prove not to be authentic, the opinions contained herein may not be relied upon. In rendering our opinion, we have reviewed the applicable provisions of the Code and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg.", "Treasury Regulations", or "Regulation") promulgated thereunder; relevant decisions of the U.S. Federal courts; published Revenue Rulings ("Rev Rul." or "Ruling") and Revenue Procedures ("Rev. Proc") of the Internal Revenue Service ("IRS"); and such other materials as we have considered relevant. In certain instances we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed.

Based on and subject to the summary set out at I above, the representations set out at II above, and the analysis of the pertinent statutory provisions at III. A-D, as affected by the analysis of the statutory provisions and legal doctrines at III. E, below, all as of the date hereof, we are of the opinion that for U.S. Federal income tax purposes, although a factual situation such as the one described above has not been before a court of law addressing the issues addressed herein, on the basis of authority arising in analogous contexts, it is more likely than not (i.e., there is a greater than 50% likelihood) that, if challenged by the IRS:

    (i)    For purposes of Code Section 301, the amount of the distribution of the LLC interest to Gainor would equal the fair market value of such interest reduced by the outstanding balance of the Margin Loan.

    (ii)    Gainor's aggregate tax basis in the LLC interest immediately after its distribution by GMUSA would be approximately $28 million.

NYLIB1/668186-4

M0303730

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 5

        (iii)    Gainor's tax basis in the stock of GMUSA immediately after its distribution of the LLC interest to Gainor would be approximately $27.4 million.

        (iv)    The distribution of the LLC interest subject to the Margin Loan would cause GMUSA to recognize gain under Code Section 311(b) in the amount of approximately $6.5 million.

        (v)    Gainor would recognize no income upon GMUSA's payment or prepayment of the Margin Loan.

## IV.   ANALYSIS

### A.   Tax Consequences to Gainor on Distribution

#### 1.   Application of Code Section 301 - Generally

Code Section 1371 generally provides that except as otherwise provided and except to the extent inconsistent with subchapter S, the rules of subchapter C apply to an S corporation and its shareholders. Under subchapter C, a distribution by a corporation to its shareholders with respect to its stock is generally governed by the rules of Code Sections 301 through 318.

Code Section 1368 (a) provides, however, that a distribution by an S corporation of property with respect to its stock which (but for such subsection) would be governed by Code Section 301(c)[1] is governed by Code Sections 1368(b) and (c). Code Section 1368(b) provides that if an S corporation has no accumulated earnings and profits, the distribution is not included in income to the extent that it does not exceed the adjusted basis of the stock and any such excess is treated as gain from the sale or exchange of property Code Section 1368(c) provides that if an S corporation has accumulated earnings and profits the portion that does not exceed the "accumulated adjustments account" as defined in Code Section 1368(e) is treated in the manner provided in Code Section 1368(b), the remaining portion is treated as a dividend to the extent

---

[1]   Code Section 301(a) provides that, generally, distributions of property by a corporation are treated in accordance with Code Section 301(c). Under Code Section 301(c), such a distribution can be treated in any of three ways: (i) as a dividend (a distribution of the earnings and profits of the corporation, as defined under Code Section 316); (ii) as a return of capital resulting in a decrease in the basis of the shareholder(s)' stock; or (iii) as a gain from the sale or exchange of property (i.e., a capital gain) to the extent the portion of a distribution not treated as a dividend exceeds the adjusted basis of the stock

NYLIB1:5083804

M0303731

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 6

that it does not exceed such earnings and profits, and any remaining portion is also treated in the manner provided in Code Section 1368(b).

Neither Code Section 1368 nor the Treasury Regulations promulgated thereunder provide how to determine the amount of a distribution by an S corporation, however. Consequently, based upon the general rule of Code Section 1371(a) reference must be made to the rules under subchapter C of the Code. In the instant case, the LLC interest distributed to the Gainor had a fair market value of approximately $33.6 million. In addition, the LLC interest was not released as collateral for the GMUSA's Margin Loan and thus remained subject to the debt of the GMUSA. As with any instance of distribution of property by a corporation with respect to its stock, the determination of the amount distributed by GMUSA to Gainor is within the purview of Code Section 301(b).

## 2. Determination of "amount distributed" –Code Section 301(b)

Generally, under Code Section 301(b) the amount of any distribution by a corporation with respect to its stock is the amount of money received, plus the fair market value of other property received. Code Section 301(b)(1). However, Code Section 301(b)(2) provides that the amount of a distribution must be reduced (but not below zero) in certain instances. Under Code Section 301(b)(2)(A), the amount of distribution is reduced by the amount of any liability of the distributing corporation assumed by the shareholder in connection with the distribution. See also, Treas. Reg. §1.301-(g). In addition, under Code Section 301(b)(2)(B) the amount of distribution is reduced by the amount of any liability to which the property received by the shareholder is subject immediately before and immediately after the distribution.

In this instance, the LLC interest was distributed to Gainor on December 22, 1999. In accordance with Code Section 301(b)(3), the fair market value of the LLC interest on such date was approximately $33.6 million. Starting from this point, one must apply Code Section 301(b)(2) to determine whether any reduction in this amount is indicated. As stated above, the LLC interest constitutes the security for the Margin Loan to GMUSA. This security interest is perfected via a lien on the LLC interest in favor of ML. Accordingly, the LLC interest is subject to the Margin Loan liability equal to the amount of the Margin Loan on the date of its distribution.

A number of cases and rulings cite Code Section 301(b)(2) as authority in affirming a reduction in the amount of a distribution by a corporation with respect to its stock. See. e.g.,

NYLIB1-968386-4

M0303732

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 7

Allen v. Comm'r, T.C. Memo 1993-612 (1993); PLR 9329329002, PLR 9221011, PLR 8626089, PLR 8347128[2]. However, there exists no statutory or regulatory authority under Code Section 301 which illustrates a 'reduction for liabilities' in this context. However, illustration is provided in Treasury Regulations under Code Section 312(c). Code Section 312(c) provides that, in cases of corporate distributions with respect to stock out of earnings and profits, proper adjustment shall be made for (1) the amount of any liability to which the property distributed is subject; and (2) the amount of any liability of the corporation assumed by a shareholder in connection with the distribution. See also, Treas. Reg. §1.312-3. In effect, Code Section 312(c) mirrors the Code Section 301(b)(2) with respect to calculating the earnings and profits of distributing corporations.

Specific examples of the mechanics of Code Section 312(c) as applied to corporate distributions of property subject to a liability are provided in Treas. Reg. §1.312-4. In Example (1), a corporation distributes a vacant lot with a fair market value of $5,000 subject to a mortgage of $2,000 to A, its sole shareholder. The example indicates that the amount of the dividend received by A is $3,000 (the fair market value of the property, $5,000, reduced by $2,000, the amount of the mortgage to which the property was subject). The next example in Treas. Reg. §1.312-4, Example (2), relies on the facts of Example (1) except that the amount of the mortgage is increased to $4,000. The example indicates that this results in a decrease in the amount of the dividend attributable to A to $1,000 (the fair market value of the property, $5,000, reduced by $4,000, the amount of the mortgage to which the property was subject). Finally, Example (3) provides for a distribution of inventory with a fair market value of $55,000, subject to a liability of $35,000. The example indicates the 'net amount of distribution' is $20,000 (the fair market

---

[2]      Although General Counsel's Memoranda and private letter rulings, including Technical Advice Memoranda, may not be relied upon as authority, they do indicate the view of the Internal Revenue Service on the issues addressed at the time of its issuance. In addition, private letter rulings issued after October 31, 1976 can be used to establish "substantial authority" for purposes of avoiding certain penalties under Code Section 6662. Treas. Reg. §1.6662-4(d)(3)(iii). Code Section 6110(j)(3) provides that a written determination, ( e.g., a private ruling, determination letter, or technical advice memorandum), may not be used or cited as precedent. However, in Xerox Corp. v. U.S., 656 F.2d 659 (Ct. Cl. 1981), the court noted that although private letter rulings have no precedential value, "they are helpful, in general, in ascertaining the scope of the ... doctrine adopted by the Service and in showing that the doctrine has been regularly considered and applied by the Service."

M0303733

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 8

value of the property, $55,000, reduced by $35,000, the amount of the liability to which the property was subject)

In the instant case, the LLC interest serve as security for the Margin Loan. These facts cause this instance to fall squarely within the fact pattern(s) established in Treas. Reg. §1.312-4, Example (1) through Example (3). Accordingly, the similarity in the facts presented here with the examples in Treas. Reg. §1.312-4, in light of the nearly identical language used in Code Sections 312(c) and 301(b)(2), support a conclusion that, for purposes of determining the amount distributed to Gainor by GMUSA, a dollar-for-dollar reduction in the fair market value of the LLC interest, to the extent of the amount of the Margin Loan, must be applied in recognition of Code Section 301(b)(2)(B). Following this reasoning, for purposes of Code Section 301 the amount distributed by GMUSA to Gainor equals approximately $5.6 million (the fair market value of the LLC interest, $33.6 million, reduced, but not below zero, by the amount of liabilities to which the LLC interest is subject, i.e. the amount of the Margin Loan, approximately $28 million).

**3.      Definition of "subject to a liability" for purposes of Code Section 301(b)(2)(B)**

While the examples contained in Treas. Reg. §1.312-4 are helpful in determining what facts will give rise to a prima facie case for a Code Section 301(b)(2)(B) adjustment to the amount of a distribution for purposes of Code Section 301, neither the Code nor the Regulations address how to determine when property is "subject to a liability". The question is reduced, therefore, to establishing a definition of the term 'subject to.' In determining the definition of terms for purposes of the I.R.C., courts first look to the plain meaning of the statute. Only if the plain meaning of the statute is ambiguous should the courts resort to extrinsic aids for interpretation. Miller v. CIR, 914 F.2d 586 (4th Cir., 1990). If the courts find the plain meaning of the statute ambiguous, they then look to other authority for guidance, such as the text of the underlying regulations and case law that has addressed the issue. See, Schleier v. CIR, 115 S.Ct. 2159 (1995).

As discussed above, it is gainsaid that if the distribution from GMUSA to Gainor is subject to any liability, the amount deemed distributed for purposes of Code Section 301 is reduced dollar-for-dollar by the amount of the liability. The meaning of the term "subject to" is broad and defined as ". . . liable, subordinate, governed or affected by. . . Black's Law Dictionary, Sixth Edition, (1990)." For legal purposes, property that is pledged to secure

NYLIB1-668386.4

M0303734

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 9

recourse debt and can be used to satisfy the liability upon default is considered subject to that liability *See, e.g.,* Owen v. CIR, 881 F.2d 832 (9th Cir. 1989); TAM 9640001.

Under the terms of the Margin Loan agreement, GMUSA specifically pledged the LLC interest to ML as security for the Margin Loan. ML's right to look to the LLC interest for repayment of the Margin Loan was thereby created, and this right was maintained after the distribution of the LLC interest. Accordingly, ML's lien on the LLC interest existed at all times relevant hereto, thereby rendering the LLC interest 'subject to' the liability of the Margin Loan both immediately before the distribution and immediately after the distribution.

### 4.    Maher v. U.S.

The Tax Court took up the matter of when property is subject to a liability for purposes of Code Section 301(b)(2)(B) in Maher v. U.S., 69-1 U.S.T.C. ¶9194 (D.C., W.D. Mo., 1969). In Maher, the distribution in question satisfied the literal statutory requirement under Code Section 301(2)(B) (i.e., the property distributed was legally 'subject to' the blanket mortgage attached to all of the distributing corporation's assets) However, the District Court for the Western District of Missouri applied a 'facts and circumstances' test to determine whether the dollar-for-dollar reduction in the amount deemed distributed under Code Section 301(b)(2)(B) was warranted. The court held that despite being legally "subject to" a liability, the amount distributed would not be reduced by the liability, because the property was not, in substance and for purposes of Code Section 301(b)(2)(B), "subject to" the liability in light of all the facts and circumstances of the case.

In Maher, the taxpayer owned 50% of a corporation; the taxpayer's brother owned the remaining 50%. The corporation owned a residence, which was leased to and occupied by the taxpayer. At some point prior to the distribution in question, the corporation borrowed $1,000,000 and granted the lender a blanket lien on all property owned by the corporation, including the residence. The residence represented less than 1% of the total value of the real property securing the debt. The taxpayer subsequently purchased the residence from the corporation. the purchase price to the taxpayer was $8,000, equal to the book value on the corporation's books. The residence had a fair market value of $18,000, as determined on the date of the purchase. The residence continued to secure the corporate liability for approximately one year following the date of sale to the taxpayer. Thereafter, the corporation requested, and the lender agreed, that the mortgage on the residence be released

NYLIB3-6683864

M0303735

BROWN & WOOD LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 10

The IRS argued that the sale resulted in a constructive dividend to the taxpayer in an amount equal to the difference between the fair market value of the residence ($18,000) and the amount paid by the taxpayer ($8,000), or $10,000. The taxpayer asserted an argument based upon Code Section 301(b)(2)(B), stating that the residence was purchased subject to the blanket lien placed on all of the corporation's property. Consequently, the taxpayer argued, the amount of distribution attributable to the difference between the fair market value of the residence and the purchase price paid by the taxpayer was effectively reduced to zero due to the amount of the liability to which the residence was subject.

The district court rejected the taxpayer's argument and held that the residence was not, "as a matter of fact . . . subject to the blanket million dollar mortgage." The court applied a substance over form analysis to strike down the taxpayer's assertion that the residence was subject to the mortgage. In doing so, the court cited the following factors:

(i) Although the corporation held title to the residence, it was not used for ordinary corporate business purposes; accordingly, the residence would not have been subject to the corporate debt but for the fact that a blanket lien was granted to secure the debt;

(ii) Had the sale of the house to the taxpayer been an arm's length sale, the buyer would have required that the lien be released prior to the sale;

(iii) The shareholder had no real risk of loss resulting from the blanket lien, since the residence was only a minor part of the total security for the Margin Loan, and the fair market value of remaining collateral for the Margin Loan was at least twice the Margin Loan amount;

(iv) The lender indicated that it would have released the residence from the blanket lien at any time, upon the request of the corporation or the taxpayer.

Based on these factors, the court held that the lender would not 'in actuality' look to the residence as security for the Margin Loan. Accordingly, because there was no 'real risk of loss' of the property to the shareholder, the property was not subject to the liability for purposes of Code Section 301(b)(2)(B).

The Maher case serves to clarify the application of Code Section 301(b)2(B) in a number of important ways. First, under Maher, the definition of the term 'subject to' is inextricably tied to the concept of risk, i.e., in order for property distributed by a corporation with respect to its

NY1 IH1/6683804

M0303736

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 11

stock to be 'subject to' a liability for purposes of Code Section 301(b)(2)(B), there must be risk of loss to the recipient shareholder. Second, the holding in Maher did not change the substance of the tax consequences of the transaction in question (i.e., a dividend distribution from corporation to the taxpayer), but merely spoke to the matter of when property that is legally subject to a liability can be treated as subject to a liability for purposes of Code Section 301(b)(2)(B). Finally, there is the matter of how the IRS approached the Maher transaction itself. In this regard, it is interesting that the IRS did not assert that a dividend occurred when the lien on the residence was released by the lender. See, III E, below.

The instant case is readily distinguishable from Maher. In Maher, the property in question was tenuously attached to a blanket lien on all of the property owned by the distributing corporation. In the instant case a lien was specifically applied by ML to the LLC interest as security for the Margin Loan to GMUSA. This lien survived distribution of the LLC interest, and is cited in the Margin Loan documents. In addition, at all times relevant hereto the LLC interest acted as the primary collateral for Margin Loan, in the form of a specifically annunciated pledge and not the result of an indiscriminate blanket lien on the assets of GMUSA.

Under the Margin Loan there is a 'real risk of loss' to Gainor. In the event of default on the Margin Loan by the party primarily liable, GMUSA, ML looks directly to the LLC interest for repayment of the debt.

The LLC interest represents a significant portion of the total assets of the GMUSA. This is in contrast to the facts in Maher, where the property distributed was of de minimus value relative to the total value of all assets owned by the distributing corporation. Accordingly, the LLC interest is clearly a significant asset of GMUSA and critical to ML's decision to make the Margin Loan. Should GMUSA default, ML would look to the LLC interest for repayment of the Margin Loan balance. Therefore, Gainor is subject to a 'real risk of loss' were there to be a default.

We have been advised that at no time was there any indication presented that the LLC interest could, under any circumstances, be released from attachment before satisfaction of Margin Loan. We understand that ML provided a discount on the interest rate charged to GMUSA in order to obtain the pledge of the LLC interest.

In light of the distinctions between the facts presented in the instant case and the facts presented in Maher, it is more likely than not that the 'facts and circumstances' test substance

M0303737

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 12

over form analysis applied in Maher would result in a conclusion that the LLC interest were distributed "subject to" the Margin Loan. As discussed above, there is a distinct connection between the Margin Loan liability and the LLC interest, which is not abrogated for these purposes by application of the factors cited in Maher. Accordingly, it is more likely than not that the amount of the distribution from GMUSA to Gainor for purposes of Code Section 301 would be reduced, dollar-for-dollar, by an amount equal to the balance of the Margin Loan from ML to GMUSA under Code Section 301(b)(2)(B).

### 5.   Analogous Provision – Code Section 357(c)

Language similar to that contained in Code Section 301(b)(2)(B) is also employed in Code Section 357(c). This language has been subjected to considerable scrutiny by the IRS, various courts, and commentators. Although Code Section 357(c) applies the 'subject to a liability' language with respect to contributions to a corporation as opposed to distributions from a corporation, the meaning of 'subject to' in the context of Code Section 357(c) provides analogies to the meaning of 'subject to' in the context of Code Section 301(b)(2)(B).

In general, Code Section 357(c)(1) requires the recognition of gain in certain exchanges of property when the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceed the total of the adjusted basis of the property transferred. Similar to Code Section 301(b)(2), the precise language of Code Section 357(c) refers to two types of liabilities: those assumed and those to which the property is subject. However, the same outcome is reached regardless of whether the transferee assumes the liability or the property is merely subject to the liability. Treas. Reg. §1.357-2(a).

The IRS has rejected the argument that because the transferor's obligation with respect to certain loans did not change, Code Section 357(c) should not apply to a Code Section 351 transfer to a controlled corporation of property which was subject to a liability as a result of a cross-collateralization and cross default agreement in which the transferor remained primarily liable. T.A.M. 964001. The IRS stated that Code Section 357(c) applies to all liabilities to which the transferred property is subject regardless of whether the transferor retains primary liability after the exchange or the transferee assumes any liability in the exchange. Ibid., citing Owen v. Comm'r, supra; Smith v. Comm'r, 84 T.C. 889 (1985); Rosen v. Comm'r, 62 T.C. 11 (1974). Therefore, in the context of Code Section 357(c), transferring property subject to a liability has the same force and effect as if the transferee assumed the liability. If the rule stated

M0303738

**BROWN & WOOD** LLP

Lucor Special Investments, Inc
Mr. Mark Gainor
December 31, 1999
Page 13


in T.A.M. 9640001 is applied to clarify the meaning of "subject to" in the context of Code
Section 301(b)(2)(B) in the instant case, the fact that GMUSA retained primary liability for the
Margin Loan is of no consequence in determining the amount distributed by GMUSA to Gainor.

As noted above, Code Section 357(c), like Code Section 301(b), makes reference to two
distinct types of transfers: (1) those in which liabilities are assumed by the transferee, and (2)
those in which no liability(s) is assumed by the transferee, but in which the property transferred
is taken subject to certain liability(s). As indicated in T.A.M. 9640001 and several of the cases
cited therein, the language describing these two types of transfers must be given separate and
distinct effects. If it were required that the transferee become primarily liable on the obligation
in order for the transfer of property to be deemed 'subject to' a liability for purposes of either
Code Section 357(c) or Code Section 301(b)(2), then the reference to the latter type of transfer
would be rendered superfluous. Both Code Sections of the Code explicitly provide for two types
of transfers; accordingly, effect must be given to the plain language in both Code Section
301(b)(2) and 357(c) which speaks to adjustments when property is transferred 'subject to' a
liability. See, Comm'r v. Asphalt Products Co., Inc., 482 US 117 (1987).

## 6. Recent Legislation Clarifying Definition of "Subject to a Liability"

On June 25, 1999, H.R. 435, the Miscellaneous Trade and Technical Corrections Act of
1999 ("'99 Act"), was signed into law. Sec. 3001 of the '99 Act clarified the tax treatment of
transfers of property to a corporation subject to a liability. The effective date of Section 3001 is
October 19, 1998.

Section 3001 modified the language of Code Sections 357, 358 and 368 by striking the
language regarding the transfer of property subject to a liability. These provisions generally
provide for the recognition of gain to the transferor (and an increased basis to the transferee) in
certain cases where the amount of liabilities assumed, or the amount of liabilities to which the
transferred property is subject, exceed the basis of the property transferred. Section 3001 also
amended provisions in addition to those found in Subchapter C that required clarification by
striking the phrase 'subject to' in Code Sections 584 (involving transfers of Regulated
Investment Companies) and 1031 (related to transfers of 'like-kind' property). Section 3001 did
not modify the term as used in Code Section 301(b)(2)(B). and Code Section 301 and the related
Treasury Regulations, which address the distribution of property from a corporation to its
shareholders, are outside the scope of legislation.

NYLIB1·n5438c·4

M0303739

**BROWN & WOOD** LLP

Lucor Special Investments, Inc
Mr. Mark Gainor
December 31, 1999
Page 14

The changes in the language of Code Sections 357, 358, and 368 focus exclusively on transfers of property to a corporation. The clarification in the law regarding these Code Sections strikes all of the language relating to corporate acquisition of property subject to a liability. For purposes of clarity, Section 3001 included a definition of what an assumption of a liability is with regard to both recourse and non-recourse debt. Additionally, Section 3001 provided a fair market value limitation on the corporation's basis in the property received. In the case where only a portion of the property securing the liability is transferred and in which the transferor is not subject to tax on the Code Section 357(c) gain recognized as a result of an assumption of non-recourse liability by the transferee, there are further limitations on the corporation's basis in the property received. In such a situation, for purposes of determining the basis of the property to the recipient corporation, the amount of the Code Section 357(c) gain to the transferor is calculated as if the amount of the indebtedness assumed by the transferee was the ratable portion of the liability based on the relative fair market values of the collateral securing the debt.

Because Section 3001 of the '99 Act was limited to transfers of property to a corporation and did not specifically address Code Section 301(b)(2)(B), it is more likely than not that such legislation will not adversely affect our forgoing conclusions as to the amount of the distribution of the for purposes of Code Section 301

### 7. Summation

It is more likely than not that the distribution from GMUSA to Gainor, with respect to Gainor's stock in GMUSA, would be reduced dollar-for-dollar by the outstanding balance of the Margin Loan from ML to GMUSA under Code Section 301(b)(2)(B).

### B. Gainor's Tax Basis in the LLC interest

As discussed above, treatment of the distribution of the LLC interest by GMUSA with respect to Gainor's stock in GMUSA is controlled by Code Section 301. Code Section 301(d) states, in pertinent part:

> (T)he basis of property received in a distribution to which subsection (a) applies shall be the fair market value of such property

Contrary to Code Section 301(b)(2), Code Section 301(d) ignores whether liabilities were assumed in connection with a Code Section 301(a) distribution or whether property received in a

NY1 IHI 65X36/4

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 15

Code Section 301(a) distribution was subject to any liabilities. See, Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, ¶8.22[1] (Sixth Ed., Supp. 1998). Accordingly, it is more likely than not that Gainor's tax basis in the LLC interest immediately after the distribution would be $33.6 million.

## C.    Gainor's Basis in GMUSA Stock

Under Code Section 301(c), a distribution by a corporation with respect to its stock can be treated in any of three ways by the shareholder. It can be treated (i) as a dividend (a distribution of the earnings and profits of the corporation, as defined under Code Section 316); (ii) as a return of capital resulting in a decrease in the basis of the shareholder(s)' stock; or (iii) as a gain from the sale or exchange of property (i.e., a capital gain) to the extent the portion of a distribution not treated as a dividend exceeds the adjusted basis of the stock. In order for any of these three treatments to apply there must be an amount distributed greater than zero. Code Section 301(b) provides the rules for determining the amount distributed for these purposes. As discussed above, in the instant case Code Section 301(b)(2)(B) applies to reduce the amount of the distribution from GMUSA to Gainor to approximately $5.6 million Accordingly, it is more likely than not that Gainor's aggregate tax basis in his GMUSA stock would be reduced by such amount, and would equal approximately $21.8 million.

## D.    Applicability of Code Section 311(b)

Under Code Section 311(b)(1), if a corporation distributes property to its shareholder with respect to its stock and the fair market value of the property exceeds the corporation's adjusted basis, the corporation recognizes gain to the extent the property's fair market value exceeds its adjusted basis. In other words, a corporation must recognize gain as if the corporation had sold the distributed property to a third party at the property's fair market value

Code Section 311(b)(2), by reference to Code Section 336(b), provides that when a corporation distributes property subject to a liability, the fair market value of the property is treated as not being less than the amount of that liability. For example, if a corporation distributes property with a basis of $90,000 and a fair market value of $100,000, subject to a liability of $125,000, the distributing corporation's gain pursuant to Code Section 311(b) is $35,000 ($125,000 less $90,000).

NYI 1211 55833A6-4

M0303741

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 16

In the instant case, the fair market value of the LLC interest exceeds its tax basis by approximately $6.5 million, and the outstanding amount of the liability is less than the fair market value of the LLC interest. Therefore, it is more likely than not that GMUSA would recognize gain on the distribution of the LLC interest to Gainor under Code Section 311(b) of approximately $6.5 million.

