# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| Luis Alfredo Cáceres and Luis Angel Cáceres, Individually, as executor of the Estate of Alfredo Cáceres, and as trustee of the Luis Angel Cáceres Charitable Remainder Unitrust,<br><br>Plaintiffs,<br><br>vs.<br><br>Sidley Austin LLP,<br><br>Defendant. | Case No. 1:23-cv-00844-SDG |

## DEFENDANT'S ANSWER AND DEFENSES TO PLAINTIFFS' AMENDED COMPLAINT

Defendant Sidley Austin LLP ("Sidley" or "Defendant"), by and through the undersigned counsel, hereby submits its Answer and Defenses to the Amended Complaint (the "Amended Complaint") filed by Plaintiffs Luis Alfredo Cáceres and Luis Angel Cáceres, Individually, as executor of the Estate of Alfredo Cáceres, and as trustee of the Luis Angel Cáceres Charitable Remainder Unitrust (together, "Plaintiffs" or "Cácereses"), and states as follows:

## DEFENSES

### FIRST DEFENSE

Each cause of action, claim, and item of damages is barred by the applicable statutes of limitations.

1

**SECOND DEFENSE**

The agreement alleged in the Amended Complaint was not in writing and signed by Sidley or by some other person authorized by Sidley, and as alleged, was an agreement that is not to be performed within the space of one year from the making thereof.

**THIRD DEFENSE**

Plaintiffs knew of the existence of the danger complained of in the Amended Complaint, realized and appreciated the possibility of injury as a result of the danger, and, having a reasonable opportunity to avoid it, voluntarily exposed themselves to the danger.

**FOURTH DEFENSE**

Plaintiffs' recovery is barred, in whole or in part, under the doctrine of unclean hands.

**FIFTH DEFENSE**

Plaintiffs' recovery is barred, in whole or in part, under the doctrine of *in pari delicto*.

**SIXTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the comparative and/or contributory negligence of Plaintiffs or others.

## SEVENTH DEFENSE

Plaintiffs' claims fail because Plaintiffs' injuries, if any, are the product of superseding or intervening causes over which Sidley had no control.

## EIGHTH DEFENSE

Plaintiffs have failed to mitigate their alleged damages, which bars their recovery in whole or in part.

## NINTH DEFENSE

Plaintiffs' recovery is barred, in whole or in part, under principles of unjust enrichment.

## TENTH DEFENSE

Plaintiffs ratified the conduct they complain of in the Amended Complaint.

## ELEVENTH DEFENSE

Plaintiffs are equitably estopped from asserting each cause of action, claim, and item of damages in their Amended Complaint.

## TWELFTH DEFENSE

Plaintiffs' cause of action for breach of contract is barred by illegality of the object of the alleged contract.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, for failure to allege an injury cognizable under the governing law. Back taxes, interest, and penalties paid to the IRS are not recoverable, in whole or in part, as damages under applicable

law.  Further, some or all of the damages Plaintiffs seek to recover would violate public policy and/or are speculative and therefore unrecoverable.

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or part, by the doctrine of laches.

## FIFTEENTH DEFENSE

To the extent that discovery shows Plaintiffs failed to name a responsible party and that their failure to do so prevents complete relief from being accorded among those who are already parties to this litigation, Plaintiffs' claims are barred for failing to join a necessary party.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the economic loss rule.

## SEVENTEENTH DEFENSE

Plaintiffs' contract claims are barred because Plaintiffs made false representations in connection with the formation and performance of the purported contract(s) with Sidley.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not been harmed by any alleged acts by Sidley.

## NINETEENTH DEFENSE

Plaintiffs are barred from recovering in excess of $250,000 in punitive damages.  *See* O.C.G.A. § 51-12-5.1(g).

**TWENTIETH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of *res judicata* and collateral estoppel.

**TWENTY-FIRST DEFENSE**

Sidley reserves the right to assert additional defenses based on information learned or obtained during discovery.

**RESPONSES TO SPECIFIC ALLEGATIONS**

Sidley hereby responds to each and every numbered paragraph of the Amended Complaint as follows:

**NATURE OF THE CASE**

1. This lawsuit results from Sidley's conflicted and negligent advice to its clients, the Cácereses, to engage in what Sidley represented to be a legitimate tax planning transaction involving Plaintiffs' sale of UPC Holding Corp. ("UPC") stock to a company that Sidley knew (but failed to disclose) was a promoter of illegal tax shelter transactions. Unbeknownst to Plaintiffs, Sidley's tax opinion letter that the transaction should be respected by the IRS was a sham.

