**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

LUIS ALFREDO CÁCERES, et al.

    Plaintiffs,

               v.

SIDLEY AUSTIN LLP,

    Defendant.

Civil Action No.
1:23-cv-00844-SDG

**<u>OPINION AND ORDER</u>**

This matter is before the Court on Defendant Sidley Austin LLP's motion

for summary judgment [ECF 99] and motion for judicial notice [ECF 101]. Because

there is no genuine dispute that Plaintiffs Luis Angel and Luis Alfredo Cáceres'

claims are barred by the applicable statute of limitations, and tolling by fraudulent

concealment does not apply, Sidley Austin's motion for summary judgment is

**GRANTED**. Sidley Austin's motion for judicial notice is likewise **GRANTED**.

## I.    INTRODUCTION

### A.    Factual Background

This case arises from allegations that a law firm provided fraudulent and

negligent legal advice to owners of a food distribution company nearly thirty years

ago.[1] Alfredo Cáceres and his sons, Plaintiffs Luis Angel and Luis Alfredo, owned

United Poultry Corporation (UPC), which itself was the majority shareholder of

---

[1]    ECF 1.

1

Belca Foodservice Corporation (Belca).[2] In 1996, the Cácereses sought to sell UPC's

Belca shares to Alliant Foodservice Inc. (Alliant).[3] After the Cácereses' counsel,

Stewart Melvin, informed them that the proceeds of the sale would be greatly

reduced by double taxation, the Cácereses decided to engage in a new money-

saving arrangement.[4]

The Cácereses hired new advisors, KPMG, who counseled them to enter into

an intermediary "midco" transaction to offset taxation.[5] Under this arrangement,

Alliant would purchase UPC's Belca stock.[6] Then, an intermediary would buy

UPC from the Cácereses.[7] This transaction would allow the Cácereses to avoid

paying taxes on the proceeds earned from the sale, with the intermediary instead

assuming the tax liability.[8] The Cácereses were informed and aware that the

money-saving arrangement was unusual and expressed some hesitation about the

transaction at the time.[9]

---

[2]   Plaintiff's Resp. to Defendant's Stmt. of Material Facts, ECF 104-2, ¶¶ 3–4.

[3]   *Id.* ¶¶ 4, 10; Defendant's Resp. to Plaintiff's Stmt. of Add'l Material Facts, ECF 108-2, ¶ 1.

[4]   ECF 104-2, ¶¶ 8, 9.

[5]   *Id.* ¶¶ 13–15.

[6]   *Id.* ¶¶ 13, 16.

[7]   *Id.* ¶¶ 15–16.

[8]   *Id.*

[9]   Defendant's Stmt. of Material Facts, ECF 100-3, ¶¶ 34, 35, 47; ECF 104-2, ¶¶ 34, 35, 47; ECF 108-2, ¶ 5.

To advise the Cácereses on the risks associated with the arrangement, KPMG, on behalf of the Cácereses, retained the law firm Brown & Wood (which later merged with Defendant Sidley Austin).[10] On April 10, 1997, Brown & Wood attorney R.J. Ruble wrote a tax opinion letter to the Cácereses opining that the IRS should not be successful if it were to challenge the Cácereses' "midco" transaction.[11] On the same day, the Cácereses effectuated the arrangement by selling their UPC Belca shares.[12] After the sale, UPC was renamed Henco Holding Corporation.[13]

In March 2002, Sidley Austin sent a letter to former Brown & Wood clients who had received Ruble tax opinion letters, like the Cácereses, to inform them of an IRS amnesty program for taxpayers who had previously engaged in tax shelter arrangements.[14] The letter informed the clients that they had engaged in a tax shelter transaction that may be subject to IRS scrutiny, that they may be eligible for amnesty under the IRS program, and encouraged them to consult with their

---

[10]   ECF 104-2, ¶ 21; ECF 108-2, ¶ 5.

[11]   ECF 104-2, ¶ 39; ECF 108-2, ¶ 8.

[12]   ECF 104-2, ¶ 42.

[13]   ECF 108-2, ¶ 12.