## E.    <u>Tax Consequences Upon Satisfaction of Liability</u>

### 1.    Constructive Dividends – In General

The term 'dividend' is defined in Code Section 316(a) as a distribution of property by a corporation to its shareholders out of its earnings and profits. See also, <u>Gulf Oil Corp. v. Comm'r</u>, 89 T.C. 1010 (1987), affirmed 496 F.2d 1384 (3rd Cir. 1990). There is no requirement that the dividend be formally declared or even intended by the corporation. <u>Croft v. United States</u>, 496 F.2d 1384 (5th Cir. 1974); <u>Sachs v. Comm'r</u>, 277 F.2d 879 (5th Cir. 1960), affirming 32 T.C. 815 (1959). Distributions by a corporation are treated as dividends to the shareholder if the distributions are made for the shareholder's personal benefit; the funds need not be distributed directly to the shareholder. <u>Rushing v. Comm'r</u>, 441 F.2d 593 (5th Cir. 1971), affirming 53 T.C. 888 (1969); <u>Rapid Electric Co. v. Comm'r</u>, 61 T.C. 232 (1973). In analyzing whether a shareholder(s) must be treated as receiving a dividend as a result of a corporation expenditure, it must be determined whether the corporate expenditure is incurred primarily for the benefit of the corporation or primarily for the personal benefit of the shareholder(s). See, <u>Gulf Oil Corp. v. Comm'r</u>, <u>supra</u> (no dividend where payments were for payor corporation's benefit); Bittker and Eustice, <u>Federal Income Taxation of Corporations and Shareholders</u>, ¶8.05[8] (Sixth Edition Supp. 1998).

### 2.    Satisfaction of Liability that Primarily Serves the Personal Interest of a Shareholder

A constructive dividend arises, among other ways, when a corporation satisfies an obligation of a shareholder or otherwise makes a payment that primarily serves the personal interest(s) of a shareholder. See, e.g., Rev. Rul. 75-421, 1975-2 CB 108 (corporate payment for valuation services regarding shareholder's stock in pending reorganization deemed a taxable dividend). A clear example of such a constructive dividend is when a corporation satisfies a debt for which a shareholder is primarily liable and such payment serves no purpose of the

NYLIB1 %0K5Mc4

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 17

corporation. Sullivan v. United States, 363 F.2d 724 (8th Cir. 1966), cert. denied, 387 U.S. 905 (1967); Wall v. United States, 164 F.2d 462 (4th Cir. 1947).

### 3. Satisfaction of Liability by Corporation that Serves the Interests of the Corporation

In cases where a corporation satisfies an obligation that serves its own interest and for which its shareholder(s) is secondarily liable, courts and the IRS have consistently held that there is no constructive dividend. Gulf Oil Corp. v. Comm'r, supra, Falkoff v. Comm'r, 604 F.2d 1045, 1050 (7th Cir. 1979); Rev. Rul. 69-608, 1969-2 CB 43. In one case, the Tax Court held that an indirect benefit to a shareholder as a result of a corporate expenditure should not be treated as a distribution to the shareholder. Dean v. Comm'r, 9 T.C. 256 (1947) (shareholder's enjoyment of riding horses owned by corporation deemed not a constructive dividend because the exercise of horses was beneficial to corporation) In another case, the 7th Circuit Court of Appeals held that when a corporation retired debt owed to a third party, no constructive dividend arose even though a shareholder pledged personal assets as collateral. Falkoff v. Comm'r, 604 F 2d at 1050. With respect to shareholder guarantees of corporate debt, the IRS has indicated that a corporation's satisfaction of a corporate debt guaranteed by a shareholder does not give rise to a constructive dividend to the guarantor/shareholder. See, Rev. Rul. 69-608, 1969-2 CB 42, Situation 5. Expanding on the general theme stated above, that an indirect benefit to a shareholder as a result of a corporate expenditure is not sufficient to give rise to a constructive dividend, the IRS has indicated that no constructive dividend can arise where a corporate expenditure satisfies an obligation for which the shareholder(s) is not personally and unconditionally liable. Ibid., Situation 6.

The Tax Court has also adopted the view that a corporate expenditure, which satisfies an obligation for which a shareholder(s) is not personally and unconditionally liable, does not give rise to a constructive dividend In Kobacker v. Comm'r, 37 T C 882 (1962), a shareholder personally guaranteed (i.e., was secondarily liable for) certain corporate debt. Refusing to find that the corporation in question was a sham, the court found that the corporation itself was primarily liable for the debt in question, and that the satisfaction of the debt by the corporation did not give rise to a constructive dividend to the guarantor/shareholder.

M0303743

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 18

### 4. Code Section 301(b)(2)(B) – Immediately Before and Immediately After

The statutory construction of Code Section 301(b)(2)(B) supports the general principles regarding constructive dividends discussed above. Code Section 301(b)(2)(B) states, in pertinent part, that, for purposes of determining the amount distributed by a corporation to its shareholder(s) with respect to its stock, the fair market value of the property distributed is reduced by the "...amount of any liability to which the property received by the shareholder is subject immediately before, and immediately after, the distribution." Thus there are only two points in time – immediately before the distribution and immediately after the distribution – that are relevant for determining the amount of distribution for purposes of Code Section 301. If Congress intended that the satisfaction of a liability that, under Code Section 301(b)(2)(B), reduced the amount of a distribution, would give rise to a constructive dividend to the recipient shareholder, it would have provided for such treatment in the Code. This intent was not reflected in the Code, and, as discussed above, neither the courts nor the IRS has adopted this view. See, e.g., Maher v U.S., supra, (lien to which the property constructively distributed to the shareholder was subject released a little more than one year after date of constructive distribution; IRS looked to facts and circumstances of original constructive distribution, not subsequent release of lien, to find grounds for constructive dividend).

### 5. Application of Constructive Dividend Rules to the Instant Case

In the instant case, GMUSA remained primarily liable for the debt secured by the LLC interest at all times relevant hereto. ML made the Margin Loan based on the cash flows of GMUSA, and these cash flows were expected to be the source of repayment of the Margin Loan principal and interest. As in Kobacker v. Comm'r, supra, unconditional liability could transfer to Gainor only in the event of default by the corporate debtor, GMUSA. Thus, GMUSA satisfied its own debt, thereby serving a corporate interest, and Gainor was only secondarily liable. As discussed above, satisfaction of a corporate debt for which a shareholder is secondarily liable does not give rise to a constructive dividend. Accordingly, it is more likely than not that no constructive dividend would arise due to the satisfaction by GMUSA of the debt owed to ML.

Were the IRS to take the position that the transaction should be viewed as resulting in the Gainor being primarily liable for the debt in question, the issue would remain whether the satisfaction of the debt was in the interest of the GMUSA or whether it was primarily to serve the interests of Gainor. An argument that shareholder was primarily liable, however, would appear to

NYLIB1 668386 4

M0303744

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 19

have no merit in substance. As noted above, ML made the Margin Loan to GMUSA based on GMUSA's expected cash flows. The lien against the LLC interest was necessary to secure favorable terms for the debt. From a business perspective, ML would place itself at a distinct disadvantage if it were to lend to Gainor based on the cash flow and assets held in the GMUSA corporate solution. For example, in order to service such a debt Gainor would depend upon dividend distributions from GMUSA. However, the failure of GMUSA to satisfy the Margin Loan would expose GMUSA's other assets to ML's claims. Accordingly, in light of both the form of the Margin Loan agreement as and between ML and GMUSA and the economic substance consistent with this form, it is more likely than not that any such attempt by the IRS to recast the legal form of the transaction in a manner described above would fail.

### F.      Rules Relating to the Limitation of Deductions

#### 1.      Sham Transaction, Economic Substance, and Business Purpose Doctrines

There are innumerable cases addressing the judicially developed doctrines of "sham transaction", "business purpose", and "economic substance". One of the most recent attempts to synthesize the rules appears in "Appendix II To JCX-82-99: Description and Analysis of Present-Law Rules and Recent Proposals Relating to Corporate Tax Shelters", Prepared by the Staff of the Joint Committee On Taxation, JCX-84-99, November 10, 1999 ("JCT Appendix")

##### a.      "Sham Transaction Doctrine"

With respect to the "sham transaction doctrine", the JCT Appendix describes two types of "shams", "shams in fact" and "shams in substance" The first involves transactions that in fact never occur. As an example, the JCT Appendix cites Goodstein v. Comm'r, 267 F.2d 127 (1st Cir. 1959), in which assets were never purchased and a loan never incurred by the taxpayer. Reference is also made to ASA Investerings Partnership v. Comm'r, T.C. Memo. 1998-305, appeal pending (DC Cir. Dec. 7, 1998) in which a party never actually entered into a partnership formed to effectuate the transaction. The Transactions should not constitute one or more "shams in fact", assuming that every transaction in fact occurs as described in Part I hereof.

With respect to the "sham in substance" aspect of the doctrine, the JCT Appendix II cites Yosha v. Comm'r, 861 F2d 494 (7th Cir 1988), as an example In Yosha, the taxpayers entered into a series of transactions on the London Metals Exchange ("LME") that were not "shams in fact" because they actually occurred The taxpayers, however, were fully protected against loss

NYI IP1 665366 4

## BROWN & WOOD LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 20

through arrangements by the promoter with the LME brokers, and the transactions were structured so that the taxpayers could not earn a profit from them, i.e , as an economic matter the trades were voided although as a legal and factual matter they occurred.[3] Thus the taxpayers were in the position of economically, or "in substance", never having entered into the transactions. A similar analysis is applied in determining whether a taxpayer is the owner for U.S. Federal income tax purposes of a particular asset. Thus, if the taxpayer has none of the economic risk of an owner and none of the economic benefits of an owner, the taxpayer would ordinarily not be treated as the owner, i.e the taxpayer's economic ownership is voided, and such situations could be viewed as "shams in substance".

We have assumed that neither Gainor nor GMUSA entered into arrangements that voided the economic effects of any of the Transactions. Consequently, the Transactions should not constitute one or more "shams in substance". Much confusion about the sham transaction doctrine has arisen because the courts often treat transactions that fail the "economic substance" or "business purpose" doctrines " as "shams". In this regard, the JCT Appendix notes:

> [T]he delineation between [the sham transaction] doctrine
> (particularly as applied to "shams in substance") and the
> "economic substance" and the "business purpose" doctrines is
> not always clear. Some courts find that if transactions lack
> economic substance and business purpose, they are "shams"
> notwithstanding that the purported activity actually did occur

### b.     Economic Substance and Business Purpose Doctrines

As with the relationship of the sham transaction doctrine to the business purpose and economic substance doctrines, there is some confusion about the relation of the latter two to each other. Again, the JCT Appendix is helpful in trying to clarify the confusion:

---

[3]     Because the arrangements to protect against loss were arranged by the promoter, the Court was not faced with addressing the effect of bona fide hedging transactions with unrelated parties. Hedges provided by a party involved in the transactions were also viewed as a negative factor in ACM Partnership v. Comm'r, T.C. Memo 1998-203, aff'd in part and rev'd in part 157 F3rd 231 (3rd Cir. 1998)

NYT 101 1986380 1

M0303746

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 21

In its common application, the courts use business purpose (in combination with economic substance…) as part of a two-prong test for determining whether a transaction should be disregarded for tax purposes: (1) the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction, and (2) the transaction lacks economic substance [citation omitted]

JCT Appendix, p. This language mirrors the language of the 4th Circuit Court of Appeals in Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89 (4th Cir. 1985)[4] Consequently, to determine whether the Transactions will be respected in the instant case one needs to test the Transactions under each prong.

### (i)    Business Purpose

For a transaction to have a business purpose, the Courts have concluded that there must be a business or commercial reason for the taxpayer to engage in the transaction independent of the tax benefits that may arise therefrom. Friedman v. Comm'r, 869 F.2d 785, 792 (4th Cir. 1989); Rice's Toyota World, Inc. v. Comm'r, supra. The existence of such a purpose was recently addressed in United Parcel Service of America, Inc v. Comm'r, T.C. Memo. 1999-268

In the United Parcel Service case, the taxpayer tried to avoid taxation with respect to certain fees by restructuring them as insurance. Economically, the taxpayer was in substantially the same position as before the restructuring, but through the arrangements was able to exclude the payments from income The taxpayer put forth a number of purported commercial reasons for the restructuring of the fees. The taxpayer argued that (i) it was required to restructure the arrangements because such payments would fall afoul of restrictions under some state insurance laws, (ii) it intended to leverage the profits into the creation of a new reinsurer that could become a full-line insurer; (iii) by removing the fees from its operating ratios it could

---

[4]    "To treat a transaction as a sham the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists." Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91.

NYLIB1 zessxo a

**BROWN & WOOD LLP**

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 22

obtain larger rate increases than had it received the fees directly; and (iv) by restructuring the fees it protected its transportation business from the risk of increased liabilities. However, the taxpayer offered no credible evidence that the restructuring would in fact achieve goals (i), (ii), and (iv). The Court also found that goal (ii) could have been accomplished by merely making an investment in such a reinsurer.

Similarly, in Winn-Dixie Stores Inc. v. Comm'r, 113 T.C. No. 21 (1999), the Court disallowed interest deductions on policy loans in a COLI program that insured the lives of approximately 30,000 workers. The program resulted in a pre-tax loss for the taxpayer. The taxpayer argued that (i) the program enabled it to fund costs of one of it benefit programs, and (ii) increased the benefits it could offer to its employees under such program. As to (i), the Court found that there was no contemporary evidence that it had purchased the COLI policies to provide such funding; that the COLI policies were not designed to fund such benefits, that the taxpayer's CFO never told the entity that was planning the COLI transactions that the purpose was to fund the benefit program; and that projections showed that the cash flow from the program was needed to pay future interest and premiums as opposed to being available to fund the benefits plan. As to (ii), the Court found that the described additional benefits were not related to the COLI program.

In Compaq Computer Corp. v. Comm'r, 113 T.C. No. 17 (1999), the Court disallowed foreign tax credits associated with dividends on certain American Depositary Receipts. Among the factors taken into account was that the officer of the taxpayer in charge of the investments made no inquiry into the commercial aspects of the transactions.

Lastly, among the more recent cases is ACM Partnership v. Comm'r, supra, and Saba Partnership v. Comm'r, T.C. Memo. 1999-359, involving similar transactions. In each case, the courts found that the purported business purposes of the transactions were unsupported by the evidence and, similar to the foregoing cases, the individuals involved with execution of the transaction did not exhibit behavior consistent with trying to achieve the purported commercial purposes.

The common thread in these cases is that to have the requisite business purpose to support the tax benefits achieved, there must be a purported commercial reason for engaging in the various transactions, the transaction must be consistent with such reason, and such reason

NY: 1JI1 663386/4

M0303748

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 23

must be supportable by contemporary evidence, including a showing that the transaction was handled in a business like-manner  This analysis is supported by a number of cases.

For example, in Levy v  Comm'r, 91 T.C. 838 (1988), the taxpayers entered into a sale-leaseback of computer equipment for the purported reason of diversifying their business and investments.  In upholding the tax benefits the Court stated:

> Based upon our careful examination of the relevant facts and evidence in this case, we conclude that petitioners entered into the transaction in issue for sound business reasons (namely to diversify their investments by entering into a legitimate long-term investment involving the purchase and leaseback of computer equipment)  Petitioners approached the decision to enter into this transaction in a businesslike manner  Petitioner's financial advisor thoroughly and in good faith investigated the proposed purchase-leaseback transaction  He prepared cash flow analyses which included the components of the transaction that were critical to earning a profit on the investment  Those components included the current fair market value and projected residual value of the equipment, the fair rental value of the lease, and the rent participation agreement. He explained to petitioners the significance of and risks associated with the projected residual value of the equipment and the rent participation agreement  In addition, he explained to petitioners the tax consequences of the transaction. Petitioners also retained a law firm with expertise in leasing transactions to investigate the financial status and creditworthiness of each participant involved in the transaction, to investigate each participant's business reputation, and to handle the legal aspects of this complex transaction.
>
> We are satisfied that petitioners had a good faith and substantial business purpose for entering into the transaction  Petitioners participated in the purchase leaseback transaction only after they were convinced that the investment had a reasonable possibility of producing a profit.

91 T.C. 838, 855-856  Similarly see, Pearlsten v. Comm'r, T C  Memo. 1989-621; Rubin v. Comm'r, T.C. Memo. 1989-484

In Caruth Corp. v. Comm'r, 865 F.2d 664 (5th Cir. 1989), aff'g 688 F. Supp 1129 (N.D. Tex 1987), the issue was whether a charitable contribution would be allowed for a

NYLIB1 658366 4

M0303749

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 24

contribution of stock of a controlled corporation to a charity after the dividend was declared, but before the dividend record date. The Court upheld the deduction in part upon finding that lag between the declaration and record dates had a business purpose:

> [Taxpayer] contends that the distinction between the two dates was designed to encourage his nephews ... to sell their shares to him....The lag between the declaration date and record dates was designed to give the nephews an opportunity to sell. The plan failed in this respect; the nephews held their shares
>
> The district court made a factual finding that the [taxpayer] wished to buy out his nephews' interests in North Park Incorporated, and that he believed declaration of a dividend might facilitate this objective. We review these findings pursuant to the clearly erroneous standard, and find clear support in the record. With these factual findings in place, we believe it obvious that the distinction between declaration and record date did, as [taxpayer] contends, serve a legitimate business purpose

Lastly, it should be noted that a transaction can have an appropriate business purpose even if the transaction itself does not generate a profit. See, Caruth v. Comm'r, supra; Horn v. Comm'r, 968 F 2d 1229 (D.C. Cir. 1992).

### (ii) Economic Substance

It is well established that a transaction or series of transactions will not be respected for tax purposes unless the transaction or transactions have economic substance separate and distinct from the economic benefit derived from tax reduction. See, Gregory v. Helvering, 293 U.S. 465 (1935). Transactions failing to meet this standard lack the requisite "economic substance" (often interpreted as a having a reasonable possibility of pre-tax profit) will not be respected for tax purposes. However, the Supreme Court has held that a transaction should be respected if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached " Frank Lyon Co. v. U.S., 435 U.S. 561, 583-584 (1978) Thus, transactions have been upheld where the transactions were designed to achieve a tax benefit, but were endowed with positive pretax economics. See, e g., Northern Indiana Public Service Company v. Comm'r, 105 T.C. 341 (1995), aff'd 115 F.3d 506 (7th Cir. 1997).

NYLIB1 66836-4

M0303750

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 25

The Yosha decision articulated the standard slightly differently:

> A transaction has economic substance when it is the kind of
> transaction that some people enter into without a tax motive, even
> though the people fighting to defend the tax advantages of the
> transaction might not or would not have undertaken it but for the
> prospect of such advantages—may indeed have had no other
> interest in the transaction.

Yosha v. Comm'r, 861 F3rd 494, 499 (supra).

It should be noted that a taxpayer need not be correct in its judgment of possible
economic benefits, only reasonable or rational. Profit motive depends on the taxpayer's
subjective and good faith intent to earn a profit. Finoli v. Comm'r, 86 T.C. 697, 722 (1986).
The fact that a venture fails to produce a profit in the anticipated amount or at all does not
indicate that the venture was not profit-motivated. King v. U.S., 545 F 2d 700, 708 (10th Cir.
1976). However, that profit potential cannot be illusory. In ACM Partnership v. Comm'r, supra,
the Tax Court found that at the time it entered into the partnership, the taxpayer's only real
opportunity to earn a profit was through an increase in the credit quality of the issuers of certain
notes, or a 400-500 basis point increase in 3-month LIBOR interest rates. The court found no
impact on credit quality was possible as the lenders were extremely highly rated at the time of
the transaction. Moreover, the court did a 6-year review of 3-month LIBOR rates and did not
find an increase of even 300 basis points in the necessary time frame. Since the analysis of the
historical data showed no reasonable basis for expecting a profit, the court ruled against the
taxpayer. "We do not suggest that a taxpayer refrain from using the tax laws to the taxpayer's
advantage. In this case, however, the taxpayer desired to take advantage of a loss that was not
economically inherent in the object of the sale, but which the taxpayer created artificially
through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a
phantom loss from a transaction that lacks economic substance". In its analysis, the Third
Circuit focused upon the foregoing finding of the Tax Court, stating

> Tax losses such as these, which are purely an artifact of tax
> accounting methods and which do not correspond to any actual
> economic losses, do not constitute the type of 'bona fide' losses
> that are deductible under the Internal Revenue Code and
> regulations

NYLIB1 660386/4

M0303751

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 26

The Third Circuit also noted

[O]n November 3, 1989, [the partnership] invested $175 million of
its cash in private placement Citicorp notes paying just three basis
points more than the cash was earning on deposit, then sold the
same notes 24 days later for consideration equal to their purchase
price, in a transaction whose terms had been finalized by
November 10, 1989, one week after ACM acquired the notes.
These transactions . . . offset one another and with no net effect on
ACM's financial position

See also, Saba Partnership v. Comm'r, supra; Merryman v. Comm'r, 873 F.2d 879 (5th Cir.
1989) (conduit partnership without economic substance disregarded).

In Compaq Computer Corp. v. Comm'r, supra, in addition to finding no business
purpose for the transactions, the Tax Court also found a lack of economic substance. This was
because as the transactions were designed and executed, the taxpayer was bound to suffer a pre-
tax loss. The Tax Court reached a similar conclusion for the same reason in Winn-Dixie Stores
Inc. v. Comm'r supra.

From these cases it appears that the "substance" necessary to meet the
requirements of the "economic substance" doctrine is somewhat different from the "substance"
required under the "sham in substance" doctrine. As discussed above, the latter requires that the
transaction have the economic consequences consistent with what the transaction purports to be:
Does the taxpayer really have the economic incidents of ownership if the taxpayer purports to
own the asset? The former requires that, having passed the "sham in substance" test, the
transaction make economic sense: Does the have a reasonable possibility of economically or
commercially benefiting from the transaction without regard to tax benefits?

Despite being inconsistent with the economic substance cases, one case has
suggested that there must be not only a reasonable possibility of making a profit, but the
possibility must relate to a profit that is greater than de minimis. See, Sheldon v. Comm'r, 94
T.C. 738 (1990) as discussed below.[5] A handful of other decisions have indicated that the court

---

[5] On December 23. 1997, the IRS issued Notice 98-5, announcing that the IRS will issue regulations

(continued...)

M0303752

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 27

should consider whether the profit motive for a transaction was greater or less than the tax motive. See, e.g., Fox v. Comm'r, 82 T.C. 1001 (1994), Estate of Baron v. Comm'r, 83 T.C. 542 (1984), aff'd, 798 F.2d 65 (2d Cir. 1986). However, to date these cases appear to represent a minority view. Thus, the tax benefits achieved in a transaction should not be denied under the economic substance doctrine merely because the transaction's principal purpose was to achieve such tax benefits. See, e.g., Northern Indiana Public Service Company v. Comm'r, supra. Congress has precluded such a broad test for all disallowance by incorporating such a principal purpose test into specific Code Sections such as Code Section 269. Long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible". Helvering v. Gregory, 69 F.2d 809 (2d Cir. 1934). See also, Cottage Savings Association v. Comm'r, 499 U.S. 554 (1991), involving a transaction executed solely for tax purposes.

### c. Conclusion

Based upon the assumption that Gainor and GMUSA each have a bona fide expectation of profit or other commercial reason for participating in the transactions in the manner in which they have done so, it is more likely than not that the Transactions described herein would have the requisite economic substance and business purpose to be respected under the authorities discussed above.

### 2. Code Section 165(c)(2)

Notwithstanding that the transactions described herein have the requisite economic substance, where applicable, Code Section 165(c) imposes additional limitations on the ability of individuals to claim losses.

---

(...continued)

effective on and after such date dealing with foreign taxes paid or accrued in connection with certain abusive transactions. Such transactions were described as those in which the anticipated economic benefits are insubstantial in relationship to the anticipated tax benefits. It is currently uncertain as to when or whether such regulations will be issued, the criteria they will establish with respect to the insubstantiality of anticipated economic benefits, or whether such regulations will have application beyond the area of foreign taxes

NYLIB1 668380.4

M0303753

## BROWN & WOOD LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 28

If an individual incurs a loss from the disposition of the assets in the individual's trade or business, Code Section 165(c)(1) generally permits the allowance of such loss. In determining whether such a business exists, the courts have required that the criteria of Code Section 183 be met. See, Farmer v. Comm'r, T.C. Memo 1994-342.

Code Section 183(a) and Treas Reg §1.183-1 requires that the activities with respect to which the loss relates be activities engaged in for profit. There has been substantial litigation regarding whether such motive exists. These cases have established that a taxpayer need only have a good faith expectation of earning a profit from the activities undertaken. See, e.g., Burger v. Comm'r, 809 F.2d 355 (7th Cir 1987); Johnson v. U.S., 11 Cl. Ct. 17 (1986).

If an individual incurs a loss from the assets in a transaction which does not involve the individual's trade or business, Code Section 165(c)(2) and Treas. Reg. §1.165-1(e) require, like Code Section 183(a) and Treas Reg §1 183-1, that the loss be incurred in a transaction entered into for profit. Thus, these statutory and regulatory provisions mirror the Code Section 183 standard

Notwithstanding the parallel nature of Code Section 183(a) and Code Section 165(c)(2), the courts have imposed a judicial gloss that appears to create a standard higher than that imposed by the statutes, i.e., that the taxpayer's profit motive be the "primary" motive for entering into the transaction. The first case that did so was Fox v. Comm'r, 82 T.C. 1001 (1987) The Tax Court in Fox derived this primary profit motive test from a footnote in Helvering v. National Grocery Co., 304 U.S. 282, 289 n 5, reh'g denied, 305 U.S. 669 (1938), which involved the constitutionality of the imposition of the accumulated earnings tax. The footnote stated in relevant part:

> Similarly, the deductibility of losses under [Code Section
> 165(c)(2)] may depend upon whether the taxpayer's motive in
> entering into the transaction was primarily profit.