**ANSWER:** Sidley denies the allegations of this paragraph.

2. Sidley was hired to provide an independent tax opinion to the Cácereses confirming that the sale of UPC stock (the "UPC Transaction") legitimately minimized the tax consequences to the Cácereses related to the sale of their interest in Belca Food Services Inc. The Cácereses relied on Sidley's tax

5

advice and representations about the propriety of the stock sale transaction before deciding to move forward with the Belca sale transaction.

**ANSWER:** Sidley admits that former Sidley partner R.J. Ruble (then a partner at Brown & Wood) provided the Cácereses with a tax opinion letter relating to the sale of their UPC stock. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

3. Sidley duped Plaintiffs into transactions Sidley knew or should have known did not and could not legally result in the tax advantages promised by Sidley. Among other things, Sidley knew or should have known that (a) if the IRS analyzed the UPC stock transaction, the basis shifting tax strategies used by the stock purchaser to avoid paying UPC's corporate taxes would be disallowed; (b) the legality of the stock sale strategy it sold to Plaintiffs would be tainted by the illegal tax shelter strategies intertwined into the transaction; and (c) the transaction would not achieve the tax treatment Sidley represented. Instead of telling Plaintiffs the truth, Sidley told Plaintiffs that intermediary transaction strategies were perfectly legal, would result in substantial savings in taxes, and would survive scrutiny by the IRS.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

4.     Plaintiffs bring this action seeking to hold Sidley responsible for the $7 million in taxes, penalties, and interest the IRS imposed on Plaintiffs resulting from the stock sale transaction about which Sidley advised Plaintiffs.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

## THE PARTIES

5.     At all times relevant to this action, plaintiff Luis Angel Cáceres resided in Alpharetta, GA, which is within the jurisdiction of this Court, and now resides in Guaynabo, PR. He is the son of Alfredo Cáceres and the brother of Plaintiff Luis Alfredo Cáceres. He owned 2.45 percent of UPC in his own name. He also served as a vice president, secretary, treasurer, and director of UPC. Luis Angel Cáceres is named both individually, as the executor of the Estate of Alfredo Cáceres, and as the beneficiary of the Luis Angel Cáceres Charitable Remainder Unitrust.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

6.     Plaintiff Luis Alfredo Cáceres resides in Guaynabo, PR. He is the son of Alfredo Cáceres and the brother of Plaintiff Luis Angel Cáceres. When UPC was incorporated and conducting business in Georgia, Luis Alfredo Cáceres owned 24.5 percent of the company, and served as a vice president and a director. As

such, he subjected himself to the Court's jurisdiction for litigation arising out of the business that he and UPC conducted in Georgia.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

7.     The Luis Angel Cáceres Charitable Remainder Unitrust is a trust with mailing addresses in Pennington, NJ and Charlotte, NC. Luis Angel Cáceres, who is within this Court's jurisdiction, is the trust's grantor, trustee, and beneficiary. He used the trust to hold a 22.05 percent interest in UPC (in addition to the 2.45 percent he held in his own name). Upon information and belief, the trust expired in January 2017.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

8.     Alfredo Cáceres, now deceased, was the father of Defendants Luis Alfredo Cáceres and Luis Angel Cáceres. When UPC was incorporated and conducting business in Georgia, Alfredo Cáceres owned 51 percent of the company, and served as its president and as a director.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

9.     Non-party UPC, now known as Henco Holding Corp., was formerly known as United Poultry Corp. These entities are collectively referred to as "UPC" throughout this Complaint. At all times relevant to this action, UPC was a Georgia

8

corporation. Plaintiffs sold the stock of UPC to Midco Henco, which is currently incorporated in Wyoming (where it was administratively dissolved in 2012 due to a tax delinquency).

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

10. Defendant Sidley Austin LLP is a limited liability partnership organized under the laws of the State of Delaware that maintains its headquarters in Chicago, Illinois.

**ANSWER:** To the extent that this paragraph purports to refer to Sidley's limited liability partnership headquartered in Chicago, Illinois, Sidley admits that it is a limited liability partnership that maintains its headquarters in Chicago, Illinois. To the extent that this paragraph purports to refer to Sidley's limited liability partnership headquartered in Chicago, Illinois, Sidley denies that Sidley Austin LLP is organized under the laws of the State of Delaware. Sidley admits that separate partnerships that are responsible for the operations of Sidley's offices in various locations are organized as Delaware limited liability partnerships.