[14]   ECF 100-3, ¶¶ 58, 59; ECF 104-2, ¶ 58; ECF 108-2, ¶ 45.

advisors.[15] The Cácereses do not recall having received or read the letter, and did not participate in the amnesty program.[16]

In 2003, Sidley Austin terminated Ruble's employment after an internal investigation uncovered that his practice of issuing tax opinion letters was fraudulent.[17] The IRS and the U.S. Department of Justice launched their own criminal investigation and ultimately decided not to prosecute Sidley Austin.[18] As part of the federal investigation, Ruble was prosecuted and convicted, and Sidley Austin paid the government a civil penalty and issued a public statement repudiating Ruble's fraudulent conduct.[19] Sidley Austin's public statement and Ruble's criminal conviction received media coverage.[20]

Eventually, the Cácereses themselves became the subject of government scrutiny. Starting in 2014, the IRS issued several summonses and letters to the Cácereses and their attorneys related to the tax liabilities of Henco, UPC's corporate successor that was created following the 1997 sale.[21] These summonses

---

[15]   ECF 104-2, ¶¶ 60, 62; ECF 108-2, ¶ 46.

[16]   ECF 104-2, ¶¶ 63, 64; ECF 108-2, ¶ 45.

[17]   ECF 104-2, ¶ 65; ECF 108-2, ¶¶ 30, 32.

[18]   ECF 104-2, ¶¶ 66–67; ECF 108-2, ¶¶ 39–40.

[19]   ECF 104-2, ¶¶ 68–72; ECF 108-2, ¶ 40.

[20]   ECF 104-2, ¶ 74.

[21]   ECF 104-2, ¶ 75; ECF 108-2, ¶ 50.

and letters referenced the criminal convictions of Ruble and others associated with the fraudulent tax opinion letters.[22] The Cácereses retained new counsel, Smith, Gambrell & Russel LLP, to represent them in responding to these summonses.[23]

On June 27, 2018, the IRS sued the Cácereses, alleging that the 1997 sale of their UPC shares was unlawful.[24] The IRS complaint included further details about Ruble's criminal conviction for issuing fraudulent tax opinion letters.[25] The Cácereses moved to dismiss the IRS lawsuit as untimely, which the district court granted.[26] The Eleventh Circuit eventually reversed the dismissal, and the Cácereses settled with the IRS in 2023.[27]

### B.    Procedural Background

On January 13, 2023, the Cácereses initiated this lawsuit by filing their complaint against Sidley Austin in the State Court of Fulton County, Georgia.[28] On February 27, Sidley Austin removed the case.[29] The Cácereses' complaint brought claims for breach of contract, negligent misrepresentation and

---

[22]   ECF 104-2 ¶ 84.

[23]   ECF 104-2, ¶ 76; ECF 108–2, ¶ 60.

[24]   ECF 104-2, ¶ 95.

[25]   *Id.* ¶ 104.

[26]   *Id.* ¶¶ 121, 133.

[27]   *Id.* ¶¶ 133, 143.

[28]   ECF 1-1.

[29]   ECF 1.

professional negligence, and common law indemnity, alleging that Sidley Austin, through Ruble's tax opinion letter, provided fraudulent advice to the Cácereses regarding the 1997 sale.[30]

On September 24, 2025, Sidley Austin filed its motion for summary judgment, as well as a motion for judicial notice.[31] Sidley Austin's motion for summary judgment asserts that the Cácereses' claims are untimely, the statute of limitations is not tolled, and the Cácereses' claims fail on the merits.[32] In response, the Cácereses assert that their claims are timely under the theory of tolling by fraudulent concealment because Sidley Austin failed over many years to disclose that it had provided the Cácereses with bad legal advice, and thus, they could not pursue their claims.[33] The Court heard oral argument on January 22, 2026, and the motions are now ripe for resolution.[34]

## II.     DISCUSSION

As a preliminary matter, Sidley Austin moves the Court to take judicial notice of four documents: an order and a motion to dismiss filed by the Cácereses

---

[30]  ECF 1-1. The Cácereses' indemnity claim was later dismissed by this Court. *See* ECF 35, at 4–5.

[31]  ECF 99; ECF 101.

[32]  ECF 100-2.

[33]  ECF 104-1.

[34]  ECF 119.

in *United States v. Henco Holding Corp.*, No. 1:18-cv-03093-CAP (N.D. Ga.), and two newspaper articles related to the federal investigation into Sidley Austin and Ruble's criminal conviction.[35] Sidley Austin's motion is unopposed. *See* LR 7.1(B), N.D. Ga ("Failure to file a response shall indicate that there is no opposition to the motion.").