In addition, the Tax Court in Fox relied on an earlier Tax Court case involving the deductibility of a loss under Code Section 165(c)(2), Smith v. Comm'r, 78 T.C. 350 (1982). In Smith, however, the Tax Court did not impose the "primary" test articulated in Fox, but rather stated at p. 391:

> The mere fact that petitioners may have had a strong tax avoidance
> motive in entering into their commodity tax straddles does not in

NYLIB1-664386-4

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 29

> itself result in a disallowance of petitioners' losses under Section 165(c)(2), provided petitioners also had a non-tax profit motive for their investments at the time, See, <u>Knetsch v. U. S.</u>, 172 Ct. Cl. 378, 348, F. 2d 932, 936-937 (1965). Such hope of deriving an economic profit aside from the tax benefits need not be reasonable so long as it is bona fide. See, <u>Bessenyey v. Comm'r</u>, 45 T.C. 261, 274 (1965), aff'd 379 F.2d 252 (2nd Cir. 1967).

Both the <u>Fox</u> and <u>Smith</u> cases, as well as the bulk of subsequent cases involving the application of the "primary" standard, arose in connection with commodities straddle transactions in which looking at the transactions as a whole, the taxpayer had little or no opportunity to earn any meaningful profit [6] In addition many of the decisions were Memoranda decisions of the Tax Court.[7] Neither the <u>Knetsch</u> case nor the <u>Bessenyey</u> case cited by the Tax Court in Smith required the profit motive of the taxpayer to be the primary standard for engaging in the transactions in issue, although the <u>Knetsch</u> decision did refer to the <u>National Grocery Co.</u> Supreme Court decision discussed above.

When a court has thoughtfully attempted to deal with the primary standard, the results have often yielded confusion. For example in <u>Nickson v. Comm'r</u>, 962 F.2d 973, 976 (10th Cir. 1992), a case involving the application of Code Section 183, the court first appeared to apply the primary standard by requiring that the taxpayer engage in the transaction with the "dominant hope and intent to realizing a profit", but then went on to provide that "the determination crucial to the instant case [is]-whether the taxpayers had an actual and honest profit objective." See

---

[6]    The Tax Court in <u>Sheldon v. Comm'r</u>, 94 T.C. 738 (1990), applied these principles wherein certain of the transactions before the Court the taxpayer demonstrated that it could have made a profit. The Tax Court denied the claimed deductions stating that "[i]n instances where intermediate repos would have or did generate some form of [positive] carry, these amounts were nominal, either fixed or short term and stable and, in any event merely reduced the fixed losses by relatively insignificant amounts." It is uncertain whether the <u>Sheldon</u> case has added an additional dimension to the economic profit motive analysis by, effectively, requiring a profit to be greater than "de minimus" or "nominal". In assessing this point it should be noted that the Tax Court ultimately found that even what nominal profit there was in <u>Sheldon</u> was absorbed by losses on related and, arguably, integrated transactions. 94 T.C. 738, 768 and 769. See also. <u>Est. of Baron v. Comm'r</u>, 83 T.C. 542, aff'd 798 F.2d 65 (2d Cir. 1986). See, Notice 98-5, discussed at footnote 2

In assessing whether the requisite profit motive exists, all of the fees incurred in engaging in the transactions will have to be taken into account. Sec. <u>ACM Partnership v. Comm'r</u>, supra

NY1DI-66N9614

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 30

also, Nickerson v. Comm'r, 700 F.2d 402, 404 (7th Cir. 1973). This confusion in part may be due to the fact that in Fox v. Comm'r, supra, which first applied the primary standard in the context of Code Section 162(c)(2), the taxpayer's had little or no opportunity to make more than a relatively small fixed economic profit from the commodity straddle transactions into which the taxpayer entered. Such a situation is unlike the instant case in which, based on the representations that we have received, the parties entered into the transactions with the reasonable possibility of making a reasonable profit. Such a profit potential is more analogous to the situation in Smith v. Comm'r, on which the Fox case relies. Although the matter cannot be exactly free from doubt because of the factual nature of the inquiry, on balance, it is more likely than not that the requisite profit motive exists to support the deduction of any loss on the disposition of the stock in GMUSA under Code Section 165(c)(2).

### 3. Application of Step Transaction Doctrine

#### a. Generally

The step transaction doctrine is a judicially created concept, which treats a series of separate steps as a single transaction when the steps are integrated parts of a single plan. The purpose of the step transaction doctrine is to prohibit the breaking down of an integrated transaction into independent steps or, conversely, to combine separate steps in determining tax consequences. The substance of each of a series of steps will be respected, and not integrated if each step has independent economic significance, is not subject to attack as a sham, and is undertaken for valid business purposes.

If the step transaction doctrine is successfully asserted, Gainor's investment in GMUSA, the Margin Loan by ML to GMUSA, and the distribution of the LLC interest by GMUSA to Gainor could be integrated into a single transaction. As a result, the Transactions could be recast to treat GMUSA as distributing the LLC interest, unencumbered by the Margin Loan, to Gainor.

A seminal case on the step transaction doctrine is Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954). In that case, the taxpayer wished to sell her stock in a corporation in which she was the sole stockholder. Because the buyer did not want to purchase all of her stock, the parties agreed that she would sell him part of her stock and the corporation would redeem her remaining shares. While the District Court held that the distribution of substantially all of the earnings and surplus of a corporation was essentially equivalent to a dividend, the Sixth Circuit reversed and found that the redemption and sale steps were part of an integrated plan to liquidate the

NYLIB1 668186 4

M0303756

**BROWN & WOOD LLP**

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 31

taxpayer's holdings in the corporation, and therefore, the redemption was not essentially equivalent to a dividend

While courts have not agreed on a single test or standard for determining when and how to apply the step transaction doctrine, there are three tests that are most often used by the courts. These are the "binding commitment" test, the "mutual interdependence" test, and the "end result" test.

### b. Binding Commitment Test

The binding commitment test, introduced in Comm'r v. Gordon, 391 U.S. 83 (1968), is the most restrictive of the tests. Under this standard, steps are integrated when a binding commitment is present. Otherwise, courts will usually apply one of the other tests. Gainor and GMUSA were not legally obligated to undertake all or any of the Transactions. Consequently, it is more likely than not that this test would not apply.

### c. Mutual Interdependence Test

The mutual interdependence test requires inquiry as to whether on a reasonable interpretation of objective facts the steps of a series of transactions are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. See, King Enterprises, Inc. v. U.S., 418 F.2d 511 (Ct. Cl. 1969). See, also, Redding v. Comm'r, 30 F.2d 1169, 1177 (7th Cir. 1980), cert. denied 450 U.S. 913 (1981); Dyess v. Comm'r, T.C. Memo. 1993-219. In Associated Wholesale Grocers, Inc. v. U.S., 927 F.2d 1517 (10th Cir. 1991), the court applied the mutual interdependence test to integrate the transactions at issue. The facts in that case involved the taxpayer's sale, by means of a taxable merger, of a subsidiary which owned stock of a second-tier subsidiary and other assets to an unrelated corporation, followed immediately by a purchase by the seller of all the assets previously owned by the merged subsidiary except for the stock of the second-tier subsidiary. The taxpayer characterized the two transactions in accordance with their form and recognized a loss on the taxable merger. By integrating the two transactions, the IRS characterized the transactions as a liquidation of the subsidiary on which no loss was recognized as it was entirely contingent on the sale of assets, as evidenced by the fact that the merger agreement stated that it would terminate if the plan of reorganization (the terms of which included the sale of assets step) was not effectuated. The court also based its holding on the fact that virtually no time passed between the steps.

NYLIB1 668380/4

M0303757

**BROWN & WOOD LLP**

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 32

In American Bantam Car Co. v. CIR, 11 T.C. 397 (1948), the Tax Court refused to apply the step transaction doctrine in holding that a transfer of property to a controlled corporation was tax-free even though the transferors were subsequently divested of the requisite controlling ownership interest through assignment of shares to underwriters. Shares of common stock were to be transferred to the underwriters upon their placement of preferred stock in the corporation. The court distinguished two prior cases in which the mutual interdependence test was used to apply the step transaction doctrine. In the prior cases, the assignment of shares received in a reorganization was not discretionary and the taxpayers were bound unconditionally. In American Bantam Car, however, the taxpayers had complete ownership of the shares received and the subsequent assignment was merely part of a general plan. The court stated that "[a]t most, there was an informal oral understanding of a general plan contemplating the organization of a new corporation, the exchange of assets for stock, and marketing of preferred stock of the new corporation to the public." Id. at 405. The court held that a mere informal oral understanding of a general plan is insufficient to result in the application of the step transaction doctrine

In McDonald's of Illinois v. Comm'r, 688 F.2d 520 (7th Cir. 1982), the Seventh Circuit reversed the Tax Court's holding that the transactions at issue should not be stepped together. The taxpayers merged their restaurant franchises into McDonald's in exchange for McDonald's stock which was unregistered when received but would be registered (and, hence, transferable) shortly thereafter. While the taxpayers fully intended to and eventually did dispose of their McDonald's stock, they were under no legal obligation to do so. McDonald's, desiring a stepped up basis in the assets acquired, argued that the step transaction doctrine was applicable and, therefore, the continuity of interest requirement for an "A" reorganization was not satisfied. The Tax Court in McDonald's of Zion v. Comm'r, 76 T.C. 972 (1981), had applied the mutual interdependence test and held that the discretionary nature of the sale by the taxpayers and the fact that the merger was not contingent on the subsequent sale indicated that the transactions were not interdependent. The Seventh Circuit reversed, stating that the Tax Court's interpretation of the mutual interdependence test looked more like the binding commitment test. The Seventh Circuit stated that the mutual interdependence test is more practical and less legalistic than the binding commitment test, and that the focus of the former test is on the relationship between the steps. Accordingly, the court applied the step transaction doctrine to combine the merger and the subsequent sale because the facts indicated that the merger would not have taken place if the taxpayers were unable to subsequently dispose of their stock

M0303758

**BROWN & WOOD LLP**

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 33

The facts in <u>Penrod v. CIR</u>, 88 T.C. 145 (1987), also involved the acquisition by McDonald's of franchises in exchange for McDonald's stock. The key difference from <u>McDonald's of Zion</u> was that the taxpayers did not originally intend to dispose of their stock. The court rejected the IRS' claim that the merger and subsequent sale should be stepped together. It looked at the intent of the parties in applying the mutual interdependence test and held that the step transaction doctrine did not apply.

We do not believe that the steps in the instant transactions would be found to be mutually interdependent. In <u>Associated Wholesale Grocers</u>, the step transaction was applied because the sale contract stated that it would terminate if the merger was not effected and because there was virtually no time between the steps. Moreover, as in <u>American Bantam Car</u>, Gainor was exposed to all of the risks inherent in holding a position in a venture such as GMUSA; subsequent distribution of the LLC interest cannot be said to be more than part of a general plan since the LLC interest itself was subject to substantial erosion due to possible losses within GMUSA. Although Gainor gained a tax benefit from the distribution of the LLC interest encumbered by the Margin Loan and GMUSA's subsequent repayment of the Margin Loan, it cannot be said that the transactions described above were fruitless without the distribution of the LLC interest. At most, there was an informal, oral understanding of a general plan, which included the possibility GMUSA would distribute the LLC interest to Gainor. Furthermore, as stated above, there were no agreements that made the transactions dependent or contingent on each other. Unlike <u>McDonald's of Zion</u>, it cannot be said that the transactions described above would not have taken place but for the subsequent distribution of the LLC interest.

It should be noted that the IRS, in Revenue Ruling 79-250, added an additional business purpose element to the mutual interdependence formulation, i.e., that each step must be undertaken for a separate business purpose. Rev. Rul. 79-250, 1979-2 CB 256. This Ruling has since been modified by Revenue Ruling 96-29, 1996-1 CB 50. That Revenue Ruling emphasizes that the central holding in Revenue Ruling 79-250 is unique to reorganizations under Code Section 368(a)(1)(F) and Revenue Ruling 79-250 is not intended to reflect the application of the step transaction doctrine in other contexts. The courts have also been inconsistent in the degree to which they have analyzed or even acknowledged the importance of business purpose in the step transaction analysis. See, <u>Associated Wholesale Grocers Inc. v. Comm'r</u>, 927 F 2d 1517 (10th Cir 1991). Because each of the transactions undertaken by the parties to the instant transaction was supported by a reasonable expectation of profit, we believe that an analysis of business purpose in this context could only buttress a conclusion that the steps were not

NYLIB1:608186/4

M0303759

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 34

interdependent  However, we do not believe that the existence of a business purpose precludes the application of the step transaction doctrine

Based upon the foregoing and on the representation of Gainor and GMUSA that neither was obligated to engage in any transaction upon the completion of any other transaction, it is more likely than not that each step undertaken by Gainor and GMUSA would be viewed as independent from the others and consequently it is more likely than not that the "mutual interdependence" formulation of the step transaction doctrine would not be applicable to the transactions

### d.     End result test

The end result test, which is the most frequently used of the three formulations of the step transaction doctrine, combines purportedly separate business transactions into a single transaction when it appears that they are really component parts of a single transaction, intended from the outset to be effected for the purpose of achieving the ultimate result  This test makes intent a necessary element for the application of the step transaction doctrine  See, Brown v. U.S., 782 F.2d 559 (6th Cir. 1986).

The end result test has been applied in numerous cases dealing with stock redemptions, in which the courts have found an integrated transaction when " the redemption occurs as part of a plan which is firm and fixed and in which the steps are clearly integrated." Niedermeyer v. Comm'r, 62 T.C. 280 (1979) aff'd per curiam, 535 F.2d 500 (9th Cir. 1976), cert. denied, 429 U.S. 1000 (1976); Leleux v. Comm'r, 54 T.C. 408 (1970); Bleily & Collishaw v. Comm'r, 72 T.C. 751 (1979)  The fact patterns in a number of these cases address whether shareholders involved in several different redemptions of their stock have had in place an integrated plan with respect to such redemption, causing such shareholders to qualify for sale treatment with respect to the redemptions

In Bleily & Collishaw, supra, the taxpayer corporation, a construction contractor, owned 30% of a subcontractor with which it did business  The other shareholder of the subcontractor wanted sole control and taxpayer agreed to sell all of its shares to the corporation  The subcontractor did not have enough cash to repurchase the shares at the time, but expected to earn sufficient funds over the next 6 months.  The parties agreed that the subcontractor would repurchase all of the stock held by taxpayers as funds became available  In integrating the

NYLIB1-6683864

M0303760

**BROWN & WOOD** LLP

Lucor Special Investments, Inc
Mr. Mark Gainor
December 31, 1999
Page 35

transactions, the court held that there was a firm and fixed plan to redeem all of the taxpayer's shares and upheld the taxpayer's exchange treatment on each partial redemption transaction

Roebling v. Comm'r, 77 T.C. 31 (1981), involved the redemption of a company's preferred stock as part of a recapitalization. To this end, the company redeemed a set number of shares each year. The taxpayer offered to and did have a portion of her shares redeemed each year to the extent that other preferred shareholders did not offer their shares for redemption. A provision to this effect was included in the corporation's articles of incorporation. The Tax Court found that there was a firm and fixed plan to redeem all of the shares of the taxpayer, and upheld the taxpayer's exchange treatment.

Courts have found a series of redemptions to be part of a single integrated plan in other cases. See, U.S. v. Carey 289 F.2d 531 (8th Cir. 1961); Monson v. Comm'r, 79 T.C 827 (1982), Howell v. Comm'r, 26 T.C. 846 (1956) aff'd, 247 F.2d 156 (9th Cir. 1957); Tiffany v. Comm'r, 16 T.C. 1443 (1951). In all of these cases, a complete termination of the taxpayer's interest was the end result of the transactions and capital gain treatment was appropriate In Howell v. Comm'r, supra, for example, where some of the taxpayers did not have a complete termination, a fixed and firm plan was not found, and yet the taxpayers received dividend treatment.

In many other redemption cases, the courts did not find a fixed and firm plan In Niedermeyer v Comm'r, supra, the taxpayers owned a portion of the common stock and preferred stock of a closely held corporation They sold their common stock to a corporation that was controlled by their sons. Three months later, they donated their preferred stock to a charity, as they had done previously The taxpayers claimed that these dispositions effected a complete termination of their interest in the corporation and should be integrated into a single transaction. The Tax Court disagreed, finding that there was no indication of a fixed and firm plan in this case. The court said, that while a plan does not "need to be in writing, absolutely binding, or communicated to others," such factors tend to show a plan which is fixed and firm.

In Leleux v. Comm'r, supra, the court reached a similar conclusion. Following an accident for which the corporation faced potential liability, the taxpayers (a husband and wife) decided to redeem as much of their stock as possible. While the parties never adopted a formal plan, the taxpayers claimed that there was a "gentleman's agreement" to redeem their stock Over a three year period, a series of redemptions occurred which decreased the taxpayers' interests in the corporation from 86.3% to 53.5% However, the court held that the redemptions

NY1:31.6683366-4

M0303761

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 36

were essentially equivalent to a dividend, because there was not a fixed and firm plan with clearly integrated steps. In addition, the court noted that there was a lack of intent to terminate the shareholders' interests.

In Johnson v. Comm'r, 78 T.C. 564 (1982), the taxpayer owned stock in a corporation that underwent a reorganization following a dispute between its two major shareholders. As part of the reorganization, taxpayer received new common shares and a large cash distribution. In addition, the agreement between the two major shareholders required one of the major shareholders to tender an offer to purchase the new common shares of all of the other shareholders. The other major shareholder was required under the agreement to tender its stock pursuant to this offer. The taxpayer, however, decided to sell a portion of his new common stock to the major shareholder and tried to characterize the income from the reorganization and sale as deriving from a single transaction. The Tax Court held that these transactions were not part of an integrated plan because the taxpayer was under no obligation to tender the shares

Other cases in which a court refused to find an integrated plan include Benjamin v. Comm'r, 66 T.C. 1084 (1976), and Johnston v. Comm'r, 77 T.C. 679 (1981). However, Niedermeyer v. Comm'r, supra, is significant as the only case where the court refused to integrate the steps of a transaction when a complete termination of interest occurred

The IRS has ruled on this issue as well. In Rev. Rul. 77-226, 1977-2 CB 90, the taxpayer corporation purchased $1 million of shares in X Corporation following X Corporation's announcement that it would repurchase its shares. X Corporation then redeemed 20% of the purchased shares, and the taxpayer reported the proceeds as a dividend and claimed a dividends received deduction (a 'DRD'). Two weeks later, the taxpayer sold the remaining shares on the open market, claiming a capital loss due to the carryover of basis from the previously redeemed shares. Without explanation, the IRS held that these two transactions were part of an integrated plan, and must be considered together. Accordingly, the taxpayer was denied the dividends received deduction and suffered no loss on the later sale.

The step transaction doctrine was also applied in a General Counsel Memorandum where the taxpayer purchased $3 million in shares of a merger target and then surrendered its stock for $1.5 million cash and $2 million in acquirer stock pursuant to the merger. GCM 39290 (1/4/84) The taxpayer characterized the $.5 million in gain as a dividend eligible for the DRD. The taxpayer then sold its remaining stock within three months on the open market for an amount

NYCD1 / 66838614

M0303762

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 37

roughly equal to its basis. The taxpayer had engaged in a pattern of similar transactions in prior years. The IRS ruled that the facts show that the taxpayer had the intent to dispose of all of its shares soon after the merger and therefore, the transactions should be integrated. In support of this conclusion, the IRS noted that most of the gain was from the dividend that it claimed it received, while the gain, if any, from an increase in the price of the stock was "minuscule".

Both Rev. Rul. 77-226 and GCM 39290 ignore the fact that the sales following the redemptions were voluntary and thus are unrelated. Both fact patterns are similar to the facts in Johnson, where the taxpayer sold some stock received in a recapitalization. The court held that there were separate transactions because the taxpayer was under no obligation to redeem his shares; nor were the taxpayers in Rev. Rul. 77-226 and GCM 39290. Arguably, the result in GCM 39290 might have been different had the taxpayer's past conduct not indicated the existence of a plan.

Lastly, notwithstanding the seemingly broad scope of the end-result formulation, the courts have recognized a significant limitation on its application. This was articulated by the Tax Court in Esmark, Inc. v. Comm'r, 90 T.C. 171, 195 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989), wherein the court stated "[The IRS's] recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step-transaction doctrine in this manner." 90 T.C. at 196. In support of its conclusion, the Tax Court cited, among a number of other cases, Grove v. Comm'r, 490 F.2d 241 (2nd Cir. 1973), aff'g, T.C. Memo. 1972-98.

The Esmark case is of particular relevance in the instant case. In Esmark, the taxpayer desired to dispose of certain unwanted businesses. The taxpayer and its advisors formulated a plan to contract its capital structure through a redemption of its outstanding shares by having a third party tender for a portion of the taxpayer's outstanding shares and then tender the acquired shares for an asset, stock of a wholly-owned subsidiary, of the taxpayer. In addition to achieving the desired business results, the proposal was tax efficient, because, under law as then in effect, the exchange of its subsidiary's stock for its outstanding shares would have been tax free to the taxpayer, whereas a sale of the subsidiary's stock for cash, which cash could then have been used for a self-tender, would have produced a taxable transaction.

Concluding that the step-transaction doctrine could not be applied to so recast the transaction, the Tax Court recognized that the reduction of taxes was a significant factor in

NYLIB1-668396.4

M0303763

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 38

structuring the transaction and that Mobil's tender offer was part of an overall plan. The court also recognized that Mobil, not the taxpayer, had borne the economic cost of the tender offer and that Mobil's ownership of the Esmark shares, "however transitory", must be respected. 90 T.C. at 198. Esmark has recently been followed by the Tax Court in Turner Broadcasting Company v. Comm'r, 111 T.C. 315 (1998), in which the Tax Court stated:

> Even if alternative explanations are available to account for the results of a transaction, this Court will not disregard the form of the transaction if it accounts for the transaction at least as well as alternative recharacterizations.

To be compared to the Tax's Court's decision in Esmark, is its decision in Idol v. Comm'r, 63 T.C. 444 (1962), aff'd 319 F.2d 647 (8th Cir. 1963), which was distinguished by the Tax Court in Esmark. In Idol, the taxpayer wished to withdraw cash from his controlled corporation as a capital gain, rather than as a dividend. To achieve this result, the taxpayer sold shares of stock to a third party who had an interest in acquiring certain of the corporation's assets. On the same day, Idol caused the corporation to exchange such assets for the recently purchased shares of stock. Furthermore, the stock purchase agreement contained a provision pursuant to which the taxpayer agreed to cause a redemption of the shares for the desired assets and a provision pursuant to which the share purchaser agreed not to be represented on the corporation's board of directors or take a role in management. (Although not specifically addressed by the Tax Court, these provisions in the sales agreement would arguably have fallen within the "binding commitment" formulation of the step transaction doctrine.) Furthermore, the record disclosed that the stock purchaser had previously expressed no interest in acquiring the corporate stock and only wished to acquire assets. Based on these facts, the Tax Court concluded that the form of the transactions should not be respected and that the transactions should be recharacterized as a sale of the assets by the corporation to the stock purchaser followed by a dividend to the taxpayer. In distinguishing Idol, the Tax Court in Esmark focused on the fact that the stock seller never effectively divested himself of the ownership of the shares that he nominally sold and that the stock purchaser effectively merely purchased the corporation's assets, whereas in Esmark, the parties changed their economic position through their participation in the transactions consistent with the transactions' form.

The National Office of the IRS has also recognized the premise of the Esmark case, i.e., that the step-transaction does not permit the creation of new steps or the reordering of existing steps, in a series of Technical Advice Memoranda. See PLR 8815003 (12/11/87), PLR 8738003

NYLIB1 6843864

M0303764

**BROWN & WOOD LLP**

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 39

(5/22/87), PLR 8735007 (5/28/87) and PLR 8735006 (5/18/87). Each involves the acquisition of a corporation's outstanding debt by an unrelated underwriter, the exchange of debt for other securities of the corporation, and the sale of such other securities by the underwriter to the public. In each case, the Technical Advice Memoranda concluded that the end result formulation does not require that the transactions be stepped together.

To be contrasted to the Esmark case are the more recent cases, Salomon, Inc. v. U.S., 976 F.2d 837 (2nd Cir.) aff'g 92-1 USTC ¶50,155 (DC NY 1992) and Walt Disney, Inc. v. U.S., 4 F.3d 735 (5th Cir. 1993), rev'g 97 T.C. 221 (1991). Both cases involved the issue of whether there had been a disposition of assets that would trigger investment credit recapture under Code Section 47(a)(1). Both cases involved similar divisive "D" reorganizations in which assets were transferred to a subsidiary and the shares of the subsidiary were spun off to the shareholders of the parent corporation. Although both courts claimed to apply the "end result" formulation in order to integrate the drop-down and spin-off, facts were present which were present which were much closer to the facts found in "binding commitment" and "mutual independence" cases. In Walt Disney, Inc., the court reached its conclusion on overall intention for the steps to occur, plus the existence of a binding agreement which "manifests" such intent and which overcame the fact that the transactions were separated by a 59 day period of time during which the parent company was at risk with respect to the transferred assets. In Salomon, the court based its conclusion on an overall intention for the steps to occur which was supported by the statements regarding the integration of the steps to the IRS in the ruling request and the fact that the spin-off occurred immediately after the drop-down.