### JURISDICTION AND VENUE

11. Jurisdiction is proper in this Court pursuant to Article 6, Section 4, Paragraph 1 of the Constitution of the State of Georgia and O.C.G.A. § 9-10-91. Sidley purposefully directed an opinion letter and gave advice to Plaintiffs, some of whom were Georgia residents, in Georgia for the purpose of facilitating and

9

advancing the Midco transaction. Sidley also drafted the legal opinion provided to Plaintiffs with the express purpose of providing a basis for Georgia residents to make business and legal decisions associated with the UPC sale. Sidley also accepted payment from Georgia residents in return. *See Curtis Inv. Co. v. HVB, Sidley, et al*, 2007 U.S. Dist. LEXIS 94012, at 19-20 (N.D. Ga. 2007) (denying Sidley motion to dismiss on personal jurisdiction grounds for opinion letter issued to Georgia resident in tax shelter transaction).

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley admits that jurisdiction is proper in this Court based on Plaintiffs' Amended Complaint as alleged and admits that Sidley received payment from Plaintiffs. Sidley denies the remaining allegations in this paragraph except as expressly admitted.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**ANSWER:** This paragraph states a legal conclusion for which no response is required.

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are residents and citizens of Puerto Rico and based on Sidley's Notice of Removal, Sidley, a limited liability partnership, does not have any partners who are citizens of either Georgia or Puerto Rico.

**ANSWER:** This paragraph states a legal conclusion for which no response is required. To the extent a response is required, Sidley admits that this Court has jurisdiction over this action based on Plaintiffs' Amended Complaint as alleged. Sidley also admits that Sidley, a limited liability partnership, does not have any partners who are citizens of either Georgia or Puerto Rico. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

## FACTUAL ALLEGATIONS

14. At all relevant times, Alfredo Cáceres and his two sons, Luis Alfredo Cáceres and Luis Angel Cáceres, controlled 100% of the stock of UPC. UPC's sole asset was a 50.5% interest in Belca Foodservice Corp. ("Belca"). The Cácereses were instrumental in building Belca into a food service business worth hundreds of millions of dollars through acquisitions and franchising.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

15. KPMG LLP provided accounting and tax related advice and services to the Cácereses and to Belca, including but not limited to advising about potential acquisitions, preparing transaction documents, dealing with third parties as Cácereses' agent, providing accounting services to the Cácereses, and preparing Belca Food Service tax returns. KPMG also served as Belca Food Service's auditor.

**ANSWER:** Sidley admits that KPMG LLP provided services to the Cácereses. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

16.     At some point, UPC began to consider selling its interest in Belca and distributing the proceeds from the sale to the Cácereses in their capacity as UPC shareholders.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

17.     If UPC liquidated its Belca stock and directly distributed the proceeds to the Cácereses, there would be a dual taxation on the transaction since (1) UPC would have to pay a capital gains tax on the Belca stock because it appreciated substantially in the time after UPC acquired it; and (2) the Cácereses would each be taxed on their respective share of the distribution.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

18.     On January 31, 1997, the Cácereses sold UPC's Belca interest to an unrelated third party. Subsequently, on April 10, 1997, the Cácereses sold their UPC stock to UP Acquisitions, a subsidiary of Skandia Capital Group (collectively, "Skandia"), and resigned their positions as officers, employees, and directors at UPC.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

19. Skandia, as the new owner and director of UPC and under the terms of the Stock Purchase Agreement, was obligated to pay taxes on the UPC transaction—but did not perform as promised and instead allowed the IRS to impose a judgment against UPC in excess of $56 million, inclusive of penalties and interest.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

## SIDLEY OPINED THAT THE CÁCERESES WOULD FACE NO LIABILITY, EVEN IF UPC FAILED TO PAY ITS TAXES

20. The Cácereses retained Sidley as special federal income tax counsel in connection with the UPC Transaction to provide an opinion regarding whether UPC shareholders—i.e., the Cácereses—could be held liable for any federal income tax liability imposed on UPC with respect to UPC's gain from the sale of its Belca shares if neither UPC nor the buyer of the shares paid the federal income tax arising from such sale.