Courts are required, upon proper request, to take judicial notice of facts that are not subject to reasonable dispute. Fed R. Evid. 201. Having been "supplied with the necessary information," the Court takes judicial notice of the motion to dismiss and the Court order as public records "whose accuracy cannot reasonably be questioned." *Id.; see also United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) ("[A] court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation."). As for the newspaper articles, the Court takes judicial notice of these documents for the purposes of determining which statements the documents contain. *See United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) ("[C]ourts may take judicial notice of documents such as the newspaper articles at issue here for the limited purpose of determining which statements the

---

[35]   ECF 101.

documents contain (but not for determining the truth of those statements)").

Accordingly, Sidley Austin's motion for judicial notice is granted.

The Court now turns to Sidley Austin's motion for summary judgment. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is "material" if it could change the outcome of the case, and a dispute is "genuine" if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). In analyzing a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Judges are not to weigh evidence, determine credibility, or draw their own inferences from the facts, those being the proper functions of the jury at trial. *Id.*

First, the Court will address which statute of limitations applies to the Cácereses' claims. Then, the Court will address the parties' arguments regarding tolling of that statute of limitations by fraudulent concealment.

### A.    Applicable Statute of Limitations

While the parties agree that a four-year statute of limitations governs the Cácereses' negligence claim, the parties dispute which statute of limitations applies to the breach of contract claim.[36] In Georgia, breaches of oral contracts are

---

[36]    ECF 100-2, at 21; ECF 104-1, at 13.

subject to a four-year statute of limitations, while breaches of written contracts are subject to a six-year statute of limitations.[37] *Compare* O.C.G.A. § 9-3-25 (four-year statute of limitations), *with* O.C.G.A. § 9-3-24 (six-year statute of limitations). Neither party has been able to locate a written engagement letter between Sidley Austin and the Cácereses.[38] Accordingly, Sidley Austin argues that the contract for legal representation between it and the Cácereses was merely oral and subject to a four-year statute of limitations.[39] On the other hand, the Cácereses assert that Ruble's tax opinion letter and an invoice evidencing proof of payment, taken together, form a written contract subject to the six-year statute of limitations.[40] Specifically, the Cácereses focus on the following language in the tax opinion letter:

> [The Cácereses] have engaged [Sidley] to act as special Federal income tax counsel to [the Cácereses] in connection with the sale of all the issued and outstanding shares ('Shares') of UPC Holding Corp. . . . [and] asked our opinion regarding whether a Shareholder could be liable for any Federal income tax liability imposed upon

---

[37] As noted in this Court's previous order denying Sidley Austin's motion to dismiss, Georgia law covers the Cácereses' claims. ECF 35, at 4–5 ("[T]he Cácereses' claims all arise under Georgia law" and "[b]ecause each of the Cácereses' legal malpractice claims arises under Georgia law, those claims' accruals and limitations periods, as well as the applicability of tolling, are governed by Georgia law.").

[38] ECF 104-2, ¶ 25.

[39] ECF 100-2, at 21.

[40] ECF 104-1, at 13–14.

> UPC with respect to UPC's gain from the sale of the Belca Shares to Alliant, if the Federal income tax arising from such sale were not paid by UPC or the Buyer.[41]

Generally, "an oral contract may be enforceable despite the contemplation of a subsequent written contract." *Barton v. Chem. Bank*, 577 F.2d 1329, 1336 (5th Cir. 1978).[42] The language in the tax opinion letter stating that the Cácereses "have engaged [Sidley] to act as special Federal income tax counsel" indicates that the letter merely evidences a previously established oral agreement.[43] "When the expected written contract is only evidence of the oral agreement, the contract is binding once the parties have reached an oral agreement." *Id.*

However, the parties take a more material approach and focus on whether the documents at issue constitute a written contract. The Cácereses' argument that the tax opinion letter and the invoice, taken together, form a written contract appears legally dubious. In making their argument, the Cácereses rely on *Bd. of Regents of Univ. Sys. of Georgia v. Tyson* for the uncontroversial proposition that "multiple documents may be considered together as a single contract as long as all the necessary terms are contained in signed contemporaneous writings."[44] 261 Ga.