More recently, in True v. U.S., __ F.3rd __ (10th Cir. 9/9/99), the Court of Appeals affirmed a the District Court's summary judgment in favor of the IRS regarding the integration of one series of transactions under the "end result" formulation of the step transaction, where the evidence clearly showed that the end result was the sole outcome intended to be achieved by entering into the transactions from the outset. With respect to such series of transactions, the Court of Appeals also concluded that such integration would be appropriate under the "mutual interdependence" formulation as well, because the facts showed that each of the steps would have been fruitless without the others. The Court of Appeals, however, reversed the District Court's summary judgement integrating another series of transactions. The Court of Appeals concluded that there was a factual issue under the "end result" formulation, because the evidence created a genuine factual issue as to whether the end result achieved was the sole intended result from the outset. The Court of Appeals concluded that there similarly was a factual issue under

NYLIB1 661596.4

**BROWN & WOOD** LLP

Lucor Special Investments, Inc
Mr. Mark Gainor
December 31, 1999
Page 40

the "mutual interdependence" formulation, because it appeared that the each of the steps might have economic significance on its own  The conclusion that can be drawn from the True decision appears to be that if the facts demonstrate that at the time of entering into series of transactions an investor has in mind a sole outcome and no other outcome can be discerned. a court can apply the "end-result" formulation of the step transaction doctrine to disregard intermediate steps, particularly if those intermediate steps had so little economic significance on their own to fall within the "mutual interdependence" formulation.

In both Salomon, Inc v. United States, supra, and Walt Disney, Inc. v. United States, supra, the issue was whether a transfer of assets to a subsidiary as part of a divisive "D" reorganization resulted in the recapture of investment credit.  While both courts seemed to apply the "end result" formulation to integrate the transfer of assets and subsequent spin-off, each court cited facts that would indicate a "binding commitment" or "mutual independence" test  In Walt Disney, the court cited an overall intention for the steps to occur, and the fact that the company had a legal obligation to transfer the assets and distribute the stock.  In Salomon, the court based its conclusion in part on the fact that at the time of the asset transfer the taxpayer intended to spin-off the stock, establishing the interdependent nature of the steps  The District Court concluded that such interdependent relationship also existed in the series of transaction integrated under the step transaction doctrine in True

Whether the end result analysis of the step transaction doctrine is applicable in the instant case turns on whether the Transactions entered into by Gainor and GMUSA are part of a "fixed and firm" plan such that they should be integrated into a single transaction.  The case law does not provide any absolute standards as to what constitutes a fixed and firm plan, but provides some guidance  While a formal written plan is not required, a mere 'gentlemen's agreement' is insufficient to find a fixed and firm plan. Niedermeyer v. Comm'r, supra at 282; Leleux v Comm'r, supra at 408.  However, as the decisions in Esmark and Standard Linen make clear, the existence of a plan alone does not justify the application of the step transaction doctrine.

In the transactions described herein, each of the parties placed itself at risk with respect thereto  Furthermore, there was no obligation for any of the parties to undertake any of the transactions, and we understand that neither Gainor nor GMUSA made any representation to third parties that the transactions would occur  Nevertheless, the IRS could argue that the closeness in time of such transactions, the involvement of Gainor in the planning of the transactions from their initial phase, and the fact that GMUSA ultimately satisfied the Margin

NYLIB1 468386 4

M0303766

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 41


Loan could evidence an anticipated end-result. Cf., PLR 9447024 (8/23/94). However, based on the factual distinctions from the Idol, Walt Disney, Inc. and Salomon, Inc. cases, and on the decision of the Tax Court in the Esmark and Turner Broadcasting cases, it is more likely than not that the "end-result" formulation of the step-transaction doctrine would not apply to collapse the transactions.

### e.    Summation

In general, the intent to act in accordance with a plan is important. This intent can be demonstrated by looking at whether the transactions have an independent business purpose. If a transaction does not have economic significance apart from another transaction, this is evidence that the transactions have an independent economic significance should generally be supportive, although not conclusive, that the step transaction doctrine does not apply. As discussed above in the context of the mutual independence formulation of the step transaction doctrine, it is more likely than not that the transactions entered into by Gainor and GMUSA would be found to have independent economic significance.

An application of the step transaction would require a court to ignore the economic substance of the various transactions. As discussed above, no binding commitment obliged GMUSA to distribute the LLC interest to Gainor. Since there was, at best, a general agreement in place regarding the distribution of the LLC interest, it is more likely than not that an assertion that a 'fixed and firm' plan existed in this instance would not be sustained. Accordingly, application of the step transaction doctrine, under any of the three tests described above, should fail.

Based on the above analysis, it is more likely than not that the step transaction doctrine would not apply to the transactions entered into by Gainor and GMUSA.

### 4.    Code Section 269

Code Section 269(a)(1) provides that if a person acquires control of a corporation for the principal purpose of evading or avoiding income tax by claiming the benefit of a deduction, credit or other allowance that would otherwise not be available, then the benefit may be

NY:1B1:6083186.4

M0303767

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 42

disallowed.[8] This provision gives the IRS broad powers, if it can prove that the principal purpose of the acquisition is the evasion or avoidance of Federal income tax. Therefore, to disallow the ordinary loss deduction the IRS must establish that MJG acquired controlling ownership of the GMUSA and that such acquisition was made for the principle purpose of securing a tax benefit. Although the manner of the acquisition may generate tax benefits, the existence of tax benefits alone is not enough to bring a transaction within the strictures of Code Section 269. See, e.g. D'Arcy MacManus & Masius Inc. v. Comm'r, 63 T.C. 440 (1975). Rather, income tax evasion or avoidance must be the principal purpose.

Although the issue is a factual one based upon the intent of persons acquiring the requisite control, it is more likely than not that Code Section 269(a) would not apply to prohibit MJG from claiming a loss deduction on the sale of the stock of GMUSA. In the instant case, MJG controlled GMUSA prior to, and independent of, the transactions described herein. Consequently, it is more likely than not that the IRS would be unsuccessful were it to attempt to assert that Code Section 269(a) applies to the transactions. Furthermore, the Tax Court has concluded that Code Section 269 does not apply where there are feasible alternatives to a transaction that are not subject to Code Section 269 and that yield equivalent tax benefits. Cromwell v. Comm'r, 43 T.C. 313 (1964). It is our understanding that feasible alternative transactions exist that are not subject to Code Section 269 and that would yield equivalent tax benefits to MJG. Thus, under the Cromwell case, it is also more likely than not that the IRS would be unsuccessful were it to attempt to assert that Code Section 269(a) applies.

### 5. Code Section 482

Code Section 482 allows the IRS to allocate gross income, deductions, credits or allowances between or among organizations, trades or businesses "owned or controlled directly or indirectly by the same interests" if the IRS "determines that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of such organizations, trades or businesses." The purpose of Code Section 482 is to place a

---

[8]    Code Section 269(a)(2) provides that if a corporation acquires property of another corporation in a carryover basis transaction having such a principle purpose the IRS can disallow such benefits. Code Section 269(a)(2) would not apply to the transactions because, among other things, MJG is not a corporation.

NYLIBI 668186 4

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 43

controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining the true taxable income from the property and business of a controlled taxpayer, using the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer

Gainor, MJG and GMUSA are under common control for purpose of Code Section 482, because as stated above MJG controlled GMUSA. However, to apply Code Section 482 in the instant case the IRS would have to show that the distribution of the LLC interest by GMUSA to Gainor, and any subsequent loss on the sale of the stock of the GMUSA, is an evasion of taxes or does not clearly reflect the true taxable income of Gainor or MJG. The Treasury Regulations define 'true taxable income' as the taxable income that would have resulted if a controlled taxpayer had dealt with the other member or members of the group at arm's length. The Treasury Regulations specify that "(i)t does not mean the taxable income resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement the controlled taxpayer chose to make . . ." The distribution of the LLC interest by GMUSA to Gainor, and any subsequent loss recognized when the stock in GMUSA was sold, does not occur as a result of a non-arm's length transaction between GMUSA, MJG and Gainor. Rather, the transactions were all at arm's length and the loss was recognized as a result of the operation of the rules of Code Sections 301 and 1001 and a sale at arm's length to an independent party Therefore it is more likely than not that the transactions would have the requisite separate existence and substance to withstand attack by the IRS under Code Section 482

### 6. Application of Code Section 465

In the case of an individual, any loss for the taxable year from an activity to which Code Section 465 applies is allowed only to the extent of the aggregate amount with respect to which the taxpayer is "at risk" for such activity at the close of the taxable year See Code Section 465(a).

### a. Activities Subject to the Code Section 465 Rules

Among the activities to which Code Section 465 applies is each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income. See Code Section 465(c)(3). These activities are aggregated or treated as separate activities as the Treasury Department prescribes by regulations No such regulations have been proposed or adopted. Gainor, and later MJG, acquired and held the GMUSA stock investment for the

NYLIB1-6483664

M0303769

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 44

production of income. Thus, an "at risk" activity of Gainor and MJG includes the investment in GMUSA stock.

### b. The Amount "At Risk"

For purposes of Code Section 465, a taxpayer is considered "at risk" for an activity with respect to amounts including the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity and the amount borrowed for use in an activity to the extent that the taxpayer is personally liable for repayment of such amount or has pledged property, other than property used in the activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). See Code Sections 465(b)(1) and (2). In the case of a shareholder in an S corporation, the shareholder's amount at risk with respect to his interest in the S corporation is initially such shareholder's basis in the stock of the S corporation. See, Treas. Reg. §1.465-10(c) and (d), which were proposed prior to the Subchapter S Revision Act of 1982 that eliminated the requirement that an S corporation itself be at risk. The amount for which a taxpayer is treated at risk is ordinarily computed at the end of the taxpayer's taxable year. Code Section 465(a)(1).

Prop. Treas. Reg. §1.465-23(c) provides that a taxpayer's amount at risk is decreased with respect to an activity by the adjusted basis in the hands of the taxpayer of property (other than money) withdrawn by the taxpayer from the activity, less the amount of liabilities to which the property is subject for which the taxpayer is not personably liable.

In the instant case, it is more likely than not that Gainor's initial at risk amount with respect to his investment in GMUSAs' stock is the tax basis in such stock. Under Prop. Treas. Reg. §1.465-23(c) the distribution of the LLC interest to Gainor would not reduce Gainor's amount at risk if Gainor is not considered to be personally liable for the Margin Loan. We have found no authority that addresses this issue in the context of a taxpayer who becomes secondarily liable as in the instant case. However, the overriding principal under Code Section 465 is that to be personally liable within the meaning of that provision, a taxpayer must be the obligor "of last resort". See, e.g., Melvin v. Comm'r, 88 T.C. 63, 75 (1987). Thus, it is more likely than not that a person holding property subject to the recourse debt of another, such as Gainor, even with a right of indemnification from the primary obligor would not be personally liable within the meaning of Code Section 465. As a result, under Prop. Treas. Reg. §1.465-23(c), it is more likely than not that Gainor's amount at risk would not be reduced by the distribution of the LLC

M0303770

**BROWN & WOOD** LLP

Lucor Special Investments, Inc
Mr. Mark Gainor
December 31, 1999
Page 45

interest subject to the Margin Loan. Furthermore, even if the IRS were to contend that Gainor were personally liable within the meaning of Prop. Treas. Reg. §1.465-23(c), Gainor's activity that includes his investment in GMUSA stock may be aggregated with other investment activities of Gainor for Code Section 465 purposes, including the holding of the LLC interest This position is particularly appropriate in the absence of statutorily mandated Regulations relating to the aggregation or segregation of activities In such case, it is more likely than not that Gainor's basis in the LLC interest would be taken into account in determining his amount at risk and that such amount would not be reduced by the amount of the Margin Loan, because of any personal liability of Gainor for the Margin Loan

Based upon the foregoing, it is more likely than not that the at-risk rules would not adversely affect MJG's ability to claim a loss with respect to the sale of its stock in the GMUSA

### 7. Notice 99-59

On December 9, 1999, the IRS issued Notice 99-59, 1999-52 IRB 1. The purpose of the Notice was to alert taxpayers and their representatives that it is the view of the IRS and the Treasury that purported losses from transactions having certain similarities to the Transactions would not be allowed for U.S. Federal income tax purposes. As described in the Notice, the typical proscribed transaction involves the taxpayer acting through a partnership to contribute cash to a newly-formed foreign corporation in exchange for the corporation's common stock while a second party contributes additional capital to the corporation for it's preferred stock The corporation then borrows additional amounts from a bank and gives the bank a security interest in securities having a value equal to the loan's principal amount Thereafter, the corporation distributes the securities subject to the loan to the partnership that holds the common stock As part of the scheme it is understood that the foreign corporation will pay off the bank debt from its other assets. The partnership then effects a constructive disposition of the common stock generating a loss either through an election to be taxed as a corporation or by taking the position that it is a dealer and marking the stock to market under Code Section 475.

The Notice provides that such a transaction lacks economic substance under the rationale of ACM Partnership v. Comm'r, supra, and certain similar cases The Notice goes on to provide that the IRS and the Treasury view the arrangements as a series of contrived steps through which the taxpayers claim artificial losses for transactions that are substantively a recovery of capital outlays made as part of the same scheme The Notice further provides that such losses may also

NYLIBI 666386 1

M0303771

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 46

be subject to challenge under a number of Code Sections including, but not limited to, Code Sections 269, 301,446, 482, 752, and 1001

As discussed above, it is more likely that not that the Transactions have the requisite business purpose and economic substance under the relevant authorities, including the ACM case  It is more likely than not that this alone would serve to distinguish the Transactions from the arrangements described in the Notice  Furthermore, as a factual matter, GMUSA is not newly formed and has a long history of substantial business activities.  Based on the analyses contained in the preceding sections of this letter, including the analysis of the doctrines of economic substance and business purpose as applied to the Transactions, it is more likely than not that the IRS would not be successful were it to challenge the Transactions under Notice 99-59.

## V.  **Applicability of Certain Penalty Provisions**

### 1.  **Substantial Understatement of Taxable Income**

Code Section 6662(b)(2) provides for a 20% underpayment penalty for taxpayers if there is a substantial understatement of income tax on a return.  For non-corporate taxpayers, an understatement is considered substantial for this purpose if it exceeds the greater of 10% of the correct tax or $5,000.  See Code Section 6662(d)(1)  An understatement generally does not include deficiency amounts attributable to a position that is supported by "substantial authority"[9] or for which there is adequate disclosure

Substantial authority for a position exists if the weight of authorities supporting the position is substantial in relation to the weight of authorities against the position.  See, Treas. Reg. §1.6662-4(d).  Authorities for this purpose include (but are not limited to) applicable provisions of the Code; proposed, temporary and final regulations; revenue rulings and revenue procedures; court cases; Congressional intent as reflected in committee reports, private letter rulings and technical advice memoranda issued after October 31, 1976; and actions on decision

---

[9]  There is considered to be substantial authority for a return position if substantial authority is present either on the last day of the taxable period covered by the taxpayer's return, or on the date the return is filed Regulation §1.6662-4(g)(1)(i)(A) and §1.6662-4(d)(3)(iv)(C).

NYLIB1 668186 4

**BROWN & WOOD LLP**

Lucor Special Investments, Inc
Mr. Mark Gainor
December 31, 1999
Page 47

and general counsel memoranda issued after March 12, 1981. The weight of an authority depends upon its relevance and persuasiveness, and the type of document. See, Treas. Reg. §1.6662-4(d)(3).

The "substantial authority" standard is higher than the "reasonable basis" standard but generally below "more likely than not". See, Treas. Reg. §1.6662-4(d)(2). The "reasonable basis" standard has been recently defined in Treas. Reg. §1.6662-3(b)(3) as a position that is significantly higher than not frivolous or not patently improper. The Internal Revenue Manual ("IRM") states that the standard is one where a position is arguable but fairly unlikely to prevail in court. The Internal Revenue Manual further states that "the substantial authority exception can be met when the taxpayer has less than a 50 percent, but more than a one-in-three likelihood of being sustained on the issue." See, IRM (20)535 (1997). The "more likely than not" standard is one where there is a greater than 50 percent likelihood that a position will be upheld if challenged by the Service. See, Treas. Reg. §1.6662-4(d)(2).

If the position involves a tax shelter[10], there must be both "substantial authority" for the position and the taxpayer must have "reasonably believed that the tax position was more likely than not the proper treatment". The "reasonable belief" requirement can be satisfied if the taxpayer reasonably relies in good faith (i.e., the taxpayer discloses all the facts it knows or should know) on the opinion of a qualified tax professional that unambiguously states there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the IRS.

## 2. Substantial Valuation Misstatement

Code Section 6662(b)(3) provides for a 20% underpayment penalty for taxpayers if there is a substantial valuation misstatement under Chapter 1 of the IRC. Code Section 6662(e) provides that there is a substantial valuation statement if, among other things, the value/adjusted basis of any property claimed on any income tax return is 200% or more of the amount

---

[10] Prior to the Taxpayer Relief Act of 1997, a tax shelter was generally defined as any plan or arrangement the principal purpose of which was the avoidance or evasion of U.S. federal income tax. Tax avoidance or evasion was considered the principal purpose if that purpose exceeded any other purpose. The 1997 Tax Act modified the definition of tax shelter by requiring only a "significant" (rather than principal) tax avoidance or evasion purpose.

NYLIB1 808380.4

M0303773

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 48

determined to be the correct amount of such valuation/adjusted basis. Code Section 6662(h)(1) increases the penalty to 40% in the case of any gross valuation misstatement. Code Section 6662(h)(2) provides that there is a gross valuation misstatement if, among other things, the value/adjusted basis of any property claimed on any income tax return is 400% or more of the amount determined to be the correct amount of such valuation/adjusted basis. The penalty does not apply, however, if the reasonable cause exception of Code Section 6664(c) and Treas. Reg. §1.6664-4, discussed below applies.

### 3.    Code Section 6664(c)

Code Section 6664(c) provides a general exception to Code Section 6662 penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts and circumstances determination made on a case-by-case basis. The most important factor is the extent of the taxpayer's effort to assess proper tax liability. See, Treas. Reg. §1.6664-4(b) Reliance on the opinion of a professional tax advisor constitutes "reasonable cause" and "good faith" if the advice is based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, relevant facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a particular manner. All facts that are relevant to the tax treatment of a transaction must be disclosed. See, Treas. Reg. §1.6664-4(c).

The regulations also set forth certain general opinion requirements ("General Opinion Requirements") that must be satisfied in order for reliance on tax advice, including opinion letters, to be considered reasonable and in good faith. Treas. Reg. §1 6664-4(c)(1). The General Opinion Requirements (all of which must be satisfied) are as follows:

    (i)    The opinion was based on all pertinent facts and circumstances, including the taxpayer's purposes (and the relative weight of such purposes) for entering into the transaction and for structuring the transaction in a particular manner. In addition, reliance on an opinion will not be considered reasonable if the taxpayer fails to disclose a fact that it knows or should know to be relevant to the proper tax treatment of an item.

    (ii)    The opinion was based on the law as it relates to those facts and circumstances

    (iii)    The opinion was not based on any unreasonable factual or legal assumptions (including assumptions as to future events)

NY1 1B1 663186-4

M0303774

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 49

        (iv)    The opinion did not unreasonably rely upon the representations, statements, findings or agreements of the taxpayer or any other person. For example, the opinion must not be based upon a representation or assumption that the taxpayer knows or has reason to know is unlikely to be true.

Although we have found no court case that has construed the General Opinion Requirements (which were issued in August of 1995; see, T.D. 8617), numerous judicial decisions have relied upon similar principles in holding that a taxpayer's reliance upon the advice of a tax professional qualified for the reasonable cause and good faith exception to the substantial understatement penalty. See, e.g., Mauerman v. Comm'r, 22 F.3d 1001 (10th Cir. 1994) (the substantial understatement penalty was not imposed where a physician reasonably relied in good faith upon his independent tax advisor); Vorsheck v. Comm'r, 933 F.2d 757 (9th Cir. 1991) (the taxpayers' reliance on their tax accountants precluded imposition of the substantial understatement penalty); Heasley v. Comm'r, 902 F.2d 380 (5th Cir. 1990) (the taxpayers' efforts to assess their proper tax liability by consulting an accountant and their limited experience in tax matters precluded the application of the substantial understatement penalty); Daoust v. Comm'r, 67 T.C.M. (CCH) 2914 (1994) (the negligence and substantial understatement penalties were not imposed where the taxpayers reasonably relied upon professional advisors); and English v. Comm'r, 65 T.C.M. (CCH) 2160 (1993) (the negligence and substantial understatement penalties were not imposed where the taxpayers relied upon the advice of their accountants on a complex tax matter).

The U.S. Supreme Court also reaffirmed the right of a taxpayer to rely upon the substantive advice of the taxpayer's accountant or attorney to avoid penalties in U.S. v. Boyle, 469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid filing deadlines, which did not constitute "reasonable cause," and reasonable reliance on professionals as to questions of substantive law, which would). According to Boyle:

        When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. Id. at p. 251.

NY1 130 6XX186 4

M0303775

**BROWN & WOOD** LLP

Lucor Special Investments, Inc.
Mr. Mark Gainor
December 31, 1999
Page 50

A number of issues raised by the matters addressed in this letter, including matters upon which we have stated opinions, are complex and have not been definitively resolved by the tax laws. The opinions that we state in this letter are based upon our interpretation of the law, Regulations, and judicial and administrative interpretations thereof (which interpretations are subject to change) on the date hereof, and upon our belief regarding what a court would more likely than not conclude if presented with the relevant issues properly framed. However, we cannot assure that our interpretations will prevail if the issues become the subject of judicial or administrative proceedings. Realization of the tax consequences set forth in this letter is subject to the significant risk that the IRS may challenge the tax treatment and that a court could sustain such challenge. Because taxpayers bear the burden of proof required to support items challenged by the IRS, the opinions stated in the letter are based upon the assumption that the appropriate taxpayer will undertake the appropriate effort and expense to present fully the case in support of any matter the IRS challenges.

This opinion is furnished to the addressee solely for use in determining the Federal income tax consequences of the transactions described herein and is not to be used, circulated, quoted or otherwise referred to for any other purpose without our express written permission. Such permission is not required in connection with any examination conducted or required by a governmental or regulatory body, including disclosures to the addressees' accountants or lawyers in connection therewith. Unless specifically requested by an addressee, we will not update our advice to take into account subsequent changes to the law, Regulations, or judicial or administrative interpretations thereof.

Very truly yours,

NYLIB1 608166/4

M0303776

# Exhibit B

December 31, 1999

Bryan Medical, Inc
3333 Peachtree Road, NE
Suite 450
Atlanta, GA 30326

Mr. Mark Gainor
8022 Fisher Island Drive
Miami, FL 33109

Ladies and Gentlemen:

You have requested our opinion regarding certain US Federal income tax consequences of certain transactions described below ("Transactions"). Bryan Medical, Inc. ("Bryan") was organized under the laws of Georgia on June 22, 1995. Bryan 's sole shareholder until August 3, 1999, was Mark Gainor ("Gainor"). Bryan elected to be treated as an S Corporation for U.S. Federal income tax purposes for its taxable year ended December 31, 1995. Bryan's only asset was a 1.2% interest in Gainor Medical Management, LLC ("LLC").

MJG Partners ("MJG") is a family limited partnership formed by Gainor during 1999. MJG was formed for estate tax purposes and serves as an investment vehicle. MJG has brokerage accounts with Merrill Lynch ("ML"), Goldman Sachs ("GS"), Morgan Stanley ("MS"), and Donaldson Lufkin Jenrette ("DLJ"). The ownership of MJG is as follows: Gainor; 45% and MJG Ventures: 55%.

## I.    DESCRIPTION OF TRANSACTIONS

On August 3, 1999, Gainor contributed all of his shares of Bryan to MJG in an effort to consolidate all of his investments in his family limited partnership. The contribution of the Bryan shares to MJG terminated Bryan's subchapter S election. Gainor and MJG made an election pursuant to Section 1362(e)(3) of the Internal Revenue Code of 1986, as amended ("Code"), to compute the taxable income of Bryan under normal tax accounting rules.

M0303673

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 2

On August 3, 1999, Bryan also opened brokerage accounts at ML, GS, MS, and DLJ. Thereafter certain of MJG's assets in its accounts at ML, GS, MS, and DLJ were transferred to Bryan's accounts at the same firms. The following summarizes the transfers from the MJG accounts to the Bryan accounts:

| FIRM | FMV | Tax Basis |
|------|------|-----------|
| GS | $30,781,957 | $30,759,416 |
| MS | $9,066,503 | $9,227,621 |
| DLJ | $378,530 | $363,169 |
| ML | $0 | $0 |
| TOTAL | **$40,226,990** | **$40,350,176** |

Based upon advice received from ML, Bryan decided to invest in United States Treasury Bills ("T-Bills"). Such investment was made for substantial non-tax business reasons including: (i) Bryan's and Gainor's belief that the Federal Reserve Board would lower interest rates in an attempt to encourage continued growth of the U.S. economy in the wake of the Y2K fears, (ii) to produce an overall economic profit due to Bryan's and Gainor's belief the yield curve for T-Bills would change, and (iii) Bryan's and Gainor's belief that the most direct way with the most leverage to realize gains for the expected change in interest rates was to invest in T-Bills

After evaluating the risks and rewards of liquidating Bryan's portfolio or purchasing T-Bills on margin, Bryan and Gainor determined that purchasing T-Bills on margin was superior to liquidating Bryan's investments and investing the proceeds in T-Bills. In addition, Bryan and Gainor felt that T-Bills would hedge some of the risk associated with Bryan's other investments

Bryan and Gainor decided to purchase the T-Bills through ML because transaction costs (interest rate and loan fees) were less than GS, MS, and DLJ. Bryan transferred $5 million of cash from its account at GS to its margin account with ML. On September 30, 1999, Bryan

NYLIB1-675334-4

M0303674

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 3

purchased $41,000,000 of face value of T-Bills that matured on December 31, 1999. The T-Bills had a cost basis of $40,616,904.