**ANSWER:** Sidley admits that former Sidley partner R.J. Ruble (then a partner at Brown & Wood) provided the Cácereses with a tax-opinion letter relating to the UPC Transaction. Sidley lacks knowledge or information sufficient

13

to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

21. Sidley opined that the Cácereses could not be held liable for several reasons, including that the UPC Transaction would be treated as a sale of the Shares by the Cácereses and not as a transfer of corporate assets that would subject them to liability, and that the IRS could not successfully apply the 'step transaction' doctrine to treat UPC as though it were distributing assets to its shareholders, the Cácereses.

**ANSWER:** Sidley admits that former Sidley partner R.J. Ruble (then a partner at Brown & Wood) provided the Cácereses with a tax opinion letter, but otherwise denies the allegations of this paragraph except as expressly admitted.

22. Sidley's opinion was wrong. The U.S. government sought to do precisely what Sidley assured the Cácereses it could not and would not do: hold the Cácereses liable for a transfer of corporate assets by applying the 'step transaction' doctrine to the UPC Transaction.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

23. Furthermore, Sidley did not disclose that it knew or should have known that Skandia, as the new owner and manager of UPC, did not intend to pay the taxes owed but would instead use a Son of BOSS tax shelter to avoid paying it.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

## SIDLEY KNEW THE UPC TRANSACTION WOULD FAIL BECAUSE IT WAS PREMISED ON FRAUDULENT TAX SHELTERS

24. Sidley concealed material facts about the UPC Transaction when it opined about its legality. First and foremost, despite its many representations that the UPC Transaction would legally achieve the tax results promised, the UPC Transaction's tax strategy failed, and the Cácereses had to pay approximately $7 million in taxes, penalties, and interest to the IRS and potential additional liability to the State of Georgia and territory of Puerto Rico.

**ANSWER:** Sidley admits that former Sidley partner R.J. Ruble (then a partner at Brown & Wood) provided the Cácereses with a tax opinion letter, but denies that the tax opinion letter issued in connection with the UPC Transaction represented that the transaction "would legally achieve the tax results promised." Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

25. Unbeknownst to the Cácereses, rather than using legitimate tax strategies to structure the UPC Transaction, Skandia loaded the UPC Transaction with what Sidley knew were fraudulent tax shelters that would not withstand IRS scrutiny. Instead of using a legitimate intermediary that could offset income with loss assets, Skandia used a shell corporation, UP Acquisitions, created only for this sale, and relied on the use of tax "products" including distressed debt and Son of BOSS transactions to attempt to shelter corporate income.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

26. Although the Midco transaction was represented as transferring any risk of the transaction from the Cácereses to the intermediary, Sidley concealed from Plaintiffs that the intermediary held no assets and was created solely for the purpose of the UPC Transaction. Skandia's use of an insolvent intermediary not only left the Cácereses on the hook for any taxes owed, but also left them without any remedy if UP Acquisitions failed to pay the taxes.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

27. Sidley also concealed that the intermediary UP Acquisitions was not independent but was working in concert with the KPMG team, another fact that defeated much of the purpose of the Midco strategy.

**ANSWER:** Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

28. Sidley knew or should have known, but did not advise the Cácereses, that if the transaction were examined, the IRS would not respect the intermediary as legitimate and would conclude that the purported stock sale by Plaintiffs was an asset sale and liquidation, which would cause the income from the asset sale to be attributed to Plaintiffs as transferees, thereby making Plaintiffs responsible for UPC's corporate taxes, as well as their own personal taxes.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley admits that former Sidley partner R.J. Ruble (then a partner at Brown & Wood) provided the Cácereses with a tax opinion letter relating to the sale of their UPC stock. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

### TAX LITIGATION

29. The IRS sued the Cácereses for $56 million in unpaid tax liabilities of UPC in 2018. But the Cácereses had every reason to believe their exposure with respect to the UPC corporation concluded when they sold the stock to UP Acquisition more than 20 years before.

**ANSWER:** Sidley admits that the IRS sued the Cácereses for approximately $56 million in unpaid tax liabilities in 2018. Sidley denies the remaining allegations in this paragraph except as expressly admitted.

30.     For that reason, the District Court initially granted the Cácereses' motion to dismiss the IRS's complaint against them as untimely in May 2019. Unfortunately, however, the Eleventh Circuit Court of Appeals recently reversed the dismissal and reinstated the IRS's claims against the Cácereses in January 2021.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley admits that the District Court initially granted the Cácereses' motion to dismiss the IRS's complaint against them as untimely in May 2019 and that the Eleventh Circuit Court of Appeals reversed that dismissal and reinstated the IRS's claims against the Cácereses in January 2021. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

31.     Prior to that time, the Cácereses had no reason to believe that Sidley's advice was incorrect or that the Cácereses would suffer any injury associated with the UPC Transaction.