---

[41] *Id.* at 14; ECF 100-20.

[42] Fifth Circuit cases decided before October 1, 1981, are binding precedent in the Eleventh. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[43] ECF 104-1 at 14; ECF 100-20.

[44] ECF 104-1, at 13–14.

368, 369 (1991) (cleaned up). But there the Georgia Supreme Court found, in part, against the existence of a written contract when "nowhere in the . . . record . . . is any signed writing establishing the essential term of 'consideration moving to the contract . . .'" *Id.* (citing O.C.G.A. § 13–3–1). Similarly here, although the tax opinion letter is technically a signed writing that lays out the bare bones of the agreement between Sidley Austin and the Cácereses, it is not signed by the Cácereses and does not indicate any consideration or assent to the contract by the Cácereses.[45] Nor does the paid invoice—which merely establishes that the Cácereses paid Sidley Austin some amount of money on a certain date—fill the written contract gap.[46] *See Wheeler v. IDN-Armstrong's Inc.*, 288 Ga. App. 253, 254 (2007) (an invoice itself "is not a contract or similar legal document that defines rights, duties, entitlements, or liabilities."). It is also worth noting that although the invoice's billing date coincides with the date Ruble provided the tax opinion letter to the Cácereses, the two documents do not explicitly reference or incorporate each other.[47] *Cf. Harris v. Baker*, 287 Ga. App 814, 816 (2007) ("[T]wo or more documents can together create a single contract if one of them is referenced by or incorporated into the other."). Thus, the Court finds that the tax opinion

---

[45]   ECF 100-20.

[46]   ECF 100-19.

[47]   ECF 100-19; ECF 100-20.

letter and the invoice taken together fail to form a written contract subject to the six-year statute of limitations.

Sidley Austin's argument ends there. However, even if the tax opinion letter and the invoice taken together *did* constitute a written contract, it would not be considered a *complete* written contract subject to the six-year statute of limitations. And this is important because written contracts deemed incomplete are subject to the four-year statute of limitations usually reserved for oral contracts. *See Newell Recycling of Atlanta, Inc. v. Jordan Jones and Goulding, Inc.*, 288 Ga. 236, 238 (2010) ("Where the agreement is incomplete, such that the writing does not form a contract or the promise allegedly broken stems from a purely oral agreement, the four-year statute of limitation of OCGA § 9–3–25 applies.").

In the legal representation context, Georgia case law specifically instructs that written contracts which fail to contain essential details about the scope of that legal representation are considered incomplete. *See Frates v. Sutherland, Asbill, & Brennan*, 164 Ga. App. 243, 246 (1982) (holding that a written contract that "merely confirms [legal] representation in broad terms and outlines in detail only the fee arrangement between the parties . . . does not constitute the entire agreement for legal services between the parties"); *see also Loftin v. Brown*, 179 Ga. App. 337, 339 (1986) ("The instruments in question were not in part or in whole the contract but were the work product or the objective of the contract for services.").

12

Ruble's tax opinion letter and the invoice likewise merely confirm in broad terms that the Cácereses engaged Sidley Austin to provide advice related to the 1997 sale and that the Cácereses paid some amount of money to Sidley Austin around the same time.[48] This is not enough to constitute a complete agreement between the parties. *See Plumlee v. Davis,* 221 Ga. App. 848, 852 (1996) (finding an incomplete agreement where the written contract only "created the attorney-client relationship and covered certain issues such as … fee[s], payment of expenses, and . . . authority," but not "the manner in which the attorney was to carry out his duties, when suit was to be filed, or numerous other material portions of the contract."). Accordingly, Ruble's tax opinion letter and the invoice taken together fail to contain the complete terms of the agreement and are, at best, a contract "partly in writing and partly in parol." *Id*. (quoting *Jankowski v. Taylor, Bishop, & Lee*, 154 Ga. App. 752, 754–755(2) (1980)). Thus, "the entire contract is considered as one in parol" and "the four-year statute of limitation applicable to oral contracts must be applied." *Id.*

For these reasons, the Court finds that, absent tolling, the Cácereses' breach of contract and negligence claims both expired in 2001, four years after their claims accrued in 1997.[49]

---

[48]    *Id*.