As part of a recapitalization, Bryan secured a credit facility from ML in the amount of $48 million ("Loan"). The Loan and the related collateral account agreement were dated September 29, 1999. Under the terms of the Loan, the borrower was allowed to take an advance of up to $48 million, but was not required to withdraw the entire $48 million. The Loan provided for interest at LIBOR plus 75 basis points. The Loan was secured by the T-Bills purchased with the Loan proceeds. The T-Bills were held in a collateral account established by Bryan with ML. On September 30, 1999, Bryan borrowed $38.1 million under the terms of the Loan to purchase the T-Bills described above.

On October 9, 1999, Bryan assigned its interest in LLC to MJG. At the time of the distribution, Bryan's tax basis in LLC was approximately equal to the interest's fair market value.

On November 23, 1999, Palladium Financial Trust ("Palladium") entered into a letter of intent with MJG to acquire all of the shares of Bryan. The letter of intent was non-binding, but provided for a period of exclusivity. Palladium was interested in acquiring Bryan due to Bryan's favorable lending relationship with ML and Bryan's favorable investment relationships with GS, MS, and DLJ.

On November 23, 1999, Bryan distributed $38,554,000 of face amount of T-Bills having a fair market value of $38,336,936 and a tax basis of $38,193,759 from its collateral account with ML to MJG's collateral account with ML. At the time of the distribution and immediately after the distribution, ML retained a security interest in the distributed T-Bills and the T-Bills remained in MJG's collateral account with ML. The T-Bills were distributed to MJG because Palladium was not interested in acquiring T-Bills, since they did not fit within Palladium's overall investment strategy.

On December 10, 1999, Bryan made an additional distribution of $1,804,000 of face amount of T-Bills having a fair market value of $1,799,291 and a tax basis of $1,782,479.

On December 14, 1999, Bryan Holdings LLC ("Holdings"), a subsidiary of Palladium, purchased all of Bryan's shares from MJG for $297,115. Under the terms of the stock purchase

NYLIB1:675334:4

M0303675

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 4

agreement between Holdings and MJG, a "true-up" payment was required to be made to MJG
The total "true-up" payment made in connection with the sale was approximately $450,000
Consequently, the total consideration paid in connection with the sale was approximately
$747,115.

## II.    REPRESENTATIONS

For purposes of this opinion, Gainor has made the following representations:

1.    The sale of shares of Bryan was made for substantial nontax business reasons.

2.    The distribution of the T-Bills was made for substantial nontax business reasons.

3    Neither Bryan nor its Shareholders were obligated to engage in any transaction
upon the completion of any other transaction.

## III.   SUMMARY OF OPINIONS

In rendering our opinions, we have reviewed representations and advice from various
parties to the transactions described herein, which representations and advice are referred to
below. In rendering our opinions, we have also examined such corporate records and such other
agreements, certificates, instruments, and documents as we have believed are relevant, and we
have made such other inquires of officers, owners and representatives of the entities involved in
the transactions described herein as we have considered necessary to render the opinions set forth
herein. We have made no independent verification of such representations, advice, records,
agreements, certificates, instruments, documents, and responses to such inquiries, if any such
representations, advice, records, agreements, certificates, instruments, documents, or responses is
inaccurate in any material respect, the opinions contained herein may not be relied upon. If such
description or assumptions are inaccurate in any material respect, or the documents prove not to
be authentic, the opinions contained herein may not be relied upon. In rendering our opinion, we
have reviewed the applicable provisions of the Code and of the final, temporary, and proposed
Treasury Regulations ("Treas. Reg.", "Treasury Regulations", or "Regulations") promulgated
thereunder; relevant decisions of the U.S Federal courts; published Revenue Rulings ("Rev.
Rul." or "Ruling") and Revenue Procedures ("Rev Proc.") of the Internal Revenue Service
("IRS"), and such other materials as we have considered relevant. In certain instances we have

NYLIB1 675334 4

M0303676

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 5

determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed.

Based on and subject to the summary set out at I above, the representations set out at II above, and the analysis of the pertinent statutory provisions at III. A-D, as affected by the analysis of the statutory provisions and legal doctrines at III. E, below, all as of the date hereof, we are of the opinion that for U.S. Federal income tax purposes, although a factual situation such as the one described above has not been before a court of law addressing the issues addressed herein, on the basis of authority arising in analogous contexts, it is more likely than not (i.e., there is a greater than 50% likelihood) that, if challenged by the IRS:

(i)  For purposes of Code Section 301, the amount of the distribution of the Margin 'T' Bills to MJG would equal the fair market value of such T Bills reduced by the outstanding balance of the Loan.

(ii)  MJG's aggregate tax basis in the T-Bills immediately after the distribution by Bryan would be approximately $40 million.

(iii)  MJG's tax basis in the stock of Bryan immediately after its distribution of the T-Bills to it would be approximately $38 million.

(iv)  The distribution of the T-Bills subject to the Loan would cause Bryan to recognize a nominal amount of gain under Code Section 311(b).

(v)  MJG would recognize no income upon Bryan's payment or prepayment of the Loan.

## IV.  ANALYSIS

### A.  Tax Consequences to Shareholders on Distribution

### 1.  Application of Code Section 301 - Generally

Code Section 1371 generally provides that except as otherwise provided and except to the extent inconsistent with subchapter S, the rules of subchapter C apply to an S corporation and its shareholders. Under subchapter C, a distribution by a corporation to its shareholders with respect to its stock is generally governed by the rules of Code Sections 301 through 318.

NYLIB1-675334-4

M0303677

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr Mark Gainor
December 31, 1999
Page 6

Code Section 1368 (a) provides, however, that a distribution by an S corporation of property with respect to its stock which (but for such subsection) would be governed by Code Section 301(c)[1] is governed by Code Sections 1368(b) and (c). Code Section 1368(b) provides that if an S corporation has no accumulated earnings and profits, the distribution is not included in income to the extent that it does not exceed the adjusted basis of the stock and any such excess is treated as gain from the sale or exchange of property. Code Section 1368(c) provides that if an S corporation has accumulated earnings and profits the portion that does not exceed the "accumulated adjustments account" as defined in Code Section 1368(e) is treated in the manner provided in Code Section 1368(b), the remaining portion is treated as a dividend to the extent that it does not exceed such earnings and profits, and any remaining portion is also treated in the manner provided in Code Section 1368(b).

Neither Code Section 1368 nor the Treasury Regulations promulgated thereunder provide how to determine the amount of a distribution by an S corporation, however. Consequently, based upon the general rule of Code Section 1371(a) reference must be made to the rules under subchapter C of the Code. In the instant case, the T-Bills distributed to MJG had a fair market value of approximately $40 million. In addition, the T-Bills were not released as collateral for Bryan's Loan and thus remained subject to the debt of Bryan. As with any instance of distribution of property by a corporation with respect to its stock, the determination of the amount distributed by Bryan to MJG is within the purview of Code Section 301(b).

## 2. Determination of "amount distributed" –Code Section 301(b)

Generally, under Code Section 301(b) the amount of any distribution by a corporation with respect to its stock is the amount of money received, plus the fair market value of other property received. Code Section 301(b)(1). However, Code Section 301(b)(2) provides that the

---

[1] Code Section 301(a) provides that, generally, distributions of property by a corporation are treated in accordance with Code Section 301(c). Under Code Section 301(c), such a distribution can be treated in any of three ways: (i) as a dividend (a distribution of the earnings and profits of the corporation, as defined under Code Section 316); (ii) as a return of capital resulting in a decrease in the basis of the shareholder(s)' stock; or (iii) as a gain from the sale or exchange of property (i e., a capital gain) to the extent the portion of a distribution not treated as a dividend exceeds the adjusted basis of the stock.

M0303678

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 7

amount of a distribution must be reduced (but not below zero) in certain instances. Under Code Section 301(b)(2)(A), the amount of distribution is reduced by the amount of any liability of the distributing corporation assumed by the shareholder in connection with the distribution. See also, Treas. Reg. §1 301-(g). In addition, under Code Section 301(b)(2)(B), the amount of distribution is reduced by the amount of any liability to which the property received by the shareholder is subject immediately before and immediately after the distribution.

In this instance, the T-Bills were distributed to MJG on November 23, 1999, and on December 12, 1999. In accordance with Code Section 301(b)(3), the fair market value of the T-Bills on such date was approximately $38 million. Starting from this point, one must apply Code Section 301(b)(2) to determine whether any reduction in this amount is indicated. As stated above, the T-Bills constitute the security for the Loan to Bryan. This security interest is perfected via a lien on the T-Bills in favor of ML. Accordingly, the T-Bills are subject to the Loan liability equal to the amount of the Loan on the date of the transfer of the Margin T Bills.

A number of cases and rulings cite Code Section 301(b)(2) as authority in affirming a reduction in the amount of a distribution by a corporation with respect to its stock. See, e.g., Allen v. Comm'r, T.C. Memo 1993-612 (1993), PLR 9329329002, PLR 9221011, PLR 8626089, PLR 8347128.[2] However, there exists no statutory or regulatory authority under Code Section 301 which illustrates a 'reduction for liabilities' in this context. However, illustration is provided in Treasury Regulations under Code Section 312(c). Code Section 312(c) provides that, in cases of corporate distributions with respect to stock out of earnings and profits, proper adjustment shall be made for (1) the amount of any liability to which the properly distributed is

---

[2]  Although General Counsel's Memoranda and private letter rulings, including Technical Advice Memoranda, may not be relied upon as authority, they do indicate the view of the Internal Revenue Service on the issues addressed at the time of its issuance. In addition, private letter rulings issued after October 31, 1976 can be used to establish "substantial authority" for purposes of avoiding certain penalties under Code Section 6662. Treas. Reg. §1.6662-4(d)(3)(iii). Code Section 6110(j)(3) provides that a written determination, ( e.g., a private ruling, determination letter, or technical advice memorandum), may not be used or cited as precedent. However, in Xerox Corp. v. U.S., 656 F.2d 659 (Ct. Cl. 1981), the court noted that although private letter rulings have no precedential value, "they are helpful, in general, in ascertaining the scope of the ... doctrine adopted by the Service and in showing that the doctrine has been regularly considered and applied by the Service."

M0303679

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 8

subject; and (2) the amount of any liability of the corporation assumed by a shareholder in connection with the distribution. See also, Treas. Reg. §1.312-3. In effect, Code Section 312(c) mirrors Code Section 301(b)(2) with respect to calculating the earnings and profits of distributing corporations.

Specific examples of the mechanics of Code Section 312(c) as applied to corporate distributions of property subject to a liability are provided in Treas. Reg. §1.312-4. In Example (1), a corporation distributes a vacant lot with a fair market value of $5,000 subject to a mortgage of $2,000 to A, its sole shareholder. The example indicates that the amount of the dividend received by A is $3,000 (the fair market value of the property, $5,000, reduced by $2,000, the amount of the mortgage to which the property was subject). The next example in Treas. Reg. §1.312-4, Example (2), relies on the facts of Example (1) except that the amount of the mortgage is increased to $4,000. The example indicates that this results in a decrease in the amount of the dividend attributable to A to $1,000 (the fair market value of the property, $5,000, reduced by $4,000, the amount of the mortgage to which the property was subject). Finally, Example (3) provides for a distribution of inventory with a fair market value of $55,000, subject to a liability of $35,000. The example indicates the 'net amount of distribution' is $20,000 (the fair market value of the property, $55,000, reduced by $35,000, the amount of the liability to which the property was subject).

In the instant case, the T-Bills serve as security for the Loan. These facts cause this instance to fall squarely within the fact pattern(s) established in Treas. Reg. §1.312-4, Example (1) through Example (3). Accordingly, the similarity in the facts presented here with the examples in Treas. Reg. §1.312-4, in light of the nearly identical language used in Code Sections 312(c) and 301(b)(2), support a conclusion that, for purposes of determining the amount distributed to MJG by Bryan, a dollar-for-dollar reduction in the fair market value of the T-Bills, to the extent of the amount of the Loan, must be applied in recognition of Code Section 301(b)(2)(B). Following this reasoning, for purposes of Code Section 301 the amount distributed by Bryan to MJG equals approximately $2 million (the fair market value of the T-Bills, approximately $40 million, reduced, but not below zero, by the amount of liabilities to which the T-Bills were subject, i.e. the amount of the Loan, approximately $38 million).

NYLIB1 675334 4

M0303680

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 9

### 3. Definition of "subject to a liability" for purposes of Code Section 301(b)(2)(B)

While the examples contained in Treas. Reg. §1 312-4 are helpful in determining what facts will give rise to a prima facie case for a Code Section 301(b)(2)(B) adjustment to the amount of a distribution for purposes of Code Section 301, neither the Code nor the Regulations address how to determine when property is "subject to a liability". The question is reduced, therefore, to establishing a definition of the term 'subject to. In determining the definition of terms for purposes of the I R C . courts first look to the plain meaning of the statute. Only if the plain meaning of the statute is ambiguous should the courts resort to extrinsic aids for interpretation Miller v. CIR, 914 F.2d 586 (4th Cir., 1990). If the courts find the plain meaning of the statute ambiguous, they then look to other authority for guidance, such as the text of the underlying regulations and case law that has addressed the issue. See, Schleier v. CIR, 115 S.Ct 2159 (1995).

As discussed above, it is gainsaid that if the distribution from Bryan to MJG is subject to any liability, the amount deemed distributed for purposes of Code Section 301 is reduced dollar-for-dollar by the amount of the liability. The meaning of the term "subject to" is broad and defined as ". . .liable, subordinate, governed or affected by.... Black's Law Dictionary, Sixth Edition, (1990)". For legal purposes, property that is pledged to secure recourse debt and can be used to satisfy the liability upon default is considered subject to that liability. See, e.g., Owen v. Comm'r, 881 F.2d 832 (9th Cir 1989); TAM 9640001.

Under the terms of the Loan agreement, Bryan specifically pledged the T-Bills to ML as security for the Loan. ML's right to look to the T-Bills for repayment of the Loan was thereby created, and this right was maintained after the distribution of the T-Bills. Accordingly, ML's lien on the T-Bills existed at all times relevant hereto, thereby rendering the T-Bills 'subject to' the liability of the Loan both immediately before the distribution and immediately after the distribution.

### 4. Maher v. U.S.

The Tax Court took up the matter of when property is subject to a liability for purposes of Code Section 301(b)(2)(B) in Maher v. U.S., 69-1 U S.T.C. ¶9194 (D.C., W.D Mo., 1969) In

M0303681

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 10

Maher, the distribution in question satisfied the literal statutory requirement under Code Section 301(2)(B) (i.e., the property distributed was legally 'subject to' the blanket mortgage attached to all of the distributing Corporation's assets). However, the District Court for the Western District of Missouri applied a 'facts and circumstances' test to determine whether the dollar-for-dollar reduction in the amount deemed distributed under Code Section 301(b)(2)(B) was warranted. The court held that despite being legally "subject to" a liability, the amount distributed would not be reduced by the liability, because the property was not, in substance and for purposes of Code Section 301(b)(2)(B), "subject to" the liability in light of all the facts and circumstances of the case.

In Maher, the taxpayer owned 50% of a corporation, the taxpayer's brother owned the remaining 50%. The corporation owned a residence, which was leased to and occupied by the taxpayer. At some point prior to the distribution in question, the corporation borrowed $1,000,000 and granted the lender a blanket lien on all property owned by the corporation, including the residence. The residence represented less than 1% of the total value of the real property securing the debt. The taxpayer subsequently purchased the residence from the corporation. The purchase price to the taxpayer was $8,000, equal to the book value on the corporation's books. The residence had a fair market value of $18,000, as determined on the date of the purchase. The residence continued to secure the corporate liability for approximately one year following the date of sale to the taxpayer. Thereafter, the corporation requested, and the lender agreed, that the mortgage on the residence be released.

The IRS argued that the sale resulted in a constructive dividend to the taxpayer in an amount equal to the difference between the fair market value of the residence ($18,000) and the amount paid by the taxpayer ($8,000), or $10,000. The taxpayer asserted an argument based upon Code Section 301(b)(2)(B), stating that the residence was purchased subject to the blanket lien placed on all of the corporation's property. Consequently, the taxpayer argued, the amount of distribution attributable to the difference between the fair market value of the residence and the purchase price paid by the taxpayer was effectively reduced to zero due to the amount of the liability to which the residence was subject.

The district court rejected the taxpayer's argument and held that the residence was not, "as a matter of fact. .subject to the blanket million dollar mortgage." The court applied a

NY1JB1-675334/4

M0303682

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 11

substance over form analysis to strike down the taxpayer's assertion that the residence was subject to the mortgage. In doing so, the court cited the following factors

(i)     Although the corporation held title to the residence, it was not used for ordinary corporate business purposes; accordingly, the residence would not have been subject to the corporate debt but for the fact that a blanket lien was granted to secure the debt;

(ii)     Had the sale of the house to the taxpayer been an arm's length sale, the buyer would have required that the lien be released prior to the sale,

(iii)     The shareholder had no real risk of loss resulting from the blanket lien, since the residence was only a minor part of the total security for the Loan, and the fair market value of remaining collateral for the Loan was at least twice the Loan amount;

(iv)     The lender indicated that it would have released the residence from the blanket lien at any time, upon the request of the corporation or the taxpayer.

Based on these factors, the court held that the lender would not 'in actuality' look to the residence as security for the Loan. Accordingly, because there was no 'real risk of loss' of the property to the shareholder, the property was not subject to the liability for purposes of Code Section 301(b)(2)(B).

The Maher case serves to clarify the application of Code Section 301(b)2(B) in a number of important ways. First, under Maher, the definition of the term 'subject to' is inextricably tied to the concept of risk, i.e., in order for property distributed by a corporation with respect to its stock to be 'subject to' a liability for purposes of Code Section 301(b)(2)(B), there must be risk of loss to the recipient shareholder. Second, the holding in Maher did not change the substance of the tax consequences of the transaction in question (i.e., a dividend distribution from corporation to the taxpayer), but merely spoke to the matter of when property that is legally subject to a liability can be treated as subject to a liability for purposes of Code Section 301(b)(2)(B). Finally, there is the matter of how the IRS approached the Maher transaction itself. In this regard, it is interesting that the IRS did not assert that a dividend occurred when the lien on the residence was released by the lender. See, III. E, below

NYLIB1/675334/4

M0303683

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 12

The instant case is readily distinguishable from Maher. In Maher, the property in question was tenuously attached to a blanket lien on all of the property owned by the distributing corporation. In the instant case a lien was specifically applied by ML to the T-Bills as security for the Loan to Bryan. This lien survived distribution of the T-Bills, and is cited in the Loan documents. In addition, at all times relevant hereto the T-Bills acted as the primary collateral for the Loan, in the form of a specifically annunciated pledge and not the result of an indiscriminate blanket lien on the assets of Bryan.

Under the Loan there is a 'real risk of loss' to MJG. In the event of default on the Loan by the party primarily liable, Bryan, ML looks directly to the T-Bills for repayment of the debt.

The T-Bills represent a significant portion of the total assets of Bryan. This is in contrast to the facts in Maher, where the property distributed was of de minimus value relative to the total value of the assets owned by the distributing corporation. Accordingly, the T-Bills are clearly a significant asset of Bryan and critical to ML's decision to make the Loan. Should Bryan default, ML would look to the T-Bills for repayment of the Loan balance. Therefore, MJG is subject to a 'real risk of loss' were there to be a default.

We have been advised that at no time was there any indication presented that the T-Bills could, under any circumstances, be released from attachment before satisfaction of the Loan. We understand that ML provided a discount on the interest rate charged to Bryan in order to obtain the pledge of the T-Bills. ML would, therefore, not release its security interest in the T-Bills until such time as Bryan satisfies its debt covenants.

In light of the distinctions between the facts presented in the instant case and the facts presented in Maher, it is more likely than not that the 'facts and circumstances' test applied in Maher would result in a conclusion that the T-Bills were distributed "subject to" the Loan. As discussed above, there is a distinct connection between the Loan liability and the T-Bills, which is not abrogated for these purposes by application of the factors cited in Maher. Accordingly, it is more likely than not that the amount of the distribution from Bryan to MJG for purposes of Code Section 301 would be reduced, dollar-for-dollar, by an amount equal to the balance of the Loan from ML to Bryan under Code Section 301(b)(2)(B).

NYLIB1 675334-4

M0303684

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 13

### 5. Analogous Provision – Code Section 357(c)

Language similar to that contained in Code Section 301(b)(2)(B) is also employed in Code Section 357(c). This language has been subjected to considerable scrutiny by the IRS, various courts, and commentators. Although Code Section 357(c) applies the 'subject to a liability' language with respect to contributions to a corporation as opposed to distributions from a corporation, the meaning of 'subject to' in the context of Code Section 357(c) provides analogies to the meaning of 'subject to' in the context of Code Section 301(b)(2)(B).

In general, Code Section 357(c)(1) requires the recognition of gain in certain exchanges of property when the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceed the total of the adjusted basis of the property transferred. Similar to Code Section 301(b)(2), the precise language of Code Section 357(c) refers to two types of liabilities: those assumed and those to which the property is subject. However, the same outcome is reached regardless of whether the transferee assumes the liability or the property is merely subject to the liability. Treas. Reg §1.357-2(a).

The IRS has rejected the argument that because the transferor's obligation with respect to certain loans did not change, Code Section 357(c) should not apply to a Code Section 351 transfer to a controlled corporation of property which was subject to a liability as a result of the cross-collateralization and cross default agreement in which the transferor remained primarily liable. T.A.M. 964001. The IRS stated that Code Section 357(c) applies to all liabilities to which the transferred property is subject regardless of whether the transferor retains primary liability after the exchange or the transferee assumes any liability in the exchange. Ibid., citing Owen v. Comm'r, supra; Smith v. Comm'r, 84 T.C. 889 (1985), Rosen v. Comm'r, 62 T.C. 11 (1974) Therefore, in the context of Code Section 357(c), transferring property subject to a liability has the same force and effect as if the transferee assumed the liability. If the rule stated in T.A.M. 9640001 is applied to clarify the meaning of "subject to" in the context of Code Section 301(b)(2)(B) in the instant case, the fact that Bryan retained primary liability for the Loan is of no consequence in determining the amount distributed by Bryan to MJG.

As noted above. Code Section 357(c), like Code Section 301(b), makes reference to two distinct types of transfers: (1) those in which liabilities are assumed by the transferee; and (2) those in which no liability(s) is assumed by the transferee, but in which the property transferred

NYLIB1/675334/4

**BROWN & WOOD LLP**

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 14

is taken subject to certain liability(s). As indicated in T.A.M. 9640001 and several of the cases cited therein, the language describing these two types of transfers must be given separate and distinct effects. If it were required that the transferee become primarily liable on the obligation in order for the transfer of property to be deemed 'subject to' a liability for purposes of either Code Section 357(c) or Code Section 301(b)(2), then the reference to the latter type of transfer would be rendered superfluous. Both Code Sections of the Code explicitly provide for two types of transfers; accordingly, effect must be given to the plain language in both Code Section 301(b)(2) and 357(c) which speaks to adjustments when property is transferred 'subject to' a liability. See, Comm'r v. Asphalt Products Co., Inc., 482 US 117 (1987)

## 6. Recent Legislation Clarifying Definition of "Subject to a Liability"

On June 25, 1999, H.R. 435, the Miscellaneous Trade and Technical Corrections Act of 1999 ("99 Act"), was signed into law. Sec 3001 of the '99 Act clarified the tax treatment of transfers of property to a corporation subject to a liability. The effective date of Section 3001 is October 19, 1998.

Section 3001 modified the language of Code Sections 357, 358 and 368 by striking the language regarding the transfer of property subject to a liability. These provisions generally provide for the recognition of gain to the transferor (and an increased basis to the transferee) in certain cases where the amount of liabilities assumed, or the amount of liabilities to which the transferred property is subject, exceed the basis of the property transferred. Section 3001 also amended provisions in addition to those found in Subchapter C that required clarification by striking the phrase 'subject to' in Code Sections 584 (involving transfers of Regulated Investment Companies) and 1031 (related to transfers of 'like-kind' property). Section 3001 did not modify the term as used in Code Section 301(b)(2)(B), and Code Section 301 and the related Treasury Regulations, which address the distribution of property from a corporation to its shareholders, are outside the scope of legislation.

The changes in the language of Code Sections 357, 358, and 368 focus exclusively on transfers of property to a corporation. The clarification in the law regarding these Code Sections strikes all of the language relating to corporate acquisition of property subject to a liability. For purposes of clarity, Section 3001 included a definition of what an assumption of a liability is with regard to both recourse and non-recourse debt. Additionally, Section 3001 provided a fair

NYLIB1 675334 4

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 15

market value limitation on the corporation's basis in the property received. In the case where only a portion of the property securing the liability is transferred and in which the transferor is not subject to tax on the Code Section 357(c) gain recognized as a result of an assumption of non-recourse liability by the transferee, there are further limitations on the corporation's basis in the property received. In such a situation, for purposes of determining the basis of the property to the recipient corporation, the amount of the Code Section 357(c) gain to the transferor is calculated as if the amount of the indebtedness assumed by the transferee was the ratable portion of the liability based on the relative fair market values of the collateral securing the debt.