**ANSWER:** Sidley denies the allegations in this paragraph.

32.     As of the original filing of this case, Plaintiffs' tax case with the IRS (the "Tax Litigation") was not resolved and as a result Plaintiffs had not yet suffered any pecuniary injury. On or about July 21, 2023, Plaintiffs paid the IRS approximately $7 million to resolve all liability associated with the UPC Transaction. On July 31, 2023, the IRS and Plaintiffs stipulated to dismiss the Tax Litigation with prejudice.

**ANSWER:** Sidley admits that as of the original filing of this case, Plaintiffs' tax case with the IRS was not resolved.  Sidley also admits that on July 31, 2023, the IRS and Plaintiffs stipulated to dismiss the Tax Litigation with prejudice.  Sidley denies the allegations in this paragraph that Plaintiffs had not suffered any pecuniary injury prior to their tax case with the IRS being resolved. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

33.     **Fraudulent Concealment/Deterrence under O.C.G.A. § 9-3-96**: Even after the IRS sued Plaintiffs with respect to the UPC Transaction, Plaintiffs had no reason to believe that Sidley's advice was knowingly false, negligent, or otherwise incorrect. As Plaintiffs' retained tax attorney, Plaintiffs put a high degree of trust in Sidley and had a confidential and fiduciary relationship with Sidley such that they reasonably expected that if Sidley learned that its prior advice was incorrect that it would communicate as much. Sidley never withdrew its written

19

opinion to Plaintiffs that the transaction should be respected nor suggested that Sidley knew or later learned facts suggesting that its prior advice was incorrect.

**ANSWER:** Sidley denies that Plaintiffs had "no reason to believe that Sidley's advice was knowingly false, negligent, or otherwise incorrect" "[e]ven after the IRS sued Plaintiffs with respect to the UPC Transaction." Sidley also denies that "Sidley never withdrew its written opinion to Plaintiffs that the transaction should be respected nor suggested that Sidley knew or later learned facts suggesting that its prior advice was incorrect." Sidley also denies that Sidley was "Plaintiffs' retained tax attorney" when the IRS sued Plaintiffs; Sidley's attorney-client relationship with Plaintiffs ended many years before the IRS lawsuit against Plaintiffs was filed. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

34. By virtue of Sidley continuing to stand by its opinion and its failure to disclose material facts it knew about the transaction, Plaintiffs were fraudulently delayed and deterred from bringing their claims against Sidley at an earlier date. Sidley knew and intentionally withheld from Plaintiffs that its prior advice was false and that its failure to correct that prior advice would be relied upon by the Plaintiffs in deciding whether to pursue the instant claims against Sidley at an earlier time.

**ANSWER:** Sidley denies the allegations in this paragraph.

20

35.     Even after the Tax Litigation was revived on appeal, Plaintiffs had no reason to believe that Sidley's prior advice was incorrect as Sidley did not produce virtually any documents in the Tax Litigation and still claims to this day that it has no written files or internal communications concerning the detailed tax opinion provided to Plaintiffs. On information and belief, Sidley did communicate with certain other tax shelter clients after closing on the transaction about the IRS's later investigation into those transactions. At no time during the pendency of the Tax Litigation Appeal did Plaintiffs believe that Sidley was not continuing to stand by its advice that the transaction should be respected. As a result, Plaintiffs exercised reasonable diligence in deciding not to sue Sidley at an earlier time.

**ANSWER:** Sidley admits that Sidley communicated with certain other tax shelter clients after closing on their tax-shelter transactions about the IRS's later investigation into those transactions, including by (among other things) (i) informing those clients (and the Cácereses) of the IRS's voluntary disclosure program in 2002, (ii) releasing a public statement regarding former Sidley partner R.J. Ruble's tax-shelter practice in 2007, and (iii) making statements to those clients during the course of litigation brought by those clients against Sidley. Sidley denies that Plaintiffs had no reason to believe that Sidley's prior advice was incorrect even after the Tax Litigation was revived on appeal.  Sidley lacks knowledge or information sufficient to admit or deny the allegation that "[a]t no time during the pendency of the Tax Litigation Appeal did Plaintiffs believe that

21

Sidley was not continuing to stand by its advice that the transaction should be respected" and therefore denies that allegation. Sidley denies the allegation that "[a]s a result, Plaintiffs exercised reasonable diligence in deciding not to sue Sidley at an earlier time." Except as expressly admitted, Sidley denies all other allegations in this paragraph.