[49]    ECF 35, at 6.

## B.    Tolling by Fraudulent Concealment

Having established the applicable statute of limitations governing the Cácereses' claims, the Court must now determine whether the running of the statute of limitations was tolled.

The Cácereses assert that Sidley Austin fraudulently concealed the Cácereses' cause of action against it by failing to disclose, both at the time of representation and after, that Ruble's tax opinion letter was fraudulent, and that this fraudulent concealment tolled the applicable statute of limitations.[50] Under Georgia law, a statute of limitations is tolled "[i]f the defendant . . . [is] guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action." O.C.G.A. § 9-3-96; *see also Kane v. Shoup*, 260 Ga. App. 723, 726 (2003) ("Actual fraud, through nondisclosure of a known injury or through acts to conceal the injury, which deters or debars the bringing of the action, tolls the running of the statute until discovery of the fraud."). In such circumstances, the limitations period runs "from the time of the plaintiff's discovery of the fraud." O.C.G.A. § 9-3-96. To invoke tolling under Section 9-3-96, a plaintiff must make three showings: (1) "the defendant committed actual fraud"; (2) "the fraud concealed the cause of action from the plaintiff, such that the plaintiff was

---

[50]   ECF 104-1.

debarred or deterred from bringing an action"; and (3) "the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the statute of limitation." *Doe v. Saint Joseph's Cath. Church*, 313 Ga. 558, 561 (2022) (quoting *Daniel v. Amicalola Elec. Membership Corp.*, 289 Ga. 437, 444–45 (2011)) (cleaned up).

Under the first prong, a plaintiff must show that "the defendant committed actual fraud." *Id.* In Georgia, "actual fraud" consists of five elements: (1) false representation or omission of a material fact, (2) scienter, (3) intention to induce the party claiming fraud to act or refrain from acting, (4) justifiable reliance, and (5) damages. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1288 (11th Cir. 2007). "Where a plaintiff alleges fraud by the omission of a material fact, the plaintiff must additionally allege a duty to disclose the omitted information." *Monilaw v. Mercedes Benz Grp. AG*, No. 1:24-CV-00608-TWT, 2025 WL 2163761, at *6 (N.D. Ga. July 30, 2025). In Georgia, a duty to disclose "may arise from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23-2-53.

Under the second prong, a plaintiff must show "the fraud concealed the cause of action from the plaintiff." *Doe,* 313 Ga. at 561. To constitute concealment of a cause of action, "some trick or artifice must be employed to prevent inquiry or elude investigation, or to mislead and hinder the party who has the cause of

action from obtaining information, and the acts relied on must be of an affirmative character and fraudulent." *Costrini v. Hansen Architects, P.C.*, 247 Ga. App. 136, 138 (2000) (quoting *Turner v. Butler*, 245 Ga. App. 250, 252–53 (2000)); *see also Charter Peachford Behav. Health Sys. v. Kohout*, 233 Ga. App. 452, 457 (1998) ("The key element for . . . tolling to apply is that the fraud must have debarred or deterred plaintiff from bringing the suit timely.").

The record in this case shows considerable dispute between the parties as to whether Sidley Austin committed actual fraud that concealed the Cácereses' cause of action. The Cácereses assert that Sidley Austin committed actual fraud because it and Ruble, as its employee, failed to disclose to the Cácereses during their attorney-client relationship that it was receiving payments and kickbacks for providing fraudulent tax opinion letters.[51] The Cácereses further assert that Sidley Austin failed to disclose its own knowledge of Ruble's fraud once it discovered it years after its representation of the Cácereses ended, and in the ensuing two decades.[52] At least while the confidential attorney-client relationship was ongoing, Sidley Austin owed the Cácereses a duty to disclose any information that could have impacted its representation, and a failure to do so would constitute actual fraud. *See Goldston v. Bank of Am. Corp.*, 259 Ga. App. 690, 694 (2003) ("In cases of

---

[51]   *Id.* at 17–18.

[52]   *Id.* at 21–24.

16

[a] confidential relationship, silence when one should speak, or failure to disclose what ought to be disclosed, is as much a fraud in law as [is] an actual . . . false representation." (alteration in original)).