Because Section 3001 of the '99 Act was limited to transfers of property to a corporation and did not specifically address Code Section 301(b)(2)(B), it is more likely than not that such legislation will not adversely affect our forgoing conclusions as to the amount of the distribution of the T Bills for purposes of Code Section 301.

### 7. <u>Summation</u>

It is more likely than not that the distribution from Bryan to MJG, with respect to MJG's stock in Bryan, would be reduced dollar-for-dollar by the outstanding balance of the Loan from ML to Bryan under Code Section 301(b)(2)(B).

### B. <u>MJG's Tax Basis in the T-Bills</u>

As discussed above, treatment of the distribution of the T-Bills by Bryan with respect to MJG's stock in Bryan is controlled by Code Section 301. Code Section 301(d) states, in pertinent part:

> (T)he basis of property received in a distribution to which subsection (a) applies shall be the fair market value of such property.

Contrary to Code Section 301(b)(2), Code Section 301(d) ignores whether liabilities were assumed in connection with a Code Section 301(a) distribution or whether property received in a Code Section 301(a) distribution was subject to any liabilities. See, Bittker & Eustice, <u>Federal Income Taxation of Corporations and Shareholders</u>, ¶8.22[1] (Sixth Ed., Supp. 1998).

NYLIB1 675314 4

M0303687

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 16

Accordingly, it is more likely than not that MJG's aggregate tax basis in the T-Bills immediately after the distribution would be $40 million

### C.  MJG's Basis in Bryan Stock

Under Code Section 301(c), a distribution by a corporation with respect to its stock can be treated in any of three ways by the shareholder.  It can be treated (i) as a dividend (a distribution of the earnings and profits of the corporation, as defined under Code Section 316), (ii) as a return of capital resulting in a decrease in the basis of the shareholder(s)' stock, or (iii) as a gain from the sale or exchange of property (i e., a capital gain) to the extent the portion of a distribution not treated as a dividend exceeds the adjusted basis of the stock  In order for any of these three treatments to apply there must be an amount distributed greater than zero  Code Section 301(b) provides the rules for determining the amount distributed for these purposes.  As discussed above, in the instant case Code Section 301(b)(2)(B) applies to reduce the amount of the distribution from Bryan to MJG to $2 million.  Accordingly, there is no amount of distribution to which Code Section 301(c)(2) can apply  Accordingly, it is more likely than not that MJG's aggregate tax basis in the Bryan stock would not be reduced by the distribution of the T-Bills to it subject to the Loan, and would equal approximately $ 38 million  Consequently, it is more likely than not that MJG would recognize gain or loss on the sale of such stock to Palladium equal to the difference between such tax basis and the amount of cash received.

### D.  Applicability of Code Section 311(b)

Under Code Section 311(b)(1), if a corporation distributes property to its shareholder with respect to its stock and the fair market value of the property exceeds the corporation's adjusted basis, the corporation recognizes gain to the extent the property's fair market value exceeds its adjusted basis  In other words, a corporation must recognize gain as if the corporation had sold the distributed property to a third party at the property's fair market value.

Code Section 311(b)(2), by reference to Code Section 336(b), provides that when a corporation distributes property subject to a liability, the fair market value of the property is treated as not being less than the amount of that liability  For example, if a corporation distributes property with a basis of $90,000 and a fair market value of $100,000, subject to a

NYLIB1 675334 4

M0303688

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 17

liability of $125,000, the distributing corporation's gain pursuant to Code Section 311(b) is $35,000 ($125,000 less $90,000).

In the instant case, the fair market value of the T-Bills approximates their tax basis. In addition, the outstanding amount of the Liability is less than the fair market value of the T-Bills. Therefore, it is more likely than not that Bryan would recognize a nominal amount of gain on the distribution of the T-Bills to MJG under Code Section 311(b).

E.      **Tax Consequences Upon Satisfaction of Liability**

1.      **Constructive Dividends – In General**

The term 'dividend' is defined in Code Section 316(a) as a distribution of property by a corporation to its shareholders out of its earnings and profits. See also, Gulf Oil Corp. v. Comm'r, 89 T.C. 1010 (1987), affirmed 496 F.2d 1384 (3rd Cir. 1990). There is no requirement that the dividend be formally declared or even intended by the corporation. Croft v. United States, 496 F.2d 1384 (5th Cir. 1974); Sachs v. Comm'r, 277 F.2d 879 (5th Cir. 1960), affirming 32 T.C. 815 (1959). Distributions by a corporation are treated as dividends to the shareholder if the distributions are made for the shareholder's personal benefit; the funds need not be distributed directly to the shareholder. Rushing v. Comm'r, 441 F.2d 593 (5th Cir. 1971), affirming 53 T.C. 888 (1969); Rapid Electric Co. v. Comm'r, 61 T.C. 232 (1973). In analyzing whether a shareholder(s) must be treated as receiving a dividend as a result of a corporate expenditure, it must be determined whether the corporate expenditure is incurred primarily for the benefit of the corporation or primarily for the personal benefit of the shareholder(s). See, Gulf Oil Corp. v. Comm'r, supra (no dividend where payments were for payor corporation's benefit); Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, ¶8.05[8] (Sixth Edition Supp. 1998).

2.      **Satisfaction of Liability that Primarily Serves The Personal Interest of a Shareholder**

A constructive dividend arises, among other ways, when a corporation satisfies an obligation of a shareholder or otherwise makes a payment that primarily serves the personal interest(s) of a shareholder. See, e.g., Rev Rul. 75-421, 1975-2 CB 108 (corporate payment for valuation services regarding shareholder's stock in pending reorganization deemed a taxable

NYLIB1/675334/4

M0303689

**BROWN & WOOD LLP**

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 18

dividend)  A clear example of such a constructive dividend is when a corporation satisfies a debt for which a shareholder is primarily liable and such payment serves no purpose of the corporation  Sullivan v. United States, 363 F.2d 724 (8th Cir. 1966), cert. denied, 387 U.S. 905 (1967); Wall v. United States, 164 F.2d 462 (4th Cir. 1947).

### 3.    Satisfaction of Liability by Corporation that Serves the Interests of the Corporation

In cases where a corporation satisfies an obligation that serves its own interest and for which its shareholder(s) is secondarily liable, courts and the IRS have consistently held that there is no constructive dividend  Gulf Oil Corp. v. Comm'r, supra, Falkoff v. Comm'r, 604 F.2d 1045, 1050 (7th Cir. 1979); Rev. Rul 69-608, 1969-2 CB 43. In one case, the Tax Court held that an indirect benefit to a shareholder as a result of a corporate expenditure should not be treated as a distribution to the shareholder, Dean v. Comm'r, 9 T.C. 256 (1947) (shareholder's enjoyment of riding horses owned by corporation deemed not a constructive dividend because the exercise of horses was beneficial to corporation).  In another case, the 7th Circuit Court of Appeals held that when a corporation retired debt owed to a third party, no constructive dividend arose even though a shareholder pledged personal assets as collateral.  Falkoff v. Comm'r, 604 F.2d at 1050  With respect to shareholder guarantees of corporate debt, the IRS has indicated that a corporation's satisfaction of a corporate debt guaranteed by a shareholder does not give rise to a constructive dividend to the guarantor/shareholder  See, Rev. Rul. 69-608, 1969-2 CB 42, Situation 5. Expanding on the general theme stated above, that an indirect benefit to a shareholder as a result of a corporate expenditure is not sufficient to give rise to a constructive dividend, the IRS has indicated that no constructive dividend can arise where a corporate expenditure satisfies an obligation for which the shareholder(s) is not personally and unconditionally liable. Ibid., Situation 6.

The Tax Court has also adopted the view that a corporate expenditure, which satisfies an obligation for which a shareholder(s) is not personally and unconditionally liable, does not give rise to a constructive dividend  In Kobacker v. Comm'r, 37 T.C. 882 (1962), a shareholder personally guaranteed (i.e., was secondarily liable for) certain corporate debt. Refusing to find that the corporation in question was a sham, the court found that the corporation itself was primarily liable for the debt in question, and that the satisfaction of the debt by the corporation did not give rise to a constructive dividend to the guarantor/shareholder

NYLIBI 675334.4

M0303690

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 19

### 4. Code Section 301(b)(2)(B) – Immediately Before and Immediately After

The statutory construction of Code Section 301(b)(2)(B) supports the general principles regarding constructive dividends discussed above. Code Section 301(b)(2)(B) states, in pertinent part, that, for purposes of determining the amount distributed by a corporation to its shareholder(s) with respect to its stock, the fair market value of the property distributed is reduced by the " amount of any liability to which the property received by the shareholder is subject immediately before, and immediately after, the distribution." Thus there are only two points in time – immediately before the distribution and immediately after the distribution – that are relevant for determining the amount of distribution for purposes of Code Section 301. If Congress intended that the satisfaction of a liability that, under Code Section 301(b)(2)(B), reduced the amount of a distribution, would give rise to a constructive dividend to the recipient shareholder, it would have provided for such treatment in the Code. This intent was not reflected in the Code, and, as discussed above, neither the courts nor the IRS has adopted this view. See, e.g., Maher v U.S., supra, (lien to which the property constructively distributed to the shareholder was subject released a little more than one year after date of constructive distribution; IRS looked to facts and circumstances of original constructive distribution, not subsequent release of lien, to find grounds for constructive dividend).

### 5. Application of Constructive Dividend Rules to the Instant Case

In the instant case, Bryan remained primarily liable for the debt secured by the T-Bills at all times relevant hereto. ML made the Loan based on the cash flows of Bryan, and these cash flows were expected to be the source of repayment of the Loan principal and interest. As in Kobacker v. Comm'r, supra, unconditional liability could transfer to MJG only in the event of default by the corporate debtor, Bryan. Thus, Bryan satisfied its own debt, thereby serving a corporate interest, and MJG was only secondarily liable. As discussed above, satisfaction of a corporate debt for which a shareholder is secondarily liable does not give rise to a constructive dividend. Accordingly, it is more likely than not that no constructive dividend would arise due to the satisfaction by Bryan of the debt owed to ML.

Were the IRS to take the position that the transaction should be viewed as resulting in MJG being primarily liable for the debt in question, the issue would remain whether the satisfaction of the debt was in the interest of Bryan or whether it was primarily to serve the

NYLIB1-675334/4

M0303691

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 20

interests of MJG. An argument that MJG was primarily liable, however, would appear to have no merit in substance. As noted above, ML made the Loan to Bryan based on Bryan's expected cash flows. The lien against the T-Bills was necessary to secure favorable terms for the debt From a business perspective, ML would place itself at a distinct disadvantage if it were to lend to MJG based on the cash flow and assets held in Bryan corporate solution. For example, in order to service such a debt MJG would depend upon dividend distributions from Bryan. The failure of Bryan to satisfy the Loan would expose Bryan's other assets to ML's claims. Accordingly, in light of both the form of the Loan agreement as and between ML and Bryan and the economic substance consistent with this form, it is more likely than not that any such attempt by the IRS to recast the legal form of the transaction in a manner described above would fail

### F.    Rules Relating to the Limitation of Deductions

### 1.    Sham Transaction, Economic Substance, and Business Purpose Doctrines

There are innumerable cases addressing the judicially developed doctrines of "sham transaction", "business purpose", and "economic substance" One of the most recent attempts to synthesize the rules appears in "Appendix II To JCX-82-99: Description and Analysis of Present-Law Rules and Recent Proposals Relating to Corporate Tax Shelters", Prepared by the Staff of the Joint Committee On Taxation, JCX-84-99, November 10, 1999 ("JCT Appendix")

### a.    "Sham Transaction Doctrine"

With respect to the "sham transaction doctrine", the JCT Appendix describes two types of "shams", "shams in fact" and "shams in substance". The first involves transactions that in fact never occur. As an example, the JCT Appendix cites Goodstein v. Comm'r, 267 F.2d 127 (1st Cir. 1959), in which assets were never purchased and a loan never incurred by the taxpayer Reference is also made to ASA Investerings Partnership v. Comm'r, T.C. Memo. 1998-305, appeal pending (DC Cir. Dec. 7, 1998) in which a party never actually entered into a partnership formed to effectuate the transaction. The Transactions described above should not constitute one or more "shams in fact", assuming that every transaction in fact occurs as described in Part I hereof.

With respect to the "sham in substance" aspect of the doctrine, the JCT Appendix II cites Yosha v. Comm'r, 861 F2d 494 (7th Cir 1988), as an example. In Yosha, the taxpayers entered

M0303692

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 21

into a series of transactions on the London Metals Exchange ("LME") that were not "shams in fact" because they actually occurred. The taxpayers, however, were fully protected against loss through arrangements by the promoter with the LME brokers, and the transactions were structured so that the taxpayers could not earn a profit from them, i e , as an economic matter the trades were voided although as a legal and factual matter they occurred.[3] Thus the taxpayers were in the position of economically, or "in substance", never having entered into the transactions. A similar analysis is applied in determining whether a taxpayer is the owner for U.S. Federal income tax purposes of a particular asset. Thus, if the taxpayer has none of the economic risk of an owner and none of the economic benefits of an owner, the taxpayer would ordinarily not be treated as the owner, i.e. the taxpayer's economic ownership is voided, and such situations could be viewed as "shams in substance".

We have assumed that neither MJG nor Bryan entered into arrangements that voided the economic effects of any of the Transactions. Consequently, the Transactions should not constitute one or more "shams in substance". Much confusion about the sham transaction doctrine has arisen because the courts often treat transactions that fail the "economic substance" or "business purpose" doctrines " as "shams". In this regard, the JCT Appendix notes:

> [T]he delineation between [the sham transaction] doctrine (particularly as applied to "shams in substance") and the "economic substance" and the "business purpose" doctrines... is not always clear. Some courts find that if transactions lack economic substance and business purpose, they are "shams" notwithstanding that the purported activity actually did occur.

---

[1] Because the arrangements to protect against loss were arranged by the promoter, the Court was not faced with addressing the effect of bona fide hedging transactions with unrelated parties. Hedges provided by a party involved in the transactions were also viewed as a negative factor in ACM Partnership v. Comm'r, T.C. Memo. 1998-203, aff'd in part and rev'd in part 157 F3rd 231 (3rd Cir. 1998).

M0303693

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr Mark Gainor
December 31, 1999
Page 22

### b.    Economic Substance and Business Purpose Doctrines

As with the relationship of the sham transaction doctrine to the business purpose and economic substance doctrines, there is some confusion about the relation of the latter two to each other   Again, the JCT Appendix is helpful in trying to clarify the confusion:

> In its common application, the courts use business purpose (in combination with economic substance...) as part of a two-prong test for determining whether a transaction should be disregarded for tax purposes: (1) the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction, and (2) the transaction lacks economic substance. [citation omitted]

JCT Appendix, p. __. This language mirrors the language of the 4th Circuit Court of Appeals in Rice's Toyota World, Inc. v. Comm'r, 752 F 2d 89 (4th Cir. 1985).[4]  Consequently, to determine whether the Transactions will be respected in the instant case one needs to test the Transactions under each prong.

### (i)    Business Purpose

For a transaction to have a business purpose, the Courts have concluded that there must be a business or commercial reason for the taxpayer to engage in the transaction independent of the tax benefits that may arise therefrom.  See, Friedman v. Comm'r, 869 F.2d 785, 792 (4th Cir. 1989); Rice's Toyota World, Inc. v. Comm'r, supra  The existence of such a purpose was recently addressed in United Parcel Service of America, Inc. v. Comm'r, T.C. Memo. 1999-268.

---

[4]   "To treat a transaction as a sham the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists." Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91

NYLIB1 675334-4

M0303694

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 23

In the United Parcel Service case, the taxpayer tried to avoid taxation with respect to certain fees by restructuring them as insurance. Economically, the taxpayer was in substantially the same position as before the restructuring, but through the arrangements was able to exclude the payments from income. The taxpayer put forth a number of purported commercial reasons for the restructuring of the fees. The taxpayer argued that (i) it was required to restructure the arrangements because such payments would fall afoul of restrictions under some state insurance laws; (ii) it intended to leverage the profits into the creation of a new reinsurer that could become a full-line insurer; (iii) by removing the fees from its operating ratios it could obtain larger rate increases than had it received the fees directly, and (iv) by restructuring the fees it protected its transportation business from the risk of increased liabilities. However, the taxpayer offered no credible evidence that the restructuring would in fact achieve goals (i), (ii), and (iv). The Court also found that goal (ii) could have been accomplished by merely making an investment in such a reinsurer.

Similarly, in Winn-Dixie Stores Inc. v. Comm'r, 113 T.C. No. 21 (1999), the Court disallowed interest deductions on policy loans in a COLI program that insured the lives of approximately 30,000 workers. The program resulted in a pre-tax loss for the taxpayer. The taxpayer argued that (i) the program enabled it to fund costs of one of it benefit programs, and (ii) increased the benefits it could offer to its employees under such program. As to (i), the Court found that there was no contemporary evidence that it had purchased the COLI policies to provide such funding; that the COLI policies were not designed to fund such benefits; that the taxpayer's CFO never told the entity that was planning the COLI transactions that the purpose was to fund the benefit program, and that projections showed that the cash flow from the program was needed to pay future interest and premiums as opposed to being available to fund the benefits plan. As to (ii), the Court found that the described additional benefits were not related to the COLI program.

In Compaq Computer Corp. v. Comm'r, 113 T.C. No. 17 (1999), the Court disallowed foreign tax credits associated with dividends on certain American Depositary Receipts. Among the factors taken into account was that the officer of the taxpayer in charge of the investments made no inquiry into the commercial aspects of the transactions.

Lastly, among the more recent cases is ACM Partnership v. Comm'r, supra, and Saba Partnership v. Comm'r, T.C. Memo. 1999-359, involving similar transactions. In each

NYLIB1-675334-4

M0303695

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 24

case, the courts found that the purported business purposes of the transactions were unsupported by the evidence and, similar to the foregoing cases, the individuals involved with execution of the transaction did not exhibit behavior consistent with trying to achieve the purported commercial purposes.

The common thread in these cases is that to have the requisite business purpose to support the tax benefits achieved, there must be a purported commercial reason for engaging in the various transactions, the transaction must be consistent with such reason, and such reason must be supportable by contemporary evidence, including a showing that the transaction was handled in a business like-manner. This analysis is supported by a number of cases

For example, in Levy v. Comm'r, 91 T.C. 838 (1988), the taxpayers entered into a sale-leaseback of computer equipment for the purported reason of diversifying their business and investments. In upholding the tax benefits the Court stated:

> Based upon our careful examination of the relevant facts and evidence in this case, we conclude that petitioners entered into the transaction in issue for sound business reasons (namely to diversify their investments by entering into a legitimate long-term investment involving the purchase and leaseback of computer equipment). Petitioners approached the decision to enter into this transaction in a businesslike manner. Petitioner's financial advisor thoroughly and in good faith investigated the proposed purchase-leaseback transaction. He prepared cash flow analyses which included the components of the transaction that were critical to earning a profit on the investment. Those components included the current fair market value and projected residual value of the equipment, the fair rental value of the lease, and the rent participation agreement. He explained to petitioners the significance of and risks associated with the projected residual value of the equipment and the rent participation agreement. In addition, he explained to petitioners the tax consequences of the transaction. Petitioners also retained a law firm with expertise in leasing transactions to investigate the financial status and creditworthiness of each participant involved in the transaction, to investigate each participant's business reputation, and to handle the legal aspects of this complex transaction.

NYLIB1/675334/4

M0303696

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 25

> We are satisfied that petitioners had a good faith and
> substantial business purpose for entering into the transaction.
> Petitioners participated in the purchase leaseback transaction only
> after they were convinced that the investment had a reasonable
> possibility of producing a profit.

91 T.C. 838, 855-856. Similarly see, Pearlsten v. Comm'r, T.C. Memo. 1989-621; Rubin v. Comm'r, T.C. Memo. 1989-484.

In Caruth Corp. v. Comm'r, 865 F.2d 664 (5th Cir. 1989), aff'g 688 F. Supp. 1129 (N.D. Tex. 1987), the issue was whether a charitable contribution would be allowed for a contribution of stock of a controlled corporation to a charity after the dividend was declared, but before the dividend record date. The Court upheld the deduction in part upon finding that lag between the declaration and record dates had a business purpose:

> [Taxpayer] contends that the distinction between the two
> dates was designed to encourage his nephews... to sell their shares
> to him... The lag between the declaration date and record dates
> was designed to give the nephews an opportunity to sell. The plan
> failed in this respect; the nephews held their shares.
>
> The district court made a factual finding that the [taxpayer]
> wished to buy out his nephews' interests in North Park
> Incorporated, and that he believed declaration of a dividend might
> facilitate this objective. We review these findings pursuant to the
> clearly erroneous standard, and find clear support in the record.
> With these factual findings in place, we believe it obvious that the
> distinction between declaration and record date did, as [taxpayer]
> contends, serve a legitimate business purpose.

Lastly, it should be noted that a transaction can have an appropriate business purpose even if the transaction itself does not generate a profit. See, Caruth v. Comm'r, supra; Horn v. Comm'r, 968 F.2d 1229 (D.C. Cir. 1992).

### (ii)    Economic Substance

It is well established that a transaction or series of transactions will not be respected for tax purposes unless the transaction or transactions have economic substance

M0303697

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 26


separate and distinct from the economic benefit derived from tax reduction. See, Gregory v. Helvering, 293 U S 465 (1935). Transactions failing to meet this standard lack the requisite "economic substance" (often interpreted as a having a reasonable possibility of pre-tax profit) will not be respected for tax purposes. However, the Supreme Court has held that a transaction should be respected if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. U.S., 435 U S 561, 583-584 (1978). Thus, transactions have been upheld where the transactions were designed to achieve a tax benefit, but were endowed with positive pretax economics See, e.g., Northern Indiana Public Service Company v. Comm'r, 105 T.C. 341 (1995), aff'd 115 F.3d 506 (7th Cir 1997).

The Yosha decision articulated the standard slightly differently:

> A transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the prospect of such advantages—may indeed have had no other interest in the transaction.

Yosha v. Comm'r, 861 F3rd 494, 499 (supra)

It should be noted that a taxpayer need not be correct in its judgment of possible economic benefits, only reasonable or rational. Profit motive depends on the taxpayer's subjective and good faith intent to earn a profit. Finoli v. Comm'r, 86 T.C. 697, 722 (1986). The fact that a venture fails to produce a profit in the anticipated amount or at all does not indicate that the venture was not profit-motivated. King v. U.S., 545 F 2d 700, 708 (10th Cir. 1976) However, that profit potential cannot be illusory. In ACM Partnership v. Comm'r, supra, the Tax Court found that at the time it entered into the partnership, the taxpayer's only real opportunity to earn a profit was through an increase in the credit quality of the issuers of certain notes, or a 400-500 basis point increase in 3-month LIBOR interest rates. The court found no impact on credit quality was possible as the lenders were extremely highly rated at the time of the transaction. Moreover, the court did a 6-year review of 3-month LIBOR rates and did not find an increase of even 300 basis points in the necessary time frame. Since the analysis of the

NYLIB1-675334-4

M0303698

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr Mark Gainor
December 31, 1999
Page 27

historical data showed no reasonable basis for expecting a profit, the court ruled against the taxpayer "We do not suggest that a taxpayer refrain from using the tax laws to the taxpayer's advantage In this case, however, the taxpayer desired to take advantage of a loss that was not economically inherent in the object of the sale, but which the taxpayer created artificially through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance" In its analysis, the Third Circuit focused upon the foregoing finding of the Tax Court, stating

> Tax losses such as these, which are purely an artifice of tax accounting methods and which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations.

The Third Circuit also noted:

> [O]n November 3, 1989, [the partnership] invested $175 million of its cash in private placement Citicorp notes paying just three basis points more than the cash was earning on deposit, then sold the same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after ACM acquired the notes. These transactions . . . offset one another and with no net effect on ACM's financial position.

See also, Saba Partnership v. Comm'r, supra; Merryman v. Comm'r, 873 F.2d 879 (5th Cir. 1989) (conduit partnership without economic substance disregarded).

In Compaq Computer Corp. v. Comm'r, supra, in addition to finding no business purpose for the transactions, the Tax Court also found a lack of economic substance. This was because as the transactions were designed and executed, the taxpayer was bound to suffer a pre-tax loss. The Tax Court reached a similar conclusion for the same reason in Winn-Dixie Stores Inc. v. Comm'r, supra

From these cases it appears that the "substance" necessary to meet the requirements of the "economic substance" doctrine is somewhat different from the "substance" required under the "sham in substance" doctrine. As discussed above, the latter requires that the

NYLIB1 675334 4

M0303699

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 28


transaction have the economic consequences consistent with what the transaction purports to be:
Does the taxpayer really have the economic incidents of ownership if the taxpayer purports to
own the asset? The former requires that, having passed the "sham in substance" test, the
transaction make economic sense: Does the have a reasonable possibility of economically or
commercially benefiting from the transaction without regard to tax benefits?