### COUNT I: BREACH OF CONTRACT

36. Plaintiffs incorporate each and every allegation made in paragraphs 1-35 above, as if fully set forth herein.

**ANSWER:** Sidley repeats and incorporates by reference each and every response to the preceding paragraphs as if fully set forth herein.

37. Plaintiffs entered into a contract with Sidley whereby Sidley agreed to satisfactorily provide a tax legal opinion and tax consulting services for Plaintiffs in exchange for the Plaintiffs' agreement to pay Sidley fees for those services.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley admits that former Sidley partner R.J. Ruble (then a partner at Brown & Wood) provided the Cácereses with a tax opinion letter. Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

38. Plaintiffs performed fully each and every contractual obligation to Sidley.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

39. Sidley breached its obligations to Plaintiffs by, among other things:

   a) failing to inform Plaintiffs of the significant risks associated with the Midco stock sale transaction;

   b) failing to inform Plaintiffs that Sidley knew of significant risks relating to the proposed stock sale transaction to Skandia;

   c) failing to inform Plaintiffs that the Midco strategy was not a legitimate tax strategy to avoid transferee liability for UPC;

   d) failing to identify legitimate alternative tax planning devices that would legally reduce Plaintiffs' taxes; and

   e) failing to provide professional legal services to Plaintiffs in a good faith manner.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

40. Sidley breached its obligations under its contract with Plaintiffs by these and other acts and omissions, including those acts and omissions previously alleged.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

41. As a direct and proximate result of Sidley's breaches of this contract, Plaintiffs suffered substantial direct, economic, and consequential damages in an amount to be proven at trial.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

42. Because Sidley knew that the tax strategies it sold to Plaintiffs had significant legal problems and would not likely pass muster with the IRS but concealed such information from Plaintiffs, Sidley acted in bad faith.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

## COUNT II: NEGLIGENT MISREPRESENTATIONS

43.     Plaintiffs incorporate each and every allegation made in paragraphs 1-42 above, as if fully set forth herein.

**ANSWER:** Sidley repeats and incorporates by reference each and every response to the preceding paragraphs as if fully set forth herein.

44.     Sidley owed a duty of care to Plaintiffs which required the transmittal of accurate and not misleading information to Plaintiffs.

**ANSWER:** This paragraph states legal conclusions for which no response is required.  To the extent a response is required, Sidley denies the allegations in this paragraph.

45.     To the extent that any of its misrepresentations to Plaintiffs were not intentional, Sidley made numerous grossly negligent misrepresentations in promoting, marketing, advising Plaintiffs in connection with the Midco stock sale transaction.

**ANSWER:** This paragraph states legal conclusions for which no response is required.  To the extent a response is required, Sidley denies the allegations in this paragraph.

46.     Sidley's grossly negligent misrepresentations to Plaintiffs include, but are not limited to:

a)     Midco was permissible, legal, and would be allowed by federal and state authorities;

b)      Sidley's opinion letter evidenced the legality and permissibility of a Midco transaction that would insulate Plaintiffs from penalties;

c)      the Sidley opinion letter was individually tailored for Plaintiffs;

d)      Sidley had thoroughly researched Midco tax transactions and determined it "should" survive IRS scrutiny;

e)      Plaintiffs' Midco stock sale transaction could be relied upon to avoid transferee liability and to minimize the tax impact of Plaintiffs' divestment of UPC;

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

47.     To the extent that Sidley's misrepresentations were not made intentionally, Sidley's misrepresentations were made with reckless and grossly negligent disregard for the truth.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

48.     Sidley knew, or a review of available information in Sidley's possession would have revealed, that the representations by Sidley were false.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

49. Sidley intended that Plaintiffs would rely or act upon Sidley's grossly negligent misrepresentations.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

50. Sidley had knowledge that Plaintiffs would rely upon the negligent misrepresentations and that such reliance would likely cause Plaintiffs economic injury.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

51. Plaintiffs justifiably relied upon Sidley's misrepresentations of material fact because of Plaintiffs' past relationship with Skandia and KPMG, Sidley's experience and expertise, and Sidley's representations that its advice was based on its expertise in tax and accounting and that Sidley's partners, including in particular R.J. Ruble, were tax and accounting experts.