However, to establish tolling by fraudulent concealment, the Cácereses must also show that they "exercised reasonable diligence to discover [their] cause of action." *Doe*, 313 Ga. at 561. Given the factual disputes as to whether Sidley Austin committed actual fraud that concealed the Cácereses' cause of action under the first two prongs for fraudulent concealment tolling, summary judgment will turn on this final "reasonable diligence" requirement.  "Fraud will toll the limitation period only until the fraud is discovered or by reasonable diligence should have been discovered." *Id.* at 568 (citation and punctuation omitted). Reasonable diligence is measured by an objective "prudent man" standard. *See id.* "Where a confidential relationship exists, a plaintiff does not have to exercise the degree of care to discover fraud that would otherwise be required, and a defendant is under a heightened duty to reveal fraud where it is known to exist." *Coe v. Proskauer Rose, LLP*, 314 Ga. 519, 530 (2022) (quoting *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 848 (1998)). "Put another way, a confidential relationship imposes a greater duty on a defendant to reveal what should be revealed, and a lessened duty on the part of a plaintiff to discover what should be discoverable through the exercise of ordinary care." *Id.*

17

The parties dispute whether a confidential relationship existed past 1997 when Sidley Austin's representation of the Cácereses ended, such that the Cácereses had a "lessened duty" to discover their claims during the two decades that followed.[53] However, the Cácereses have failed to demonstrate that they exercised reasonable diligence, even under any "lessened duty" that may have existed. *See Falanga v. Kirschner & Venker, P.C.*, 286 Ga. App. 92, 95 (2007) ("[W]e cannot conclude that appellants' lessened duty of care to discover [Defendant's] fraud excused them from exercising ordinary care . . . ."); *see also Doe v. Archdiocese of Atlanta*, No. A25A1760, 2026 WL 656504, at *5 (Ga. Ct. App. Mar. 9, 2026) ("[T]he Court has previously stated that the mere fact that a confidential relationship once existed between two parties may not forever excuse a plaintiff from the duty to exercise reasonable diligence.").

To support their claims of reasonable diligence, the Cácereses rely heavily on the opinion of the Georgia Supreme Court in *Coe v. Proskauer Rose, LLP*, in which similarly situated plaintiffs succeeded in showing reasonable diligence to establish tolling by fraudulent concealment.[54] 314 Ga. at 519. Even this Court, in its order denying Sidley Austin's previous motion to dismiss, remarked on the

---

[53]   ECF 100-2, at 22 n. 5; ECF 104-1, at 18.

[54]   ECF 104-1, at 26–28.

similarities between the cases.[55] Some facts in *Coe* remain remarkably similar to the facts at hand in this case, in that the *Coe* plaintiffs were business owners that were deceived into entering a fraudulent tax scheme by a law firm. *Id.* at 520–23. However, the factual record that has emerged in this case presents material dissimilarities between the *Coe* Plaintiffs and the Cácereses, particularly as to the level of knowledge each group of plaintiffs had about their potential causes of actions.

In *Coe*, the plaintiffs were able to establish their reasonable diligence because they lacked knowledge about their causes of action, were unable to pursue them due to the defendant law firm's failure to disclose its fraudulent conduct, and, most significantly, had little opportunity to discover their claims otherwise. *Id.* at 531–33. Accordingly, due to their relative lack of knowledge regarding their causes of action, the *Coe* plaintiffs were "entitled to rely on the disclosure or lack thereof made by [their] attorney even after the legal engagement was completed, at least until other facts come to light that would cause a reasonably diligent person to revisit the issue." *Id.* at 531.

By contrast, the undisputed facts here show that the Cácereses became privy to an abundance of information that should have reasonably made them "revisit

---

[55]    ECF 35, at 16.

the issue" of whether they had claims against Sidley Austin. *Id.* As early as 2014, the Cácereses were made aware that their sale and the advice provided to them by Ruble was potentially troublesome, with their attorneys advising them that the IRS was scrutinizing similar "midco" transactions.[56] And by 2015, the Cácereses were subject to IRS summonses that related "at least in some way" to the 1997 sale and Ruble's tax opinion letter.[57] The avoidance of any doubt was certainly satisfied by June 2018, when the IRS sued the Cácereses, alleging that the 1997 sale was unlawful.[58] The IRS complaint explained in detail that Ruble's tax opinion letters, like the one provided to them, were fraudulent.[59] Despite acknowledging that the 2018 IRS complaint was "the worst development" of their lives, the Cácereses still did nothing to uncover their claims.[60] *See Klopfenstein v. Deutsche Bank Secs., Inc.*, No. 1:14-cv-278-TCB, 2014 WL 12521383, at *5 (N.D. Ga. May 13, 2014) (holding that plaintiff was not reasonably diligent as a matter of law by failing to discover claims after, in part, a legal "complaint gave him reason to investigate his own transactions with Defendants and their behavior.").