Despite being inconsistent with the economic substance cases, one case has
suggested that there must be not only a reasonable possibility of making a profit, but the
possibility must relate to a profit that is greater than de minimis. See, Sheldon v. Comm'r, 94
T.C. 738 (1990) as discussed below.[5] A handful of other decisions have indicated that the court
should consider whether the profit motive for a transaction was greater or less than the tax
motive. See, e.g., Fox v. Comm'r, 82 T.C. 1001 (1994); Estate of Baron v. Comm'r, 83 T.C. 542
(1984), aff'd, 798 F.2d 65 (2d Cir. 1986). However, to date these cases appear to represent a
minority view. Thus, the tax benefits achieved in a transaction should not be denied under the
economic substance doctrine merely because the transaction's principal purpose was to achieve
such tax benefits. See, e.g., Northern Indiana Public Service Company v. Comm'r, supra.
Congress has precluded such a broad test for all disallowance by incorporating such a principal
purpose test into specific Code Sections such as Code Section 269. Long-standing judicial
authority has also recognized that "any one may so arrange his affairs that his taxes shall be as
low as possible". Helvering v. Gregory, 69 F. 2d 809 (2d Cir. 1934). See also, Cottage Savings
Association v. Comm'r, 499 U.S. 554 (1991), involving a transaction executed solely for tax
purposes.

---

[5]   On December 23, 1997, the IRS issued Notice 98-5, announcing that the IRS will issue regulations
effective on and after such date dealing with foreign taxes paid or accrued in connection with certain
abusive transactions. Such transactions were described as those in which the anticipated economic benefits
are insubstantial in relationship to the anticipated tax benefits. It is currently uncertain as to when or
whether such regulations will be issued, the criteria they will establish with respect to the insubstantiality of
anticipated economic benefits, or whether such regulations will have application beyond the area of foreign
taxes.

M0303700

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 29

### c.    **Conclusion**

Based upon the assumption that MJG and Bryan each have a bona fide expectation of profit or other commercial reason for participating in the Transactions in the manner in which they have done so, it is more likely than not that the transactions described herein would have the requisite economic substance and business purpose to be respected under the authorities discussed above.

### 2.    **Code Section 165(c)(2)**

Notwithstanding that the transactions described herein have the requisite economic substance, where applicable, Code Section 165(c) imposes additional limitations on the ability of individuals to claim losses.

If an individual incurs a loss from the disposition of the assets in the individual's trade or business, Code Section 165(c)(1) generally permits the allowance of such loss. In determining whether such a business exists, the courts have required that the criteria of Code Section 183 be met. See, Farmer v. Comm'r, T C Memo 1994-342.

Code Section 183(a) and Treas. Reg. §1.183-1 requires that the activities with respect to which the loss relates be activities engaged in for profit There has been substantial litigation regarding whether such motive exists. These cases have established that a taxpayer need only have a good faith expectation of earning a profit from the activities undertaken. See, e.g., Burger v. Comm'r, 809 F.2d 355 (7th Cir. 1987); Johnson v. U.S., 11 Cl. Ct. 17 (1986).

If an individual incurs a loss from the assets in a transaction which does not involve the individual's trade or business, Code Section 165(c)(2) and Treas. Reg. §1 165-1(e) require, like Code Section 183(a) and Treas. Reg §1.183-1, that the loss be incurred in a transaction entered into for profit Thus, these statutory and regulatory provisions mirror the Code Section 183 standard

Notwithstanding the parallel nature of Code Section 183(a) and Code Section 165(c)(2), the courts have imposed a judicial gloss that appears to create a standard higher than that imposed by the statutes, i.e., that the taxpayer's profit motive be the "primary" motive for entering into the transaction. The first case that did so was Fox v. Comm'r, 82 T.C. 1001 (1987)

NYLIB1 675334.1

M0303701

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 30

The Tax Court in Fox derived this primary profit motive test from a footnote in Helvering v. National Grocery Co., 304 U.S. 282, 289 n 5, reh'g denied, 305 U.S. 669 (1938), which involved the constitutionality of the imposition of the accumulated earnings tax. The footnote stated in relevant part:

> Similarly, the deductibility of losses under [Code Section 165(c)(2)] may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit.

In addition, the Tax Court in Fox relied on an earlier Tax Court case involving the deductibility of a loss under Code Section 165(c)(2), Smith v. Comm'r, 78 T.C. 350 (1982). In Smith, however, the Tax Court did not impose the "primary" test articulated in Fox, but rather stated at p. 391:

> The mere fact that petitioners may have had a strong tax avoidance motive in entering into their commodity tax straddles does not in itself result in a disallowance of petitioners' losses under Section 165(c)(2), provided petitioners also had a non-tax profit motive for their investments at the time. See, Knetsch v. U.S., 172 Ct. Cl. 378, 348, F. 2d 932, 936-937 (1965). Such hope of deriving an economic profit aside from the tax benefits need not be reasonable so long as it is bona fide. See, Bessenyey v. Comm'r, 45 T.C. 261, 274 (1965), aff'd 379 F.2d 252 (2nd Cir. 1967).

Both the Fox and Smith cases, as well as the bulk of subsequent cases involving the application of the "primary" standard, arose in connection with commodities straddle transactions in which looking at the transactions as a whole, the taxpayer had little or no opportunity to earn any meaningful profit.[6] In addition many of the decisions were Memoranda decisions of the Tax

---

[6] The Tax Court in Sheldon v. Comm'r, 94 T.C. 738 (1990), applied these principles wherein certain of the transactions before the Court the taxpayer demonstrated that it could have made a profit. The Tax Court denied the claimed deductions stating that: "[i]n instances where intermediate repos would have or did generate some form of [positive] carry, these amounts were nominal, either fixed or short term and stable and, in any event merely reduced the fixed losses by relatively insignificant amounts." It is uncertain whether the Sheldon case has added an additional dimension to the economic profit motive analysis by, effectively, requiring a profit to be greater than "de minimus" or "nominal". In assessing this point it should

(continued...)

NYLIB1:675334/4

M0303702

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 31

Court.[7] Neither the Knetsch case nor the Bessenyey case cited by the Tax Court in Smith required the profit motive of the taxpayer to be the primary standard for engaging in the transactions in issue, although the Knetsch decision did refer to the National Grocery Co. Supreme Court decision discussed above.

When a court has thoughtfully attempted to deal with the primary standard, the results have often yielded confusion. For example in Nickson v. Comm'r, 962 F 2d 973, 976 (10th Cir. 1992), a case involving the application of Code Section 183, the court first appeared to apply the primary standard by requiring that the taxpayer engage in the transaction with the "dominant hope and intent to realizing a profit", but then went on to provide that "the determination crucial to the instant case [is]-whether the taxpayers had an actual and honest profit objective." See also, Nickerson v. Comm'r, 700 F 2d 402, 404 (7th Cir 1973). This confusion in part may be due to the fact that in Fox v. Comm'r, supra, which first applied the primary standard in the context of Code Section 162(c)(2), the taxpayer's had little or no opportunity to make more than a relatively small fixed economic profit from the commodity straddle transactions into which the taxpayer entered. Such a situation is unlike the instant case in which, based on the representations that we have received, the parties entered into the transactions with the reasonable possibility of making a reasonable profit from investment in the Assets. Such a profit potential is more analogous to the situation in Smith v. Comm'r, on which the Fox case relies. Although the matter cannot be exactly free from doubt because of the factual nature of the inquiry, on balance, it is more likely than not that the requisite profit motive exists to support the deduction of any loss on the disposition of the Bryan stock under Code Section 165(c)(2)

---

(...continued)

be noted that the Tax Court ultimately found that even what nominal profit there was in Sheldon was absorbed by losses on related and, arguably, integrated transactions. 94 T.C. 738, 768 and 769. See also, Est. of Baron v. Comm'r, 83 T.C. 542, aff'd 798 F.2d 65 (2d Cir 1986). See, Notice 98-5, discussed at footnote 2.

In assessing whether the requisite profit motive exists, all of the fees incurred in engaging in the transactions will have to be taken into account See, ACM Partnership v. Comm'r, supra.

NYLIB1-675334-4

M0303703

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 32

### 3. Application of Step Transaction Doctrine

### a. Generally

The step transaction doctrine is a judicially created concept, which treats a series of separate steps as a single transaction when the steps are integrated parts of a single plan. The purpose of the step transaction doctrine is to prohibit the breaking down of an integrated transaction into independent steps or, conversely, to combine separate steps in determining tax consequences. The substance of each of a series of steps will be respected, and not integrated if each step has independent economic significance, is not subject to attack as a sham, and is undertaken for valid business purposes.

If the step transaction doctrine is successfully asserted, MJG's investment in Bryan, the Loan by ML to Bryan, and the distribution of the T-Bills by Bryan to MJG could be integrated into a single transaction. As a result, the Transactions could be recast to treat the Bryan as distributing the T-Bills, unencumbered by the Loan, to MJG

A seminal case on the step transaction doctrine is Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954). In that case, the taxpayer wished to sell her stock in a corporation in which she was the sole stockholder. Because the buyer did not want to purchase all of her stock, the parties agreed that she would sell him part of her stock and the corporation would redeem her remaining shares. While the District Court held that the distribution of substantially all of the earnings and surplus of a corporation was essentially equivalent to a dividend, the Sixth Circuit reversed and found that the redemption and sale steps were part of an integrated plan to liquidate the taxpayer's holdings in the corporation, and therefore, the redemption was not essentially equivalent to a dividend

While courts have not agreed on a single test or standard for determining when and how to apply the step transaction doctrine, there are three tests that are most often used by the courts. These are the "binding commitment" test, the "mutual interdependence" test, and the "end result" test.

NYLIB1·675334·4

M0303704

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 33

### b.    Binding Commitment Test

The binding commitment test, introduced in Comm'r v. Gordon, 391 U.S. 83 (1968), is the most restrictive of the tests. Under this standard, steps are integrated when a binding commitment is present. Otherwise, courts will usually apply one of the other tests. We understand that MJG and Bryan were not legally obligated to undertake all or any of the transactions. Consequently, it is more likely than not that this test would not apply.

### c.    Mutual Interdependence Test

The mutual interdependence test requires inquiry as to whether on a reasonable interpretation of objective facts the steps of a series of transactions are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. See, King Enterprises, Inc. v. U.S., 418 F.2d 511 (Ct. Cl. 1969). See also, Redding v. Comm'r, 30 F. 2d 1169, 1177 (7th Cir. 1980), cert. denied 450 U.S. 913 (1981); Dyess v. Comm'r, T.C. Memo. 1993-219. In Associated Wholesale Grocers, Inc. v. U.S., 927 F.2d 1517 (10th Cir. 1991), the court applied the mutual interdependence test to integrate the transactions at issue. The facts in that case involved the taxpayer's sale, by means of a taxable merger, of a subsidiary which owned stock of a second-tier subsidiary and other assets to an unrelated corporation, followed immediately by a purchase by the seller of all the assets previously owned by the merged subsidiary except for the stock of the second-tier subsidiary. The taxpayer characterized the two transactions in accordance with their form and recognized a loss on the taxable merger. By integrating the two transactions, the IRS characterized the transactions as a liquidation of the subsidiary on which no loss was recognized as a Corp. entirely contingent on the sale of assets, as evidenced by the fact that the merger agreement stated that it would terminate if the plan of reorganization (the terms of which included the sale of assets step) was not effectuated. The court also based its holding on the fact that virtually no time passed between the steps.

In American Bantam Car Co. v. CIR, 11 T.C. 397 (1948), the Tax Court refused to apply the step transaction doctrine in holding that a transfer of property to a controlled corporation was tax-free even though the transferors were subsequently divested of the requisite controlling ownership interest through assignment of shares to underwriters. Shares of common stock were to be transferred to the underwriters upon their placement of preferred stock in the corporation.

NYLIB1-675334-4

M0303705

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 34

The court distinguished two prior cases in which the mutual interdependence test was used to apply the step transaction doctrine. In the prior cases, the assignment of shares received in a reorganization was not discretionary and the taxpayers were bound unconditionally. In American Bantam Car, however, the taxpayers had complete ownership of the shares received and the subsequent assignment was merely part of a general plan. The court stated that "[a]t most, there was an informal oral understanding of a general plan contemplating the organization of a new corporation, the exchange of assets for stock, and marketing of preferred stock of the new corporation to the public." Id. at 405. The court held that a mere informal oral understanding of a general plan is insufficient to result in the application of the step transaction doctrine.

In McDonald's of Illinois v. Comm'r, 688 F.2d 520 (7th Cir. 1982), the Seventh Circuit reversed the Tax Court's holding that the transactions at issue should not be stepped together. The taxpayers merged their restaurant franchises into McDonald's in exchange for McDonald's stock which was unregistered when received but would be registered (and, hence, transferable) shortly thereafter. While the taxpayers fully intended to and eventually did dispose of their McDonald's stock, they were under no legal obligation to do so. McDonald's, desiring a stepped up basis in the assets acquired, argued that the step transaction doctrine was applicable and, therefore, the continuity of interest requirement for an "A" reorganization was not satisfied. The Tax Court in McDonald's of Zion v. Comm'r, 76 T.C. 972 (1981), had applied the mutual interdependence test and held that the discretionary nature of the sale by the taxpayers and the fact that the merger was not contingent on the subsequent sale indicated that the transactions were not interdependent. The Seventh Circuit reversed, stating that the Tax Court's interpretation of the mutual interdependence test looked more like the binding commitment test. The Seventh Circuit stated that the mutual interdependence test is more practical and less legalistic than the binding commitment test, and that the focus of the former test is on the relationship between the steps. Accordingly, the court applied the step transaction doctrine to combine the merger and the subsequent sale because the facts indicated that the merger would not have taken place if the taxpayers were unable to subsequently dispose of their stock.

The facts in Penrod v. CIR, 88 T.C. 145 (1987), also involved the acquisition by McDonald's of franchises in exchange for McDonald's stock. The key difference from McDonald's of Zion was that the taxpayers did not originally intend to dispose of their stock. The court rejected the IRS' claim that the merger and subsequent sale should be stepped

NYLIB1 675334 4

M0303706

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 35


together. It looked at the intent of the parties in applying the mutual interdependence test and held that the step transaction doctrine did not apply

We do not believe that the steps in the instant transactions would be found to be mutually interdependent. In Associated Wholesale Grocers, the step transaction was applied because the sale contract stated that it would terminate if the merger was not effected and because there was virtually no time between the steps. Moreover, as in American Bantam Car, MJG was exposed to all of the risks inherent in holding a position in a venture such as Bryan; subsequent distribution of the T-Bills cannot be said to be more than part of a general plan since the T-Bills themselves were subject to substantial erosion due to possible losses within Bryan. Although MJG gained a tax benefit from the distribution of the T-Bills encumbered by the Loan and Bryan's subsequent repayment of the Loan, it cannot be said that the transactions described above were fruitless without the distribution of the T-Bills. At most, there was an informal, oral understanding of a general plan, which included the possibility Bryan would distribute the T-Bills to MJG. Furthermore, as stated above, there were no agreements that made the transactions dependent or contingent on each other. Unlike McDonald's of Zion, it cannot be said that the transactions described above would not have taken place but for the subsequent distribution of the T-Bills

It should be noted that the IRS, in Rev. Rul. 79-250, added an additional business purpose element to the mutual interdependence formulation, i.e., that each step must be undertaken for a separate business purpose. Rev Rul 79-250, 1979-2 CB 256. This Ruling has since been modified by Rev. Rul. 96-29, 1996-1 CB 50. That Rev. Rul. emphasizes that the central holding in Rev. Rul 79-250 is unique to reorganizations under Code Section 368(a)(1)(F) and the Rev. Rul. 79-250 is not intended to reflect the application of the step transaction doctrine in other contexts. The courts have also been inconsistent in the degree to which they have analyzed or even acknowledged the importance of business purpose in the step transaction analysis. See, Associated Wholesale Grocers Inc. v. Comm'r, 927 F.2d 1517 (10th Cir. 1991). Because each of the transactions undertaken by the parties to the instant transaction was supported by a reasonable expectation of profit, we believe that an analysis of business purpose in this context could only buttress a conclusion that the steps were not interdependent. However, we do not believe that the existence of a business purpose precludes the application of the step transaction doctrine

NYLIB1 675334 4

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 36

Based upon the foregoing and on the representation of MJG and Bryan that neither was obligated to engage in any transaction upon the completion of any other transaction, it is more likely than not that each step undertaken by the parties to the Transactions would be viewed as independent from the others and consequently it is more likely than not that the "mutual interdependence" formulation of the step transaction doctrine would not be applicable to the transactions

### d.    End Result Test

The end result test, which is the most frequently used of the three formulations of the step transaction doctrine, combines purportedly separate business transactions into a single transaction when it appears that they are really component parts of a single transaction, intended from the outset to be effected for the purpose of achieving the ultimate result  This test makes intent a necessary element for the application of the step transaction doctrine  See, Brown v. U.S., 782 F 2d 559 (6th Cir. 1986).

The end result test has been applied in numerous cases dealing with stock redemptions, in which the courts have found an integrated transaction when " the redemption occurs as part of a plan which is firm and fixed and in which the steps are clearly integrated." Niedermeyer v. Comm'r, 62 T C  280 (1979) aff'd per curiam, 535 F 2d 500 (9th Cir. 1976), cert. denied, 429 U.S. 1000 (1976); Leleux v. Comm'r, 54 T.C. 408 (1970); Bleily & Collishaw v. Comm'r, 72 T.C. 751 (1979). The fact patterns in a number of these cases address whether shareholders involved in several different redemptions of their stock have had in place an integrated plan with respect to such redemption, causing such shareholders to qualify for sale treatment with respect to the redemptions

In Bleily & Collishaw, supra, the taxpayer corporation, a construction contractor, owned 30% of a subcontractor with which it did business.  The other shareholder of the subcontractor wanted sole control and taxpayer agreed to sell all of its shares to the corporation.  The subcontractor did not have enough cash to repurchase the shares at the time, but expected to earn sufficient funds over the next 6 months.  The parties agreed that the subcontractor would repurchase all of the stock held by taxpayers as funds became available  In integrating the transactions, the court held that there was a firm and fixed plan to redeem all of the taxpayer's shares and upheld the taxpayer's exchange treatment on each partial redemption transaction

NYLIB1-675334 4

M0303708

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 37

Roebling v. Comm'r, 77 T C. 31 (1981), involved the redemption of a company's preferred stock as part of a recapitalization. To this end, the company redeemed a set number of shares each year. The taxpayer offered to and did have a portion of her shares redeemed each year to the extent that other preferred shareholders did not offer their shares for redemption. A provision to this effect was included in the corporation's articles of incorporation. The Tax Court found that there was a firm and fixed plan to redeem all of the shares of the taxpayer, and upheld the taxpayer's exchange treatment.

Courts have found a series of redemptions to be part of a single integrated plan in other cases. See, U.S. v. Carey 289 F 2d 531 (8th Cir. 1961); Monson v. Comm'r, 79 T C 827 (1982); Howell v. Comm'r, 26 T C 846 (1956) aff'd, 247 F.2d 156 (9th Cir. 1957); Tiffany v. Comm'r, 16 T C 1443 (1951). In all of these cases, a complete termination of the taxpayer's interest was the end result of the transactions and capital gain treatment was appropriate. In Howell v. Comm'r, supra, for example, where some of the taxpayers did not have a complete termination, a fixed and firm plan was not found, and yet the taxpayers received dividend treatment.

In many other redemption cases, the courts did not find a fixed and firm plan. In Niedermeyer v. Comm'r, supra, the taxpayers owned a portion of the common stock and preferred stock of a closely held corporation. They sold their common stock to a corporation that was controlled by their sons. Three months later, they donated their preferred stock to a charity, as they had done previously. The taxpayers claimed that these dispositions effected a complete termination of their interest in the corporation and should be integrated into a single transaction. The Tax Court disagreed, finding that there was no indication of a fixed and firm plan in this case. The court said, that while a plan does not "need to be in writing, absolutely binding, or communicated to others," such factors tend to show a plan which is fixed and firm.

In Leleux v. Comm'r, supra, the court reached a similar conclusion. Following an accident for which the corporation faced potential liability, the taxpayers (a husband and wife) decided to redeem as much of their stock as possible. While the parties never adopted a formal plan, the taxpayers claimed that there was a "gentleman's agreement" to redeem their stock. Over a three year period, a series of redemptions occurred which decreased the taxpayers' interests in the corporation from 86 3% to 53 5%. However, the court held that the redemptions were essentially equivalent to a dividend, because there was not a fixed and firm plan with

M0303709

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 38

clearly integrated steps  In addition, the court noted that there was a lack of intent to terminate the shareholders' interests.

In Johnson v. Comm'r, 78 T.C. 564 (1982), the taxpayer owned stock in a corporation that underwent a reorganization following a dispute between its two major shareholders  As part of the reorganization, taxpayer received new common shares and a large cash distribution  In addition, the agreement between the two major shareholders required one of the major shareholders to tender an offer to purchase the new common shares of all of the other shareholders.  The other major shareholder was required under the agreement to tender its stock pursuant to this offer.  The taxpayer, however, decided to sell a portion of his new common stock to the major shareholder and tried to characterize the income from the reorganization and sale as deriving from a single transaction.  The Tax Court held that these transactions were not part of an integrated plan because the taxpayer was under no obligation to tender the shares.

Other cases in which a court refused to find an integrated plan include Benjamin v. Comm'r, 66 T.C. 1084 (1976), and Johnston v. Comm'r, 77 T.C. 679 (1981).  However, Niedermeyer v. Comm'r, supra, is significant as the only case where the court refused to integrate the steps of a transaction when a complete termination of interest occurred.

The IRS has ruled on this issue as well.  In Rev. Rul. 77-226, 1977-2 CB 90, the taxpayer corporation purchased $1 million of shares in X Corporation following X Corporation's announcement that it would repurchase its shares. X Corporation then redeemed 20% of the purchased shares, and the taxpayer reported the proceeds as a dividend and claimed a dividends received deduction (a 'DRD')  Two weeks later, the taxpayer sold the remaining shares on the open market, claiming a capital loss due to the carryover of basis from the previously redeemed shares. Without explanation, the IRS held that these two transactions were part of an integrated plan, and must be considered together.  Accordingly, the taxpayer was denied the dividends received deduction and suffered no loss on the later sale.

The step transaction doctrine was also applied in a General Counsel Memorandum where the taxpayer purchased $3 million in shares of a merger target and then surrendered its stock for $1.5 million cash and $2 million in acquirer stock pursuant to the merger  GCM 39290 (1/4/84)  The taxpayer characterized the $.5 million in gain as a dividend eligible for the DRD.  The taxpayer then sold its remaining stock within three months on the open market for an amount

M0303710

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 39

roughly equal to its basis. The taxpayer had engaged in a pattern of similar transactions in prior years. The IRS ruled that the facts show that the taxpayer had the intent to dispose of all of its shares soon after the merger and therefore, the transactions should be integrated. In support of this conclusion, the IRS noted that most of the gain was from the dividend that it claimed it received, while the gain, if any, from an increase in the price of the stock was "minuscule".

Both Rev. Rul. 77-226 and GCM 39290 ignore the fact that the sales following the redemptions were voluntary and thus are unrelated. Both fact patterns are similar to the facts in Johnson, where the taxpayer sold some stock received in a recapitalization. The court held that there were separate transactions because the taxpayer was under no obligation to redeem his shares; nor were the taxpayers in Rev Rul. 77-226 and GCM 39290. Arguably, the result in GCM 39290 might have been different had the taxpayer's past conduct not indicated the existence of a plan.

Lastly, notwithstanding the seemingly broad scope of the end-result formulation, the courts have recognized a significant limitation on its application. This was articulated by the Tax Court in Esmark, Inc. v. Comm'r, 90 T.C. 171, 195 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989), wherein the court stated: "[The IRS's] recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step-transaction doctrine in this manner." 90 T.C. at 196. In support of its conclusion, the Tax Court cited, among a number of other cases, Grove v. Comm'r, 490 F.2d 241 (2nd Cir. 1973), aff'g, T.C. Memo. 1972-98.

The Esmark case is of particular relevance in the instant case. In Esmark, the taxpayer desired to dispose of certain unwanted businesses. The taxpayer and its advisors formulated a plan to contract its capital structure through a redemption of its outstanding shares by having a third party tender for a portion of the taxpayer's outstanding shares and then tender the acquired shares for an asset, stock of a wholly-owned subsidiary, of the taxpayer. In addition to achieving the desired business results, the proposal was tax efficient, because, under law as then in effect, the exchange of its subsidiary's stock for its outstanding shares would have been tax free to the taxpayer, whereas a sale of the subsidiary's stock for cash, which cash could then have been used for a self-tender, would have produced a taxable transaction.