27

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

52. As a direct and proximate result of Sidley's grossly negligent misrepresentations, Plaintiffs have suffered direct, consequential, and economic damages in an amount to be proven at trial.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

53. Sidley's wrongful actions constitute willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences, rendering Sidley liable to Plaintiffs for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

54. Because Sidley acted with specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

## COUNT III: SIDLEY'S PROFESSIONAL NEGLIGENCE

55.     Plaintiffs incorporate each and every allegation made in paragraphs 1-54 above, as if fully set forth herein.

**ANSWER:**  Sidley repeats and incorporates by reference each and every response to the preceding paragraphs as if fully set forth herein.

56.     Sidley was specifically engaged by Plaintiffs to provide an independent tax legal opinion regarding whether the IRS would respect the UPC Transaction and that Plaintiffs would not be subject to personal (or transferee) liability associated with UPC's tax liabilities after sale of stock.

**ANSWER:**  This paragraph states legal conclusions for which no response is required.  To the extent a response is required, Sidley admits that former Sidley partner R.J. Ruble (then a partner at Brown & Wood) provided the Cácereses with a tax opinion letter relating to the UPC Transaction.  Sidley lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph and therefore denies them except as expressly admitted.

57.     As a result of this relationship, Sidley owed Plaintiffs a duty to use the degree of care and skill ordinarily employed by and required of tax lawyers under similar conditions and like surrounding circumstances when providing such services (the "standard of care").

**ANSWER:**  This paragraph states legal conclusions for which no response is required.  To the extent a response is required, Sidley admits that during the

course of any attorney-client relationship between Sidley and Plaintiffs, to the extent one existed, Sidley owed Plaintiffs a duty of care. Sidley denies that Sidley and Plaintiffs had any ongoing attorney-client relationship at the time that the IRS lawsuit was filed in 2019. Sidley denies the remaining allegations in this paragraph except as expressly admitted.

58. Plaintiffs were entitled to expect that Sidley's services would be performed consistent with the standard of care.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley admits that during the course of any attorney-client relationship between Sidley and Plaintiffs, to the extent one existed, Plaintiffs were entitled to expect that Sidley's services would be performed consistent with the standard of care. Sidley denies that Sidley and Plaintiffs had any ongoing attorney-client relationship at the time that the IRS lawsuit was filed in 2019. Sidley denies the remaining allegations in this paragraph except as expressly admitted.

59. Despite its relationship with Plaintiffs, Sidley's acts and omissions fell significantly below the standard of care.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

60. Sidley breached the standard of care by, among other things:

a) failing to provide the tax legal services for which Plaintiffs contracted;

b) failing to design and implement Plaintiffs' divestment of interests in UPC through legitimate strategies allowed by the IRS;

c) inducing Plaintiffs to structure their divestment of UPC using a fraudulent Midco tax shelter that Sidley knew or should have known would not pass muster with the IRS;

d) failing to adequately disclose the risks of using that tax shelter which risks were known to Sidley;

e) inducing Plaintiffs to participate in that tax shelter when Sidley knew or should have known that the purported "strategy" it proposed would not achieve the results promised and that Plaintiffs could be hit with massive transferee tax liability;

f) inducing Plaintiffs to structure their divestment of UPC knowing Skandia, the party purchasing UPC's stock, would likely use fraudulent tax shelters that Sidley knew or should have known would not pass muster with the IRS;

g) preparing an opinion letter that falsely stated Plaintiffs would not be responsible for UPC Enterprises' tax liability as transferees;

h) preparing an opinion letter that falsely claimed that the strategy

"should" survive IRS scrutiny if reviewed by the IRS;

i) inducing Plaintiffs to rely on its purportedly independent opinion letter, when Sidley knew or should have known the letter did not represent the independent opinion of the law firm;

j) representing to Plaintiffs that Sidley had thoroughly reviewed and considered all aspects of the purported stock sale transaction while concealing from Plaintiffs the fact that Sidley's own partners and staff had expressed concerns about the legitimacy of these fraudulent tax shelters;

k) failing to advise Plaintiffs that the Sidley opinion letter did not represent independent advice with respect to the merit of the Midco tax shelter;

l) failing to identify and advise Plaintiffs to use tax planning that would legally and legitimately minimize Plaintiffs' taxes.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley lacks knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

61. By committing these and other acts, Sidley's acts and omissions fell substantially below the standard of care.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

62. Sidley intentionally, recklessly, and/or with gross negligence breached the duty of care that it owed to Plaintiffs by these and other acts and omissions, including those acts and omissions previously alleged.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

63. As a direct and proximate result of Sidley's professional negligence, Plaintiffs have suffered direct, consequential, and economic damages in an amount to be proven at trial.