---

[56]  ECF 104-2, ¶ 79.

[57]  *Id.* ¶ 86.

[58]  *Id.* ¶¶ 95, 104.

[59]  *Id.*

[60]  *Id.* ¶ 96.

Further evidence abounds that the Cácereses knew or should have known that something was amiss with Ruble's legal advice: frequently discussing amongst themselves, their associates, and their attorneys the criminal convictions of their past advisors and the risks associated with the tax opinion letter; sharing newspaper articles with each other detailing Ruble's criminal convictions; and sarcastically noting in an email to a friend "[g]reat advisors we had!"[61] The Cácereses' level of knowledge about their claims against their former attorneys far surpassed that of the *Coe* plaintiffs, and yet, they still failed to timely pursue their claims. This response, or lack thereof, is unreasonable by any standard.[62] *See Rollins v. LOR, Inc.*, 345 Ga. App. 832, 849 (2018) (holding that plaintiffs "failed to exercise even a minimal degree of due diligence to discover their claims as a matter

---

[61]  *Id.* ¶¶ 108–111, 113–116, 118–19.

[62]  Further undisputed evidence shows that, in 2002, Sidley Austin sent letters to at least some former Ruble clients, like the Cácereses, that stated it had "provided an opinion to [them] in connection with a transaction that may be questioned by the IRS," advised the clients about avoiding penalties, and encouraged them to seek counsel. *Id.* ¶¶ 58–64; ECF 108-2, ¶¶ 45–46. However, the Cácereses do not recall receiving or reading this letter, and further dispute whether this letter sufficiently notified them or other former Ruble clients about the nature of their transactions. *Id.* Additional undisputed evidence shows that, in 2007, Sidley Austin issued a public apology and repudiation of Ruble's past conduct, and news of this statement and Ruble's criminal convictions received coverage in the press. ECF 104-2, ¶¶ 69–74. However, the record does not establish that the Cácereses were personally aware of this public apology and repudiation.

of law" when they "made no attempt at all to obtain information they were legally entitled to. . . .").

Like the plaintiffs in *Coe*, the Cácereses did hire new counsel to represent them in handling the IRS summons and lawsuit.[63] Indeed, the Georgia Supreme Court in *Coe* relied on the plaintiffs' retention of new counsel to demonstrate a certain level of reasonable diligence. 314 Ga. at 532–33. However, the Court highlighted the new attorneys' lack of knowledge as to their clients' potential liability as a major factor in finding that the *Coe* plaintiffs did not have enough awareness of their claims but had nonetheless exercised reasonable diligence. *Id*. Here, by contrast, the Cácereses' new attorneys had abundant knowledge about their clients' potential liability years before the Cácereses were sued by the IRS in 2018. *Id.* at 533. Specifically, the record shows that the Cácereses' attorneys repeatedly advised them as early as 2014 of the risks associated with the tax opinion letter and that the IRS was prosecuting others for engaging in similar tax shelter arrangements.[64] Further, although the exact context of the research is in dispute, it is undisputed that their new attorneys billed the Cácereses for research related to "causes of action that may be available, especially as against KPMG and Brown & Wood" and the "liability of professional firms for opinions on

---

[63]   *Id.* ¶¶ 76, 79, 120; ECF 108-2, ¶ 60.

[64]   ECF 104-2, ¶¶ 79, 89, 120.

transactions" in October 2018.[65] While the retention of new attorneys with little to no knowledge of their potential liabilities might have been the ace in the hole for the *Coe* plaintiffs, this is not the case for the Cácereses. Rather, the Cácereses' retention of new attorneys who were well-informed and communicative with them about their potential liabilities underscores the Cácereses' failure to pursue their claims in a timely manner. Indeed, the Cácereses' decision to not pursue claims against Sidley Austin as long as the viability of the IRS's enforcement action against them remained in doubt, appears to have been a strategic one.