NYLIB1 675334 4

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 40


Concluding that the step-transaction doctrine could not be applied to so recast the transaction, the Tax Court recognized that the reduction of taxes was a significant factor in structuring the transaction and that Mobil's tender offer was part of an overall plan. The court also recognized that Mobil, not the taxpayer, had borne the economic cost of the tender offer and that Mobil's ownership of the Esmark shares, "however transitory", must be respected. 90 T.C. at 198. Esmark has recently been followed by the Tax Court in Turner Broadcasting Company v. Comm'r, 111 T.C. 315 (1998), in which the Tax Court stated:

> Even if alternative explanations are available to account for the results of a transaction, this Court will not disregard the form of the transaction if it accounts for the transaction at least as well as alternative recharacterizations

To be compared to the Tax's Court's decision in Esmark, is its decision in Idol v. Comm'r, 63 T.C. 444 (1962), aff'd 319 F.2d 647 (8th Cir 1963), which was distinguished by the Tax Court in Esmark In Idol, the taxpayer wished to withdraw cash from his controlled corporation as a capital gain, rather than as a dividend To achieve this result, the taxpayer sold shares of stock to a third party who had an interest in acquiring certain of the corporation's assets. On the same day, Idol caused the corporation to exchange such assets for the recently purchased shares of stock. Furthermore, the stock purchase agreement contained a provision pursuant to which the taxpayer agreed to cause a redemption of the shares for the desired assets and a provision pursuant to which the share purchaser agreed not to be represented on the corporation's board of directors or take a role in management. (Although not specifically addressed by the Tax Court, these provisions in the sales agreement would arguably have fallen within the "binding commitment" formulation of the step transaction doctrine.) Furthermore, the record disclosed that the stock purchaser had previously expressed no interest in acquiring the corporate stock and only wished to acquire assets. Based on these facts, the Tax Court concluded that the form of the transactions should not be respected and that the transactions should be recharacterized as a sale of the assets by the corporation to the stock purchaser followed by a dividend to the taxpayer. In distinguishing Idol, the Tax Court in Esmark focused on the fact that the stock seller never effectively divested himself of the ownership of the shares that he nominally sold and that the stock purchaser effectively merely purchased the corporation's assets, whereas in Esmark, the parties changed their economic position through their participation in the transactions consistent with the transactions' form

NYLIB1:675334:4

M0303712

**BROWN & WOOD** LLP

Bryan Medical, Inc
Mr. Mark Gainor
December 31, 1999
Page 41


The National Office of the IRS has also recognized the premise of the Esmark case, i.e., that the step-transaction does not permit the creation of new steps or the reordering of existing steps, in a series of Technical Advice Memoranda. See PLR 8815003 (12/11/87), PLR 8738003 (5/22/87), PLR 8735007 (5/28/87) and PLR 8735006 (5/18/87). Each involves the acquisition of a corporation's outstanding debt by an unrelated underwriter, the exchange of debt for other securities of the corporation, and the sale of such other securities by the underwriter to the public. In each case, the Technical Advice Memoranda concluded that the end result formulation does not require that the transactions be stepped together.

To be contrasted to the Esmark case are the more recent cases, Salomon, Inc v. U.S., 976 F.2d 837 (2nd Cir.) aff'g 92-1 USTC ¶50,155 (DC NY 1992) and Walt Disney, Inc. v. U.S., 4 F.3d 735 (5th Cir. 1993), rev'g 97 T C 221 (1991). Both cases involved the issue of whether there had been a disposition of assets that would trigger investment credit recapture under Code Section 47(a)(1). Both cases involved similar divisive "D" reorganizations in which assets were transferred to a subsidiary and the shares of the subsidiary were spun off to the shareholders of the parent corporation. Although both courts claimed to apply the "end result" formulation in order to integrate the drop-down and spin-off, facts were present which were present which were much closer to the facts found in "binding commitment" and "mutual independence" cases. In Walt Disney, Inc., the court reached its conclusion on overall intention for the steps to occur, plus the existence of a binding agreement which "manifests" such intent and which overcame the fact that the transactions were separated by a 59 day period of time during which the parent company was at risk with respect to the transferred assets. In Salomon, the court based its conclusion on an overall intention for the steps to occur which was supported by the statements regarding the integration of the steps to the IRS in the ruling request and the fact that the spin-off occurred immediately after the drop-down.

More recently, in True v U.S., ___ F.3rd ___ (10th Cir 9/9/99), the Court of Appeals affirmed the District Court's summary judgment in favor of the IRS regarding the integration of one series of transactions under the "end result" formulation of the step transaction, where the evidence clearly showed that the end result was the sole outcome intended to be achieved by entering into the transactions from the outset. With respect to such series of transactions, the Court of Appeals also concluded that such integration would be appropriate under the "mutual interdependence" formulation as well, because the facts showed that each of the steps would have been fruitless without the others. The Court of Appeals, however, reversed the District

NYLIB1 675334 4

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 42

Court's summary judgement integrating another series of transactions. The Court of Appeals concluded that there was a factual issue under the "end result" formulation, because the evidence created a genuine factual issue as to whether the end result achieved was the sole intended result from the outset. The Court of Appeals concluded that there similarly was a factual issue under the "mutual interdependence" formulation, because it appeared that the each of the steps might have economic significance on its own. The conclusion that can be drawn from the True decision appears to be that if the facts demonstrate that at the time of entering into series of transactions an investor has in mind a sole outcome and no other outcome can be discerned, a court can apply the "end-result" formulation of the step transaction doctrine to disregard intermediate steps, particularly if those intermediate steps had so little economic significance on their own to fall within the "mutual interdependence" formulation.

In both Salomon, Inc v. United States, supra, and Walt Disney, Inc. v. United States, supra, the issue was whether a transfer of assets to a subsidiary as part of a divisive "D" reorganization resulted in the recapture of investment credit. While both courts seemed to apply the "end result" formulation to integrate the transfer of assets and subsequent spin-off, each court cited facts that would indicate a "binding commitment" or "mutual independence" test. In Walt Disney, the court cited an overall intention for the steps to occur, and the fact that the company had a legal obligation to transfer the assets and distribute the stock. In Salomon, the court based its conclusion in part on the fact that at the time of the asset transfer the taxpayer intended to spin-off the stock, establishing the interdependent nature of the steps. The District Court concluded that such interdependent relationship also existed in the series of transaction integrated under the step transaction doctrine in True.

Whether the end result analysis of the step transaction doctrine is applicable in the instant case turns on whether the Transactions entered into by MJG and Bryan are part of a "fixed and firm" plan such that they should be integrated into a single transaction. The case law does not provide any absolute standards as to what constitutes a fixed and firm plan, but provides some guidance. While a formal written plan is not required, a mere 'gentlemen's agreement' is insufficient to find a fixed and firm plan. Niedermeyer v. Comm'r, supra at 282, Leleux v. Comm'r, supra at 408. However, as the decisions in Esmark and Standard Linen make clear, the existence of a plan alone does not justify the application of the step transaction doctrine

NYLIB1 675334 4

M0303714

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 43

In the Transactions described herein, each of the parties placed itself at risk with respect thereto. Furthermore, there was no obligation for any of the parties to undertake any of the Transactions, and we understand that neither MJG nor Bryan made any representation to third parties that the Transactions would occur. Nevertheless, the IRS could argue that the closeness in time of such transactions, the involvement of MJG and its controlling partners in the planning of the transactions from their initial phase, and the fact that Bryan ultimately satisfied the Loan could evidence an anticipated end-result. Cf, PLR 9447024 (8/23/94). However, based on the factual distinctions from the Idol, Walt Disney, Inc. and Salomon, Inc. cases, and on the decision of the Tax Court in the Esmark and Turner Broadcasting cases, it is more likely than not that the "end-result" formulation of the step-transaction doctrine would not apply to collapse the transactions.

e.    **Summation**

In general, the intent to act in accordance with a plan is important. This intent can be demonstrated by looking at whether the transactions have an independent business purpose. If a transaction does not have economic significance apart from another transaction, this is evidence that the transactions have an independent economic significance should generally be supportive, although not conclusive, that the step transaction doctrine does not apply. As discussed above in the context of the mutual independence formulation of the step transaction doctrine, it is more likely than not that the transactions entered into by the MJG and Bryan would be found to have independent economic significance.

An application of the step transaction would require a court to ignore the economic substance of the various transactions. As discussed above, no binding commitment obliged Bryan to distribute the T-Bills to MJG. Since there was, at best, a general agreement in place regarding the distribution of the T-Bills, it is more likely than not that an assertion that a 'fixed and firm' plan existed in this instance would not be sustained. Accordingly, application of the step transaction doctrine, under any of the three tests described above, should fail.

Based on the above analysis, it is more likely than not that the step transaction doctrine would not apply to the transactions entered into by MJG and Bryan.

NYLIB1 675334/4

M0303715

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr Mark Gainor
December 31, 1999
Page 44

### 4. Code Section 269

Code Section 269(a)(1) provides that if a person acquires control of a corporation for the principal purpose of evading or avoiding income tax by claiming the benefit of a deduction, credit or other allowance that would otherwise not be available, then the benefit may be disallowed [8] This provision gives the IRS broad powers, if it can prove that the principal purpose of the acquisition is the evasion or avoidance of Federal income tax. Therefore, to disallow the ordinary loss deduction the IRS must establish that the shareholders acquired controlling ownership of the corporation and that such acquisition was made for the principle purpose of securing a tax benefit. Although the manner of the acquisition may generate tax benefits, the existence of tax benefits alone is not enough to bring a transaction within the strictures of Code Section 269. See, e.g. D'Arcy MacManus & Masius Inc. v. Comm'r, 63 T.C. 440 (1975). Rather, income tax evasion or avoidance must be the principal purpose.

Although the issue is a factual one based upon the intent of persons acquiring the requisite control, it is more likely than not that Code Section 269(a) would not apply to prohibit MJG from claiming a loss deduction on the sale of the stock of Bryan. In the instant case, MJG acquired control of Bryan prior to, and independent of, the distribution of the T-Bills and the sale of Bryan. Consequently, although the issue is a factual one, it is more likely than not that the IRS would be unsuccessful were it to attempt to assert that Code Section 269(a) applies to deny MJG loss on the sale of the stock of Bryan. Furthermore, the Tax Court has concluded that Code Section 269 does not apply where there are feasible alternatives to a transaction that are not subject to Code Section 269 and that yield equivalent tax benefits. See, Cromwell v. Comm'r, 43 T.C. 313 (1964). It is our understanding that feasible alternative transactions exist that are not subject to Code Section 269 and that would yield equivalent tax benefits. Thus, under the Cromwell case, it is also more likely than not that the IRS would be unsuccessful were it to

---

[8]   Code Section 269(a)(2) provides that if a corporation acquires property of another corporation in a carryover basis transaction having such a principle purpose the IRS can disallow such benefits. Code Section 269(a)(2) would not apply to the Transactions because, among other things, MJG is not a corporation.

NYLIB1:675334:4

M0303716

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 45

attempt to assert that Code Section 269(a) applies to deny a loss on the sale of the stock of Bryan.

### 5. Code Section 482

Code Section 482 allows the IRS to allocate gross income, deductions, credits or allowances between or among organizations, trades or businesses "owned or controlled directly or indirectly by the same interests" if the IRS "determines that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of such organizations, trades or businesses." The purpose of Code Section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining the true taxable income from the property and business of a controlled taxpayer, using the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer

MJG and Bryan are under common control for purpose of Code Section 482. However, to apply Code Section 482 in the instant case the IRS would have to show that the distribution of the T-Bills by Bryan to MJG, and any subsequent loss on the sale of the stock of the Bryan, is an evasion of taxes or does not clearly reflect the true taxable income of MJG. The Treasury Regulations define 'true taxable income' as the taxable income that would have resulted if a controlled taxpayer had dealt with the other member or members of the group at arm's length. The Treasury Regulations specify that "(i)t does not mean the taxable income resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement the controlled taxpayer chose to make. . . ." The distribution of the T-Bills by Bryan to MJG, and the subsequent loss recognized when the stock in Bryan was sold, does not occur as a result of a non-arm's length transaction between Bryan and MJG. Rather, the transactions were all at arm's length and the loss was recognized as a result of the operation of the rules of Code Sections 301 and 1001 and a sale by MJG at arm's length to an independent party. Therefore it is more likely than not that the Transactions would have the requisite separate existence and substance to withstand attack by the IRS under Code Section 482

### 6. Application of Code Section 465

In the case of an individual, any loss for the taxable year from an activity to which Code Section 465 applies is allowed only to the extent of the aggregate amount with respect to which

NYLIB1 675334-4

M0303717

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 46

the taxpayer is "at risk" for such activity at the close of the taxable year. See Code Section 465(a).

### a.    Activities Subject to the Code Section 465 Rules

Among the activities to which Code Section 465 applies is each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income. See Code Section 465(c)(3). These activities are aggregated or treated as separate activities as the Treasury Department prescribes by regulations. No such regulations have been proposed or adopted. MJG and Gainor acquired and held the Bryan stock investment for the production of income. Thus, an "at risk" activity includes the investment in Bryan stock.

### b.    The Amount "At Risk"

For purposes of Code Section 465, a taxpayer is considered "at risk" for an activity with respect to amounts including the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity and the amount borrowed for use in an activity to the extent that the taxpayer is personally liable for repayment of such amount or has pledged property, other than property used in the activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). See Code Sections 465(b)(1) and (2). In the case of a shareholder in an S corporation, the shareholder's amount at risk with respect to his interest in the S corporation is initially such shareholder's basis in the stock of the S corporation. See, Treas. Reg. §1.465-10(c) and (d), which was proposed prior to the Subchapter S Revision Act of 1982 that eliminated the requirement that an S corporation itself be at risk. The amount for which a taxpayer is treated at risk is ordinarily computed at the end of the taxpayer's taxable year. Code Section 465(a)(1).

Prop. Treas. Reg. §1 465-23(c) provides that a taxpayer's amount at risk is decreased with respect to an activity by the adjusted basis in the hands of the taxpayer of property (other than money) withdrawn by the taxpayer from the activity, less the amount of liabilities to which the property is subject for which the taxpayer is not personably liable

In the instant case, it is more likely than not that the initial at risk amount with respect to the investment in the partners' stock is the tax basis of such stock. Under Prop. Treas Reg §1 465-23(c) the distribution of the T-Bills to MJG would not reduce MJG's amount at risk if

NYLIB1 675334 4

M0303718

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 47

MJG is not considered to be personally liable for the Loan. We have found no authority that
addresses this issue in the context of a taxpayer who becomes secondarily liable as in the instant
case. However, the overriding principal under Code Section 465 is that to be personally liable
within the meaning of that provision, a taxpayer must be the obligor "of last resort". See, e.g.,
Melvin v. Comm'r, 88T.C. 63, 75 (1987). Thus, it is more likely than not that a person holding
property subject to the recourse debt of another, such as MJG, even with a right of
indemnification from the primary obligor would not be personally liable within the meaning of
Code Section 465. As a result, under Prop. Treas. Reg. §1.465-23(c), it is more likely than not
that MJG's amount at risk would not be reduced by the distribution of the T-Bills subject to the
Loan. Furthermore, even if the IRS were to contend that MJG were personally liable within the
meaning of Prop. Treas. Reg. §1.465-23(c), MJG's activity that includes its investment in Bryan
stock may be aggregated with other investment activities of MJG for Code Section 465 purposes,
including the holding of the T-Bills. This position is particularly appropriate in the absence of
statutorily mandated Regulations relating to the aggregation or segregation of activities. In such
case, it is more likely than not that MJG's basis in the T-Bills would be taken into account in
determining its amount at risk and that such amount would not be reduced by the amount of the
Loan, because of any personal liability of MJG for the Loan.

Based upon the foregoing, it is more likely than not that the at-risk rules would not
adversely affect the ability to claim a loss with respect to the sale of the stock in Bryan.

### 7.    Notice 99-59

On December 9, 1999, the IRS issued Notice 99-59, 1999-52 IRB 1. The purpose of the
Notice was to alert taxpayers and their representatives that it is the view of the IRS and the
Treasury that purported losses from transactions having certain similarities to the Transactions
would not be allowed for U.S. Federal income tax purposes. As described in the Notice, the
typical proscribed transaction involves the taxpayer acting through a partnership to contribute
cash to a newly-formed foreign corporation in exchange for the corporation 's common stock
while a second party contributes additional capital to the corporation for its preferred stock. The
corporation then borrows additional amounts from a bank and gives the bank a security interest
in securities having a value equal to the loan's principal amount. Thereafter, the corporation
distributes the securities subject to the loan to the partnership that holds the common stock. As
part of the scheme it is understood that the foreign corporation will pay off the bank debt from its

NYLIB1 675334-4

M0303719

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 48


other assets. The partnership then effects a constructive disposition of the common stock generating a loss either through an election to be taxed as a corporation or by taking the position that it is a dealer and marking the stock to market under Code Section 475.

The Notice provides that such a transaction lacks economic substance under the rationale of ACM Partnership v. Comm'r, supra, and certain similar cases. The Notice goes on to provide that the IRS and the Treasury view the arrangements as a series of contrived steps through which the taxpayer's claim artificial losses for transactions that are substantively a recovery of capital outlays made as part of the same scheme. The Notice further provides that such losses may also be subject to challenge under a number of Code Sections including, but not limited to, Code Sections 269, 301,446, 482, 752, and 1001

As discussed above, the Transactions have the requisite business purpose and economic substance under the relevant authorities, including the ACM case. It is more likely than not that this alone would serve to distinguish the Transactions from the arrangements described in the Notice. Furthermore, as a factual matter, Bryan is not newly formed and has a long history of substantial business activities. Based on the analyses contained in the preceding sections of this letter, including the analysis of the doctrines of economic substance and business purpose as applied to the Transactions, it is more likely than not that the IRS would not be successful were it to challenge the Transactions under Notice 99-59.

## V.  APPLICABILITY OF CERTAIN PENALTY PROVISIONS

### A.  Substantial Understatement of Taxable Income

Code Section 6662(b)(2) provides for a 20% underpayment penalty for taxpayers if there is a substantial understatement of income tax on a return. For non-corporate taxpayers, an understatement is considered substantial for this purpose if it exceeds the greater of 10% of the correct tax or $5,000. See Code Section 6662(d)(1). An understatement generally does not

NY1:DB1 675334 4

M0303720

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 49

include deficiency amounts attributable to a position that is supported by "substantial authority"[9] or for which there is adequate disclosure.

Substantial authority for a position exists if the weight of authorities supporting the position is substantial in relation to the weight of authorities against the position. See, Treas. Reg. §1.6662-4(d). Authorities for this purpose include (but are not limited to) applicable provisions of the Code, proposed, temporary and final regulations, revenue rulings and revenue procedures, court cases, Congressional intent as reflected in committee reports; private letter rulings and technical advice memoranda issued after October 31, 1976, and actions on decision and general counsel memoranda issued after March 12, 1981. The weight of an authority depends upon its relevance and persuasiveness, and the type of document. See, Treas. Reg. §1.6662-4(d)(3).

The "substantial authority" standard is higher than the "reasonable basis" standard but generally below "more likely than not". See, Treas. Reg. §1.6662-4(d)(2). The "reasonable basis" standard has been recently defined in Treas. Reg. §1.6662-3(b)(3) as a position that is significantly higher than not frivolous or not patently improper. The Internal Revenue Manual ("IRM") states that the standard is one where a position is arguable but fairly unlikely to prevail in court. The Internal Revenue Manual further states that "the substantial authority exception can be met when the taxpayer has less than a 50 percent, but more than a one-in-three likelihood of being sustained on the issue." See, IRM (20)535 (1997). The "more likely than not" standard is one where there is a greater than 50 percent likelihood that a position will be upheld if challenged by the Service. See, Treas. Reg. §1.6662-4(d)(2).

If the position involves a tax shelter[10], there must be both "substantial authority" for the position and the taxpayer must have "reasonably believed that the tax position was more likely

---

[9]     There is considered to be substantial authority for a return position if substantial authority is present either on the last day of the taxable period covered by the taxpayer's return, or on the date the return is filed. Regulation §1.6662-4(g)(1)(i)(A) and §1.6662-4(d)(3)(iv)(C).

[10]     Prior to the Taxpayer Relief Act of 1997, a tax shelter was generally defined as any plan or arrangement the principal purpose of which was the avoidance or evasion of U.S. federal income tax. Tax avoidance or evasion was considered the principal purpose if that purpose exceeded any other purpose. The 1997 Tax

(continued...)

NY1IBI 675334.4

M0303721

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 50

than not the proper treatment". The "reasonable belief" requirement can be satisfied if the taxpayer reasonably relies in good faith (i.e., the taxpayer discloses all the facts it knows or should know) on the opinion of a qualified tax professional that unambiguously states there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the IRS

## B. Substantial Valuation Misstatement

Code Section 6662(b)(3) provides for a 20% underpayment penalty for taxpayers if there is a substantial valuation misstatement under Chapter 1 of the IRC. Code Section 6662(e) provides that there is a substantial valuation statement if, among other things, the value/adjusted basis of any property claimed on any income tax return is 200% or more of the amount determined to be the correct amount of such valuation/adjusted basis. Code Section 6662(h)(1) increases the penalty to 40% in the case of any gross valuation misstatement. Code Section 6662(h)(2) provides that there is a gross valuation misstatement if, among other things, the value/adjusted basis of any property claimed on any income tax return is 400% or more of the amount determined to be the correct amount of such valuation/adjusted basis. The penalty does not apply, however, if the reasonable cause exception of Code Section 6664(c) and Treas Reg §1.6664-4, discussed below applies.

## C. Code Section 6664(c)

Code Section 6664(c) provides a general exception to Code Section 6662 penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts and circumstances determination made on a case-by-case basis. The most important factor is the extent of the taxpayer's effort to assess proper tax liability. See, Treas Reg §1.6664-4(b). Reliance on the opinion of a professional tax advisor constitutes "reasonable cause" and "good faith" if the advice is based on all pertinent facts and circumstances and the law as it relates to

(...continued)

Act modified the definition of tax shelter by requiring only a "significant" (rather than principal) tax avoidance or evasion purpose.

NYLIB1 675334-4

M0303722

**BROWN & WOOD LLP**

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 51

those facts and circumstances. For example, relevant facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a particular manner. All facts that are relevant to the tax treatment of a transaction must be disclosed. See, Treas. Reg. §1.6664-4(c).

The regulations also set forth certain general opinion requirements ("General Opinion Requirements") that must be satisfied in order for reliance on tax advice, including opinion letters, to be considered reasonable and in good faith. Treas. Reg. §1.6664-4(c)(1) The General Opinion Requirements (all of which must be satisfied) are as follows:

(i)   The opinion was based on all pertinent facts and circumstances, including the taxpayer's purposes (and the relative weight of such purposes) for entering into the transaction and for structuring the transaction in a particular manner In addition, reliance on an opinion will not be considered reasonable if the taxpayer fails to disclose a fact that it knows or should know to be relevant to the proper tax treatment of an item

(ii)   The opinion was based on the law as it relates to those facts and circumstances.

(iii)   The opinion was not based on any unreasonable factual or legal assumptions (including assumptions as to future events).

(iv)   The opinion did not unreasonably rely upon the representations, statements, findings or agreements of the taxpayer or any other person For example, the opinion must not be based upon a representation or assumption that the taxpayer knows or has reason to know is unlikely to be true.

Although we have found no court case that has construed the General Opinion Requirements (which were issued in August of 1995; see, T.D. 8617), numerous judicial decisions have relied upon similar principles in holding that a taxpayer's reliance upon the advice of a tax professional qualified for the reasonable cause and good faith exception to the substantial understatement penalty See, e g , Mauerman v. Comm'r, 22 F.3d 1001 (10th Cir. 1994) (the substantial understatement penalty was not imposed where a physician reasonably relied in good faith upon his independent tax advisor); Vorsheck v. Comm'r, 933 F.2d 757 (9th Cir 1991) (the taxpayers' reliance on their tax accountants precluded imposition of the substantial understatement penalty); Heasley v. Comm'r, 902 F 2d 380 (5th Cir. 1990) (the taxpayers' efforts to assess their proper tax liability by consulting an accountant and their limited

NYLIB1 675534 4

M0303723

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr. Mark Gainor
December 31, 1999
Page 52

experience in tax matters precluded the application of the substantial understatement penalty); Daoust v. Comm'r, 67 T.C.M. (CCH) 2914 (1994) (the negligence and substantial understatement penalties were not imposed where the taxpayers reasonably relied upon professional advisors); and English v. Comm'r, 65 T C M. (CCH) 2160 (1993) (the negligence and substantial understatement penalties were not imposed where the taxpayers relied upon the advice of their accountants on a complex tax matter).

The U.S. Supreme Court also reaffirmed the right of a taxpayer to rely upon the substantive advice of the taxpayer's accountant or attorney to avoid penalties in U.S. v. Boyle, 469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid filing deadlines, which did not constitute "reasonable cause," and reasonable reliance on professionals as to questions of substantive law, which would) According to Boyle:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. Id. at p. 251.

A number of issues raised by the matters addressed in this letter, including matters upon which we have stated opinions, are complex and have not been definitively resolved by the tax laws. The opinions that we state in this letter are based upon our interpretation of the law, Regulations, and judicial and administrative interpretations thereof (which interpretations are subject to change) on the date hereof, and upon our belief regarding what a court would more likely than not conclude if presented with the relevant issues properly framed. However, we cannot assure that our interpretations will prevail if the issues become the subject of judicial or administrative proceedings. Realization of the tax consequences set forth in this letter is subject to the significant risk that the IRS may challenge the tax treatment and that a court could sustain such challenge. Because taxpayers bear the burden of proof required to support items challenged by the IRS, the opinions stated in the letter are based upon the assumption that the appropriate taxpayer will undertake the appropriate effort and expense to present fully the case in support of any matter the IRS challenges.

NYLIB1 675334 4

M0303724

**BROWN & WOOD** LLP

Bryan Medical, Inc.
Mr Mark Gainor
December 31, 1999
Page 53


This opinion is furnished to the addressee solely for use in determining the Federal income tax consequences of the transactions described herein and is not to be used, circulated, quoted or otherwise referred to for any other purpose without our express written permission. Such permission is not required in connection with any examination conducted or required by a governmental or regulatory body, including disclosures to the addressees' accountants or lawyers in connection therewith. Unless specifically requested by an addressee, we will not update our advice to take into account subsequent changes to the law, Regulations, or judicial or administrative interpretations thereof.


Very truly yours,


NYLIB1 675134 4

M0303725