**ANSWER:** This paragraph states legal conclusions for which no response is required. To the extent a response is required, Sidley denies the allegations in this paragraph.

## COUNT IV: COMMON LAW INDEMNITY

64. Plaintiffs incorporate each and every allegation made in paragraphs 1-63 above, as if fully set forth herein.

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

65. Sidley represented to Plaintiffs that a Midco transaction was a reliable way to avoid transferee liability and to minimize the tax impact of Plaintiffs' divestment of UPC, and that such transactions were permissible, legal, and "should" survive IRS scrutiny.

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

66. Sidley knew, or a review of available information in Sidley's possession, would have revealed, that the representations by Sidley were false. Sidley's actions constitute tortious negligent misrepresentations and professional negligence.

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

67. In the Tax Litigation, Plaintiffs are alleged to have engaged in fraudulent transfers pursuant to Ga. Code Ann. §§ 12-2-21 and 18-2-22 that were in effect in 1997 (the time of the allegedly fraudulent transactions), which require the IRS to establish that the transaction was made with the intent to defraud UPC's creditors, and that Plaintiffs were aware of that intent.

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

68. Specifically, Plaintiffs are alleged to have known that the purpose of the UPC Transaction was the artificial reduction of tax liability because they hired

R.J. Ruble, a Sidley partner, to write a tax opinion letter on the legality of the UPC Transaction. (Compl. ¶¶ 37-38, ECF No. 1, *United States v. Henco Holding Corp.*, No. 1:18-cv-03093 (N.D. Ga.).)

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

69. Only R.J. Ruble had actual knowledge of the fraudulent nature of the UPC Transaction; the Complaint in the Tax Litigation alleges that "Mr. Ruble acknowledged his awareness that Skandia was 'using the tax position to make a profit,'" that "Mr. Ruble was informed that Skandia intended to use the 'pot of cash' from the Belca sale to 'repay their lender,'" and that "Mr. Ruble, on behalf of Transferee Defendants, wrote in a letter to Mr. Cornelison that it would be problematic for Skandia to use UPC's cash to 'directly pay the selling shareholders.'" *Id.* ¶¶ 42, 46, 48.

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

70. Plaintiffs' liability in the Tax Litigation turned on Plaintiffs' alleged knowledge of Skandia's intent to defraud the IRS—knowledge that only Sidley had (but did not share with Plaintiffs), and which the IRS imputed to Plaintiffs through Sidley as Plaintiffs' provider of allegedly independent legal tax advice.

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

71. As a direct result of Sidley's tortious conduct, liability including direct, consequential, and economic damages were imputed to Plaintiffs.

**ANSWER:** This Count has been dismissed; Sidley therefore is not required to answer as to this paragraph.

As a further defense to Plaintiffs' purported claims, Sidley denies any remaining allegation in Plaintiffs' Amended Complaint, whether express or implied, to the extent such allegation has not previously been addressed in this Answer.

**WHEREFORE**, Sidley requests entry of judgment in its favor and against Plaintiffs, and an award of costs and fees.

Respectfully submitted this 1st day of October, 2024.

**CAPLAN COBB LLC**

By: _____*/s/ Michael A. Caplan*_____

MICHAEL A. CAPLAN (GA Bar No. 601039)
mcaplan@caplancobb.com
JARRED A. KLORFEIN (GA Bar No. 562965)
jklorfein@caplancobb.com
CAPLAN COBB LLC
75 Fourteenth Street, N.E., Suite 2700
Atlanta, Georgia 30309
Telephone: (404) 596-5600
Facsimile: (404) 596-5604

**MUNGER, TOLLES & OLSON LLP**

By: _____/s/ John B. Major_____
BRAD D. BRIAN (*pro hac vice*)
brad.brian@mto.com
JOHN B. MAJOR (*pro hac vice*)
john.major@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

XIAONAN APRIL HU (*pro hac vice*)
April.Hu@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

*Attorneys for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2024, I electronically filed the foregoing document through the Court's CM/ECF system, which will automatically send electronic notification of such filing to all counsel of record.

This 1st day of October, 2024.

/s/ Michael A. Caplan

GA Bar No. 601039

*Attorney for Defendant*