"[Q]uestions of reasonable diligence must often be resolved by the trier of fact . . . ." *Scully v. First Magnolia Homes*, 279 Ga. 336, 339 n.11 (2005). However, "this is not always the case. A party may fail to exercise due diligence as a matter of law." *Antley v. Small*, 360 Ga. App. 617, 621 (2021). While the smoke that gathered around the Cácereses' transaction in the two decades following the sale may arguably have been enough to put the Cácereses on notice that something was amiss with Ruble's (and by extension, Sidley Austin's) legal advice, the five-alarm fire that came in the form of the IRS lawsuit in 2018 was unmistakable. Under the "prudent man" standard, the evidence in this case "establishes that as

---

[65] *Id.* ¶ 122. As to any argument that the Cácereses were not privy to the information known by their attorneys, this Court has already acknowledged that *Coe* itself "suggests that [the Cácereses' attorneys'] knowledge . . . can be imputed to the Cácereses for purposes of the tolling issue." ECF 81, at 3.

a matter of law [the] alleged fraud . . . could have and should have been discovered through the exercise of reasonable diligence" no later than June 2018. *Falanga*, 286 Ga. App. at 94.

Accordingly, the Court concludes that, as a matter of law, the Cácereses' claims against Sidley Austin began running their four-year statutes of limitations no later than June 2018, were tolled beginning in March 2020 for 122 days by virtue of the Georgia Supreme Court's COVID-related tolling period,[66] and expired in October 2022. The Cácereses filed their complaint in January 2023, three months too late.[67] Thus, the Cácereses claims are time-barred.

---

[66] The parties dispute whether the Georgia Supreme Court's 122-day COVID-19 tolling period in 2020 applies to the Cácereses' claims. [ECF 104-1, at 13; ECF 108-1, at 8]. *See Third Order Extending Declaration of Statewide Judicial Emergency*, SUP. CT. GA. (June 12, 2020), https://www.gasupreme.us/wp-content/uploads/2020/06/THIRD_ORDER_EXTENDING_DECLARATION _OF_STATEWIDE_JUDICIAL_EMERGENCY_AS_ISSUED.pdf ("[F]or cases that were pending before the March 14 Order, litigants will have the same amount of time to file or act after July 14 that they had as of March 14."). Based on the findings made in this Order, the Cácereses were in the middle of a running statute of limitations period when the Georgia Supreme Court enacted its tolling mandate. Given that timeline, the Cácereses should receive the benefit of this tolling period. *See Zadoorian v. Gwinnett Tech. Coll.*, No. 22-14206, 2024 WL 1554362, at *3 (11th Cir. Apr. 10, 2024).

[67] ECF 1-1.

## III.   CONCLUSION

Sidley Austin's motion for summary judgment [ECF 99] and motion for judicial notice [ECF 101] are **GRANTED.**

The Court previously issued a protective order in this case to allow the parties to shield certain designated documents from public disclosure. [ECF 68]. Pursuant to this protective order, the parties have filed documents under provisional seal, including:

- deposition transcripts [ECF 98];
- Sidley Austin's motion for summary judgment and supporting documents [ECF 100];
- the Cácereses' response to Sidley Austin's motion for summary judgment and supporting documents [ECF 104]; and
- Sidley Austin's reply in support of its motion for summary judgment and supporting documents [ECF 108].

To the extent the parties want the provisionally sealed documents in this case to remain under permanent seal, the parties are **DIRECTED** to file a motion to seal for their respective filings within 7 days of this Order. The Clerk is **DIRECTED** to resubmit this Order to undersigned after 7 days.

The pending discovery issues raised by the parties pursuant to undersigned's standing order are rendered moot. To the extent the parties wish for those pending discovery issues to be made part of the record, they are **DIRECTED** to file on the docket a summary thereof within 7 days of this Order. The parties may enter this filing jointly or individually.

25

The Clerk is **DIRECTED** to enter judgment in favor of Defendant Sidley Austin and against Plaintiffs, and to **CLOSE** this case.

**SO ORDERED** this 31st day of March, 2026.

Steven D. Grimberg
United States District Judge